IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**NICHOLAS FRAZIER,** *et al.*                                                                    **PLAINTIFFS**

**v.**                              **CASE NO. 4:20-CV-00434-KGB-JJV**

**WENDY KELLEY,** *et al.*                                                                      **DEFENDANTS**

### DECLARATION OF DEXTER PAYNE

I, Dexter Payne, am competent to testify and have personal knowledge regarding the statements contained in this declaration and under the penalty of perjury, do hereby state and verify the following:

1.      I am the Director of the Arkansas Division of Correction, an agency that falls under the Arkansas Department of Corrections. Until July 1, 2019, the Arkansas Division of Correction was known as the Arkansas Department of Correction. For the purposes of this declaration, I will refer to the Arkansas Division of Correction, formerly the Arkansas Department of Correction, as the "ADC."

2.      The ADC is responsible for the operations of prisons, typically referred to as "units," throughout Arkansas.

3.      As soon as it became apparent that the spread of COVID-19 may reach Arkansas, the ADC immediately began preparing to respond to the threat posed by the virus.

4.      Certain aspects of the ADC's preparation for and response to COVID-19 are included in the ADC's Emergency Preparedness Manual, which is confidential and not

EXHIBIT 1

subject to public disclosure. *See* Ark. Code Ann. § 12-27-137. As a result, this declaration describes many of the ways the ADC responded to the threat posed by COVID-19, but security concerns prohibit identification and explanation of every approach.

5. From the very beginning, the ADC's preparation involved working closely with other state and federal agencies, in addition to national correctional organizations, to formulate and direct the ADC's preparation and response to the impact of the virus on staff and the inmate population within ADC facilities.

6. For instance, ADC officials worked closely with the Arkansas Department of Health, Arkansas Department of Emergency Management, the ADC's contracted medical provider, Wellpath, LLC, the National Institute of Corrections, the American Correction Association, the Correctional Leaders Association, and others.

7. ADC officials communicated regularly with Department of Health officials, often multiple times per day.

8. ADC officials also attended webinars about COVID-19 to learn more about the virus and to assist in preparing a thorough and comprehensive response.

9. This joint effort between the ADC and other state agencies and entities is ongoing, and the ADC's evidence-based approach to safely addressing the risks presented by COVID-19 continues to this day as new information and strategies become available through the Center for Disease Control and Prevention, and other partners.

10. The collaborative approach between these agencies and the ADC has included input into the ADC's efforts to prevent the virus from entering ADC facilities,

as well as input into the ADC's operational response to the COVID-19 outbreak in Arkansas.

11. The ADC worked with these entities both in terms of the formulation and implementation of ADC procedures and protocols generally, as well as specific involvement in working with ADC staff, including unit wardens, with respect to that response.

12. At all times, the ADC has worked diligently to combat the spread of COVID-19 and to ensure the health and safety of the inmates housed within ADC units, as well as the health and safety of staff and officials.

13. On Wednesday, March 11, 2020, Arkansas Governor Asa Hutchinson announced the first presumptive case of COVID-19 in Arkansas.

14. That same day, the Arkansas Department of Corrections, the cabinet department of which the ADC is one part, began immediately taking proactive steps in response to the virus. (Mar. 11, 2020 Memo).

15. At that time, the ADC reminded and encouraged inmates and staff to regularly wash their hands, practice respiratory etiquette, such as covering coughs and sneezes, avoid handshakes, and continue regular surface cleaning. (Mar. 11, 2020 Memo).

16. The ADC also encouraged employees to stay home when ill. (Mar. 11, 2020 Memo).

17. In addition, the ADC created a website, which is updated multiple times per day in some instances, to inform the public about the ADC's continued efforts in

response to COVID-19. That website is located at https://adc.arkansas.gov/coronavirus-covid-19-updates.

18. The ADC also regularly updated its social media accounts to provide information about its response to COVID-19, as well as providing updates during Governor Hutchinson's daily press conferences.

19. The ADC continued to diligently investigate what steps it could take to further protect inmates and staff at its units across the state and implement procedural changes to achieve that goal.

