THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**NICHOLAS FRAZIER**                                                            **PLAINTIFF**

**v.**                              **Case No. 4:20-cv-00434-KGB**

**WENDY KELLEY,** *et al.*                                                      **DEFENDANTS**

## TEMPORARY RESTRAINING ORDER

Before the Court is a supplemental motion for a temporary restraining order filed by plaintiffs Nicholas Frazier, Alvin Hampton, Marvin Kent, Michael Kouri, Jonathan Neeley, Alfred Nickson, Harold "Scott" Otwell, Trinidad Serrato, Robert Stiggers, Victor Williams, and John Doe, individually and on behalf of all others similarly situated (collectively, "plaintiffs") (Dkt. No. 22). Plaintiffs bring this action against defendants Wendy Kelley, Secretary of the Arkansas Department of Correction ("ADC"); Dexter Payne, Division of Correction Director, ADC; Jerry Bradshaw, Division of Community Correction Director, ADC; Asa Hutchinson, Governor of Arkansas; Benny Magness, Chairman of Arkansas Board of Corrections ("ABC"); Bobby Glover, Vice Chairman of ABC; John Felts, Member of ABC; William "Dubs" Byers, Member of ABC; and Whitney Gass, Member of ABC, all in their official capacities (collectively, "defendants") (Dkt. No. 1).[1] For the following reasons, the Court denies plaintiffs' supplemental motion for a temporary restraining order (Dkt. No. 22).

---

[1] Initially, plaintiffs also named as a defendant Buddy Chadick, Secretary of the Arkansas Board of Corrections (Dkt. No. 1). However, plaintiffs have filed a notice of voluntarily dismissal of separate defendant Buddy Chadick pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) (Dkt. No. 8). Accordingly, the Court directs the Clerk of the Court to terminate Mr. Chadick as a defendant in this action.

I.      **Background**

A.      **COVID-19**

COVID-19 is a disease caused by a novel coronavirus that began infecting humans in late 2019.  The COVID-19 pandemic has created a public health emergency (Dkt. No. 3, at 14).  More than two million individuals worldwide have tested positive for COVID-19, and more than 146,000 have died from the disease (*Id.*).  There is no cure for COVID-19, and once contracted it can have life-threatening consequences, particularly for people who have underlying medical conditions, have a disability, or are over the age of 50 (Dkt. No. 23, at 3).

The World Health Organization ("WHO") declared COVID-19 a pandemic on March 11, 2020 (Dkt. No. 3, at 14).  That same day, Governor Hutchinson signed Executive Order 20-03 ("EO 20-03") declaring a state of emergency and confirmed the first presumptive case of COVID-19 in Arkansas (*Id.*).  Also on March 11, Ms. Kelley issued a memorandum outlining the ADC's protocols to reduce the risk and combat the spread of COVID-19 within ADC facilities (*Id.*, at 25). This memorandum encouraged regular handwashing, covering coughs and sneezes, avoiding handshakes, continuing cleaning, and telling staff members to stay at home if ill (*Id.*, at 25-26). *See* Wendy Kelley, Sec. of Corrections, Memorandum (Mar. 11, 2020), https://adc.arkansas.gov/coronavirus-covid-19-updates.  On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency (*Id.*, at 15).

On March 23, 2020, the CDC published its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (*Id.*, at 26).  *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.  The CDC published these guidelines, in

part, to help correctional facilities ensure the protection, health, and safety of incarcerated people (Dkt. No. 3, at 26).

At the time of the complaint's filing, Arkansas had 1,971 COVID-19 infections and 42 deaths statewide; incarcerated people make up at least one in three confirmed COVID-19 infections statewide (Dkt. No. 1, ¶ 2).  COVID-19 has proven highly contagious in congregate environments such as nursing home facilities, cruise ships, naval aircraft carriers, and prisons (*Id.*, ¶ 3).  Because ADC prisoners are housed in close quarters, unable to maintain a six-foot distance from others, and share or touch objects used by others, the risks of contracting COVID-19 are greatly increased in ADC facilities (Dkt. No. 3, at 20).  As of April 27, 2020, 856 people incarcerated at the Cummins Unit ("Cummins") alone have been confirmed to have contracted COVID-19 (*Id.*).

