# Exhibit 11

Expert Declaration of Eldon Vail, May 3, 2020

## I.     INTRODUCTION

1.      I am a former corrections administrator with nearly thirty-five years of experience working in and administering adult and juvenile institutions. Before becoming a corrections administrator, I held various line and supervisory level positions in a number of prisons and juvenile facilities in Washington State. I have served as the Superintendent (Warden) of 3 adult institutions, including facilities that housed maximum, medium and minimum-security inmates. I am over 18 years of age, and competent to make this declaration.

2.      I served for seven years as the Deputy Secretary for the Washington State Department of Corrections (WDOC), responsible for the operation of prisons and community corrections. I briefly retired, but was asked by the former Governor of Washington, Chris Gregoire, to come out of retirement to serve as the Secretary of the Department of Corrections in the fall of 2007. I served as the Secretary for four years, until I retired in 2011.

3.      Since my retirement I have served as an expert witness and correctional consultant for cases and disputes over 50 times in multiple jurisdictions—state, local and federal—in twenty-one different states. As an expert witness and correctional consultant, I have been retained to evaluate and offer my opinions on a variety of issues in the correctional environment.

4.      Specifically, over the last few years, I have testified in the following cases:

> ***Coleman, et al. v. Brown, et al.***; No. 2:90-cv-
> 0520-LKK-JMP, United States District Court,
> Eastern District of California; Testified, October 1,
> 2, 17 and 18, 2013

***Graves v. Arpaio***; No. cv-77-00479-PHX-NVW, United States District Court of Arizona; Testified, March 5, 2014

***Corbett v. Branker***; No. 5:13 CT-3201-BO, United States District Court, Eastern District of North Carolina, Western District; Special Master appointment November 18, 2013, Testified, March 21, 2014

***C.B., et al. v. Walnut Grove Correctional Authority, et al.***; No. 3:10-cv-663-DPS-FKB, United States District Court for the Southern District of Mississippi, Jackson Division; Testified, April 1, 2 and 27, 2015

***Fontano v. Godinez***; No. 3:12-cv-3042, United States District Court, Central District of Illinois, Springfield Division; Testified, June 29, 2016

***Doe v. Wolf***; Case 4:15-cv-00250-DCB, United States District Court for the District of Arizona; Testified, November 14, 2016 and January 13, 14 and 22, 2020

***Braggs, et al. v. Dunn, et al.***; No. 2:14-cv-00601-WKW-TFM, United States District Court, Middle District of Alabama; Testified, December 22, 2016, January 4, 2017, February 21, 2017 and December 5, 2017; February 13, October 23, November 29, 2018; April 3, 2019

***Wright v. Annucci, et al.***; No. 13-CV-0564-MAD-ATB, United States District Court, Northern District of New York; Testified, February 13, 2017

***Padilla v. Beard, et al.***; Case 2:14-at-00575 United States District Court, Eastern District of California, Sacramento Division; Testified April 19, 2017

> *Cole v. Livingston*; Civil Action No. 4:14-cv-1698, United States District Court, Southern District of Texas, Houston Division; Testified, June 20, 2017

> *Holbron v. Espinda*; Civil No. 16-1-0692-04-RAN, Circuit Court of the First Circuit, State of Hawai'i; Testified, December 20, 2017

> *Dockery v. Hall*; No. 3:13-cv-326-TSL-JMR, United States District Court for the Southern District of Mississippi, Jackson Division; Testified March 5-7, 2018

> *Valentine v. Collier;* Case 4:20-cv-01115, United States District Court, Southern District of Texas, Houston Division*;* Testified, April 16, 2020

5.      As a Superintendent, Assistant Director of Prisons, Assistant Deputy Secretary, Deputy Secretary and Secretary, I have been responsible for the safe and secure operations of adult prisons in the State of Washington, a jurisdiction that saw and continues to see a significant downward trend in prison violence. As an expert witness and consultant I have been called upon to address security issues and conditions of confinement in adult prisons and jails in 22 other states. I am experienced with sound correctional practice.

6.      Attached hereto as **Exhibit 1** is a true and correct copy of my resume, which lists my work experience, publications, and service as an expert witness and correctional consultant. My billing rate for work on this case is $175 per hour.

## II.     ASSIGNMENT

7.      I have been asked by Plaintiffs' counsel to offer my opinion on whether or not the measures the Arkansas Department of Corrections (ADC) are taking to protect prisoners from the novel coronavirus (COVID-19) are

minimally adequate and if the requests of the Plaintiffs' are reasonable in the correctional environment.

## III.  MATERIALS REVIEWED

8.     For this report I have reviewed two sets of declarations of the named plaintiffs that were written during the third and final week of April 2020. In this report I rely heavily on these declarations as they describe current conditions in Arkansas prisons. I have also reviewed the declarations of the Plaintiffs' medical experts and the declaration of Dexter Payne. I have also reviewed some court documents related to this case and public information from the Arkansas Deportment of Corrections and the Arkansas Department of Health (ADH). A complete list of the documents reviewed is attached to this report as **Exhibit 2**.

## IV.   OPINIONS

9.     COVID-19 presents a special threat to people incarcerated in prisons and jails. It is well known by corrections administrators that any infectious disease must be taken extremely seriously in prisons and jails. People are housed in prisons and jails in very close quarters, and all infectious diseases appear to spread quickly. Jails and prisons represent a ticking time bomb during this pandemic. In my experience, once a single prisoner developed an infectious disease, a large number of other prisoners would also catch it. COVID-19 is particularly dangerous as those infected can be asymptomatic for several days, or may never show symptoms at all. In fact, we are seeing this occur all over our nation.

10.    Jurisdictions are experiencing extreme situations in their prisons and jails. At the Marion Correctional Institution in Ohio, the number of prisoners testing positive for the virus increased dramatically and rapidly. As of April 18, 2020 1,057 prisoners out of a total population of about 2,500

tested positive for COVID-19.[1] The number testing positive in the surrounding county and at the prison literally doubled in a day. The National Guard is training 50 people to respond to the prison due to the severe shortage of staff.[2] As of April 17, 2020, at least 99 staff members have tested positive for the virus.[3] As of April 22, 2020 it has been reported that 1,950 prisoners at Marion have tested positive for the virus[4], indicating how fast this virus can spread in an incarcerated population where it doubled in four days. And now concern about the impact of the virus in the Marion facility on the surrounding community are being expressed in the local media,[5] clearly indicating the impact an infected prison population can have on the health of the general public.