20. On March 16, 2020, after discussion with the Arkansas Department of Health and Wellpath, LLC, the ADC suspended inmate visitation in an effort to prevent the spread of COVID-19 to the employees and inmates at its correctional facilities. (Mar. 16, 2020 Press Release).

21. That suspension applied to all prisons and community correction centers, and it applied to regular and special visits. (Mar. 16, 2020 Press Release).

22. In recognition that suspending in-person visitation could negatively impact the mental and emotional wellbeing of inmates and their families, the ADC conferred with its telephone and video visitation providers and reduced the price of phone calls, e-mails, and video visitation in order to keep family ties as strong as possible, and the ADC promptly notified inmates of these changes. (Mar. 16, 2020 Press Release; Mar. 19, 2020 Visitation Poster). The ADC also extended video visitation hours.

23. The Division of Community Correction—another agency within the Department of Corrections that is responsible for more than 60,000 offenders on parole

and supervised probation and operates six licensed residential treatment centers—took similar steps, including waiving supervision fees, suspending face-to-face office visits, expanding the use of mobile applications to supervise offenders, and finding alternative means for individuals to participate in discretionary groups, such as Alcoholic Anonymous or substance abuse groups.

24. The ADC also worked to reduce the number of people entering correctional facilities across the state. To that end, the ADC restricted visitation so that only badged volunteers, as opposed to occasional volunteers, were allowed to enter facilities. (Mar. 16, 2020 Press Release).

25. Later, the ADC took even further steps to reduce the number of people entering ADC facilities and stopped badged volunteers from entering its facilities to reduce potential exposure.

26. Inmates housed in ADC units were also no longer allowed to go on meritorious or emergency furloughs, except those inmates participating in a work-release program. (Mar. 16, 2020 Press Release; Mar. 19, 2020 Furlough Memo).

27. Other exceptions for work release included two "lockdowns" when a presumptively positive employee was tested at a work release site. The site was locked down and inmates were not sent out to work in the community until cleared in consultation with the Arkansas Department of Health.

28. Importantly, the ADC changed its practice relating to incoming inmates as well. All new intakes into ADC's prisons are housed together for a period of 14 days following intake. Similarly, all new intakes into community correction centers are housed

together for a period of 14 days. By doing so, the Department of Corrections sought to slow a potential spread of COVID-19 from the community into an ADC or community corrections facility. Relatedly, county jails housing inmates to be incarcerated in an ADC unit are working with the ADC to confirm incoming inmates do not exhibit symptoms of the virus.

29. Likewise, the ADC continued to ensure staff and visitors were not bringing the virus within ADC facilities. As early as March 20, 2020, the ADC posted signage throughout its facilities informing staff and visitors of new precautions. (Mar. 20, 2020 Poster; Public Health Notice Poster).

30. Those precautions include screening anyone entering ADC facilities for possible exposure to COVID-19. (Mar. 20, 2020 Poster).

31. At the direction of the Arkansas Department of Health, the ADC began restricting access to correctional facilities for anyone that had: (1) traveled internationally within the previous 14 days to countries with sustained transmission of COVID-19; (2) contact with anyone who had a confirmed diagnosis of, or was under investigation for, COVID-19; or (3) exhibited symptoms of a respiratory infection, including cough, shortness of breath, or a fever. (Mar. 20, 2020 Poster).

32. The ADC also began screening the temperature of all staff before they enter the facility prior to the start of their shifts, and employees who have a temperature of higher than 100.4 degrees Fahrenheit are sent home and advised to seek care from their doctor if they have other symptoms. (Mar. 20, 2020 Poster).

33. Wellpath, the ADC's medical provider, also worked with inmates to reduce the potential spread of the virus through ADC facilities. On March 27, 2020, Wellpath sent a memorandum to ADC inmates and Arkansas Community Correction residents informing them that non-urgent on- and off-site medical appointments could be rescheduled to limit the risk of spreading the virus. (Mar. 27, 2020 Wellpath Memo). Inmates were also informed that urgent consultations and emergencies would be treated as usual. (Mar. 27, 2020 Wellpath Memo).