### B.    Complaint And Parties

On April 21, 2020, plaintiffs filed a class action complaint and petition for writ of habeas corpus (Dkt. No. 1).  Plaintiffs are individuals incarcerated in facilities operated by the ADC, and plaintiffs seek immediate relief against the substantial risk of COVID-19 infection, illness, and death while incarcerated in facilities operated by the ADC (*Id.*, at 1-2).  Based on the allegations in their complaint, each named plaintiff faces a heightened risk of death or serious injury if exposed to COVID-19 due to a chronic medical condition, a disability, or both (*Id.*, ¶¶ 15-35).

Mr. Kouri alleges that he has been diagnosed with aortic heart valve degeneration; has an artificial heart valve and is on blood thinners; suffers from hypertension and extreme obesity; has been experiencing more severe shortness of breath, headaches, chills, coughing; was recently diagnosed with conjunctivitis; and has not been tested for COVID-19 (*Id.*, ¶¶ 15-16).  Mr. Serrano alleges that he is a carrier of tuberculosis and suffers from asthma (*Id.*, ¶ 17).  Mr. Frazier alleges

that he suffers from seizures and asthma (*Id.*, ¶ 19).  Mr. Kent alleges that he has been diagnosed with heart failure and has a pacemaker; suffers from chest pain daily; has hypertension and high cholesterol; is currently experiencing headaches, body aches, coughing, and nausea; and has not been tested for COVID-19 (*Id.*, ¶ 20).  Mr. Otwell alleges that he is obese, pre-diabetic, has osteoarthritis, receives physical therapy for his right hip, and has limited mobility (*Id.*, ¶ 22).  Mr. Stiggers alleges that he suffers from asthma (*Id.*, ¶ 24).  Mr. Nickson alleges that he suffers from diabetes, rheumatoid arthritis, and osteoarthritis; has experienced shortness of breath, fatigue, coughing, and repeated vomiting; and has not been tested for COVID-19 (*Id.*, ¶ 26).  Mr. Williams alleges that his lymphoma is in remission and claims that he suffers from a collapsed lung, hypertension, and bruised tissue surrounding his heart (*Id.*, ¶ 28).  Mr. Hampton alleges that he suffers from seizures, Bell's palsy, and bipolar disorder; has reported difficulty breathing in the morning, constant coughing, and congestion; and has not been tested for COVID-19 (*Id.*, ¶ 31).  Mr. Neeley alleges that he was diagnosed with rectal cancer in January 2020; has not received treatment or chemotherapy; and has traveled to three local hospitals recently related to his cancer diagnosis (*Id.*, ¶ 33).  Plaintiff John Doe recently tested positive for COVID-19 and suffers from severe asthma which requires use of an inhaler throughout the day, according to plaintiffs' complaint (*Id.*, ¶ 35).

Mr. Kouri, Mr. Serrato, Mr. Otwell, Mr. Williams, Mr. Hampton, and Mr. Neeley are incarcerated in the Ouachita River Correctional Unit ("Ouachita") (*Id.*, ¶¶ 15, 17, 22, 28, 31, 33).  Mr. Frazier and Mr. Kent are incarcerated in the Varner Supermax ("Varner") (*Id.*, ¶¶ 19-20).  Mr. Stiggers, Mr. Nickson, and John Doe are incarcerated in Cummins (*Id.*, ¶¶ 24, 26, 35).  Mr. Kouri, Mr. Serrato, Mr. Frazier, Mr. Otwell, Mr. Stiggers, Mr. Nickson, Mr. Williams, Mr. Hampton, and

Mr. Neeley filed grievances regarding their vulnerability to COVID-19 (*Id.*, ¶¶ 16, 18, 19, 23, 25, 27, 30, 32, 34).

Plaintiffs seek relief on behalf of themselves and a class consisting of people who are currently incarcerated, or will be in the future, in an ADC detention facility during the duration of the COVID-19 pandemic (*Id.*, ¶ 41).  Plaintiffs also propose two subclasses:  (a) high risk subclass, defined as:

> [P]eople in the custody of an ADC facility aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions such as chronic lung disease or asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), or an inherited metabolic disorder; people who have had or are at risk of a stroke; and people with any condition specifically identified by the Center for Disease Control ("CDC"), currently or in the future, as increasing their risk of contracting, having severe illness, and/or dying from COVID-19.

and (b) disability subclass, defined as:

> [P]eople in custody who suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of contracting, becoming severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability.

(*Id.*).