11.     Rikers Island, in New York City, has been especially hard hit, and has an infection rate 87 times higher than the rest of the country.[6] The Federal Bureau of Prisons reports 1,046 prisoners and 330 staff test positive for the virus and 28 prisoners deaths.[7] In the state of Michigan 1,325 prisoners have tested positive as of April 26, 2020[8] and 28 prisoners have

---

[1] DRC COVID-19 information 04-18-2020

[2] https://www.marionstar.com/story/news/local/2020/04/18/ohio-prison-marion-correctional-coronavirus-cases-covid-19-national-guard-called/5159921002/

[3] https://www.marionstar.com/story/news/local/2020/04/17/covid-19-marion-prison-home-one-ohios-largest-outbreaks/5151815002/

[4] https://businessjournaldaily.com/judge-orders-elkton-prison-to-remove-vulnerable-inmates/

[5] https://www.marionstar.com/story/news/local/2020/04/25/marion-prison-ohio-coronavirus-outbreak-seeping-into-larger-community/3026133001/

[6] Jessica Schulberg & Angelina Chapin, *Prisoners at Rikers Say It's Like a 'Death Sentence' as Coronavirus Spreads*, Huffington Post (Mar. 28, 2020), https://www.huffpost.com/entry/rikers-prisoners-coronavirus_n_5e7e705ec5b6256a7a2a995d.

[7] https://www.bop.gov/coronavirus/

[8] https://wwmt.com/news/state/gov-whitmer-extends-order-protecting-jail-juvenile-detention-center-populations

died.[9] The situation is also advanced in Illinois state prisons and has been ongoing for nearly a month when it was reported one man died after testing positive for the virus[10], seventeen were taken to a local hospital on March 30, 2020 and nine were on ventilators, stressing the resource for the surrounding, non-incarcerated community. At the Illinois prison in Stateville 121 prisoners and 70 staff have tested positive.[11] As of the writing of this report, 12 prisoners have died in Illinois prisons as a result of the virus.[12] By the time this declaration is submitted, there are likely to be more reports of COVID-19 in our nation's prisons. Tragically, this is just the beginning but prisons can reduce the risk to prisoners, staff and the public if prompt actions are taken.

12.     Prisons are not closed systems. Large numbers of staff enter prisons every day, and have the potential to bring the virus with them. As of May 1, 2020, one inmate has died, and 921 prisoners and 64 staff have tested positive for the COVID-19 virus in Arkansas prisons. That is an increase from April 17, 2020 when the prisoner count of positive tests was 163, several times greater in a two-week period. [13] Given this level of infection it is highly likely that more people in the ADC will become infected. Given this reality it is my opinion that ADC needs to become much more aggressive to slow the spread of the virus than the records show today, including increasing the number of prisoners tested for COVID-19 in their prisons.

---

[9] https://docs.google.com/spreadsheets/u/0/d/1bTMdmt2IG2UrRDcDhKK2ws_ZS-sXqDsPMVC_2SDb3Lw/htmlview#

[10] https://www.nbcchicago.com/news/coronavirus/stateville-inmate-dies-several-others-on-ventilators-after-testing-positive-for-coronavirus/2247361/

[11] https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx

[12] https://docs.google.com/spreadsheets/u/0/d/1bTMdmt2IG2UrRDcDhKK2ws_ZS-sXqDsPMVC_2SDb3Lw/htmlview#

[13] https://adc.arkansas.gov/coronavirus-covid-19-updates

13.    The Center for Disease Control (CDC) says:

Incarcerated/detained persons live, work, eat, study, and
recreate within congregate environments, heightening the
potential for COVID-19 to spread once introduced.[14]

14.    The level of COVID-19 infection in the Cummins Unit is
extraordinary nationally and serves as an example of what happens when a
corrections agency is slow to respond to the pandemic. The virus represents
a unique challenge for corrections systems that should cause agencies to
question fundamental assumptions about how they typically operate. The
failure to do so is literally a life and death decision.

***Lack of Systemic Education and Information of the Incarcerated
Population***

15.    On March 23, 2020, the Center for Disease Control (CDC)
published *Interim Guidance on Management of Coronavirus Disease 2910
(COVID-19) in Correctional and Detention Facilities.* This document is
critical in advising correctional facilities about how to reduce the risk of
COVID-19 in incarcerated populations. The ADC did little to follow these
guidelines upon its publication and has yet to fully embrace and implement
CDC's guidance. The result is an explosion of people infected with this
disease in their prison population.

16.    The CDC guidance is that prisoners be educated about the risk
of the virus and how prisoners can protect themselves. The CDC says:

o  Administrators can plan and prepare for COVID-
19 by ensuring that all persons in the facility know

---

[14] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in
Correctional and Detention Facilities*, Center for Disease Control, March 23, 2020, page
2 (Hereafter called *"CDC Guidance"*)

the <u>symptoms of COVID-19</u> and how to respond if they develop symptoms.[15]

- o **Post <u>signage</u> throughout the facility communicating the following:**
  - ▪ **For all:** symptoms of COVID-19 and hand hygiene instructions
  - ▪ **For incarcerated/detained persons:** report symptoms to staff

- o Ensure that signage is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.[16]

- o **Provide <u>clear information</u> to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions.**

- o Consider having healthcare staff perform regular rounds to answer questions about COVID-19.[17]

The emphasis on clear communication with the prisoner population is strong and clear in the guidance offered by the CDC.

17.     The Arkansas Department of Health (DPH) offers similar guidance. In a publication titled *COVID-19: Guidance for State Correctional and Local Detention Facilities,* they say:

- • Communicate with staff, offenders, volunteers, and visitors.

- • Educate staff, residents, and family members of offenders about COVID-19

---

[15] CDC Guidance, page 5
[16] Ibid, page 6
[17] Ibid, page 22

- Post signage throughout the facility[18]

18.    The declarations of the named plaintiffs reveal inadequate attempts to educate the prisoners in ADC prisons about the risk of the virus. Nor is the status of the virus in the prisons being communicated. Prisoners remain fearful as a result and clearly seek to hear more from prison officials. Some examples in the prisoners' own words from their declarations of April 20, 2020:

> Until last Thursday, the only sign up was a sign saying to wash your hands. On Friday I saw a flyer about how to stop transmission of the virus. But many of the things listed on the flyer on impossible here.