34. On March 23, 2020, to encourage inmates to seek medical attention if they experienced symptoms of COVID-19, the ADC immediately suspended the medical copays inmates would normally have paid for a health services visit. This means that any inmate who believes he or she is experiencing symptoms of COVID-19 may seek immediate treatment from Wellpath, for free.

35. On Monday, March 23, 2020, following the extensive efforts explained above, the United States Centers for Disease Control and Prevention ("CDC") issued guidance specifically directed to correctional institutions. (CDC Guidance for Corr. Fac.).

36. On Friday, March 27, 2020, the Arkansas Department of Health issued its own recommendations, entitled "COVID-19: Guidance for State Correctional Facilities and Local Detention Facilities." (ADH Mar. 27, 2020, Guidance).

37. The Arkansas Department of Health's guidance synthesized many of the CDC's recommendations and issued particularized guidance for correctional facilities within the state. As detailed above, the ADC had already implemented many of these

recommendations, but it promptly implemented new procedures to follow the Department of Health's guidance.

38. For example, the Department of Health's guidance recommends the ADC communicate with staff, offenders, volunteers, and visitors about COVID-19 and educate them about how to prevent contracting and spreading the virus. (ADH Mar. 27, 2020, Guidance, at *1). By March 11, 2020, and even before, the ADC had already taken steps to inform inmates, staff, and visitors about COVID-19 and the topics discussed in the Department of Health's guidance. (Mar. 11, 2020 Memo).

39. The ADC also posted signage throughout its facilities informing inmates and staff to wash their hands often with soap and water, for at least 20 seconds, wear face masks as much as possible, avoid touching their eyes, nose, or mouth without cleaning their hands first, clean their personal belongings, to keep as much distance between each other as possible, and other important information recommended by the Department of Health. (Protect Yourself Poster).

40. The ADC posted additional signage throughout its facilities, in both English and Spanish, further educating inmates and staff. (Mar. 20, 2020 Poster; Clean Hands Poster; Cover Your Cough Poster; Wash Hands English; Wash Hands Spanish). Wellpath also provided educational posters in English and Spanish. (Wellpath Informational Posters).

41. Inmates were also informed to report any symptoms to ADC staff or medical personnel as soon as possible.

42. In addition to educating inmates and staff, the Department of Health recommended the use of personal protective equipment ("PPE") for inmates and staff to the extent possible. (ADH Mar. 27, 2020, Guidance, at *1).

43. Around the time the guidance was issued, the ADC rapidly began a massive operation to manufacture and distribute 80,000 cloth masks for inmates and staff. The masks are made by Arkansas Correctional Industries in the garment factory outside of the Cummins Unit.

44. To date, over 42,000 masks and 250 face shields have been created and distributed to units, facilities, and offices across the state.

45. The ADC also received a distribution of PPE, including masks, face shields, gloves, and other items, from the Arkansas Department of Emergency Management. The ADC purchased additional PPE from the open market.

46. As recommended by the Department of Health, every inmate housed in general population has already received one mask, and the ADC is continuing production to ensure each inmate also has a second mask.

47. My understanding of the CDC guidance and other reporting is that cloth masks are designed to reduce the risk of the wearer from *spreading* the virus, but they are not designed to prevent the wearer from *contracting* the virus. (CDC Cloth Mask Rec.). In other words, cloth masks protect others from the wearer, not the other way around.

48. As a result, inmates in restrictive housing have not received masks. Those inmates are housed in individual or two-man cells, do not come into contact with other

inmates, and have very limited exposure to staff. Accordingly, a cloth mask is unnecessary for those inmates.

49. ADC staff also wear masks and gloves as precautionary measures throughout the units, including when interacting with inmates in restrictive housing.

50. Inmates and staff have been educated on best practices for wearing their masks and instructed to wear them as often as possible.

51. In addition, inmates have the ability to anonymously report staff members, or other inmates, for failing to comply with health and safety procedures by anonymously submitting a request for interview form.