In their complaint, plaintiffs allege that conditions in ADC facilities create a serious risk of COVID-19-related infection, disease, and death (*Id.*, ¶¶ 72-89).  Plaintiffs claim that the spread of COVID-19 in ADC facilities jeopardizes the public health of surrounding communities, especially black communities (*Id.*, ¶¶ 90-97).  Plaintiffs assert that defendants have intentionally failed to adopt and implement adequate policies and procedures to prevent and mitigate the spread of COVID-19 (*Id.*, ¶¶ 98-126).  Plaintiffs assert three causes of action:  (1) violation of the Eighth

Amendment brought pursuant to 42 U.S.C. § 1983 on behalf of all plaintiffs; (2) violation of the Eighth Amendment brought via a petition for writ of habeas corpus under 28 U.S.C. § 2241 on behalf of the proposed high risk subclass; and (3) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, on behalf of the proposed disability subclass (*Id.*, ¶¶ 127-48).

### C.    Pending Requests For Immediate Relief

Plaintiffs filed an emergency motion for temporary restraining order and preliminary injunction on April 21, 2020 (Dkt. No. 2).  In that motion, plaintiffs request that this Court grant immediate relief to protect them against the substantial risk of COVID-19 infection, illness, and death while incarcerated in the ADC (*Id.*, at 1-2).  The Court set a briefing schedule for consideration of that motion and a hearing on it for May 7, 2020 (Dkt. No. 20).  The emergency motion for temporary restraining order and preliminary injunction remains pending before the Court and will be ruled on in a separate Order (Dkt. No. 2).[2]

On Monday, April 27, 2020, plaintiffs filed the instant motion (Dkt. No. 22).  Plaintiffs' supplemental motion for temporary restraining order requests that the Court enter immediately a temporary restraining order requiring defendants to undertake certain basic social distancing and sanitation measures (*Id.*, at 1).  Plaintiffs have provided a draft proposed order outlining in detail the relief they seek (Dkt. No. 22-1).  Specifically, plaintiffs request that the ADC take the following measures:  (1) ensure that each incarcerated individual receives a free and adequate personal supply of: hand soap sufficient to permit frequent hand washing, paper towels, facial tissues, cleaning

---

[2] Defendants have also submitted a response to plaintiffs' emergency motion for temporary restraining order and preliminary injunction including further argument and evidence (Dkt. No. 36).  The Court will address that argument and evidence in a later Order addressing plaintiffs' emergency motion for temporary restraining order and preliminary injunction (Dkt. No. 2).

implements such as sponges or brushes, and EPA-registered disinfectants that are effective against COVID-19 infection, without costs; (2) ensure that all individuals have access to hand sanitizer containing at least 60% alcohol or, to the extent such hand sanitizer is not permitted, the best alternative, consistent with CDC Guidelines; (3) provide daily access to showers and clean laundry, including clean towels after each shower; (4) disinfect frequently touched surfaces, including but not limited to doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones, at least three times a day with EPA-registered disinfectants that are effective against the virus that causes COVID-19, as appropriate for the surface; (5) thoroughly clean and disinfect all areas where people who have tested positive for COVID-19, or have been suspected of having COVID-19, spent time (e.g., cells, bathrooms, and common areas) with EPA-registered disinfectants that are effective against the virus that causes COVID-19, as appropriate for the surface; (6) require that all ADC staff wear personal protective equipment ("PPE") consistent with the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, including masks and gloves, when interacting with visitors and incarcerated individuals or when touching surfaces in common areas; (7) train all ADC staff and people incarcerated in ADC facilities on how properly to don, doff, and dispose of PPE; (8) post signage through ADC facilities communicating the following:  (a) For all:  the symptoms of COVID-19 and hand hygiene instructions; (b) For incarcerated/detained persons:  how to report symptoms to staff; (c) For staff:  to stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor; and (d) ensure that signage