> I asked the nurse if it was coronavirus and the nurse said there was no coronavirus in the facility, and that there was no need to worry about it since there was no way I could have been exposed to it.[19]

> They have put a paper on a board that says to cover your mouth and wash your hands, but they don't really tell us anything, because they think we will wig out. We hear things through the grapevine. I've heard people talking about inmates going to the infirmary with fevers and testing positive.[20]

> About 3 days ago they put some generic information on a board about COVID-19.[21]

> Normally to see medical, I have to turn in a request, and I might see a nurse within 72 hours, but it would be about 2-3 weeks before I see a doctor. Everything is so messed

---

[18] Arkansas Department of Health, *COVID-19: Guidance for State Correctional and Local Detention Facilities,* March 27, 2020, page 1, (Hereafter called ADH Guidance)
[19] Declaration of Michael Kouri, 4/20/20. # 9
[20] Declaration of Trindiad Serrato, 4/20/20, # 9
[21] Declaration of Harold Scott Orwell, 4/20/20, # 10

up now that I don't even know if they even have a
doctor.[22]

The comment attributed to the nurse appears to have been made the first
week of April. The comment regarding posting signage last Thursday was
likely April 16, 2020. The comment saying signage going up about "3 days
ago" would have been April 17, 2020. In my opinion, the comment from the
prisoner about not knowing if there even was a doctor reflects the simple
fear of the prisoner in the absence of adequate and ongoing communication.

19.     From the prisoners' declarations from April 29, 2020.

About 10 days ago they put some generic information on
a board about COVID-19. Friday, April 24, 2020 they
put up an 8 x 10 sheet of paper in the barracks showing
how to put a mask on and off. I only noticed the new
flier because I saw them taking pictures of it. No other
information on how to properly wear, put on, or take off
a mask has been provided.[23]

They put a paper on a board that said to cover your
mouth and wash your hands about a month ago, in the
last week they put up a new flier on the board about
COVID-19 and added a picture of the flier on the board
to the Morning show.[24]

Late last week they put up a flier that says, "How to
Protect Yourself from COVID-19" but it only talks
about how to wear a cloth mask. The same flier began
appearing on the Morning Show late last week also.[25]

These examples indicated there has been no serious, structured attempt to
communicate and educate the prisoners about the risk they face from

---

[22] Declaration of Nicholas Frazier, April 20, 2020, # 9
[23] Declaration of Harold Scott Otwell, April 29, 2020, # 17
[24] Declaration of Trinidad Serrato, April 29, 2020, #11
[25] Declaration of Victor Williams, April 29, 2020, # 13

COVID-19 in ADC prisons. The CDC Guidance was published March 23, 2020 and the DPH guidance was published on March 27, 2020. Given the fluid and dynamic nature of the COVID-19 pandemic information, these delays in any systemic attempt to communicate and educate the prisoners in Arkansas prisons placed them at increased risk of harm. The ADC must do more to educate the prisoners in their custody. Providing accurate, timely and regular communication to the prisoners is fundamental in the midst of the COVID crisis.

***Facility Cleaning and Personal Hygiene Needs to Improve***

20. The CDC goes into great detail in their guidance regarding cleaning the facilities and providing for the personal hygiene of those incarcerated. Regarding cleaning the facility, the CDC says in part:

- **Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced.**

- **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.

- Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

- Use household cleaners and <u>EPA-registered disinfectants effective against the virus that causes COVID-19</u> as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.

- Labels contain instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use.

- **Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.**[26]

21.    Although providing less detail, the Arkansas Department of Health guidelines for prison and detention facilities are similar:

- Frequently clean and disinfect surfaces.
- Cleaning and disinfecting frequently touched surfaces with an EPA-registered disinfectant with a label indicating effectiveness against human coronavirus or emerging viral pathogens.[27]

22.    It is very clear from the prisoner declarations that no such protocols are in place in the ADC prisons, putting the population at greater risk of contracting the disease. From the April 20, 2020 declarations of the prisoners:

Even if you want to clean (phones, etc.), there isn't anything to clean with. One bottle of disinfectant, one bottle of glass cleaner, and one bottle of floor cleaner are given to the barracks twice a day, they are intended to be used to clean the bathrooms and common areas in the

---

[26] CDC Guidance, page 9
[27] ADH Guidance, pages 1 & 2

morning and the cells in the afternoon. Only the porters can handle the chemicals. I personally do not have access to any chemicals to clean my area.

After watching the Governor's press conference where he responded to a question about access to cleaning supplies in the prisons by stating they are being given everything that they need, I asked (an) officer, who is over Fire and Safety and issues all the chemicals, if we would be getting more chemicals to clean with and she responded that each barracks gets what they get, and that's it.[28]

It is very unsanitary here. There is no access to cleaning supplies in barracks, and they spray bleach maybe once every couple of weeks.

I work in the kitchen. Even there, you need staff authorization to access cleaning chemicals. The kitchen is the dirtiest place in the prison. They unload trucks without masks or gloves and don't wipe anything down before putting it in storage.[29]

There is an older inmate who cleans and wipes down the shared phone. He hasn't been given gloves.

Non-bleach cleaners are made available to designated inmates to clean the showers twice per day. Bleach is only used to clean the bathrooms once every one of two weeks. There is no way for individual inmates to clean the bathrooms or showers before or after using them. Cleaning hasn't changed or ramped up since this all began.[30]

I live in a cell with another inmate and we share a toilet and sink. I have not been provided with disinfectant to sanitize my cell. In my housing unit 5 inmates shower at

---

[28] Declaration of Michael Kouri, April 20, 2020, #'s 14 & 15
[29] Declaration of Trinidad Serrato, April 20, 2020, #'s 10 & 11
[30] Declaration of Harold Scott Otwell, April 20, 2020, # 9

a time. The showers are not cleaned until after everyone in the barracks has showered, which is approximately 90 inmates.[31]

I live in a cell with another inmate, where we share a toilet and sink. I have not been provided disinfectant to sanitize my cell. I use state issued soap to clean.