52. The ADC also ordered enhanced cleaning and disinfection of its units. For example, barracks-style housing for general population inmates are cleaned continuously throughout the day by inmate porters housed in those barracks. This includes cleaning the residential area, showers, bathrooms, and recreational areas in the barracks. Other inmate porters clean hallways throughout the unit, the chow hall, gym, and other areas accessed by inmates.

53. Porters have been instructed to pay particular attention to high-touch surfaces throughout the units, and their cleaning efforts are monitored by security staff.

54. The porters use Razor Chemical Company's Citrus Breeze III, which is a hospital-grade fungicide, disinfectant, deodorizer, and virucidal product to clean the barracks, common areas, high-touch items, and other areas of the unit.

55. Inmates in restrictive housing are provided the same cleaning products twice per week in order to clean their cells.

56. Providing inmates with unrestricted access to alcohol-based hand sanitizer and chemicals such as bleach would provide security risks to other inmates and staff.

57. Likewise, inmates are provided ample supplies to ensure they can maintain their personal hygiene. All inmates within the ADC are provided soap free of charge and have constant access to warm water to ensure they can wash their hands as often as they'd like in accordance with CDC and Department of Health guidance.

58. Because soap and water are available to all inmates at ADC units, hand sanitizer is not necessary. Neither the CDC nor Department of Health guidelines mandate or require the ADC to provide hand sanitizer to inmates. In fact, the CDC guidance specifically acknowledges that alcohol-based hand sanitizer may not be permissible based on security restrictions, because it is flammable, intoxicating, and potentially poisonous. Alcohol-based hand sanitizer, moreover, is really only needed if, unlike in the ADC, soap and water are unavailable. (CDC Guidance at *2, 7).

59. The ADC has, however, provided non-alcohol-based hand sanitizer stations for all general population inmates in different areas of the units, except for the inmates at the Cummins Unit for reasons explained below, for use once the inmates leave their barracks.

60. Inmates in general population housing have access to showers throughout the day and are free to shower as often as they deem fit. Inmates in restrictive housing are able to shower multiple times per week.

61. Inmates also have access to free toilet paper they can use as face tissue and to clean their personal belongings if they wish.

62. In addition, inmates are provided a free hand towel and bath towel that are laundered multiple times per week, and inmates receive clean hand and bath towels when their soiled towels are taken to be laundered.

63. The ADC implemented new procedures for detecting the presence of COVID-19 in its facilities. As an initial matter, every inmate in general population of each unit (except the Cummins Unit as explained below) has their temperature checked with a no-contact infrared laser thermometer each time they leave the barracks and move to the chow hall.

64. Any inmates who register a temperature in excess of CDC and Department of Health guidelines then have a follow-up temperature screening using an under-the-tongue thermometer with a protective sheath to prevent transmission. Inmates in restrictive housing have their temperatures checked when they exhibit symptoms.

65. Inmates who register a temperature indicating potential infection are taken to medical services.

66. In addition, all inmates who experience symptoms of COVID-19 are encouraged to submit a health services request to meet with Wellpath.

67. Beginning as early as March 23, 2020, all medical copays were waived to encourage inmates to seek medical care and report any symptoms they experience.

68. Likewise, staff have been educated on the symptoms of COVID-19 and instructed to be on the lookout for symptoms in inmates and staff and to take inmates exhibiting symptoms to the infirmary or some other area to be seen by medical staff.

69. As recommended by the Department of Health, once taken to medical for exhibiting symptoms, the inmate is isolated and treated by medical staff. If medical staff determine the inmate is presenting symptoms because of COVID-19, as opposed to some other, non-COVID reason, the inmate is tested for other respiratory ailments and, if necessary based on those results, the virus.

70. As also recommended by the Department of Health, inmates remain isolated until the various, necessary test results are returned.

71. Wellpath has taken steps to reduce exposure as well by placing plastic, translucent barriers in the medical department to allow medical staff to see inmates while minimizing risk of spreading the virus.

72. The Department of Health also recommends implementing strategies for social distancing, to the extent possible in the facilities. (ADH Mar. 27, 2020, Guidance, at *1). The ADC has implemented several procedures to encourage social distancing, including educating inmates about the practice.