is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision; (9) provide an anonymous mechanism for incarcerated individuals to report staff who violate these guidelines so that appropriate corrective action may be taken; (10) take each incarcerated person's temperature daily (with a properly disinfected and accurate thermometer) to identify potential COVID-19 infections; (11) assess each incarcerated individual daily through questioning to identify potential COVID-19 infections; (12) conduct immediate testing for anyone displaying known symptoms of COVID19; (13) immediately provide clean masks for all individuals who display or report potential COVID-19 symptoms until they can be evaluated by a qualified medical professional or placed in a non-punitive quarantine and ensure the masks are properly laundered with replacements as necessary; (14) ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property; (15) assure incarcerated people are told that they will not be retaliated against for reporting COVID-19 symptoms; (16) respond to all emergency (as defined by the medical community) requests for medical attention within an hour; (17) produce and implement a comprehensive written plan to ensure adequate spacing of six feet or more between incarcerated people, to the maximum extent possible, so that social distancing can be accomplished (this plan shall include an account of current and projected numbers of incarcerated people in shared spaces at any given time); (18) provide frequent communications to all incarcerated individuals regarding COVID-19, measures taken to reduce the risk of infection, best practices for incarcerated people to avoid infection, and any changes in policies and practices; and (19) prohibit

ADC staff from entering correctional facilities if they test positive for COVID-19 or exhibit symptoms of having contracted COVID-19 (*Id.*, at 5-8).

In support of their supplemental motion for temporary restraining order, plaintiffs contend that hundreds of additional incarcerated people and staff in ADC facilities will likely contract COVID-19 if these preventative measures are not taken immediately (Dkt. No. 23, at 1).  Plaintiffs maintain that the ADC has not implemented the CDC's recommendations, and plaintiffs request this Court's intervention to make sure the ADC implements these recommended measures (*Id.*, at 4).

In electronic communication to the Court on April 27, 2020, within hours of this motion being filed and without Court prompting, defendants communicated their opposition to this motion.  *See* Court's Ex. A.  Defendants maintain that plaintiffs' supplemental motion for temporary restraining order requests almost all of the same relief as plaintiffs' emergency motion for temporary restraining order and preliminary injunction.  Defendants assert that the only apparent difference between the two motions is that plaintiffs' supplemental motion for temporary restraining order omits at this time their emergency request for release of certain putative class members.

In this motion, plaintiffs requested an opportunity to present expedited oral argument to the Court on the urgent need for the requested relief (Dkt. No. 22, at 1-2).  The Court conducted a hearing with all parties on this motion on Tuesday, April 28, 2020 (Dkt. Nos. 24; 26).  At that hearing, plaintiffs alleged three particular areas of failure by defendants:  (1) failure to intensify cleaning and disinfecting in accordance with CDC guidelines; (2) failure to implement social distancing to the extent possible amid the pandemic; and (3) failure to address adequately suspected or confirmed cases of COVID-19.  Defendants argued that they have already taken

adequate steps in response to the COVID-19 threat in ADC facilities, including some of the relief specifically requested in plaintiffs' supplemental motion for temporary restraining order.

## II.     Legal Standard

In the Eighth Circuit, the same standards are applied to a request for a preliminary injunction as to a request for a temporary restraining order.  *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).  In determining whether to issue a temporary restraining order, a district court should consider:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).  Under *Dataphase*, no one factor is determinative.  *See Dataphase*, 640 F.2d at 113.  A temporary restraining order "is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant."  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted).

## III.     Analysis Of Supplemental Motion For Temporary Restraining Order

### A.     Habeas Corpus

As an initial matter, the Court reiterates that in their complaint plaintiffs bring, in part, a petition for writ of habeas corpus for violation of the Eighth Amendment on behalf of the proposed high risk subclass pursuant to 28 U.S.C. § 2241 (Dkt. No. 1, ¶¶ 136-38).  For relief on this claim, plaintiffs seek in part release from custody for members of the proposed high risk subclass (*Id.*, ¶ 138).  Plaintiffs in their complaint request a temporary restraining order, preliminary injunction, permanent injunction, and/or writs of habeas corpus requiring defendants to release immediately members of the high risk subclass and disability subclass or transfer them to home confinement

10

(*Id.*, at 46).  The Court also reiterates that plaintiffs' emergency motion for temporary restraining order and preliminary injunction seeks emergency medical release or temporary medical furlough for the proposed high risk subclass and disability subclass (Dkt. No. 3, at 45, 49, 56).

Plaintiffs' supplemental motion for temporary restraining order and attendant filings currently before the Court and addressed in this Order do not include these same requests for relief (Dkt. Nos. 22; 22-1; 23).  Because these requests for relief are not in plaintiffs' supplemental motion for temporary restraining order, the Court will not consider or discuss them in this Order. The Court will take up those issues in a later Order ruling on plaintiffs' emergency motion for temporary restraining order and preliminary injunction (Dkt. No. 2).