Since the COVID-19 pandemic, I have refused communal showers because of the unsanitary conditions. Instead, I bathe in the sink inside my cell.[32]

In my housing unit multiple inmates shower at a time and showers are not disinfected daily. I do not have access (to) bleach, disinfectant or hand sanitizer.[33]

In my housing unit multiple inmates shower at a time and showers are not disinfected daily.[34]

I do not have access to cleaning supplies or disinfectant.[35]

23.     The declarations of the prisoners from April 29, 2020 show that little has changed.

I do not have direct access to cleaning supplies or disinfectant. ***Cleaning and disinfecting has not increased since the pandemic began.*** (Emphasis added)[36]

I live in a cell with another inmate, where we share a toilet and sink. I have not bee provided with disinfectant to sanitize my cell. I use state issued soap to clean. Yesterday, a sergeant walked around and sprayed bleach on our toilet from the chuckhole (flap that opens in the

---

[31] Declaration of Robert Stiggers, April 20, 2020, # 4
[32] Declaration of Alfred Nickson, April 20, 2020, #'s 5 & 7
[33] Declaration of Alvin Hampton, April 20, 2020. # 5
[34] Declaration of Victor Williams, April 20, 2020, # 4
[35] Declaration of Johnathan Neeley, April 20, 2020, # 5
[36] Declaration of Johnanthan Neeley, April 20, 2020, # 6

door) and sprayed bleach on my towel at my request, she
did not do this for every cell. This is the only time I have
had access to bleach.[37]

It is very unsanitary here. I do not have access to
cleaning supplies in the barracks. Cleaning supplies are
supposed to be made available to the barracks porter
twice a day but I have only seen them in the morning.
They were spraying bleach maybe once every couple of
weeks, but it had been as least 3 weeks since they have
sprayed bleach.[38]

The last time they came through and sprayed bleach in
the barracks bathroom was approximately 1.5 weeks ago,
prior to that they were spraying the bathrooms with
bleach every few days. ***Nothing has changed or
increased as far as cleaning since the pandemic began.***
(Emphasis added) The showers are not being cleaned
properly and there is visible soap scum build up. The
porters were reported to their supervisor due to only
spending 15 minutes a day cleaning but nothing
improved.[39]

These prisoners are precisely correct in identifying the cleaning problems in
ADC prisons and it appears that little has changed. Their concerns are
consistent with CDC and DPH guidelines that call for frequent, continual
cleaning several times a day of all common areas and common touch
surfaces. Failure to do so increases the risk of contracting the virus.

24.     The contrast in the lack of a systemic approach to cleaning is
clear when compared to what is going on in the State of California.

All CDCR institutions have been instructed to conduct
additional deep-cleaning efforts in high-traffic, high-
volume areas, including visiting and health care facilities.

---

[37] Declaration of Alfred Nickson, April 29, 2020, # 5
[38] Declaration of Trinidad Serrato, April 29, 2020, # 13
[39] Declaration of Victor Williams, April 29, 2020, #'s 11 & 12

> Those in the incarcerated population identified as
> assisting with cleaning areas of the institution have
> received direct instruction on proper cleaning and
> disinfecting procedures in order to eliminate coronavirus.
>
> Communal areas such as dayrooms, showers, restrooms
> and offices are cleaned at a minimum of once every three
> hours and more if needed. Disinfecting frequency has
> been increased, including regular disinfecting of
> touchpoints (telephones, door knobs, desk areas, etc.).
> All cleaning practices will allow for physical distancing
> of staff and porters.[40]

25.     When I was the Deputy Secretary of the Washington Department of Corrections (DOC) during a flu epidemic at one of our 2,000 plus bed facilities, we had nearly 1,000 prisoners infected with the flu and we took several steps to fight the epidemic. One of those steps was to add inmate janitors, give them the appropriate protective gear, and had them continuously cleaning common touch surfaces with disinfectant or bleach such as prisoner telephones, doorknobs, tables, chairs and bathroom facilities. This step was guided by our medical staff and was an important tool to gain control of the flu epidemic we were experiencing.

***Hand Sanitizer Should Be Provided***

26.     The other thing we did in the face of the flu epidemic in Washington was to temporarily suspend our prohibition about allowing prisoners to have supervised access to alcohol based hand sanitizer. Use of hand sanitizer appears to be a cornerstone of addressing the virus, and the rule prohibiting access should be suspended. While there is some risk associated with the misuse of alcohol-based hand sanitizer (potential abuse by some prisoners with substance abuse problems), that risk pales in

---

[40] https://www.cdcr.ca.gov/covid19/

comparison to the benefit for a much larger number of prisoners. This moment is about balancing risks, and the overriding consideration is protecting the prisoners from the threat of this lethal virus by providing them with access to alcohol based hand sanitizer. I authorized the temporary use of alcohol-based hand sanitizer during our flu epidemic without problem.

27.     Alcohol based hand sanitizer is apparently not available in ADC prisons.

- There is no hand sanitizer.[41]

- I do not have access (to) bleach, disinfectant or hand sanitizer.[42]

28.     The CDC is cautious in their recommendation about alcohol based hand sanitizer. They say:

> Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow.[43]

The CDC recommendation is deferential to correctional authorities as alcohol based hand sanitizer may be consumed by prisoners and/or used to start fires as it is combustible. I have a different opinion, based on my own experience, and believe it should be allowed. Again, it is about balancing the risk with the potential benefit.

29.     The Arkansas DPH says clearly, "Wash hands often with soap and water or use alcohol-based hand sanitizer."[44]

30.     The Washington State DOC has taken this step again in the face of the COVID-19 pandemic and allows access to alcohol based hand

---

[41] Declaration of Harold Scott Otwell, April 20, 2020, # 9
[42] Declaration of Alvin Hampton, April 20, 2020, # 5
[43] CDC Guidance, page 8
[44] ADH Guidance, page 1

sanitizer in the face of the COVID crisis, related to their job duties.[45] On April 18, 2020 Washington authorities published a memo explaining the availability of alcohol based hand sanitizer to all of their incarcerated population.[46]

31.    The State of New York has said they are:

Issuing hand sanitizer to all facilities for staff and the incarcerated population to use, as well as community supervision offices.[47]

32.    The State of California announced:

On March 29, CDCR institutions began receiving extra hand sanitizer dispensing stations along with the new production of the type of alcohol-based hand sanitizer recommended by the Centers for Disease Control and Prevention (CDC) to help eliminate coronavirus produced by California Prison Industry Authority (CALPIA). The dispensers have been placed inside institution dining halls, work change areas, housing units, and where sinks/soap are not immediately available.[48]

33.    Mr. Dexter in his declaration says:

Providing inmates with unrestricted access to alcohol-based hand sanitizer and chemicals such as bleach would provide security risks to other inmates and staff.