73. The ADC also took steps to reduce inmates from gathering together in groups, including suspending congregational religious services, staggering meal times to reduce the number of inmates in the chow halls, requiring inmates to spread out while eating meals, and reducing the number of inmates going to areas such as the commissary, recreation, medical pill call, and other areas at any one time.

74. Inmates in restrictive housing who are assigned to one-man cells already do stay at least six feet away from other inmates and staff.

75. Security and space constraints, however, make it difficult to ensure all inmates remain six feet apart at all times. For example, ADC housing units are not large enough so that every inmate's bed can be moved six-feet away from another. Inmate beds are organized in compliance with American Correctional Association standards. Moving inmates to non-secure housing areas would create significant security risks and put staff and other inmates in danger.

76. In light of the physical characteristics of ADC units, as well as security and staffing needs, a court order requiring additional social distancing measures would both risk the safety and security of the facilities and constitute an undue burden on the operations of the ADC's prison system.

77. ADC staff continue to develop additional ways to facilitate social distancing within the units, including, as explained further below, working to release certain inmates to create additional space in the units.

78. The ADC has taken many other precautions recommended by the Department of Health as the ADC continues to respond to the virus and work to protect inmates and staff.

79. As recommended by the Department of Health, the ADC has coordinated with local law enforcement and followed the procedures set out by court officials for hearings and other inmate appearances.

80. And, even before Department of Health guidance, the ADC amended its visitation policy to severely restrict the number of individuals entering and leaving the facility.

81. The ADC also temporarily modified congregational religious services to avoid inmates interacting with individuals from other housing areas.

82. Non-urgent medical services were also postponed. (Mar. 27, 2020 Wellpath Memo).

83. The ADC also modified its inmate-transfer procedures to reduce inmate movement between units.

84. The ADC also changed other procedures, such as staggering meal times in the chow hall to reduce the number of inmates in the room at once, encouraging inmates to spread out from each other as much as possible, limiting non-essential travel for ADC personnel, and many other procedures as recommended by the Department of Health. (ADH Mar. 27, 2020, Guidance).

85. As recommended by the Department of Health, the ADC prepared a plan for how to respond in the event the virus reached a unit. Importantly, as of April 29, 2020, COVID-19 has only been detected in inmates in one unit within the ADC: the Cummins Unit.

86. On April 12, 2020, the first inmate tested positive for COVID-19.

87. Once the ADC discovered COVID-19 had in fact made it into the Cummins Unit, the ADC implemented a host of new procedures directly aimed at reducing the spread of the virus as much as possible. First, on April 13, 2020, the ADC tested every inmate housed in the barracks with the first confirmed positive inmate.

88. The ADC then began randomly testing a sample of other inmates housed in the Cummins Unit to determine if the virus had spread to any other housing areas. Those tests confirmed the virus had indeed infected other areas.

89. To combat the spread of the virus within the unit, the ADC placed all barracks on "lockdown" so that inmates do not leave their barracks unless they are receiving medical attention or have tested negative and they are being used for the assistance of daily operations.

90. For those inmates who have tested negative, and are being used for the assistance of daily operations, those inmates have their temperatures checked each time they leave the barracks and, if they exhibit symptoms of COVID-19, are isolated and tested again.

91. Meals are brought to the inmates in their barracks to reduce inmate movement throughout the unit.

92. Next, the ADC tested nearly every inmate in the Cummins Unit and a total of nearly 1,700 inmates were tested.

93. In fact, to ensure results on inmate tests as quickly as possible, ADC officials drove overnight to Memphis, Tennessee, to deliver cases full of inmate samples for testing. ADC officials have also rushed inmate test samples to Little Rock, Arkansas, for quicker results.

94. The ADC has also conducted widespread testing of its staff. For instance, on April 21, 2020, Wellpath held a drive-through testing clinic for staff at the Cummins Unit and approximately 250 employees were tested for the virus. Wellpath held another

testing clinic on April 23, 2020, in order to ensure testing for all the various shifts worked by ADC staff. In total, over 400 employees were tested for COVID-19. Wellpath has also planned a third clinic to test any remaining staff who were not tested during the two previous clinics.