### B.      *Dataphase* Analysis

In ruling on plaintiffs' motion, the Court must consider (1) plaintiffs' likelihood of success on the merits; (2) the threat of irreparable harm; (3) the balance of the equities; and (4) the public interest.  *See Dataphase*, 640 F.2d at 113.  Assuming without deciding for purposes of resolving the pending motion only that plaintiffs have Article III standing to bring their claims; that plaintiffs have exhausted fully their claims in accordance with the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), *et seq.*, to the extent it applies; and that plaintiffs' proposed general class and subclasses merit certification under Federal Rules of Civil Procedure 23(a) and 23(b)(2), the Court concludes that the *Dataphase* factors weigh in favor of denying plaintiffs' supplemental motion for a temporary restraining order.

### 1.      Likelihood Of Success

Because plaintiffs bring both Eighth Amendment claims on behalf of all plaintiffs and proposed class members and ADA claims on behalf of all plaintiffs and the proposed disability

subclass, the Court will analyze plaintiffs' likelihood of success on the merits under each cause of action separately.

### a.      Eighth Amendment Claim

Plaintiffs allege that defendants' failure to provide adequate protection and, if necessary, medical care in response to the rapid spread of a deadly virus constitutes deliberate indifference to the serious medical needs of incarcerated individuals in violation of the Eighth Amendment (Dkt. No. 1, ¶ 129).

### i.      Deliberate Indifference Standard

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).    State officials have a responsibility under the Eighth Amendment to "provide humane conditions of confinement," "ensure that inmates receive adequate food, clothing, shelter, and medical care," and "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-57 (1984)).  The Eighth Amendment standard for conditions of confinement asks whether defendants acted with "deliberate indifference." *Davis v. Oregon Cty.*, 607 F.3d 543, 548 (8th Cir. 2010).   Deliberate indifference has both an objective and subjective component. *See id.*  The objective component considers "whether a substantial risk to the inmate's safety existed," and the subjective component considers "whether the officer had knowledge of the substantial risk to the inmate's safety but nevertheless disregarded it." *Id.*  The Eighth Amendment forbids deliberate indifference to conditions that "pose an unreasonable risk of serious damage to . . . future health." *Helling*, 509 U.S. at 35; *see also DeGidio v. Pung*, 920 F.2d 525, 533 (8th Cir. 1990) (continuing failure by prison officials to institute a system to prevent the spread of tuberculosis violated the

Eighth Amendment); *Brown v. Moore*, 93 F. Supp. 3d 1032, 1041 (W.D. Ark. 2015) ("Plaintiff

need not have contracted the disease for an actionable [Eighth Amendment] claim to be stated.").

"In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious

medical need, the plaintiff must establish a 'mental state akin to criminal recklessness:

disregarding a known risk to the inmate's health.'"  *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir.

2009) (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)).  Under controlling precedent,

the deliberate indifference standard may be satisfied when officials respond to an infectious disease

"outbreak with a series of negligent and reckless actions."  *DeGidio*, 920 F.2d at 533.

### ii.     Objective Prong

As to the objective prong, it cannot be disputed that COVID-19 poses an objectively serious

health risk to named plaintiffs and the putative classes given the nature of the disease and the

congregate living environment of the ADC's facilities.  These risks can be exacerbated by a lack

of access to PPE for prisoners and many staff members, a lack of cleaning of shared items like

toilets, sinks, and showers, and an inability to social distance properly.  This objectively serious

health risk appears heightened for named plaintiffs and members of the putative subclasses given

plaintiffs' allegations regarding their susceptibility to contracting COVID-19 and experiencing

worsened symptoms.  Thus, plaintiffs are likely to satisfy the objective prong of the deliberate

indifference test for their Eighth Amendment claims.