Because soap and water are available to all inmates at ADC units, hand sanitizer is not necessary. Neither the CDC nor Department of Health guidelines mandate or require the ADC to provide hand sanitizer to inmates.

---

[45] Respondents' Report on the Department of Corrections' COVID-19 Response, Colvin v. Inslee, No. 98317-8filed 4/13/20 in the Washington State Supreme Court, page 30
[46] https://doc.wa.gov/news/2020/docs/2020-0418-incarcerated-individuals-memo-appropriate-use-of-hand-sanitizer.pdf
[47] https://doccs.ny.gov/doccs-covid-19-report
[48] https://www.cdcr.ca.gov/covid19/

> Alcohol-based hand sanitizer, moreover, is really only
> needed if, unlike in the ADC, soap and water are
> unavailable.[49]

There are several things wrong with these statements. First, none of the CDC guidelines are mandates. They are all recommendations. Two, my recommendation is not for "unrestricted access" to alcohol based hand sanitizer but for supervised access. Three, it is not realistic to expect all prisoners at all times will have access to hot water and soap. The reference to the CDCR above acknowledges this reality by allowing alcohol based hand sanitizer in dining halls and work change areas. It is highly likely there are prisoners in the ADC who do not have ready access to hot water and soap. In my opinion, the risks of alcohol based hand sanitizer in prisons are far outweighed by the benefits.

34.     The State of New York operates 52 prisons and houses nearly 43,000 prisoners. The State of California operates 22 prisons and houses almost 118,000 prisoners. The State of Washington operates 12 prisons and houses over 16,000 prisoners. These three jurisdictions operate 86 different prisons and houses more than 175,000 prisoners. Each has made the decision to balance the risk of alcohol based hand sanitizer in favor of the safety of their prison populations. The high risk of covid-19 to both staff and prisoners requires ADC do the same.

***Social Distancing Efforts Must Improve***

35.     Social distancing guidelines are difficult, if not sometimes impossible, to completely achieve in prisons or jails. Still these guidelines should be given attention and correctional authorities need to work to

---

[49] Declaration of Dexter Payne, April 29, 2020, #'s 56 - 58

achieve them, or get close to achieving them whenever and wherever they can. The CDC says:

> Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19.[50]

36.     It is my understanding that effective March 2, 2020, the Arkansas Parole Board declared a prison overcrowding emergency. In corrections parlance, that means they are beyond their rated capacity to hold prisoners. I am very confident in saying that the rated capacity of any jail or prison does not account for the requirements of COVID-19 social distancing or the staffing needs required to effectively maintain a facility on the brink of an infectious disease outbreak. In other words, a facility full of prisoners up to their rated capacity do not, by understanding how prisons are designed and built, allow for maintaining a six foot distance between prisoners as the CDC recommends. In crowded prisons, the challenge is even greater.

37.     The best action the State of Arkansas could do to reduce the risk of harm to persons in their prisons would be to release whoever they can. The Vera Institute of Justice offers the following guidance:

> Prioritize prevention first and foremost. To reduce contact between people, corrections authorities and other

---

[50] CDC Guidance, page 4

detention administrators should:

1. Use their authority to release as many people from their custody as possible. States that do not allow for discretionary releases should adopt these policies on a temporary basis as well as implementing medical furloughs.

2. Work with court administrators to identify for immediate release people in detention who are at high risk of being affected by coronavirus, including people who are 55 years and older, those who are pregnant, and those with serious chronic medical conditions.

3. Partner with community providers to connect people leaving custody with medical care, housing, and other essential services.[51]

38.    I note Arkansas has announced plans to make 1,244 inmates for release.[52] Other jurisdictions have taken similar action in the face of the COVID-19 pandemic to release prisoners in order to increase the possibility of social distancing in their prisons.

39.    In California,

As of April 13, CDCR has expedited the release of approximately 3,500 eligible inmates who were due to be released within 60 days or less and were not currently serving time for a violent crime…[53]

40.    The State of New York is releasing 1,100 prisoners.[54]

41.    In Colorado:

Facing fears of a widespread COVID-19 outbreak among the incarcerated, state officials have agreed to the early release of almost 150 people so far from state prisons so

---

[51] https://www.vera.org/downloads/publications/coronavirus-guidance-jails-prisons-immigration-youth.pdf

[52] Declaration of Dexter Payne, # 104

[53] https://www.cdcr.ca.gov/covid19/

[54] https://www.newsweek.com/new-york-city-jails-coronavirus-1494852

it is easier to socially distance and space people out inside.[55]

42.     In my home State of Washington plans are in place to release nearly a thousand from prison.[56]

43.     Whether or not the ADC actually follows these best practices from other jurisdictions to reduce their prison population, and even with such releases, prisons will still struggle to comply with the requirements for social distancing caused by this pandemic because of the way they have been constructed. But moving in the direction of social distancing will increase protection of prisoners and such efforts are critically important to reduce the risk of the spread of COVID-19.

44.     In the meantime, the inability of the ADC to achieve social distancing with its existing population is made clear in the declarations of the prisoners.  In their first declarations, we learn:

> There are only about two and a half feet between beds. A person can lay on a bunk and touch the bunks next to them.[57]

> I live in open barracks. Each bed is approximately three feet from the next.[58]

> In the Alpha barracks I am housed with 46 inmates. Many inmates in my barracks are sick with COVID-19 symptoms. I sleep in a bed, which is 2.5 feet away from neighboring beds.[59]

---

[55] https://www.cpr.org/2020/04/23/colorado-corrections-agrees-to-release-some-inmates-early-to-reduce-prison-populations/

[56] https://komonews.com/news/local/state-to-release-nearly-1000-inmates-early-to-limit-coronavirus-spread