95. Based on the test results, the ADC restructured housing arrangements in compliance with Department of Health guidance. The Department of Health recommends that inmates who have tested positive, if single cells are not available, should be housed with other positive-testing inmates. (ADH Mar. 27, 2020, Guidance, at *3). The Cummins Unit has complied with that recommendation and created three housing groups and made adjustments to security staffing in relation to the new housing arrangement.

96. First, all inmates who have tested positive for COVID-19 are removed from the prison population and only housed with other inmates who also tested positive. The security staff assigned to this housing group do not work in any other areas of the unit.

97. Second, all inmates who have tested negative are separated from the prison population and housed with other negative-tested inmates. The security staff assigned to that group also work only in those areas of the unit.

98. Third, all inmates who are currently indeterminate, including inmates whose test results have not been returned, are housed only with other indeterminate inmates and, again, the security staff assigned to these areas only work in those locations. Both the inmate housing adjustments, and attendant security staff procedures, were implemented in response to COVID-19's presence in the unit.

99. Inmates at the Cummins Unit have been informed of their test results, given guidance on seeking additional medical treatment if needed, and further educated on best practices to avoid transmission.

100. The Cummins Unit has also worked to balance the normal medical needs of the inmate population with the new needs posed by COVID-19. More particularly, the ADC has created a field hospital at the Cummins Unit to treat positive-tested inmates who need medical care.

101. Other inmates with non-COVID ailments who require medical attention are treated, and oftentimes housed, in the Unit's infirmary. This process ensures inmates who need medical attention for COVID-related illnesses receive medical treatment without risking potential exposure to other inmates requiring non-COVID-related medical attention.

102. The Department of Health has issued additional guidance for correctional facilities. For instance, on April 13, 2020, the Department of Health issued "ADH Guidance for Reducing Spread of COVID-19 in Correctional Facilities." (ADH Apr. 13, 2020, Guidance). Two days later, the Department of Health released a slightly modified version of their new guidance. (ADH Apr. 15, 2020, Guidance). These documents make many of the recommendations previously suggested in prior Department of Health guidance, and the ADC continues to comply with these recommendations as best as possible.

103. The Arkansas Department of Corrections, including the Board of Corrections, have continued efforts to protect inmates while balancing the risk of other societal harms.

104. On Friday, April 24, 2020, the Board of Corrections voted unanimously to invoke the expanded Emergency Powers Act and certify a list of 1,244 inmates to be eligible for release, pending the Parole Board's decision.

105. In doing so, the Board of Corrections suspended its normal requirement that inmates must spend at least six months in the ADC before being considered for release, in addition to relaxing offense restrictions, as authorized by Governor Hutchinson's executive orders regarding the public health emergency.

106. All inmates under consideration have been convicted of non-sexual and non-violent crimes, as determined by Ark. Code Ann. § 5-4-501(d)(2), and their release is determined by the Parole Board.

107. All such inmates will receive a COVID-19 symptoms screening before they are released, all symptomatic inmates will be tested for the virus, and no inmates who are known or presumed to be positive for the virus will be released into the community until they are medically cleared.

108. Any such inmates will have their parole delayed until the inmate is no longer contagious. As an additional precautionary measure, the Department of Corrections enhanced its offender management information system to flag COVID-positive offenders.

109.   In addition, I understand the Plaintiffs in this action have alleged that the ADC enacted emergency release of inmates in early March 2020 in response to the COVID-19 pandemic. That is inaccurate. The ADC frequently enacts the emergency release provision, including around every 90 days, to release inmates to relieve the backlog of inmates headed to the ADC that are currently housed in jails around the state.

110.   None of the Plaintiffs in this action ever requested any accommodations from me, or any of the named Defendants that I am aware of, under the Americans with Disabilities Act, such as hand sanitizer, cleaning products, antibacterial hand soap, additional social distancing measures, or release or transfer.

111.   Plaintiffs' request to release them from prison or to transfer them to home confinement would fundamentally alter the nature of the correctional institution and the sentences the ADC is charged with carrying out by state law.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2020.

By (signature)
Dexter Payne