### iii.    Subjective Prong

As to the subjective prong, plaintiffs assert that defendants have failed to address the

COVID-19 risk despite being aware of it (Dkt. No. 3, at 41-45).  Plaintiffs identify several ADC

actions that allegedly satisfy the subjective prong of the deliberate indifference test.  The ADC

posted a flyer stating, "COVID-19 is known to cause a greater risk for severe illness in older adults

and persons with underlying health conditions or compromised immune conditions.  Younger people can be infected and spread the disease to others, too." (*Id.*, at 42).  The ADC website provides that face masks help prevent the spread of COVID-19 and the steps that must be taken to keep those coverings sanitary (*Id.*, at 43).  The ADC website contains a Frequently Asked Questions ("FAQ") document that outlines "steps" that can be "take[n] to reduce our risk of getting COVID-19" (*Id.*).  The FAQ provides that individuals should regularly clean surfaces that are frequently used and that if someone contracts the virus they should "get immediate medical attention" (*Id.*).  As early as March 15, 2020, the ADC posted a separate informational document outlining the steps being taken to prevent the spread of COVID-19 among the general public (*Id.*).

Plaintiffs also argue that defendants can address this matter by ensuring that proper cleaning supplies are available, suitable distance between prisoners is possible, regular care is provided to those infected, and releasing on at least a temporary basis while maintaining ADC monitoring extremely vulnerable individuals who cannot be safely confined in a congregate setting (*Id.*, at 43-44).  Plaintiffs assert that defendants must institute immediate testing, immediate screening, appropriate use of quarantine, and significant improvements in hygiene, among other things (*Id.*, at 45).  Plaintiffs also note that defendants have demonstrated clear knowledge of the COVID-19 risk, as evidenced by the ADC tracking the number of prisoners and staff who have contracted COVID-19 and publishing those numbers twice per week (*Id.*, at 41).

On this record, and at this stage of the litigation, considering plaintiffs' allegations and affidavits and weighing arguments advanced by counsel at the hearing on the emergency motion for temporary restraining order, the Court concludes that plaintiffs have not demonstrated a likelihood of success in demonstrating that defendants have exhibited the subjective deliberate indifference necessary to substantiate plaintiffs' Eighth Amendment claims.  The parties do not

dispute that defendants have taken some response to COVID-19, as even plaintiffs' affidavits refer to dissemination of information to some regarding COVID-19 and its avoidance, masks for some inmates and staff, requirements as to when to wear those masks, temperature checks for staff, inmates' access to soap and water, and the frequency and type of cleaning for certain areas within facilities.  On this record, at least at this stage, the Court concludes that plaintiffs have not demonstrated a likelihood of success in showing that actions defendants have taken betray a "mental state akin to criminal recklessness" or that defendants are "disregarding a known risk to the inmate's health." *Gordon*, 454 F.3d at 862.

In reaching this conclusion, the Court acknowledges that plaintiffs argue these steps are insufficient, not uniform or implemented across all ADC facilities, and not in compliance with recognized guidance, among other things.  Further, the Court is concerned about events that occurred and are occurring in the Cummins Unit and actions taken, or not taken, prior to and since that outbreak.  Given what is known about COVID-19, and on this record at this stage of the litigation, however, the Court cannot conclude that such an outbreak necessarily arises from deficiencies that likely demonstrate Eighth Amendment violations.

The Court reserves final judgment on this issue until all parties have completed briefing in accordance with the Court's briefing schedule and until the Court has conducted the May 7, 2020, hearing on plaintiffs' emergency motion for temporary restraining order and preliminary injunction (Dkt. No. 20).

### b.    ADA Claim

Plaintiffs claim that defendants have intentionally discriminated against named plaintiffs and members of the proposed disability subclass by denying them reasonable accommodations that have been recommended by the CDC and are necessary to protect them from COVID-19 (Dkt.

No. 1, ¶ 140).  In their complaint, plaintiffs assert that reasonable accommodations necessary to protect incarcerated individuals with disabilities include, but are not limited to:  access to alcohol-based sanitizer; provision of cleaning supplies, including products containing bleach, adequate to clean individuals' housing areas; provision of PPE; access to antibacterial hand soap and towels to enable individuals to wash their hands as necessary; implementation of social distancing measures in all locations where incarcerated people are required to congregate; and release or transfer to home confinement if social distancing is not practicable (*Id.*, ¶ 141).  Plaintiffs claim that defendants' failure to provide these accommodations constitutes illegal discrimination under the ADA and entitles them to injunctive and declaratory relief (*Id.*, ¶ 142).  In their current pending motion, plaintiffs request relief common to all, not different or specific relief for the proposed disability subclass (Dkt. No. 22-1, at 5-8). Also in the current pending motion, plaintiffs make no request for release or transfer to home confinement if social distancing is not practicable (*Id.*).