[57] Declaration of Trinidad Serrato, April 20, 2020, # 4

[58] Declaration of Harold Scott Otwell, April 20, 2020, # 4

[59] Declaration of Alvin Hampton, April 20, 2020, # 5

In the Alpha barracks I am housed with approximately 46
inmates. I sleep in a cell that is approximately 10 feet by
10 feet with a cell mate that is a front officer porter and
comes into contact with everyone who enters or leaves a
facility each day, including all officers and staff…Due to
my health condition, I frequently visit the medical clinic.
While waiting to be seen by a clinician I am put in a
small holding cell with approximately 10 other inmates…
My current living conditions make social distancing
impossible. I filed a grievance on April 12, 2020
regarding my vulnerability to COVID-19 and the prison's
non-compliance with procedures to decrease or prevent
the spread of the virus. My grievance was denied.[60]

On an average day, I closely interact with numerous
guards and over 100 inmates in the barracks, during meal
service, and recreation, making social distance
impossible. I filed a grievance on April 12, 2020
regarding my vulnerability to COVID-19 and the prison's
non-compliance with procedures to decrease or prevent
the spread of the virus. My grievance was denied.[61]

At chow, seating is four to a table, so we are all within a
couple of feet of one another.[62]

45.    The CDC says:

Rearrange seating in the dining hall so that there is more
space between individuals (e.g., remove every other chair
and use only one side of the table).[63]

46.    The ADH says:

Consider limiting exposure during meals, for example
restricting movement to and from the dining facilities to
provide social distancing or serving meals in housing

---

[60] Declaration of Johnathan Neeley, April 20, 2020, #'s 4, 6 & 7
[61] Declaration of Victor Williams, April 20, 2020, #'s 6 & 7
[62] Declaration of Michael Kouri, April 20, 2020, # 8
[63] CDC Guidance, page 11

areas.[64]

47.     Meal service is a prime example of where and how social distancing should be approximated in the correctional environment. Slowing down meal service so that fewer prisoners are in dining halls at a time and restricting how many can be seated, as the CDC suggests, are excellent ways to reduce risk. From the example above describing "chow", it appears the ADC has not followed this guidance.

48.     The CDC also says:

- If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are <u>cleaned</u> thoroughly if assigned to a new occupant.)

- Arrange bunks so that individuals sleep head to foot to increase the distance between them.[65]

From the examples in the declarations above, it is also clear the ADC has not followed this guidance either. At a minimum the "head to foot" step could easily be made.

49.     Regarding the comment about crowding in the holding cell in the medical area, the CDC says:

Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)[66]

Again, this is a step that could be taken with relative ease in the correctional environment by simply controlling the flow of prisoners called to medical for evaluation or treatment.

50.     It does not appear the ADC is making much progress with their

---

[64] ADH Guidance, page 3
[65] CDC Guidance, page 11
[66] Ibid

social distancing efforts. The prisoner declarations from April 29, 2020 say:

> I sleep about 2 feet from the bed next to me and my bed
> is back to back with the next row leaving only a few
> inches, if that, between that bed and mine.[67]

> The holding cell I was in while waiting to talk to my
> attorneys is a cell that has been used for quarantining
> inmates. The person in the cell next to me is COVID-19
> positive. He showed me his paperwork while we were
> waiting.[68]

> The toilets in my cell and approximately 30 other 2 man
> cells have not been working since April 24, 2020. We
> are taken from our cells to the East building to use the
> bathroom…When we got our results back from the
> COVID-19 testing, I know of at least one inmate that
> tested negative and was forced to remain in the cell with
> an inmate that tested positive. I witnessed and
> altercation when that inmate attempted to refuse to
> return to his cell after being taken out to go to the
> bathroom.[69]

51.     The CDC calls on correctional agencies to:

Make a list of possible social distancing strategies that
could be implemented as needed at different stages of
transmission intensity.[70]

52.     The ADH says:

Implement social distancing strategies to increase the
physical space between offenders (ideally 6 feet between
all individuals, regardless of the presence of symptoms).
Strategies will need to be tailored to the individual space
in the facility, in addition to the needs of the offender

---

[67] Declaration of Marvin Kent, April 29, 2020, # 16
[68] Declaration of Robert Stiggers, April 29, 1010, # 9
[69] Declaration of Alfred Nickson, April 29, 2020, #'s 6 & 10
[70] Ibid, page 6

population and staff. Not all strategies will be feasible in
all facilities.[71]

53.     Accepting ADH guidance that, "not all strategies will be
feasible in all facilities", there is no evidence that the ADC has made a
systemic effort to come up with a list of "social distancing strategies" or any
such implementation in their prisons. The failure to do so in the face of the
pandemic puts prisoners at increased risk of harm.

54.     Facing the limitations inherent in the correctional environment,
after releasing who can be released and doing one's best within the structure
of a particular correctional environment, there are still steps that can be
taken by redefining where prisoners are housed. In my home state of
Washington, "Department staff repurposed various areas within the facility,
including a classroom and extended family visit units, to spread the
population out".[72]

55.     In the California Department of Corrections and Rehabilitation:

CDCR has moved more than 500 inmates from dormitory
housing into vacant space within state institutions in an
effort to increase physical distancing in these living
environments.[73]

56.     It is an excellent suggestion to review all available space and
repurpose it, in order to reduce the risk of harm to prisoners in the ADC
prisons. Even reviewing space within the secure perimeter of a prison should
be studied for the potential of bringing in temporary housing units such as
tents or trailers. The current state of the pandemic requires it. I have seen no
indication that the Arkansas prison authorities have undertaken such an

---

[71] ADH Guidance, page 2
[72] Respondents' Report on the Department of Corrections' COVID-19 Response, Colvin
v. Inslee, No. 98317-8filed 4/13/20 in the Washington State Supreme Court, page 35
[73] https://www.cdcr.ca.gov/covid19/

assessment of what could be done to increase social distancing within their prison system.

57.    One of my biggest concerns is ADC's resistance to exploring avenues to increase social distancing. Mr. Dexter says:

> In light of the physical characteristics of ADC units, as well as security and staffing needs, a court order requiring additional social distancing measures would both risk the safety and security of the facilities and constitute an undue burden on the operations of the ADC's prison system.[74]

Mr. Dexter's statement is typical of the orientation of too many corrections officials. We get stuck in the ways we have always done business and when faced with a crisis such as COVID-19 fail to be willing to examine the assumptions of how we regularly operate. This pandemic is different. We must examine all of the opportunities to move in the direction of increased social distancing such as expanding where prisoners are housed within the secure perimeter of corrections facilities. Lives are at stake.