The ADA prohibits public entities, including state prisons, from discriminating on the basis of disability.  *See, e.g., Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).  To assert a claim under Title II of the ADA, plaintiffs must show that:  (1) each plaintiff is a "qualified individual with a disability"; (2) defendants denied plaintiffs "the benefits of the services, programs, or activities of a public entity"; and (3) plaintiffs were discriminated against "by reason of" their disabilities.  *See* 42 U.S.C. § 12132; *see also Folkerts v. City of Waverly*, 707 F.3d 975, 983 (8th Cir. 2013).  A "qualified individual with a disability" means an individual "with a disability who, with or without reasonable modifications. . . , meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *See* 42 U.S.C. § 12131(2).  The Eighth Circuit construes broadly the "services, programs, or activities" language in the ADA to encompass "anything a public entity does."  *Bahl v. Cty. of Ramsey*, 695

F.3d 778, 787 (8th Cir. 2012) (citations omitted).  State actors may rely on the "reasonable assessments" of their own professionals in determining whether an individual is qualified for services and programs and whether "reasonable modifications" are available to prevent discrimination.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999) (citing 28 C.F.R. §§ 35.130(b)(7), (d)).  Plaintiffs need not plead exclusion from participation in or denial of benefits offered to state a claim under Title II of the ADA.  *See, e.g., Loye v. Cty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010) ("[W]e construe Title II of the ADA as requiring that qualified persons with disabilities receive 'meaningful access' to a public entity's services, not merely 'limited participation.'").

The regulations implementing Title II of the ADA require that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  This is considered an affirmative defense to an ADA Title II claim; the ADA regulations explicitly provide that the entity must demonstrate that making the modification would fundamentally alter the subject program.  28 C.F.R. § 35.130(b)(7).  For this affirmative defense, the entity may demonstrate that the requested action "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."  28 C.F.R. § 35.150(a)(3).  The Eighth Circuit has noted that whether a requested accommodation is reasonable or imposes an undue burden on defendants should be considered in the light of "the heightened security concerns of a prison."  *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir. 1999) (examining Title II ADA claim against prison).  Generally, ADA plaintiffs are entitled to reasonable accommodations, which may not always be plaintiffs' preferred

or ideal accommodations. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (8th Cir. 2011); *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007).

Plaintiffs may prove unlawful discrimination under Title II by offering evidence of disparate treatment based on disability or by showing that a facially-neutral policy has the "effect of discriminating against the disabled or the severely disabled." *DeBord v. Bd. of Educ.*, 126 F.3d 1102, 1105 (8th Cir. 1997).   In regard to an ADA failure-to-accommodate claim, ""the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations. . . .  The known disability triggers the duty to reasonably accommodate and, if the [defendant] fails to fulfill that duty, [the Court] do[es] not care if he was motivated by the disability." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004) (internal citation omitted); *see also Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1040 (N.D. Ia. 2011) (failure to accommodate is an independent basis for liability under the ADA, but accommodation is only required when necessary to avoid discrimination on the basis of disability, and accommodation must be reasonable) (citing 28 C.F.R. § 35.130(b)(7)).   Though a plaintiff seeking compensatory money damages under Title II must show intentional discrimination on the basis of disability, a plaintiff seeking prospective injunctive relief is not required to make this showing. *See Meagley v. City of Little Rock*, 639 F.3d 384, 388-89 (8th Cir. 2011).

On this record, and at this stage of the litigation, considering plaintiffs' allegations and affidavits and weighing arguments advanced by counsel at the hearing on the emergency motion for temporary restraining order, the Court concludes that plaintiffs are unlikely to succeed on their claims under Title II of the ADA.   Assuming *arguendo* that named plaintiffs and proposed members of the disability subclass are qualified individuals with a disability, the Court concludes that plaintiffs are not likely to succeed on their claim that defendants' action or inaction in

combatting the COVID-19 risk in ADC facilities has had the effect of denying plaintiffs in the disability subclass "the benefits of the services, programs, or activities" within the ADC "by reason of" those plaintiffs' disabilities.  *See* 42 U.S.C. § 12132.  However, the Court reserves final judgment on this issue until all parties have completed briefing in accordance with the Court's briefing schedule and until the Court has conducted the May 7, 2020, hearing on plaintiffs' emergency motion for temporary restraining order and preliminary injunction (Dkt. No. 20).