### *ADC May Allow Asymptomatic COVID-19 Staff to Continue to Work*

58.    The ADH amended their guidelines as follows:

Staff that test positive can return to work during their isolation period under the following circumstances, after approval is received from the Secretary of Corrections and appropriate Division Director:

- There is a critical shortage of workers and critical activities cannot occur without the use of these workers.

- No workers that are symptomatic will be allowed to work, so they must daily pass the screening procedures at the facility entrance.

---

[74] Declaration of Dexter Payne, 4/29/20, # 76

- Positive staff are only allowed to work on units with positive inmates.

- Positive staff will wear a mask at all times and monitor symptoms throughout their shift.

- Should a positive staff member become symptomatic (cough, fever, shortness of breath) they will be immediately removed from work duties and sent home.[75]

I am aware of COVID-19 litigation in other jurisdictions.  I have not seen such guidance in any other jurisdiction. Allowing asymptomatic individuals to work creates a further risk for the spread of the virus. "Asymptomatic" does not mean one cannot transmit the virus. If COVID-19 positive individuals are to work only with COVID-19 positive prisoners, it ignores the reality of work in a correctional facility. At a minimum all staff must travel to their workplace from outside the institution, putting all who they encounter at risk. And correctional staff will often respond to the scene of a disturbance in order to maintain order in a prison. This guidance from the ADH must not be followed. If the ADC is experiencing staff shortages, they should consider following the path of the State of Ohio who have brought in the National Guard to supplement their staffing levels. This same option could be pursued if the ADC could locate other areas inside their secure perimeter to find additional housing for prisoners.

***Education and Enforcement Must Be Provided About the Use and Access to Masks***

59.    It is clear that access to and proper use of facemasks is a critical ingredient in slowing the spread of COVID-19. The use of masks in the

---

[75] *ADH Guidance for Reducing Spread on COVID-19 in Correctional Facilities,* April 15, 2020, page 1

ADC is problematic. From the April 20, 2020 prisoner declarations commenting about their masks:

> No one wears masks in the barracks or the chow hall. We are only required to wear masks in the hallway. My biggest fear is that we have only been given one mask. There is no way to clean it without being without it for a period of time that is not safe. You can't wear it while it is drying after you have tried to hand wash it. Sending the mask to laundry is no better, because then you will be without the mask until it comes back. And those who have sent their masks to the laundry have gotten them back damaged. I did wash my mask once. Many people have not washed their masks.[76]

> I was given one mask. We are responsible for washing out own masks. You have to use bar soap or hand soap in the shower to wash it.[77]

> Food service workers wear gloves, but they do not wear masks. Inmates are required to wear masks in the hallways, but there is no enforcement as to how they are worn. So a lot of inmates put their masks under their chins.[78]

> I also spoke to an assistant warden about getting a mask and was told inmates in restricted housing would not be receiving them.[79]

> I have not been provided with a mask or any other personal protective equipment. When I requested a mask, I was informed that inmates in restrictive housing could not have masks.[80]

---

[76] Declaration of Michael Kouri, April 20, 2020, #'s 10 & 11
[77] Declaration of Harold Scott Otwell, April 20, 2020, # 8
[78] Ibid, #'s 11 & 12
[79] Declaration of Marvin Kent, April 20, 2020, # 5
[80] Declaration of Robert Stiggers, April 20, 2020, # 5

I have not been provided with a mask or any other personal protective equipment. I made a mask out of one of my shirts. We asked for masks but were told we could not have them.[81]

I also have not been provided with a mask or any other personal protective equipment. I even asked the person who gives me an insulin shot for a mask, but I never heard back.[82]

I was provided with one mask about two weeks ago and was told to wash it by hand. Inmates are supposed to wear masks whenever we leave the barracks or we could get a disciplinary, but the rule is not really enforced. Even during meal service I have noticed that inmates are not wearing masks or serving food with gloves.[83]

60.     Some prisoners received a second mask since they filed their first declarations, but not all.

I was moved to general population on Friday, April 24, 2020 from restrictive housing and given on mask that seems to be made out of a t-shirt.[84]

I received a cloth mask today, April 29, 2020 when I came to the Captain's office to make phone calls. To my knowledge, no one else in my unit has received a mask.[85]

I received a second mask last week. We are responsible for washing out own masks. You have to use bar soap or hand soap in the shower area to wash it.[86]

I received one cloth mask 3 weeks ago. I received a second mask last week. I have not received any

[81] Declaration of Nicholas Frazier, April 20, 2020, #'s 5 & 6
[82] Declaration of Alfred Nickson, April 20, 2020, # 6
[83] Declaration of Alvin Hampton, April 20, 2020,  # 6
[84] Declaration of Marvin Kent, April 29, 2020, # 8
[85] Declaration of Alfred Nickson, April 29, 2020, # 7
[86] Declaration of Harold Scott Otwell, April 29, 2020, # 12

> information on how to properly put on or take off a
> mask.[87]

> Even though I am in a single occupant cell, I share
> recreational facilities with other inmates and at a
> minimum I am exposed to staff members 6 times a day,
> when trays are dropped off or picked up. (This prisoner
> lives in restrictive housing)[88]

61.    In his declaration Mr. Dexter addresses the issue of no masks

for prisoners in restrictive housing. He says:

> As a result, inmates in restrictive housing have not
> received masks. Those inmates are housed in individual
> or two-man cells, do not come into contact with other
> inmates, and have very limited exposure to staff.
> Accordingly, a cloth mask is unnecessary for those
> inmates.[89]

I disagree. Mr. Dexter acknowledges that some restrictive housing cells

house two prisoners. He also ignores the fact that even prisoners in

restrictive housing are provided out of cell opportunities such as recreation,

medical appointments and other escorts that cause the prisoners to leave

their cells. Prisoners in restricted housing should also be issued masks.

62.    The prisoner declarations commenting on the use of masks by

ADC staff indicate they are not always being worn properly.