### 2.      Threat Of Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Ia. Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).  A plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (citations omitted).  The Eighth Circuit has held that it is "no question . . . that irreparable injury exist[s]" when the harm contemplated is "a life threatening illness." *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993); *see also Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003) ("[T]he danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury.").

Plaintiffs' alleged harm is both imminent and irreparable, as plaintiffs face a risk of severe illness or possible death in the light of COVID-19.  Based on allegations in plaintiffs' complaint, one of the named plaintiffs has already tested positive for COVID-19, along with hundreds more

individuals in ADC facilities.  Plaintiffs face the progression of the COVID-19 pandemic in a congregate environment.  The irreparability of this harm is magnified by the fact that no known vaccine or cure for COVID-19 exists at this time (Dkt. Nos. 3, at 53; 3-1, ¶ 10; 3-2, ¶ 5).

At the hearing, defendants argued that no impending imminent risk exists for prisoners in Cummins who have tested negative; for prisoners who have been quarantined; or for prisoners in ADC facilities that have had no positive tests.  The Court is unconvinced by these arguments. Prisoners who have tested negative or have been quarantined could still contract COVID-19. Additionally, the lack of positive tests to date in other ADC facilities does not foreclose that COVID-19 is already in these facilities undetected or that COVID-19 could reach these facilities and spread as rapidly as it has in Cummins.

Because the alleged harm is a high likelihood of serious illness or death, the Court finds that plaintiffs have properly alleged irreparable harm.

### 3.      Balance Of The Equities

"The third *Dataphase* factor requires a district court to consider the balance between the harm to the movant and the injury that granting the injunction will inflict on other interested parties." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993) (citing *Dataphase*, 640 F.2d at 114).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113 (footnote omitted).  "No single [*Dataphase*] factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (citations omitted).

The balance of the equities at this stage is a neutral factor in this analysis. Plaintiffs face irreparable harm to their constitutional rights and their health, including severe illness, long-term health effects, and possible death. Plaintiffs argue that there is not much potential harm to defendants in granting plaintiffs' requested relief in the instant motion because plaintiffs' supplemental motion for temporary restraining order mostly requests basic protective measures recommended by the CDC that defendants have been aware of since March 23, 2020. Defendants maintain that requiring defendants to implement steps they already have taken as demonstrated by record evidence is unnecessary and that requiring them to implement the steps requested that go beyond those already implemented would impose undue costs, harms, burdens, and disruptions in running the ADC facilities. There are strong considerations that favor both sides in this dispute.

### 4.      Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The public is certainly served by the preservation of constitutional rights. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (internal quotations and citations omitted). However, in assessing the public interest, the Supreme Court has also cautioned that federal courts must tread lightly when it comes to questions of managing prisons, particularly state prisons. States have a strong interest in the administration of their prisons, which is "bound up with state laws, regulations, and procedures." *Woodford v. Ngo*, 548 U.S. 81, 94 (2006). The Supreme Court has stated that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973); *see also Turner*

*v. Safley*, 482 U.S. 78, 85 (1987) ("[W]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities."); *Meachum v. Fano*, 427 U.S. 215, 229 (1976) ("Federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States."). Courts accordingly should give deference to prison authorities. *See Turner*, 482 U.S. at 84-85.

The public interest in this case cuts both ways. In plaintiffs' favor, the public interest is served by protecting plaintiffs and the putative class members from COVID-19 and its possible consequences via the relief requested in plaintiffs' supplemental motion for temporary restraining order. Further, minimizing the spread of COVID-19 both within ADC facilities and among communities surrounding and interacting with those facilities serves the public interest. Efforts to stop the spread of COVID-19 and promote public health appear to be in the public interest. In defendants' favor, the public interest also commands respect for federalism and comity. These factors dictate that the Court should approach intrusion into the core activities of the state's prison system with caution.

## IV.   Conclusion

For the foregoing reasons, given the *Dataphase* analysis and that plaintiffs do not demonstrate a likelihood of success on the merits of their claims at issue in the pending motion, the Court provisionally denies plaintiffs' supplemental motion for temporary restraining order (Dkt. No. 22). The Court still has under advisement plaintiffs' emergency motion for temporary restraining order and preliminary injunction (Dkt. No. 2).

It is so ordered this Monday, May 4, 2020, at 8:05 a.m. CT.

Kristine G. Baker
United States District Judge