> There are only about two officers in the entire facility
> taking the virus seriously. On two days last week only
> two officers properly wore masks. Nurses that pass pills
> weren't wearing masks the other day. When asked about
> it, the nurse said stop worrying and asking about it
> because we were not going to get the virus.[90]

---

[87] Declaration of Trinidad Serrato, April 29, 2020, # 6
[88] Declaration of Nicholas Frazier, April 29, 2020, # 4
[89] Declaration of Dexter Payne, 4/29/20, # 48
[90] Declaration of Michael Kouri, April 20, 2020, #'s 12 & 13

Half of the corrections officers don't wear their masks.
On Friday, April 17, 2020, the female officer at the door
and the main officer in my barracks did not have masks
on until the Warden came in. I was in the infirmary
today, April 20, 2020 and there were 3 nurses there that
did not have masks on.[91]

Staff often wear masks below the nose or mouth, and
some have forgotten their masks altogether and had to go
home.[92]

Lately, I've observed a lot of officers not wearing masks
or gloves.[93]

63.     According to the prisoner declarations of April 29, 2020, the

problems with staff and masks continue.

Some staff members wear masks but a lot of them do not
wear them properly and they rarely have gloves on. I
was in the infirmary on Friday and the two officers who
escorted me and the doctor were not wearing masks.[94]

A lot of staff do not wear their masks properly.[95]

I still see staff that do not wear masks at all and staff do
not properly wear mask, including wearing them under
their nose and under their chin. A lot of the nurses do
not wear masks.[96]

I come into contact daily with officers who are not
wearing their masks. Frequently officers pull down their
mask to talk to inmates and give orders in the barracks.

---

[91] Declaration of Trinidad Serrato, April 20, 2020, #'s 6 & 7
[92] Declaration of Harold Scott Otwell, April 20, 2020,  # 7
[93] Declaration of Alfred Nickson, April 20, 2020, # 6
[94] Declaration of Nicholas Frazier, April 29, 2020, #'s 9 & 10
[95] Declaration of Alvin Hampton, April 29, 2020, # 10
[96] Declaration of Marvin Kent, April 29, 2020, #10

Yesterday, April 28, 2020 (a) Corporal was not wearing his mask the entire shift.[97]

Staff do not always wear masks or wear them properly while in the unit. They generally have masks and gloves on when they serve meals to the cells.[98]

Staff often wear masks below the nose or mouth when in the barracks talking to us. While completing this declaration on the phone with my attorneys at approximately 6:00 pm on April 29, 2020 (a) Lt. entered out barracks with the mask pulled down under his chin.[99]

I see guards daily that are either not wearing a mask or not wearing it properly.[100]

Some staff wear masks and some do not. Some staff also wear masks below their chins or noses.[101]

64.    Like other critical ingredients of an effort to reduce the transmission of the COVID-19 virus—hygiene and social distancing—the use of masks is fundamental. The ADC must establish and enforce clear guidelines for the use of masks for both prisoners and officers, including establishing a rational system of cleaning the masks for the prisoners

## V.    CONCLUSION AND RECOMMENDATIONS

65.    I have also reviewed the declaration of a Corporal from an ADC facility who has a son in the Cummins Unit who has tested positive for COVID-19.[102] Her declaration is heartbreaking to read and illustrates what

---

[97] Declaration of Johnathan Neeley, April 29, 2020, # 11
[98] Declaration of Alfred Nickson, April 29, 2020, # 8
[99] Declaration of Harold Scott Otwell, April 29, 2020, # 10
[100] Declaration of Robert Stiggers, April 29, 2020, # 6
[101] Declaration of Victor Williams, April 29, 2020, # 7
[102] Declaration of Janice Nicholson

other family members and friends of those incarcerated must be experiencing,

66.   The ADC has been slow to respond to the COVID-19 crisis and the result at the Cummins Unit is an infection rate that is one of the worst in the country. The ADC must be more aggressive with their interventions to prevent other facilities from experiencing the same.

67.   Bizarrely, the Defendants begin their response to the Plaintiffs' motion with:

> Plaintiffs are murderers, rapists, armed robbers, arsonists, and repeat violent offenders. Each has a history of assaulting fellow inmates and staff.[103]

Of course people in prison have done bad things. That does not change the responsibility of corrections officials to do all they can to mitigate the risk of the virus, no matter what crimes individual prisoners have committed. Framing their response in this manner is an insult to the corrections profession and a complete misunderstanding of the responsibilities of corrections' officials.

68.   The named plaintiffs describe a variety of underlying conditions that can place them at greater risk, should they contract the COVID virus.[104] All of the prisoners who wrote declarations express their fear of the COVID virus living in the current conditions of the Arkansas prisons. Their fears are credible, realistic and compelling given what they have told us about how the prisons are managing the risk. The prisons must

---

[103] Defendants' Response in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, Introduction, page 1
[104] Declarations, April 20, 2020 of Michael Kouri, # 3; Trinidad Serrato, # 3; Harold Scott Otwell, # 3; Marvin Kent, # 3; Robert Stiggers, # 3; Nicholas Frazier, # 3; Alfred Nickson, # 3; Alvin Hampton, # 3; Johnanthan Neeley, # 3; Victor Williams, # 3

do more to reduce the risk to the prisoners in their care, including adhering closely to the guidance provided by the CDC and the ADH.

69.   To that end I recommend:

- Make efforts to reduce the total prison population

- Explore all opportunities to increase social distancing and employ as many as are feasible to safely space the prisoner population

- Search for opportunities to expand bunk space for prisoners

- Seek to eliminate dangerous crowding for medical appointments

- Provide an orientation to all prisoners and on-going updates on how to protect oneself from the virus as well as the status of infections within the prisons. Allow for opportunities to ask COVID-19 related questions of medical staff

- Post educational COVID related signage

- Provide no cost access to hand soap and paper towels

- Provide alcohol based hand sanitizer in locations where dispensers can be regularly viewed by staff

- Develop a cleaning schedule that is frequent and on-going by hiring more prisoner janitors and providing them with appropriate chemical and protective equipment. Provide for continual, around the clock cleaning of all commonly shared and common touch areas, especially the toilet areas in dormitory settings.

- Provide CDC approved cleaning supplies so that prisoners can continuously clean their cells and personal dormitory areas.

- Provide direction on how to use the recently issued masks, how to keep them clean and how to get another when necessary

- Increase the number of COVID-19 tests performed for the prisoner population in all facilities

- Forbid any staff who might be infected with covid-19 from working at any facility until they are no longer contagious

71.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____May 3, 2020_____ in Olympia, Washington.

_____
Eldon Vail