THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

NICHOLAS FRAZIER                                                    PLAINTIFF

v.                         Case No. 4:20-cv-00434-KGB

WENDY KELLEY, *et al.*                                            DEFENDANTS

## ORDER DENYING PRELIMINARY INJUNCTION

Before the Court is an emergency motion for temporary restraining order and preliminary injunction filed by plaintiffs Nicholas Frazier, Alvin Hampton, Marvin Kent, Michael Kouri, Jonathan Neeley, Alfred Nickson, Harold "Scott" Otwell, Trinidad Serrato, Robert Stiggers, Victor Williams, and John Doe, individually and on behalf of all others similarly situated (collectively, "plaintiffs") (Dkt. No. 2).  A response was filed by defendants Wendy Kelley, Secretary of the Arkansas Department of Corrections ("DOC"); Dexter Payne, Division of Correction Director, Arkansas Department of Corrections ("ADC"); Jerry Bradshaw, Division of Community Correction Director, Arkansas Department of Corrections ("ADCC"); Asa Hutchinson, Governor of Arkansas; Benny Magness, Chairman of Arkansas Board of Corrections ("ABC"); Bobby Glover, Vice Chairman of ABC; John Felts, Member of ABC; William "Dubs" Byers, Member of ABC; and Whitney Gass, Member of ABC, all in their official capacities (collectively, "defendants") (Dkt. No. 36).  Plaintiffs filed a reply on May 4, 2020 (Dkt. No. 44).

On Monday, April 27, 2020, plaintiffs also filed a supplemental motion for temporary restraining order (Dkt. No. 22).  Plaintiffs' supplemental motion for temporary restraining order requested that the Court enter immediately a temporary restraining order (*Id.*, at 1).  Plaintiffs provided a draft proposed order outlining in detail the relief they requested in their motion, which was comparable but not identical to the relief they seek in their current motion for preliminary

injunction (Dkt. No. 22-1).  The Court conducted a hearing with all parties on that motion on Tuesday, April 28, 2020 (Dkt. Nos. 24; 26).  On May 4, 2020, the Court entered an order denying plaintiffs' motion for temporary restraining order but holding under advisement plaintiffs' previously filed motion for preliminary injunction (Dkt. No. 42).

Since the Court's ruling on plaintiffs' request for a temporary restraining order, plaintiffs and defendants have submitted to the Court additional record evidence and further briefing.  The Court conducted a hearing on plaintiffs' pending motion for preliminary injunction on May 7, 2020 (Dkt. Nos. 62; 63), and the parties filed post-hearing briefs on May 8, 2020 (Dkt. Nos. 64; 65).  For the following reasons, the Court denies plaintiffs' motion for preliminary injunction.

## I.   Overview

### A.   Claims

On April 21, 2020, plaintiffs filed a class action complaint and petition for writ of habeas corpus (Dkt. No. 1).  Plaintiffs allege that conditions in ADC facilities create a serious risk of COVID-19-related infection, disease, and death (*Id.*, ¶¶ 72-89).  Plaintiffs claim that the spread of COVID-19 in ADC facilities jeopardizes the public health of surrounding communities, especially black communities (*Id.*, ¶¶ 90-97).  Plaintiffs assert that defendants have intentionally failed to adopt and implement adequate policies and procedures to prevent and mitigate the spread of COVID-19 (*Id.*, ¶¶ 98-126).  Plaintiffs assert three causes of action:  (1) violation of the Eighth Amendment brought pursuant to 42 U.S.C. § 1983 on behalf of all plaintiffs; (2) violation of the Eighth Amendment brought by a petition for writ of habeas corpus under 28 U.S.C. § 2241 on behalf of the proposed high risk subclass; and (3) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, on behalf of the proposed disability subclass (*Id.*, ¶¶ 127-48).

Plaintiffs also filed the instant emergency motion for temporary restraining order and preliminary injunction on April 21, 2020 (Dkt. No. 2).  In this motion, plaintiffs request that this Court grant immediate relief to protect them against the substantial risk of COVID-19 infection, illness, and death while incarcerated in ADC facilities (*Id.*, at 1-2).  Plaintiffs assert that they are entitled to a preliminary injunction because they are substantially likely to succeed on the merits of their claim that defendants' failure to take steps to address the imminent risk caused by COVID-19 constitutes deliberate indifference in violation of plaintiffs' Eighth Amendment rights (*Id.*, at 2).  Plaintiffs further assert that defendants have violated, and will continue to violate, the ADA by failing to provide plaintiffs with disabilities with reasonable accommodations that would allow them to have safe housing while serving their prison sentence that does not place them at substantial risk of COVID-19 infection, illness, or death by virtue of their disability (*Id.*).  Plaintiffs maintain that defendants are aware of the substantial risk posed by the virus and the recommended steps issued by the Centers for Disease Control ("CDC") to prevent its spread but have failed to take steps to protect plaintiffs (*Id.*).  Plaintiffs assert that they and putative class members are also entitled to relief because they will suffer irreparable harm absent relief and that traditional legal remedies will not adequately protect their rights (*Id.*).

### B.      Class Allegations

Plaintiffs are individuals incarcerated in facilities operated by the ADC (Dkt. No. 1, at 1-2).  Based on the allegations in their complaint, each named plaintiff faces a heightened risk of death or serious injury if exposed to COVID-19 due to a chronic medical condition, a disability, or both (*Id.*, ¶¶ 15-35).

Plaintiffs seek relief on behalf of themselves and a class consisting of people who are currently incarcerated, or will be in the future, in an ADC detention facility during the duration of

the COVID-19 pandemic (*Id.*, ¶ 41).  Plaintiffs also propose two subclasses:  (a) high risk subclass,

defined as:

> [P]eople in the custody of an ADC facility aged 50 or over and/or who have serious
> underlying medical conditions that put them at particular risk of serious harm or
> death from COVID-19, including but not limited to people with respiratory
> conditions such as chronic lung disease or asthma; people with heart disease or
> other heart conditions; people who are immunocompromised as a result of cancer,
> HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or
> renal failure (including hepatitis and dialysis patients); people with diabetes,
> epilepsy, hypertension, blood disorders (including sickle cell disease), or an
> inherited metabolic disorder; people who have had or are at risk of a stroke; and
> people with any condition specifically identified by the Center for Disease Control
> ("CDC"), currently or in the future, as increasing their risk of contracting, having
> severe illness, and/or dying from COVID-19.

and (b) disability subclass, defined as:

> [P]eople in custody who suffer from a disability that substantially limits one or
> more of their major life activities and who are at increased risk of contracting,
> becoming severely ill from, and/or dying from COVID-19 due to their disability or
> any medical treatment necessary to treat their disability.

(*Id.*).

The Court determines that, for reasons unrelated to plaintiffs' class allegations, plaintiffs

have not demonstrated that they are likely to succeed on the merits of their Eighth Amendment

and ADA claims.  Therefore, the Court denies plaintiffs' request for a preliminary injunction and,

at this stage of the proceeding, declines to address matters related to plaintiffs' class allegations.

## C.     Request For Injunctive Relief

Plaintiffs request in their pending motion that the Court grant preliminary injunctive relief

and appoint a special master or an expert under Federal Rule of Evidence 706 to take certain

actions and to make recommendations to the Court regarding a number of issues (Dkt. No. 44, at

90-92).  Plaintiffs also request a preliminary injunction requiring defendants to take 26 specific

actions with respect to COVID-19 (*Id.*, at 92-96).  After the preliminary injunction hearing,

plaintiffs proposed an alternative preliminary injunction for the Court's consideration (Dkt. No. 65, at 45-47). The Court has considered these requests in making its determination.

## II.     Findings Of Fact

The Court has considered the entire evidentiary record presented by the parties in reaching its decision, although citing only specific portions in this Order. The Court makes the following specific findings of fact.

### A.     COVID-19

1.      COVID-19 is a disease caused by a novel coronavirus that began infecting humans in late 2019.

2.      The World Health Organization ("WHO") declared COVID-19 a pandemic on March 11, 2020 (Dkt. Nos. 3, at 14; 3-1, ¶ 2). The COVID-19 pandemic has created a public health emergency (*Id.*).

3.      COVID-19 has proven highly contagious in congregate environments such as nursing home facilities, cruise ships, naval aircraft carriers, and prisons (Dkt. Nos. 1, ¶ 3; 3-1, ¶¶ 12-13; 3-2, ¶ 9).

4.      There is no cure for COVID-19, and once contracted it can have life-threatening consequences, particularly for people who have certain underlying medical conditions, have a disability, or are over the age of 50 (Dkt. Nos. 23, at 3; 3-1, ¶¶ 3, 10; 3-2, ¶¶ 7-8).

5.      In most people, the virus causes fever, cough, and shortness of breath (Dkt. No. 3-1, ¶ 5). In high-risk individuals, the shortness of breath can often be severe, and even in younger and healthier individuals, infection of this virus requires supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation (*Id.*).

6.      The incubation period for COVID-19 is typically five days but can vary from as short as two days to an infected individual never developing symptoms (*Id.*, ¶ 6).  There is evidence that transmission can occur before the development of infection from infected individuals who remain asymptomatic or never develop symptoms (*Id.*).

7.      On March 11, 2020, Governor Hutchinson signed Executive Order 20-03 declaring a state of emergency and confirmed the first presumptive case of COVID-19 in Arkansas (Dkt. No. 3, at 14).

8.      On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency (*Id.*, at 15).

9.      On March 23, 2020, the CDC published its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Dkt. No. 36-9). The CDC published these guidelines, in part, to help correctional facilities ensure the protection, health, and safety of incarcerated people (Dkt. No. 3, at 26).

10.      At the time plaintiffs filed their complaint, Arkansas had 1,971 COVID-19 infections and 42 deaths statewide; at that time, incarcerated people made up at least one in three confirmed COVID-19 infections statewide (Dkt. No. 1, ¶ 2).

11.      At the time plaintiffs filed their reply on May 4, 2020, Arkansas had 3,431 COVID-19 infections and 76 deaths statewide (Dkt. No. 44, at 4).

12.      On or about April 13, 2020, in a 150-bed facility of the ADCC, 63 residents or people incarcerated at the center and 27 staff tested positive for COVID-19 (Dkt. No. 63, at 188).

13.      As of April 27, 2020, 856 people incarcerated at the ADC's Cummins Unit ("Cummins") have been confirmed to have contracted COVID-19 (Dkt. No. 44, at 4).

14.     Two men from Cummins lost their lives to COVID-19 on May 1, 2020, and two more men from Cummins lost their lives to COVID-19 on May 3, 2020 (*Id.*).

15.     A staff member from the ADC's Grimes Unit ("Grimes") has tested positive for COVID-19 (Dkt. No. 63, at 235).

16.     After the preliminary injunction hearing concluded, plaintiffs filed with the Court a motion for the Court to take judicial notice of 45 inmates at the Randall L. Williams Unit ("Williams") who tested positive for COVID-19 and three more inmates who are being treated as likely positive COVID-19 cases (Dkt. No. 66).

### B.     Parties

17.     Mr. Frazier alleges that he suffers from seizures and asthma (Dkt. No. 1, ¶ 19).

18.     Defendants assert that Mr. Frazier is not currently on any asthma medication and that his condition is well controlled (Dkt. No. 36-23, ¶ 14).

19.     Mr. Frazier is serving a 10-year prison sentence for commercial burglary, manufacture, delivery, and possession of controlled substances, criminal mischief, possession of drug paraphernalia, and theft of property (Dkt. No. 36-21).

20.     Mr. Hampton alleges that he suffers from seizures, Bell's palsy, and bipolar disorder; has reported difficulty breathing in the morning, constant coughing, and congestion; and has not been tested for COVID-19 (Dkt. No. 1, ¶ 31).

21.     Defendants dispute that Mr. Hampton has been diagnosed with bipolar disorder or prescribed medication for that disorder (Dkt. No. 36-23, ¶ 31).

22.     Mr. Hampton is serving a five-year prison sentence for battery, terroristic threatening, and fleeing and resisting arrest (Dkt. No. 36-24).

23.     Mr. Kent alleges that he has been diagnosed with heart failure and has a pacemaker; suffers from chest pain daily; has hypertension and high cholesterol; is currently experiencing headaches, body aches, coughing, and nausea; and has not been tested for COVID-19 (Dkt. No. 1, ¶ 20).

24.     Mr. Kent is serving an 18-year prison sentence for first degree battery and endangering the welfare of a minor, and he is serving the remainder of a prior conviction because he violated the terms of his probation (Dkt. No. 36-26).

25.     Mr. Kouri alleges that he has been diagnosed with aortic heart valve degeneration; has an artificial heart valve and is on blood thinners; suffers from hypertension and extreme obesity; has been experiencing more severe shortness of breath, headaches, chills, coughing; was recently diagnosed with conjunctivitis; and has not been tested for COVID-19 (Dkt. No. 1, ¶¶ 15-16).

26.     Mr. Kouri is serving a 10-year prison sentence for aggravated robbery (Dkt. No. 36, at 21).

27.     Mr. Neeley alleges that he was diagnosed with rectal cancer in January 2020; has not received treatment or chemotherapy; and has traveled to three local hospitals recently related to his cancer diagnosis (Dkt. No. 1, ¶ 33).

28.     Defendants contend that Mr. Neeley received surgery for his condition in January 2020; saw an oncologist in approximately March 2020; visited another doctor who ordered additional treatment; and is currently scheduled to receive radiation treatment at an outside provider later this year (Dkt. No. 36-23, ¶¶ 34-35).

29.     Mr. Neeley is serving a 10-year prison sentence for multiple counts of sexual assault (Dkt. No. 36-30).

30.     Mr. Nickson alleges that he suffers from diabetes, rheumatoid arthritis, and osteoarthritis; has experienced shortness of breath, fatigue, coughing, and repeated vomiting; and has not been tested for COVID-19 (Dkt. No. 1, ¶ 26).

31.     Mr. Nickson is serving a 25-year prison sentence for murder (Dkt. No. 36-31).

32.     Mr. Otwell alleges that he is obese, pre-diabetic, has osteoarthritis, receives physical therapy for his right hip, and has limited mobility (Dkt. No. 1, ¶ 22).

33.     Defendants assert that neither the ADC nor Wellpath, LLC ("Wellpath"), the ADC's contracted medical provider, have records suggesting Mr. Otwell has been diagnosed with pre-diabetes or that Mr. Otwell has been prescribed diabetes medication (Dkt. No. 36-23, ¶ 22). Defendants also assert that Mr. Otwell does not participate in physical therapy for any injury (*Id.*, ¶ 23).

34.     Mr. Otwell is serving a 15-year sentence for conspiracy to commit arson and jury tampering (Dkt. No. 36-33).

35.     Mr. Serrato alleges that he is a carrier of tuberculosis and suffers from asthma (Dkt. No. 1, ¶ 17).

36.     Defendants contend that Mr. Serrato has not been diagnosed with asthma (Dkt. No. 36-23, ¶ 10).

37.     Mr. Serrato is incarcerated due to a 2017 conviction for felon in possession of a firearm, for which he was convicted as a habitual offender (Dkt. No. 36-34).

38.     Mr. Stiggers alleges that he suffers from asthma (Dkt. No. 1, ¶ 24).

39.     Mr. Stiggers is serving a 40-year sentence for first-degree murder and a 20-year sentence for battery, which are set to run consecutively (Dkt. No. 36, at 18).

40.     Mr. Williams alleges that his lymphoma is in remission and claims that he suffers from a collapsed lung, hypertension, and bruised tissue surrounding his heart (Dkt. No. 1, ¶ 28).

41.     Defendants challenge Mr. Williams' allegations regarding his health conditions (Dkt. No. 36-23, ¶¶ 27-29).

42.     Mr. Williams is serving a five-year sentence for manslaughter (Dkt. No. 36, at 25).

43.     Plaintiff John Doe recently tested positive for COVID-19 and suffers from severe asthma which requires use of an inhaler throughout the day, according to plaintiffs' complaint (Dkt. No. 1, ¶ 35).

44.     Mr. Hampton, Mr. Kouri, Mr. Neeley, Mr. Otwell, Mr. Serrato, and Mr. Williams are incarcerated in the ADC's Ouachita River Correctional Unit ("Ouachita")[1] (*Id.*, ¶¶ 15, 17, 22, 28, 31, 33).

45.     Mr. Frazier and Mr. Kent are incarcerated in the Varner Supermax ("Varner") (*Id.*, ¶¶ 19-20).

46.     Mr. Nickson, Mr. Stiggers, and John Doe are incarcerated in Cummins (*Id.*, ¶¶ 24, 26, 35).

47.     The Arkansas Department of Corrections ("DOC") includes the Arkansas Department of Corrections ("ADC"), the Arkansas Department of Community Correction ("ADCC"), the Arkansas Board of Corrections ("ABC"), and the Arkansas Board of Parole (Dtk. No. 63, at 66).[2]

---

[1] According to defendants, the "most vulnerable populations are housed at the Ouachita River Correctional Unit.  It is designed for special needs inmates including those who are chronically ill and medically fragile.  The facility provides hospital services." (Dkt. No. 46-42, Response to Question 9).

[2] Until July 1, 2019, the ADC was known as the Arkansas Department of Correction (Dkt. No. 36-1, ¶ 1).

C.       **Grievance Policy**

48.     Defendants maintain that at all times relevant to this lawsuit ADC had a policy relating to grievances filed by inmates housed in its facilities (Dkt. No. 36, at 25).

49.     The version of the policy in effect since December 2, 2019 is Administrative Directive 2019-34 ("AD 19-34") (Dkt. Nos. 36, at 26; 36-37, ¶¶ 4-5).

50.     AD 19-34 applies to both medical and non-medical grievances, the exhaustion process is similar for both types of grievances, and the procedure includes an informal resolution stage and a formal resolution stage (Dkt. Nos. 36, at 26; 36-38, ¶¶ 3, 8).

51.     AD 19-34 contains a multi-step process to file and exhaust a grievance (Dkt. No. 36-37, ¶ 8).

52.     An inmate initiates Step One by submitting his Unit Level Grievance Form to the designated problem solver on duty, and the problem solver has three business days to respond to the inmate (*Id.*, ¶ 12).

53.     If an inmate does not submit a Step One grievance within 15 days of the incident's occurrence, the grievance is untimely and can be rejected by ADC (*Id.*, ¶ 10).

54.     If the grievance cannot be resolved by the problem solver, the inmate has three business days after receiving a response from the problem solver to initiate Step Two (*Id.*, ¶ 12).

55.     Alternatively, if the problem solver fails to contact the inmate regarding his grievance within three business days, the inmate may proceed to Step Two directly and file a formal Step Two grievance within six business days of submitting the original Unit Level Grievance Form (*Id.*, ¶ 13).

56.     ADC's inmate grievance policy also accounts for emergencies and is designed to ensure that ADC staff act quickly to resolve emergencies, defining an "emergency" as "a problem

that, if not immediately addressed, subjects the inmate to a substantial risk of personal injury or other serious and irreparable harm, such as physical abuse" (Dkt. Nos. 36, at 27; 36-37, at 8).

57.     If the inmate believes the matter to be an emergency, the inmate is directed to designate the grievance as an emergency and present the form to any staff member (Dkt. No. 36-37, ¶ 15).

58.     If the staff recipient determines that an emergency does exist, corrective action should be taken within 24 hours (*Id.*, ¶ 15, at 13).

59.     If the problem solver determines that an emergency exists, the grievance is submitted immediately to the Warden without further completion of Step One, essentially converting an emergency informal grievance into a Step Two grievance (*Id.*).

60.     Step Two's procedure is slightly different for medical and non-medical grievances (Dkt. No. 36, at 27).

61.     For non-medical grievances, the Warden or Warden's designee will consider the grievance, any other documents relevant to the grievance, and respond to the Step Two grievance within 20 business days of receipt (Dkt. No. 36-37, ¶ 16).

62.     If the inmate is not satisfied with the Warden's response, the inmate may appeal within five business days to the appropriate Chief Deputy, Deputy, or Assistant Director who will attempt to resolve the matter or assign an appropriate staff member to do so (*Id.*, ¶ 17).

63.     To complete the appeal for a non-medical grievance, the inmate must state a reason for disagreeing and must date, sign, and write the inmate's ADC number on the attachment being appealed (*Id.*, ¶¶ 18-19).

64.     The Chief Deputy, Deputy, or Assistant Director must respond to the non-medical grievance within 30 days (*Id.*, at 19).

65.     For Step Two medical grievances, the Health Services Administrator at the Unit Medical Department will consider the grievance, any other documents relevant to the grievance, and respond within 20 business days of receipt (36-38, ¶ 8).

66.     After receiving a response from the Health Services Administrator, the inmate may appeal to the Deputy Director for Health and Correctional Programs (*Id.*, ¶ 9).

67.     The Deputy Director for Health and Correctional Programs has 30 days to respond (*Id.*, at 19).

68.     The Deputy Director for Health and Correctional Program's written decision or rejection of an appeal is the end of the medical grievance process (*Id.*, ¶ 12).

### D.     Plaintiffs' Use Of Grievance Procedures

69.     Plaintiffs have submitted purported copies of grievances filed by Mr. Frazier, Mr. Hampton, Mr. Kouri, Mr. Neeley, Mr. Otwell, Mr. Serrato, and Mr. Williams (Dkt. Nos. 46-33; 46-34; 46-35; 46-36; 46-37; 46-38; 46-39).

70.     Plaintiffs assert that Mr. Frazier, Mr. Kouri, and Mr. Nickson filed emergency grievances that prison officials failed to treat as emergency grievances in accordance with AD 19-34 (Dkt. Nos. 44, at 53-54; 44-1, ¶ 14; 44-4, ¶ 16; 44-6, ¶ 11; 44-33).

71.     Mr. Frazier designated his grievance as an emergency grievance and submitted that grievance on April 18, 2020 (Dkt. No. 46-33).  When prompted to state why there is an emergency, Mr. Frazier wrote "[d]ue to proper cleaning supplies not being provided on a daily basis with Covid 19 going around" (*Id.*, at 3-4).  Mr. Frazier also wrote his grievance "under Reasonable Accomidation [*sic*] under the 'ADA' American Disability Act due to the fact that I have asthma and a seizure disorder, and feel I or we as a whole need daily cleaning supplies during this time of crisis while the Covid 19 disease is at peak points" (*Id.*).  Mr. Frazier's request was received by a

staff member named Sergeant Garcia, Identification Number 90495, on April 18, 2020, and Sergeant Garcia designated the grievance as a Step One grievance rather than an emergency grievance (*Id.*, at 4). The grievance was not forwarded to medical or mental health, and the section of the grievance asking staff to describe action taken to resolve the complaint is blank (*Id.*).

72. Gloria Thompson, Inmate Grievance Supervisor for Varner, states that she has reviewed the ADC's grievance records pertaining to Mr. Frazier and that her office has no record of Mr. Frazier submitting a grievance on April 18, 2020, or any other grievance related to COVID-19 (Dkt. No. 36-39, ¶¶ 5-7).

73. Mr. Hampton submitted informal grievances regarding COVID-19 on April 13, 2020, and April 19, 2020 (Dkt. No. 36-40, ¶¶ 6-7).

74. Mr. Hampton designated his first grievance as an emergency grievance and submitted that grievance on April 13, 2020 (Dkt. No. 46-34, at 2). In the grievance, Mr. Hampton complains of the inability to social distance; states that inmates have no gloves and only one mask; asserts that the majority of the barracks, including himself, are experiencing flu-like symptoms; and seeks immediate release for his safety (*Id.*). Mr. Hampton's request was received by a staff member named Sergeant Griffin, Identification Number 91214, on April 13, 2020, and Sergeant Griffin designated the grievance as a Step One grievance rather than an emergency grievance (*Id.*). In describing the action taken to resolve the complaint, a staff member wrote that "[n]o matter the situation, release is a non-grievable issue" (*Id.*).

75. Mr. Hampton also designated his second grievance as an emergency grievance and submitted that grievance on April 19, 2020 (*Id.*, at 3). Though this grievance is harder to read, a staff member designated the grievance as a Step One grievance rather than an emergency grievance

(*Id.*).  The section of the grievance asking staff to describe action taken to resolve the complaint is blank (*Id.*).

76.     Jason Gray, Inmate Grievance Supervisor at Ouachita, avers that Mr. Hampton did not submit a formal grievance regarding COVID-19 or fully exhaust any such grievance by April 21, 2020 (Dkt. No. 36-40, ¶¶ 1, 6-8).

77.     Mr. Kent maintains that, on April 21, 2020, he filed an emergency grievance explaining that he has a serious heart condition and pacemaker and asking for a mask to avoid contracting COVID-19 (Dkt. No. 46-3, ¶ 6).

78.     Mr. Kent maintains that he received a response April 28, 2020; the facility mailed its response to him stating that, because he was an inmate in SuperMax, he did not need a mask (*Id.*, ¶ 7).

79.     By the time Mr. Kent received that response, he maintains he had been transferred out of SuperMax (*Id.*).

80.     Further, Mr. Kent explains that the response was mailed to him, meaning more than 72 hours had passed before he received it which was passed the deadline for moving onto Step Two of the grievance process based on that response, and that in the ordinary course responses are handed to the inmate who can then inform the officer if he wishes to move to Step Two of the grievance process (*Id.*).

81.     Mr. Kent maintains that he and most of the inmates he knows fear retaliation for speaking out about COVID-19 and asking for help (*Id.*, ¶ 19).

82.     Inmates and family members of inmates reported fearing retaliation, as well, for speaking out about COVID-19 issues (Dkt. Nos. 46-13, ¶ 10; 46-21, ¶ 10; 46-30, ¶ 9).

83.     Varner's grievance office has no record of Mr. Kent submitting any COVID-related grievances, though he has filed multiple grievances since December 2019 (Dkt. Nos. 3-6, ¶ 3; 36-39, ¶ 6).

84.     Mr. Kouri submitted two grievances on April 18, 2020 (Dkt. No. 46-35).  Mr. Kouri designated his first grievance as an emergency grievance (Dkt. Nos. 3-3, ¶ 16; 36-40, ¶ 9; 46-35, at 4).  When prompted to state why there is an emergency, Mr. Kouri wrote "[t]he current conditions are an imminent threat to my life, health, and wellbeing" (Dkt. No. 46-35, at 4).  Mr. Kouri complained of COVID-19-related issues in the prison related to social distancing, sanitation, PPE, and cleaning supplies (*Id.*).  Mr. Kouri "request[ed] accommodations such as PPE, cleaning supplies[,] or release from prison" (*Id.*).  No staff member signed the form indicating receipt, and the section of the grievance asking staff to describe action taken to resolve the complaint is blank (*Id.*).

85.     After the appropriate problem solver responded to Mr. Kouri's informal grievance, Mr. Kouri filed a Step Two grievance on April 18, 2020, to which the Warden responded two days later (Dkt. Nos. 36-40, ¶ 10; 60-2, ¶¶ 14-15).  The Warden's response to Mr. Kouri was the same response as many other people received (Dkt. No. 60-2, ¶ 15).

86.     Mr. Gray characterizes the grievance as an informal grievance and avers that a problem solver responded to this initial grievance, after which Mr. Kouri moved to Step Two of the inmate grievance procedure (Dkt. No. 36-40, ¶¶ 9-10).

87.     On April 20, 2020, Mr. Kouri mailed the grievance to Pine Bluff to initiate Step Three (Dkt. No. 60-2, ¶ 16).  He received a notice that it was received in Pine Bluff on April 29, 2020, that it was assigned Grievance # OR-20-00357, and that he can expect a response by June 11, 2020 (*Id.*).

88.     Mr. Kouri avers that, when he was called to sign for the response to the grievance on April 18, 2020, a prison official sent him back to his barracks to get his own pen to sign and then confiscated the pen in what Mr. Kouri believes was a retaliatory move after Mr. Kouri signed for the grievance response, despite Mr. Kouri's claim that he has "a hobby craft card that allows [him] to have that pen." (Dkt. Nos. 3-3, ¶ 16; 60-2, ¶ 17).

89.     Mr. Kouri filed an additional grievance and complained of retaliation for writing his first grievance, including having his pen confiscated (Dkt. Nos. 46-35, at 2; 60-2, ¶ 18).  No staff member signed the form indicating receipt, and the section of the grievance asking staff to describe action taken to resolve the complaint is blank (*Id.*).

90.     Mr. Kouri reports that he was told he improperly filed his grievance alleging retaliation; that it had to go to Step One; and that it could no longer go directly to the Warden under Step Two (Dkt. No. 60-2, ¶ 18).

91.     Mr. Kouri then resubmitted his grievance alleging retaliation on April 20, 2020; received no response at the Step One level; and submitted the grievance to Step Two on April 23, 2020 (Dkt. No. 60-2, ¶ 19).

92.     Mr. Kouri maintains that Captain Mulliguin returned Mr. Kouri's confiscated pen to him on April 27, 2020 (Dkt. No. 60-2, ¶ 20).

93.      On April 28, 2020, Mr. Kouri received a response from the Warden finding the grievance alleging retaliation with merit but claiming it had been resolved (Dkt. No. 60-2, ¶ 21).

94.     Mr. Neeley submitted informal grievances regarding COVID-19 on April 13, 2020, and April 19, 2020 (Dkt. Nos. 3-11, ¶ 7; 36-40, ¶¶ 11-12).  He designated both grievances as emergency grievances (Dkt. No. 46-36).

95.     When prompted to state why there is an emergency in his first grievance, Mr. Neeley wrote "Covid-19 pandemic" (*Id.*, at 2).  In his first grievance, Mr. Neeley complained that he was unable to social distance; that he had only been issued one mask and no gloves to protect himself; that he had been requesting medical care and had received no form of treatment; that he had received no teaching or information on how to protect himself from COVID-19; and that the conditions at Ouachita posed a serious risk and imminent harm to his health in violation of the Eighth Amendment (*Id.*).  Mr. Neeley stated that he feared for his life and his immediate health because of the COVID-19 outbreak and his lack of protection from it, and he sought immediate release from prison for his safety (*Id.*).

96.     Sergeant Griffin received this grievance and determined that it was a Step One grievance instead of an emergency grievance, and a staff member wrote that "[n]o matter the situation, release is a non-grievable issue" (*Id.*).

97.     When prompted to state why there is an emergency in his second grievance, Mr. Neeley wrote "I fear for my life because of Covid-19 virus pandemic" (*Id.*, at 3).  Though Mr. Neeley's second grievance is harder to read, Sergeant Griffin received this grievance and designated it as a Step One grievance rather than an emergency grievance (*Id.*).  The section of the grievance asking staff to describe action taken to resolve the complaint is blank (*Id.*).

98.     Mr. Gray avers that Mr. Neeley did not submit a formal grievance regarding COVID-19 or fully exhaust any such grievance by April 21, 2020 (Dkt. No. 36-40, ¶¶ 11-13).

99.     Mr. Nickson claims to have filed a grievance on April 17, 2020, though the grievance officer at Cummins has no record of him submitting any such grievance or any COVID-related grievances (Dkt. Nos. 3-9, ¶ 8; 36-41, ¶¶ 6-7; 46-6, ¶ 11).

100.    Mr. Nickson also avers that "[a] lot of sergeants have stopped picking up and signing grievances" (Dkt. No. 46-6, ¶ 12).  Mr. Nickson maintains that, when he attempted to submit a grievance, a sergeant refused to sign it on April 25, April 26, and April 27, 2020 (*Id.*).

101.    Mr. Otwell submitted informal grievances regarding COVID-19 on April 13, 2020, and April 19, 2020 (Dkt. No. 36-40, ¶¶ 14-15).  He designated both grievances as emergency grievances (Dkt. No. 46-37).

102.    When prompted to state why there was an emergency in his first grievance, Mr. Otwell wrote "COVID-19" (*Id.*, at 2).  Mr. Otwell complained that he could not social distance; that he was issued one mask and no gloves; and that he had seen no memorandums on proper use of PPE or whether Ouachita had a plan for any COVID-19 outbreak (*Id.*).  Mr. Otwell claimed that he was in serious risk of harm to his health from COVID-19 and that this risk violated the Eighth Amendment and the Arkansas Constitution (*Id.*).

103.    Mr. Otwell's request was received by a staff member named Sergeant Kemp, Identification Number 96204, on April 13, 2020, and Sergeant Kemp designated the grievance as a Step One grievance rather than an emergency grievance (*Id.*).  In describing the action taken to resolve the complaint, a staff member wrote that "[n]o matter the situation, release is a non-grievable issue" (*Id.*).

104.    When prompted to state why there was an emergency in his second grievance, Mr. Otwell wrote "COVID-19 and reasonable accommodations according to the guidelines of the ADA" (*Id.*, at 4).  Mr. Otwell raised similar complaints in his second grievance, but Mr. Otwell also asked for reasonable accommodations according to the guidelines of the ADA due to his medical conditions (*Id.*).  Sergeant Griffin received this grievance and designated it as a Step One

grievance rather than an emergency grievance (*Id.*).  The section of the grievance asking staff to describe action taken to resolve the complaint is blank (*Id.*).

105.    Mr. Gray avers that Mr. Otwell did not submit a formal grievance regarding COVID-19 or fully exhaust any such grievance by April 21, 2020 (Dkt. No. 36-40, ¶¶ 14-16).

106.    Mr. Serrato submitted informal grievances regarding COVID-19 on April 12, 2020, and April 19, 2020 (Dkt. No. 36-40, ¶¶ 17-18).  He designated both grievances as emergency grievances, though he failed to state why there was an emergency in either grievance where prompted to do so (Dkt. No. 46-38).

107.    In his first grievance, Mr. Serrato complained that he had no gloves; that he could be around infected but asymptomatic staff; and that COVID-19 posed a serious risk to his health in violation of the Eighth Amendment and the Arkansas Constitution (*Id.*, at 2).  Mr. Serrato asked to be considered for release (*Id.*).

108.    Sergeant Kemp received this grievance on April 14, 2020, and designated it as a Step One grievance rather than an emergency grievance (*Id.*).  In describing the action taken to resolve the complaint, a staff member appears to have written that release is not grievable (*Id.*). This is consistent with Mr. Serrato's recollection of the response to this grievance (Dkt. No. 3-4, ¶ 13).

109.    Mr. Serrato's second grievance is much harder to read, though it does mention COVID-19 (*Id.*, at 3).

110.    Sergeant Griffin received this grievance on April 19, 2020, and designated it as a Step One grievance rather than an emergency grievance (*Id.*).  The section of the grievance asking staff to describe action taken to resolve the complaint is blank (*Id.*).

111.    Mr. Gray avers that Mr. Serrato did not submit a formal grievance regarding COVID-19 or fully exhaust any such grievance by April 21, 2020 (Dkt. No. 36-40, ¶¶ 17-19).

112.    Mr. Stiggers claims to have prepared a grievance on April 18, 2020, but Cummins' grievance office has no record of Mr. Stiggers filing any such grievance or any COVID-related grievances (Dkt. Nos. 3-7, ¶ 6; 36-41, ¶ 8).

113.    Mr. Stiggers maintains that, although he prepared a greivance related to COVID-19 on April 18, 2020, it took until April 27, 2020, "to get appropriate staff to sign and take the grievance, despite multiple attempts" (Dkt. No. 46-9, ¶ 8).

114.    Mr. Stiggers maintains he received a response that inmates in restrictive housing cannot get masks, and he asked for his grievance to go to Step Two (*Id.*).  As of April 29, 2020, Mr. Stiggers was waiting on the verification that his grievance had gone through to Step Two (*Id.*).

115.    Mr. Williams submitted informal grievances regarding COVID-19 on April 13, 2020, and April 19, 2020 (Dkt. Nos. 36-40, ¶¶ 20-21; 46-10, ¶¶ 15-16).  He designated both grievances as emergency grievances (Dkt. No. 46-39).

116.    When prompted to state why there was an emergency in his first grievance, Mr. Williams wrote "Covid-19" (*Id.*, at 2).  Mr. Williams complained that he had no ability to social distance; that he had only one mask and no gloves to protect himself; that he could come in contact with infected but asymptomatic staff; that he had received no information on how to protect himself from the virus or on what Ouachita's plan was for combatting COVID-19; and that these risks posed a serious risk and imminent harm to his health in violation of the Eighth Amendment and the Arkansas Constitution (*Id.*).  Mr. Williams stated that he feared for his life because of the COVID-19 outbreak, his health risk, and the lack of protection, and Mr. Williams requested immediate release for his safety (*Id.*).

21

117.     Sergeant Griffin received this grievance on April 13, 2020, and designated it as a
Step One grievance rather than an emergency grievance (*Id.*).  In describing the action taken to
resolve the complaint, a staff member wrote that "[n]o matter the situation, release is a non-
grievable issue" (*Id.*).

118.     Mr. Williams' second grievance is harder to read, and Mr. Williams did not state
why there was an emergency when prompted (*Id.*, at 3).  It appears that Mr. Williams' second
grievance was received by some staff member, though the Court cannot tell who received it (*Id.*).
The section of the grievance asking staff to describe action taken to resolve the complaint appears
blank (*Id.*).

119.     Mr. Gray avers that Mr. Williams did not submit a formal grievance regarding
COVID-19 or fully exhaust any such grievance by April 21, 2020 (Dkt. No. 36-40, ¶¶ 19-21).

120.     Teri Grigsby, the ADC Inmate Grievance Supervisor, avers that her office has no
record of any of the named plaintiffs appealing non-medical grievances related to COVID-19
before April 20, 2020 (Dkt. No. 36-37, ¶¶ 21-22).

121.     Jacqueline Michele Buterbaugh, the ADC Medical Grievance Supervisor, avers
that her office has no record of any of the named plaintiffs appealing medical grievances related
to COVID-19 before April 19, 2020 (Dkt. No. 36-38, ¶¶ 15-16).

122.     Director Payne avers that none of the plaintiffs ever requested any COVID-19
related accommodations from him or any of the named defendants to his knowledge (Dkt. No. 36-
1, ¶ 110).

### E.     Claimed Response To COVID-19

123.     On March 11, Secretary Kelley issued a memorandum outlining the ADC's
protocols to reduce the risk and combat the spread of COVID-19 within ADC facilities (Dkt. Nos.

36-1, ¶¶ 14-16; 36-2).  This memorandum encouraged regular handwashing, covering coughs and sneezes, avoiding handshakes, continuing cleaning, and telling staff members to stay at home if ill (Dkt. No. 36-2).

124.    Defendants were on notice of the March 23, 2020, CDC guidance (Dkt. No. 60-1).

125.    On March 27, 2020, the Arkansas Department of Health ("ADH") issued recommendations entitled "COVID-19 Guidance for State Correctional Facilities and Local Detention Facilities," which addressed the CDC's recommendations and gave Arkansas-specific guidance (Dkt. No. 36-1, ¶¶ 36-37; 36-10).

126.    The ADH has continued to issue additional guidance for correctional facilities including but not limited to guidance issued on April 13, 2020, and again on April 15, 2020; according to defendants, the ADC continues to comply to the extent possible (Dkt. Nos. 36-1, ¶ 102; 36-11, ¶¶ 5-7; 36-19; 36-20).

**1.      Visitors To And Movements Within Facilities**

127.    On March 16, 2020, the ADC suspended inmate visitation, regular and special visits, at all prisons and community correction centers in an effort to respond to COVID-19; the ADC maintains it took this action after discussions with the ADH and Wellpath (Dkt. Nos. 36-1, ¶¶ 5-7, 9, 19-21).

128.    Director Payne maintains that the ADC continues to work closely with the ADH, other Arkansas state agencies, federal agencies, other states, and national correction organizations in formulating its response to COVID-19 (Dkt. Nos. 36-1, ¶¶ 5-7, 9; 36-23, ¶ 4; 49-7; 49-10; 49-11; 49-12; 49-15).

129.    In mid-March 2020, the ADC conferred with its telephone and video visitation providers and reduced the price of phone calls, emails, and video visitation; extended video

23

visitation hours; and notified ADC inmates of these changes (Dkt. Nos. 36-1, ¶ 22; 36-3; 36-4; 36-5).

130.    The ADCC took similar steps with regard to telephone and video visitation (Dkt. No. 36-1, ¶ 23).

131.    Beginning on March 16, 2020, the ADC began to restrict volunteers and others permitted into the facilities (Dkt. Nos. 36-1, ¶¶ 24-25, 31; 36-6).

132.    The ADC changed its practice with regard to inmates leaving the units for meritorious or emergency furloughs and work release (Dkt. Nos. 36-1, ¶¶ 26-27; 36-5).

133.    The ADC and ADCC changed practices with regard to incoming inmates or residents, as well, to house new intakes together for a period of 14 days following intake (Dkt. Nos. 36-1, ¶ 28; 49-13).

134.    Plaintiffs dispute whether practices regarding incoming inmates or residents, and the transfers or movements of inmates or residents, changed or changed sufficiently in response to COVID-19 (Dkt. Nos. 46-7, ¶ 5; 46-8, ¶¶ 5, 12; 57-3, ¶ 11).

135.    The ADC has screened individuals for COVID-19 related symptoms, including staff, who enter facilities (Dkt. No. 36-1, ¶¶ 30, 32).

136.    Plaintiffs dispute whether staff screening has continued among alleged staffing shortages (Dkt. No. 3-4, ¶ 8; 46-8, ¶ 9).

## 2.    Information And Education

137.    The ADC created a website, updated daily and sometimes multiple times a day, to inform the public about the ADC's efforts in response to COVID-19 and regularly updated its social media accounts to provide information about its response to COVID-19 (Dkt. No. 36-1, ¶¶ 17-18).

138.    The ADC has posted signage informing staff and visitors of COVID-19 precautions (Dkt. Nos. 36-1, ¶ 29; 36-7; 63, at 205).

139.    The ADC and Wellpath have posted signage in English and Spanish informing inmates of COVID-19 precautions and information recommended by the ADH (Dkt. Nos. 36-1, ¶ 39-40; 36-11, ¶ 10; 36-12 to 36-17).

140.    Plaintiffs dispute the impact and effectiveness of that signage (Dkt. Nos. 46-22, ¶ 10; 50-2, ¶ 8).

141.    The ADC has a closed-circuit television program called the Morning Show that is an educational tool, plays continuously from the morning until early afternoon, and on which COVID-19 information is shared, according to defendants; Director Payne is uncertain how many ADC units have a Morning Show but testified that most do (Dkt. No. 63, at 204-05).

142.    Plaintiffs dispute the effectiveness of the Morning Show at conveying information about COVID-19 (Dkt. No. 60-2, ¶ 8).

143.    The ADC permits inmates to watch on the television Governor Hutchinson's briefings on COVID-19, during which information on COVID-19 and Arkansas's response is relayed including but not limited to information from the ADH, the number of positive tests for COVID-19 in Arkansas, and the number of COVID-19 related deaths in Arkansas (Dkt. No. 63, at 206).

144.    Defendants present an affidavit from Kelley Garner, an Epidemiology Supervisor with the ADH who is a member of a team known as Healthcare-Associated Infection Program and has worked preparing guidance for various industries in Arkansas in response to the threat posed by COVID-19, including nursing homes and prisons within the state (Dkt. No. 36-11, ¶¶ 1, 4).  On

April 17, 2020, she and others toured Cummins; she provides to the Court her observations from that tour in an affidavit (*Id.*, ¶ 8).

145.    Defendants present photographs, many of which appear to have been taken in late April 2020, regarding measures instituted at Ouachita River (Dkt. No. 49-32).

### 3.    Personal Protective Equipment

146.    In its March 27, 2020, guidance, the ADH recommended use of PPE for inmates and staff to the extent possible, so the ADC began to manufacture cloth masks for inmates and staff and has distributed cloth masks and face shields; updated guidance regarding PPE has been issued (Dkt. No. 36-1, ¶¶ 42-44; 49-29).

147.    The ADC obtained additional PPE from the Arkansas Department of Emergency Management and purchased PPE on the open market (Dkt. Nos. 36-1, ¶ 45; 49-8; 49-19; 49-35).

148.    Every inmate housed in general population has received one cloth mask, and the ADC is continuing production to ensure each inmate housed in general population also has a second mask (Dkt. Nos. 36-1, ¶ 46; 63, at 143).

149.    Plaintiffs maintain that masks are being produced through inmate labor and submit record evidence from a family member suggesting that infected prisoners from Cummins make these masks (Dkt. No. 46-15, ¶ 4).

150.    According to defendants, inmates in restricted housing, which are one-person or two-person cells, do not come into contact with other inmates, have limited exposure to staff, and therefore are not issued masks; the CDC guidance indicates masks protect others from risk of infection from the wearer but do not protect the wearer from risk of infection (Dkt. Nos. 36-1, ¶¶ 47-48; 63, at 143-44).

151.    Plaintiffs Mr. Frazier and Mr. Stiggers, who are in restricted housing and have not been provided with masks, state that they share recreational facilities with other inmates at a minimum, may have additional exposure to other inmates throughout the day, and are exposed to staff members during the day, too (Dkt. Nos. 46-1, ¶¶ 4-6; 46-9, ¶¶ 4-5).  Mr. Frazier made his own mask from a t-shirt (Dkt. No. 46-1, ¶ 6).

152.    According to defendants, ADC staff are directed to wear masks and gloves when interacting with inmates including those in restricted housing, and inmates and ADC staff have been told best practices for wearing masks (Dkt. Nos. 36-1, ¶¶ 49-50; 49-2; 49-4; 49-23; 49-24; 49-25; 49-27; 49-28; 49-37; 57-12).

153.    Plaintiffs dispute that ADC staff wear masks and gloves as directed when interacting with inmates including those in restricted housing; they also dispute whether inmates wear masks and gloves as directed (Dkt. Nos. 3-3, ¶¶ 10, 12; 3-4, ¶ 6; 3-5, ¶¶ 7, 11-13; 3-10, ¶ 6; 36-4, ¶¶ 10, 12, 13; 46-1, ¶¶ 9-10; 46-2, ¶¶ 8-10; 46-3, ¶¶ 10-11; 46-4, ¶¶ 10, 12-13; 46-5, ¶¶ 11-12; 46-6, ¶ 8; 46-7, ¶¶ 10-11, 19-20; 46-8, ¶¶ 6-8, 14; 46-9, ¶ 6; 46-10, ¶¶ 7, 10; 46-13, ¶ 9; 46-16, ¶ 7; 46-17, ¶¶ 10-11; 46-23, ¶ 8; 46-26, ¶¶ 12-13; 46-30, ¶ 3; 46-45; 60-2, ¶¶ 10-11).

154.    Plaintiffs maintain that even some medical providers do not wear masks or gloves when interacting with inmates (Dkt. Nos. 3-3, ¶ 13; 3-4, ¶ 7; 60-2, ¶¶ 10-11).

155.    Defendants present evidence of clear barriers installed and efforts to social distance implemented with respect to pill call and medical care (Dkt. Nos. 49-3; 49-32).

156.    On April 9, 2020, at the COVID-19 Pandemic Physicians' Group meeting a doctor reported that University of Arkansas for Medical Sciences ("UAMS") had a problem with prisoners being brought for evaluation with guards who were refusing to wear their masks (Dkt. No. 51-9).

157.    On April 21, 2020, Director Payne sent an email to ADC Wardens, ADC Deputy Wardens, and others titled, "Masks during transports," in which he directed that officers transporting inmates to outside hospitals wear their masks at all times at outside hospitals and specifically stated, "Hospitals are not wanting to treat our inmates because our staff are not following the guidelines that we are sending out." (Dkt. No. 57-8).

158.    As of May 1, 2020, and prior to that date, the DOC required that masks must be worn full time by staff, that staff "in direct care, such as [correctional officers] and healthcare, and in food service positions" are required to wear gloves, and that all also must implement social distancing when possible and practice regular and proper hand washing throughout the day (Dkt. Nos. 49-29; 63, at 144-45).

159.    As of May 1, 2020, the DOC required that inmates and residents "assigned to the kitchen, as office and porters, or to community service in [ADCC] offices" wear aprons and safety glasses (Dkt. Nos. 49-29; 63, at 144-45).

160.    Director Payne testified that he issues directives to Wardens and Deputy Directors, and then Wardens and Deputy Directors monitor compliance (Dkt. No. 63, at 203).

161.    When made aware of a staff member who is not in compliance with directives, normally corrective action in the form of counseling up to termination occurs, depending on the event (Dkt. No. 63, at 203).

162.    According to Director Payne, the only corrective action taken in response to issues around COVID-19 compliance has been a corrective counseling given to the staff members involved in the incident at UAMS (Dkt. No. 63, at 204).

163.     According to defendants, inmates have the ability to report anonymously staff or other inmates for failing to comply with health and safety procedures by anonymously submitting a request for interview form (Dkt. Nos. 36-1, ¶ 51; 63, at 205-06).

164.     Plaintiff Mr. Kent and most of the inmates he knows fear retaliation for speaking out about COVID-19 and asking for help; inmates and family members of inmates reported fearing retaliation, as well, for speaking out about COVID-19 issues (Dkt. Nos. 46-3, ¶ 19; 46-13, ¶ 10; 46-21, ¶ 10; 46-30, ¶ 9).

### 4.     Cleaning And Disinfecting

165.     Defendants maintain that ADC has ordered enhanced cleaning and disinfecting of its units, including barracks and the residential areas, showers, bathrooms, and recreational areas in barracks, as well as hallways, the chow hall, the gym, and other areas (Dkt. Nos. 36-1, ¶¶ 52-53; 49-34; 50-1; 50-8; 50-17; 50-18; 50-19; 50-20; 50-21; 50-22; 50-23; 50-24; 57-1; 57-2; 57-7; 63).

166.     Plaintiffs dispute that enhanced cleaning and disinfecting are occurring (Dkt. Nos. 46-3, ¶ 13; 46-4, ¶ 15; 46-5, ¶ 6; 46-7, ¶ 14; 46-10, ¶ 12; 46-13, ¶ 7; 46-14, ¶¶ 15-19; 46-22, ¶¶ 5-6; 46-24, ¶ 9; 49-27; 49-30; 50-3; 50-12).

167.     Inmates in restricted housing are provided the same cleaning products twice per week to clean their cells (Dkt. No. 36-1, ¶ 55).

168.     Razor Chemical Company's Citrus Breeze III ("Citrus Breeze III") and non-alcohol-based hand sanitizer are provided to inmates in ADC, but, due to security risks, alcohol-based hand sanitizer and chemicals such as bleach are not; inmates in Cummins do not have access to non-alcohol-based hand sanitizer (*Id.*, ¶¶ 54, 56).

169.    There is record evidence that the ADH discussed conferring with Secretary Kelley specifically about the use of alcohol-based hand sanitizer (Dkt. No. 46-50).

170.    Soap, warm water, toilet paper, hand towels, and bath towels are provided free of charge and are accessible by inmates in the ADC; the towels are laundered multiple times per week with inmates receiving clean towels when soiled towels are laundered (Dkt. Nos. 36-1, ¶ 57; 50-14).

171.    The ADC maintains that inmates in general population housing have access to showers throughout the day, and inmates in restrictive housing have access to showers multiple times per week (Dkt. No. 36-1, ¶ 60).

### 5.    Social Distancing

172.    The ADC has implemented procedures to encourage social distancing, including suspending congregational religious services, staggering meal times, requiring certain seating at meal times, postponing non-urgent medical services, modifying inmate transfer procedures, limiting the numbers of inmates going to commissary, recreation, medical pill call and other areas at one time, and educating inmates about the practice (Dkt. Nos. 36-1, ¶¶ 72-74, 80-84; 49-22; 49-24; 49-25; 49-27; 49-28; 50-5; 50-6; 50-7; 50-9; 50-10; 50-13; 50-15; 63, at 176-77).

173.    Plaintiffs dispute the effectiveness of these procedures and whether these procedures are carried out at all (Dkt. Nos. 36-3, ¶¶ 9, 16; 36-4, ¶¶ 6-8; 46-2, ¶¶ 6, 13; 46-5, ¶¶ 4, 7, 8; 46-7, ¶¶ 4, 6-7; 46-8, ¶ 4; 46-9, ¶¶ 4, 9; 46-10, ¶¶ 4-6; 46-14, ¶¶ 13, 35-17; 46-17, ¶¶ 7-8; 46-22, ¶ 9; 46-26, ¶ 11; 46-45).

174.    The ADC concedes that it is difficult to ensure that all inmates remain six feet apart at all times and that making adjustments to achieve this would risk safety and security of the facilities, amounting to what ADC claims would be an undue burden ((Dkt. No. 36-1, ¶¶ 75-76).

175.    The CDC guidance issued March 23, 2020, included the recommendation that those in congregate environments like prions sleep head to foot (Dkt. No. 36-9, at 11).

176.    The record evidence indicates this practice was not implemented in the DOC, if at all, until late April or early May 2020 (Dkt. Nos. 49-14, ¶ 12; 50-16; 57-3, ¶ 9; 57-4, ¶¶ 6-8; 57-6).

177.    Based on Director Payne's testimony at the May 7, 2020, hearing, the ADC at Cummins has utilized library, school, and visitation areas to house inmates in an effort to aid social distancing (Dkt. No. 63, at 210).

### 6.    Application Of COVID-19 Policies And Practices

178.    Due to the differences in inmate populations, ADC and ADCC have different cultures and policies (*Id.*, at 170)

179.    James Banks, Deputy Director of Residential Services for the ADCC, testified that, as to COVID-19 policies and procedures, those have been general overall recommendations and practices (*Id.*, at 184).

180.    Deputy Director Banks testified that, although each facility has its own specifications on emergency plans, overall all of the COVID-19 initiatives have been by the guidelines of the ADH and have applied to both ADC and ADCC facilities (*Id.*).

181.    COVID-19 policies and practices are similar across the DOC, ADC, and ADCC, as the "ADC and [ADCC] facilities follow the guidance provided in [DOC] policies" (Dkt. No. 46-42 (Question 2); 49-4; 49-16; 49-24; 50-2).

### 7.     First Cases Of COVID-19 In ADCC

182.    The first state employee who passed away from COVID-19 was Richard Richardson, a substance abuse counselor who worked for the ADCC at the Central Arkansas Center ("CAC") and who passed away April 9, 2020 (Dkt. No. 63, at 188-89).

183.    According to Deputy Director Banks, many measures to respond to the threat of COVID-19 were put in place at ADCC centers prior to April 9, 2020, and Deputy Director Banks testified that all need to continue to take those measures and to be vigilant moving forward (*Id.*, at 192).

184.    Deputy Director Banks testified about those measures including decreasing incoming residents into ADCC facilities; taking steps to social distance, including head-to-toe staggering of residents on bunks and adjusting the feeding schedule; providing cleaning supplies to residents and tasking an assigned team of residents with responsibility for cleaning, including providing Citrus Breeze III for cleaning; providing soap and water to residents; providing alcohol and non-alcohol-based hand sanitizer to residents; and issuing two masks per resident with the expectation that staff and residents all will wear masks (*Id.*, at 176-82).

185.    Deputy Director Banks testified that every resident at CAC was tested on April 13, 2020 (*Id.*, at 188).

186.    In the 150-bed facility of CAC, 63 residents and 27 staff tested positive for COVID-19 (*Id.*).

187.    Residents who testified positive for COVID-19 were segregated within the CAC and quarantined for more than 14 days, with meals brought to those residents during that time to reduce their movements within the CAC; the COVID-19 positive residents have now been cleared by the ADH (*Id.*, at 182-83).

188.    Staff who tested positive for COVID-19 did not return to work at CAC after testing positive for COVID-19 during their quarantine period, according to Deputy Director Banks (*Id.*, at 194-95).

189.    According to Deputy Director Banks, the last time any testing for COVID-19 was done at CAC was April 13, 2020 (*Id.*, at 188).

190.    Deputy Director Banks testified that no residents have been brought into the CAC facility since that date; no resident has signs or symptoms of COVID-19; no resident is reporting to the infirmary with signs or symptoms of COVID-19; and the ADH has not directed any further testing of residents at the facility (*Id.*).

191.    Deputy Director Banks is aware a large number of people who contract COVID-19 are asymptomatic (*Id.*).

192.    Deputy Director Banks testified that medical staff go around twice per day at CAC and take temperatures and are instructed to look for, listen for, and talk to residents about signs and symptoms of COVID-19 (*Id.*, at 198).

193.    According to Deputy Director Banks, if a resident complains of symptoms of COVID-19, correctional officers have been instructed to take the resident to the medical unit to have him examined; this is based solely on what the resident says, not on what the correctional officer sees; the medical unit staff should then examine the resident and make the determination whether the inmate meets the threshold established by the ADH to be tested for COVID-19 (*Id.*, at 199-200).

194.    It is Deputy Director Banks' understanding that the ADH has given guidance to medical provider Wellpath on when to test for COVID-19 (*Id.*, at 200).

195.     A family member of a COVID-19 positive resident of CAC testified and called into question certain of Deputy Director Banks' representations regarding measures taken by the ADCC (*Id.*, at 28-34).

### 8.     First Cases Of COVID-19 In ADC

196.     On April 12, 2020, the first ADC inmate tested positive for COVID-19 (Dkt. No. 36-1, ¶ 86).

197.     According to defendants, the ADC then implemented new procedures aimed at reducing the spread of the virus as much as possible, including on April 13, 2020, testing every inmate housed in the barracks with the first confirmed positive inmate, randomly testing a sample of other inmates housed in Cummins which confirmed the virus had spread to other housing areas, and placing all barracks on "lockdown" meaning no inmates leave the barracks except to receive medical attention or unless the inmate has tested negative and is assisting daily operations; even then, those inmates assisting daily operations are continually monitored for symptoms of COVID-19 according to defendants (*Id.*, ¶¶ 87-91).

198.     When the first person tested positive at Cummins, samples were taken from inmates housed in the different barracks and then other inmates were tested (Dkt. No. 63, at 217).

199.     ADC tested nearly every inmate in Cummins, with nearly 1,700 inmates tested; according to defendants, inmates have been informed of their test results and given guidance on best practices to avoid transmission and on seeking additional medical treatment, according to defendants (Dkt. Nos. 36-1, ¶¶ 92-93, 99; 36-42).

200.     Plaintiffs dispute that inmates have received tests; received their test results in some cases at all and in other cases timely; and received information on best practices and seeking treatment (Dkt. Nos. 46-13, ¶¶ 4, 8; 46-25, ¶ 4; 46-29, ¶ 4; 46-30, ¶¶ 5-6).

201.    Based on test results, according to defendants, the ADC has restructured housing in compliance with ADH guidelines by separating COVID-19 positive, negative, and indeterminate inmates and assigning staff so that only certain staff work with each of these specific group of inmates to reduce the risk of exposure (Dkt. No. 36-1, ¶¶ 96-98).

202.    Plaintiffs dispute that this always occurs and describe observing one situation in which a COVID-19 positive inmate was housed in the same cell as a COVID-19 negative inmate, despite protest (Dkt. No. 46-6, ¶ 10).

203.    According to defendants, the ADC also conducted contact tracing of people who had contact with infected staff members (Dkt. No. 63, at 217).

204.    Cummins has created a field hospital for COVID-19 positive inmates who need medical care to keep those inmates separated from other inmates who require medical attention at the Cummins infirmary (Dkt. No. 36-1, ¶¶ 100-01).

### 9.    Medical Care

205.    On March 23, 2020, to encourage inmates to seek medical attention if they experienced symptoms of COVID-19, the ADC immediately suspended medical copays inmates would normally have incurred for health services visits; according to defendants, any inmate experiencing symptoms of COVID-19 could seek immediate treatment from Wellpath for free and were informed to report any symptoms to ADC staff or medical personnel as soon as possible (Dkt. No. 36-1, ¶¶ 34, 41, 66-67).

206.    On March 27, 2020, Wellpath sent a memorandum to ADC inmates and ADCC residents informing them that non-urgent on- and off-site medical appointments could be rescheduled to limit the COVID-19 risk and informed them that urgent consultations and emergencies would be treated as usual (Dkt. No. 36-1, ¶ 33; 36-8).

207.    There is record evidence that, on May 1, 2020, defendants changed, or at a minimum considered changing, the policy with respect to medical copays and that only inmates who submit requests related to COVID-19 will no longer be charged a copay, that medical staff will determine if a copay is appropriate, and that inmates must use the grievance process if they believe they are inappropriately charged a copay; defendants indicate this change in policy occurred because "medical departments [were] overwhelmed with requests that [were] not all related to COVID symptoms" (Dkt. No. 57-11).

208.    The ADC has implemented procedures to check inmates' temperatures to monitor for COVID-19 in its facilities ((Dkt. Nos. 36-1, ¶¶ 63-64; 57-5).

209.    Plaintiffs generally agree that procedures to check inmates' temperatures have been instituted, but plaintiffs dispute the timing, consistency, and implementation of those procedures (Dkt. Nos. 46-1, ¶ 7; 46-2, ¶ 12; 46-5, ¶¶ 10, 14; 46-9, ¶ 9; 46-22, ¶ 12; 62-2, ¶ 7).

210.    According to defendants, inmates who register temperatures indicating potential infection are taken to medical services and treated in accord with ADH guidelines (Dkt. No. 36-1, ¶¶ 65, 69-70).

211.    According to defendants, ADC staff have been educated on the symptoms of COVID-19, instructed to watch for symptoms in inmates and staff, and instructed to take inmates exhibiting symptoms to be seen by medical services (Dkt. No. 36-1, ¶ 68).

212.    Plaintiffs dispute that inmates exhibiting symptoms of COVID-19 have received attention or been taken to be seen by medical services (Dkt. No. 46-5, ¶ 5; 46-7, ¶ 9; 46-22, ¶ 4).

213.    Plaintiffs dispute that individuals with COVID-19 symptoms, including those who have tested positive for COVID-19, are being seen, tested, or treated (Dkt. Nos. 46-2, ¶ 4; 46-3, ¶¶ 3-4; 46-4, ¶¶ 4-5; 46-7, ¶ 9; 46-13, ¶ 5; 46-14, ¶¶ 8, 9, 14, 22-24; 46-15, ¶¶ 4-14; 46-18 to 46-

36

20; 46-23, ¶¶ 5-6; 46-24, ¶ 7; 46-25, ¶¶ 3-15; 46-26, ¶¶ 9, 15-17; 46-27, ¶ 5; 46-28, ¶¶ 3-4; 46-30, ¶¶ 7-8).

214.     Family members report inmates suffering from COVID-19 symptoms but receiving no assistance in the barracks from staff or medical providers (Dkt. Nos. 46-15, ¶¶ 4-7, 16-17, 19; 46-24, ¶¶ 7-9).

215.     One family reported that, when inquiring about inmates suffering from COVID-19, "a staff member" informed her that her son, an inmate, "was refusing treatment" for COVID-19, when this is false information; her son reported to her about medical providers barely coming to the barracks to check on inmates and, when they do, standing at the gate of the barracks, calling for inmates to come to the gate to be seen, and if the inmate is too sick to approach the gate they do not treat or check on the inmate (Dkt. No. 46-25, ¶¶ 12-14).

216.     The family member who made this inquiry works for the ADC and even hired an attorney to aid in obtaining information about her son's health, but the attorney received no timely response from defendants to letters or phone calls (Dkt. Nos. 46-25, ¶¶ 1, 11; 46-18; 46-19; 46-20).

217.     From January 1, 2020, to April 1, 2020, approximately 2,899 medical grievances were filed (Dkt. No. 46-41).

218.     According to Director Payne, the ADC does not track how many of its medical grievances are related to inmates reporting COVID-19 symptoms; he testified that this "would be hard" (Dkt. No. 63, at 232).

### 10.     Staffing During COVID-19

219.     ADC has implemented wide-spread testing of its staff (Dkt. Nos. 36-1, ¶ 94; 49-1).

220.    The April 13, 2020, ADH guidance for correctional facilities addresses circumstances under which staff who test positive for COVID-19 are permitted to return to work during their isolation period (Dkt. No. 36-19).

221.    Director Payne testified that having staff who tested positive for COVID-19 but were asymptomatic report to work under the conditions specified by the ADH was done only upon guidance from the ADH with the CDC providing that this is possible if necessary (Dkt. Nos. 49-14, ¶¶ 4-12; 63, at 211).

222.    Director Payne testified that less than ten positive but asymptomatic staff members have actually reported to work at Cummins; those employees did not participate in shift briefings or enter break rooms; those employees wear masks and gloves; and they work only with inmates who have tested positive and are not to interact with other inmates and staff who have not tested positive (Dkt. No. 63, at 211-13).

223.    A staff member tested positive for COVID-19 at Grimes (*Id.*, at 235).

224.    That COVID-19 positive staff member from Grimes was asymptomatic and allowed to work at Cummins while positive (*Id.*).

225.    Grimes is approximately a two-and-a-half-hour drive to Cummins (*Id.*).

226.    All parties acknowledge that certain COVID-19 positive, asymptomatic staff have been reporting to work (Dkt. No. 46-32).

227.    Plaintiffs' medical expert opines that "staff who have or are suspected of having COVID-19, even if asymptomatic, should not be allowed in any ADC facility until they are no longer contagious." (Dkt. No. 46-12, ¶ 5).

228.    Plaintiffs also report apparent staffing shortages with an impact in facility operations, including the feeding of inmates even those in quarantine (Dkt. Nos. 46-14, ¶¶ 28-29; 46-24, ¶ 10; 46-28, ¶ 5; 46-29, ¶¶ 6-10, 14; 46-30, ¶ 10).

### 11.    Release Of Inmates

229.    On April 24, 2020, the Board of Corrections voted to invoke the expanded Emergency Powers Act and certify a list of certain inmates identified as eligible for release, pending the Arkansas Board of Parole's decision; this was not done in response to COVID-19 but measures are being taken to ensure released inmates are screened for COVID-19 and medically cleared before release (Dkt. No. 36-1, ¶¶ 103-09).

230.    Director Payne testified that, as of May 7, 2020, 300 inmates on the list of 1,200 inmates had been released, with the screening process continuing and with the ADC waiting on the Arkansas Board of Parole to conduct screening as well (Dkt. No. 63, at 210)

231.    ADC has no authority to release inmates before the Arkansas Board of Parole has the opportunity to screen the inmate, according to Director Payne (*Id.*).

### III.   Standing

Defendants assert that plaintiffs lack standing to seek preliminary injunctive relief (Dkt. No. 36, at 34-35).   The Court rejects defendants' argument on standing and determines that plaintiffs have standing to seek preliminary injunctive relief.

Defendants maintain that they are taking many of the measures plaintiffs seek.   To the extent plaintiffs seek relief based on the measures defendants are taking, defendants claim plaintiffs lack standing to seek such relief through a preliminary injunction.   Further, to the extent plaintiffs request additional measures beyond those defendants currently are taking, such a request would not preserve the status quo, according to defendants, and they claim it is improper injunctive

relief (*Id.*).  Defendants maintain that directing them to take plaintiffs' additional measures "would fundamentally alter [the status quo] from what it is or ever has been." (*Id.*, at 35).

Plaintiffs dispute that defendants have taken the measures plaintiffs seek in their motion for preliminary injunction and, therefore, argue that they have standing to seek this relief (Dkt. No. 44, at 32-33).  Further, all parties concede defendants have not taken all measures plaintiffs seek.  Therefore, plaintiffs challenge defendants' characterization of the "status quo" (*Id.*, at 33-35).

Plaintiffs agree with defendants that "[t]he primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984).[3]  Plaintiffs maintain that "the 'status quo' for Plaintiffs is not an environment where they are exposed to infection from a lethal virus.  Sanitizing and other measures to eliminate and prevent the spread of a deadly infection would not fundamentally alter the status quo; it would maintain it." (Dkt. No. 44, at 34).  Further, plaintiffs argue that "where the status quo is a condition not of rest, but of action, and the condition of rest . . . will cause irreparable harm, a mandatory preliminary injunction [that requires action] is proper." *Ferry-Morse Seed Co.*, 729 F.2d at 593; *see also N. States Power Co v. Fed. Transit Admin.*, 270 F.3d 586, 587 (8th Cir. 2001); *Mental Health Ass'n v. Heckler*, 720 F.2d 965, 973 (8th Cir. 1983).

---

[3]  This Court acknowledges that *Ferry-Morse Seed* involved a preliminary injunction issued prior to arbitration, but in a later case, the Eighth Circuit observed as to those circumstances:

> In *Ferry–Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589 (8th Cir. 1984), this court did apply the *Dataphase* criteria in a case involving arbitration.  However, the injunction at issue in *Ferry–Morse* was a traditional preliminary injunction.  The district court had not yet determined whether the underlying dispute was arbitrable.  Applying the *Dataphase* criteria, this court affirmed a grant of injunctive relief while the district court addressed the merits of the arbitrability issue.

*Peabody Coalsales Co. v. Tampa Elec. Co.*, 36 F.3d 46, 49 n.7 (8th Cir. 1994).

The Court determines on the record before it at this stage of the proceeding that plaintiffs have standing to maintain their request for preliminary injunctive relief under these circumstances.[4]

## IV.    Legal Standard For Awarding Preliminary Injunctive Relief

In the Eighth Circuit, the same standards are applied to a request for a preliminary injunction as to a request for a temporary restraining order. *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).  A preliminary injunction "is an extraordinary remedy, and the burden of establishing the propriety of  an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (internal citations omitted).  In determining whether to issue a preliminary injunction, a district court should consider:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).  The Court examines the *Dataphase* factors as applied to plaintiffs' request for a preliminary injunction. *See Dataphase*, 640 F.2d at 109.  "While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)) (internal quotations and citation omitted). However, likelihood of success "is insufficient on its own."

---

[4]  The Court does not understand defendants to contest plaintiffs' standing to bring these claims but instead only to contest standing to seek the preliminary injunctive relief plaintiffs request.  The Court determines plaintiffs have standing to bring these claims, even if defendants maintain they have already taken many of the measures plaintiffs seek. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993); *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952); *DeGidio v. Pung*, 920 F.2d 525, 533 (8th Cir. 1990); *Enterprises, Inc. v. Humble*, 622 F.2d 400, 401-02 (8th Cir. 1980).

*Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citing *Watkins*, 846 F.3d at 844). "Even when a plaintiff has a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a threat of irreparable harm." *Id.* The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined." *Watkins*, 346 F.3d at 844.

## V.      Analysis

In ruling on plaintiffs' motion, the Court must consider:  (1) plaintiffs' likelihood of success on the merits; (2) the threat of irreparable harm; (3) the balance of the equities; and (4) the public interest. *See Dataphase*, 640 F.2d at 113. Having conducted this analysis, the Court concludes that the *Dataphase* factors weigh in favor of denying plaintiffs' motion for preliminary injunction.

Plaintiffs have styled this lawsuit as a civil rights action claiming Eighth Amendment violations pursuant to 42 U.S.C. § 1983 for all plaintiffs, a petition for writ of habeas corpus claiming Eighth Amendment violations pursuant to 28 U.S.C. § 2241 for the proposed high risk subclass, and an ADA action pursuant to 42 U.S.C. § 12101 for the proposed disability subclass (Dkt. No. 1, ¶¶ 127-38). The Court examines each claim.

### A.      Likelihood Of Success:  Habeas Corpus Claim

Plaintiffs on behalf of the proposed high risk subclass bring a petition for writ of habeas corpus claiming Eighth Amendment violations pursuant to 28 U.S.C. § 2241. As part of the relief they seek, plaintiffs request that the Court release or transfer to home confinement any person currently in the custody of the ADC pursuant to any recommendation by any Court-appointed special master or expert that has been approved by the Court (Dkt. Nos. 1, ¶ 138; 44, at 96). Based on that request, the Court understands plaintiffs to seek two types of relief. Plaintiffs represent that they "do not seek unconditional release" but instead seek measures such as transferring

vulnerable plaintiffs "to their homes to self-isolate, while still in ADC custody and being monitored via electronic monitoring, until the emergency abates" (Dkt. No. 3, at 56).  Plaintiffs describe this request for relief as seeking a "transfer[] on medical furlough to home confinement" (*Id.*, at 36).   Alternatively, it appears plaintiffs also may seek unconditional release from confinement (Dkt. No. 65, at 41-45).

The parties dispute whether plaintiffs' habeas corpus claims are cognizable under controlling Eighth Circuit precedent.  Further, the parties dispute whether, even if plaintiffs' habeas corpus claims are cognizable, an exhaustion requirement applies to those claims.  The Court acknowledges these disputes.  However, the Court determines that, assuming without deciding that plaintiffs' habeas corpus claims are cognizable and that plaintiffs are able to maintain them in this action, plaintiffs are not likely to succeed on the merits of their Eighth Amendment claims.

There is no indication before the Court that the analysis of plaintiffs' Eighth Amendment habeas claims should be different from the analysis the Court applies to plaintiffs' Eighth Amendment claims brought pursuant to § 1983.  The Court acknowledges that plaintiffs' proposed high risk subclass are intended plaintiffs for the habeas claims.  Under habeas or § 1983, plaintiffs challenge the same alleged conduct by defendants and maintain that it violates the Eighth Amendment.  For the reasons explained in this Order, the Court determines plaintiffs have not demonstrated at this early stage of the litigation that they are likely to succeed on the merits of their Eighth Amendment claims.

### B.      Likelihood Of Success:  Exhaustion Under The PLRA

Plaintiffs' Eighth Amendment claims brought pursuant to § 1983 and ADA claims must adhere to the Prison Litigation Reform Act ("PLRA").[5]  The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Accordingly, plaintiffs' Eighth Amendment claims brought pursuant to § 1983 and ADA claims are governed by the PLRA's exhaustion requirement.  To determine whether plaintiffs are likely to succeed on these claims, the Court first examines the issue of exhaustion, which is an affirmative defense defendants have the burden of pleading and proving.

### 1.      PLRA Legal Standard

On claims covered by the PLRA, prisoner plaintiffs are required to exhaust administrative remedies before seeking a preliminary injunction, just as they are required to do before seeking other remedies.  *See Jones v. Bock*, 549 U.S. 199, 211 (2007); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).  Notably, exhaustion is not a pleading requirement for plaintiffs.  *See Jones*, 549 U.S. at 212 (citing Fed. R. Civ. P. 8(a), (c)).  Instead, "[f]ailure to exhaust is an affirmative defense under the PLRA; 'inmates are not required to specially plead or demonstrate exhaustion in their complaints.'"  *Minter v. Bartruff*, 939 F.3d 925, 928 (8th Cir. 2019) (quoting *Jones*, 549 U.S. at 216); *see also Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005) ("This Circuit considers the PLRA's exhaustion requirement to be an affirmative defense that the defendant has the burden to plead and to prove.").  A complaint may be subject to dismissal for failure to state a claim if the

---

[5]   By its terms, the PLRA does not apply to habeas corpus proceedings challenging the fact or duration of confinement in prison.  18 U.S.C. §§ 3626(a)(3) and (g)(2).  The PLRA's exhaustion requirement also does not apply to habeas corpus proceedings.  42 U.S.C. § 1997e(a).

allegations, taken as true, show that relief is barred by an applicable affirmative defense. *See Jones*, 549 U.S. at 215. Although failure to exhaust is an affirmative defense, the Court must consider at the preliminary injunction stage whether defendants are likely to succeed in establishing this defense. *See Gonzales v. O Centro Espirita Benificente Uniao de Vegetal*, 546 U.S. 418, 428-29 (2006); *see also Junior v. Swain*, No. 20-11622-C, 2020 WL 2161317, at *6-7 (11th Cir. May 5, 2020).

The PLRA requires inmates:  (1) fully and properly to exhaust their administrative remedies as to each claim in the complaint; and (2) to complete the exhaustion process prior to filing an action in federal court. *Johnson v. Jones,* 340 F.3d 624, 627 (8th Cir. 2003). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218.

"Under the PLRA, a prisoner need exhaust only 'available' administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). "[T]he availability of a remedy, according to the Supreme Court, is about more than just whether an administrative procedure is 'on the books.'" *Townsend v. Murphy*, 898 F.3d 780, 783 (8th Cir. 2018) (quoting *Ross*, 136 S. Ct. at 1859). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). A prison administrative procedure or remedy may be "unavailable" for purposes of the PLRA's exhaustion requirement when "despite what regulations or guidance materials may promise[,] it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use"; when the remedy is "essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands"; or when "prison

administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. However, when the administrative procedure grants "authority to take some action in response to a complaint," that procedure is considered "available," even if it cannot provide "the remedial action an inmate demands." *Booth*, 532 U.S. at 736.

The PLRA also provides that "no court shall enter a prisoner release order unless . . . a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right," and defendants have "had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. §§ 3626(a)(3)(A)(i)-(ii).

## 2.    PLRA Exhaustion Analysis

Defendants do not argue that plaintiffs' complaint is subject to dismissal on the basis of exhaustion. Plaintiffs' allegations, if taken as true, do not show that relief is barred by the affirmative defense of exhaustion (Dkt. No. 1). *See Jones*, 549 U.S. at 215. Plaintiffs allege that several, but not all, named plaintiffs filed grievances prior to filing suit (Dkt. No. 1, ¶¶ 16, 18, 19, 23, 25, 27, 30, 32, 34); the complaint is silent as to whether two plaintiffs filed grievances at all (Dkt. No. 1, ¶¶ 20-21; 35).

Defendants do assert plaintiffs' claims subject to the PLRA are barred by exhaustion, and defendants have the burden of establishing this affirmative defense. At this stage of the litigation and on the record before the Court, there are factual disputes regarding whether and to what extent plaintiffs filed grievances, exhausted grievances, and the ADC's administrative remedies were available to plaintiffs. On the record before the Court, and for the reasons explained in this Order, defendants have not demonstrated a likelihood of success on this affirmative defense as to all

46

named plaintiffs.   For this reason, the Court will analyze the merits of plaintiffs' Eighth Amendment claims brought pursuant to § 1983 and ther ADA claims.

### a.      ADC Grievance Process

Defendants maintain that at all times relevant to this lawsuit ADC had a policy relating to grievances filed by inmates housed in its facilities (Dkt. No. 36, at 25).   The version of the policy in effect since December 2, 2019 is AD 19-34.   AD 19-34 applies to both non-medical and medical grievances, the exhaustion process is similar for both types of grievances, and the procedure includes an informal resolution stage and a formal resolution stage.   AD 19-34 provides detailed procedures for how inmates must grieve their problems and complaints with ADC and explains the steps inmates must take in order to exhaust their grievance fully.   Of relevance here, AD 19-34 deems release a non-grievable issue.   ADC's inmate grievance policy also accounts for emergencies and is designed to ensure that ADC staff act quickly to resolve emergencies, defining an "emergency" as "a problem that, if not immediately addressed, subjects the inmate to a substantial risk of personal injury or other serious and irreparable harm, such as physical abuse" (Dkt. Nos. 36, at 27; 36-37, at 8).

### b.      Analysis Of Plaintiffs' Grievances

In part, plaintiffs argue that ADC's grievance procedure does not provide emergency relief that will protect plaintiffs' safety and remedy the alleged violation of their rights under the Eighth Amendment and the ADA.   *See Ross*, 136 S.Ct. at 1859 (directing courts to consider "the facts on the ground" when evaluating exhaustion issues).   Plaintiffs assert that, although "Defendants insist that Plaintiffs must wait to file a federal lawsuit in these emergency circumstances until an appeal to the appropriate Chief Deputy/ Deputy/Assistant Director is filed and resolved," even defendants admit that process "can take more than two months." (Dkt. No. 44, at 56).   Plaintiffs argue that

this "grievance process for an emergency requiring immediate action is plainly not available if it would take two months to address." (*Id.*).

Along with considering these general arguments, the Court has reviewed purported copies of grievances filed by Mr. Frazier, Mr. Hampton, Mr. Kouri, Mr. Neeley, Mr. Otwell, Mr. Serrato, and Mr. Williams (Dkt. Nos. 46-33; 46-34; 46-35; 46-36; 46-37; 46-38; 46-39).  Each grievance outlines some or all of these plaintiffs' alleged health vulnerabilities or disabilities and raises complaints related to social distancing, sanitation, protective gear, and health risks in the light of COVID-19 (*Id.*).

Defendants claim to have no record of Mr. Frazier's grievance, yet there is record evidence of a grievance submitted by Mr. Frazier signed for by an ADC staff member.

Mr. Nickson claims to have filed a grievance on April 17, 2020, though the grievance officer at Cummins has no record of him submitting any such grievance or any COVID-related grievances.  Mr. Nickson also avers that "[a] lot of sergeants have stopped picking up and signing grievances" (Dkt. No. 46-4, ¶ 12).  Mr. Nickson maintains that, when he attempted to submit a grievance, a sergeant refused to sign it on April 25, April 26, and April 27, 2020.

Mr. Stiggers maintains that he completed a grievance on April 18, 2020, but he could not get an appropriate staff member to sign and take the grievance, despite multiple attempts.  He states that nine days later on April 27, 2020, a staff member accepted his grievance.  Mr. Stiggers avers that he received a response to his grievance stating that inmates in restrictive housing cannot get masks, and he asked for his grievance to go to Step Two of the process but that, as of April 29, 2020, he was waiting on the verification that his grievance had gone through to Step Two.  The Cummins' grievance office has no record of Mr. Stiggers filing any such grievance or any COVID-related grievances.

48

Mr. Kent maintains that, on April 21, 2020, he filed an emergency grievance explaining that he has a serious heart condition and pacemaker and asking for a mask to avoid contracting COVID-19.  Mr. Kent states that he received a response April 28, 2020; the facility mailed its response to him stating that, because he was an inmate in SuperMax, he did not need a mask.  By the time Mr. Kent received that response, he maintains he had been transferred out of SuperMax.  Further, Mr. Kent explains that the response was mailed to him, meaning more than 72 hours had passed before he received the response, and that in the ordinary course responses are handed to the inmate who can then inform the officer if he wishes to move to Step Two of the grievance process.  Varner's grievance office has no record of Mr. Kent submitting any COVID-related grievances, though he has filed multiple medical grievances since December 2019.

Mr. Kouri claims he experienced retaliation for filing his first grievance related to COVID-19 issues, and he grieved that retaliation in a second grievance he filed.

Plaintiffs maintain that their concerns regarding COVID-19 rise to the level of an emergency as defined by AD 19-34, meaning "a problem that, if not immediately addressed, subjects the inmate to a substantial risk, of personal injury or other serious and irreparable harm" (Dkt. No. 36-37, at 8).  As early as April 12, 2020, multiple named plaintiffs filed emergency grievances describing the serious risks they believed they were facing as a result of COVID-19.  Record evidence suggests none of named plaintiffs' grievances were treated as emergency grievances; it is unclear whether any COVID-19 grievances were or have been treated as emergency grievances by defendants.

In response to plaintiffs' grievances, prison officials stated that plaintiffs' request for release was not grievable.  Under controlling precedent, courts will "not read futility or other exceptions into statutory exhaustion requirements."  *Booth*, 523 U.S. at 741 n.6 (determining the

PLRA required administrative exhaustion even where grievance process did not permit an award of money damages and the inmate sought only money damages, as long as the grievance tribunal had authority to take some action).

Even acknowledging that AD 19-34 stipulates release is a non-grievable issue, plaintiffs' grievances in the record clearly demonstrate additional concerns raised by plaintiffs regarding COVID-19 besides requests for release. These additional concerns provide the foundation of plaintiffs' Eighth Amendment and ADA claims, and multiple grievances invoke the Eighth Amendment and ADA by name. Plaintiffs contend that, during the days between the filing of these grievances and the filing of their complaint, "the number of COVID-19 cases increased from 1 to approximately 850 in the Cummins Unit." (Dkt. No. 44, at 53 n.10 (citing Emma Tucker, 850 of 1,200 Inmates at Arkansas Prison Reportedly Have Coronavirus, Daily Beast, Apr. 21, 2020, https://www.thedailybeast.com/850-of-1200-inmates-in-arkansas-prison-reportedly-have-coronavirus (last visited May 18, 2020)).

In addition, there is record evidence that Mr. Hampton, Mr. Kouri, Mr. Neely, Mr. Otwell, and Mr. Williams all filed grievances seeking reasonable accommodations under the ADA (Dkt. Nos. 46-2, ¶ 15; 46-4, ¶ 16; 46-5, ¶ 15; 46-10, ¶ 16; 46-34; 46-35; 46-36; 46-37). In response, each received a typed form letter telling them that they needed to be patient and that the Division of Correction was already doing all that they could (Dkt. No. 46-35, at 3). In response to his request for reasonable accommodations, Mr Kouri was told that ADC was already doing everything CDC had recommended and that upper management had directed (Dkt. No. 46-4, ¶ 16).

The Court has considered all record evidence related to the grievance process, plaintiffs' grievances, and exhaustion. At this stage, defendants have not demonstrated on the record evidence currently before the Court that they are likely to succeed in establishing the affirmative

defense that each named plaintiff failed to exhaust his claims pursuant to the PLRA such that the Court need not reach the merits of plaintiffs' Eighth Amendment claims brought pursuant to § 1983 and their ADA claims.  On this record, the Court determines that genuine issues of material fact remain in dispute as to whether the administrative remedies offered by defendants are "unavailable" or "not capable of use" as interpreted by the Supreme Court.  *See Ross*, 136 S. Ct. at 1859-60.  Further, the Court concludes that, at least at this stage of the proceeding, there are disputes regarding whether and to what extent plaintiffs filed grievances, exhausted grievances, and the ADC's administrative remedies were available to plaintiffs.

### 3.    PLRA's Impact On Prisoner Transfer Or Release

Further, the Court determines that, regardless of the merits of plaintiffs' claims subject to the PLRA, the PLRA prevents this Court from granting temporary release or transferring to home confinement members of the proposed disability subclass who bring Title II ADA claims seeking such relief.  As stated above, the PLRA governs plaintiffs' ADA claims.  The PLRA provides that "no court shall enter a prisoner release order unless . . . a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right," and defendants have "had a reasonable amount of time to comply with the previous court orders."  18 U.S.C. §§ 3626(a)(3)(A)(i)-(ii).  The Court has entered no such previous order.  Additionally, the PLRA provides that "only" a "three-judge court" can enter a prisoner release order, meaning this Court on its own lacks the authority to issue "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population" to the extent plaintiffs seek release of any members of the disability subclass.  18 U.S.C. §§ 3626(a)(3)(B), (g)(4).  Accordingly, regardless of the merits of plaintiffs' ADA claims,

under the PLRA, the Court may not at this time issue any prisoner release order sought by plaintiffs on behalf of the disability subclass in the instant motion.

### C.      Likelihood Of Success:  Eighth Amendment Claims

Plaintiffs allege that defendants' failure to provide adequate protection and, if necessary, medical care in response to the rapid spread of COVID-19 constitutes deliberate indifference to the serious medical needs of incarcerated individuals in violation of the Eighth Amendment (Dkt. No. 1, ¶ 129).  Additionally, plaintiffs allege through their habeas claims that defendants are holding members of the proposed high risk subclass in violation of the Eighth Amendment (*Id.*, ¶ 138).  The Court addresses whether plaintiffs' habeas claims are cognizable elsewhere in this Order.  For the following reasons, although certain aspects of the record evidence before the Court give it pause, the Court determines on the record evidence as a whole that plaintiffs have not demonstrated that they are likely to succeed on the merits of their Eighth Amendment claims at this early stage of the proceeding.

### 1.      Deliberate Indifference Standard

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Helling*, 509 U.S. 36.  It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions."  *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982).  State officials have a responsibility under the Eighth Amendment to "provide humane conditions of confinement," "ensure that inmates receive adequate food, clothing, shelter, and medical care," and "'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-57 (1984)).  The Eighth Amendment standard for conditions of confinement asks whether defendants acted with "deliberate indifference."  *Davis v. Oregon Cty.*, 607 F.3d 543, 548 (8th Cir. 2010).

The Eighth Amendment forbids deliberate indifference to conditions that "pose an unreasonable risk of serious damage to . . . future health." *Helling*, 509 U.S. at 35; *see also DeGidio*, 920 F.2d at 533 (continuing failure by prison officials to institute a system to prevent the spread of tuberculosis violated the Eighth Amendment); *Brown v. Moore*, 93 F. Supp. 3d 1032, 1041 (W.D. Ark. 2015) ("Plaintiff need not have contracted the disease for an actionable [Eighth Amendment] claim to be stated."). Deliberate indifference has both an objective and subjective component. *See Davis*, 607 F.3d at 548. The objective component considers "whether a substantial risk to the inmate's safety existed," and the subjective component considers "whether the officer had knowledge of the substantial risk to the inmate's safety but nevertheless disregarded it." *Id.* This "subjective component of deliberate indifference requires proof that [defendants] 'actually knew of and recklessly disregarded' this substantial risk of serious harm" *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (quoting *Pietrafeso v. Lawrence Cty., S.D.*, 452 F.3d 978, 983 (8th Cir. 2006)). "In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.'" *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)).

Under controlling precedent, the deliberate indifference standard may be satisfied when officials respond to an infectious disease "outbreak with a series of negligent and reckless actions." *DeGidio*, 920 F.2d at 533. The Court stresses that these objective and subjective components should not be "collapsed" into one another and remain separate but related inquiries. *See Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317, at *4 (11th Cir. May 5, 2020); *see also Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425, at *2-3 (5th Cir. Apr. 27, 2020) (separating the

"objective" prong of the deliberate indifference test from the "subjective" consideration of whether defendants' measures were inadequate).

The district court may consider either the objective or subjective prong first and, if there is a failure of proof on the first prong the court chooses to consider, it need not proceed to the other prong. *Helling*, 509 U.S. at 35. This Court considers the subjective prong first, determines that plaintiffs are unlikely to succeed on the merits of the subjective prong of their Eighth Amendment claims, and declines to consider at this stage plaintiffs' likelihood of succeeding on the objective prong of the Eighth Amendment.

## 2.     Subjective Prong

As to the subjective prong, plaintiffs assert that defendants have failed to address the COVID-19 risk despite being aware of it (Dkt. No. 3, at 41-45). Plaintiffs also argue that defendants can address this matter by ensuring that proper cleaning supplies are available, suitable distance between prisoners is possible, regular care is provided to those infected, and releasing on at least a temporary basis while maintaining ADC monitoring extremely vulnerable individuals who cannot be safely confined in a congregate setting (*Id.*, at 43-44). Plaintiffs assert that defendants must institute immediate testing, immediate screening, appropriate use of quarantine, and significant improvements in hygiene, among other things (*Id.*, at 45). In short, plaintiffs argue that "[d]efendants' policies fall well short of CDC guidance with respect to social distancing and sanitation to reduce the risk of COVID-19 transmission" (Dkt. No. 44, at 44).

In his testimony at the preliminary injunction hearing, Eldon Vail, who formerly served as the Secretary for the Washington State Department of Corrections, has over 35 years of experience working in corrections, and testified as an expert witness on behalf of plaintiffs, offered his opinions regarding defendants' actions with regard to COVID-19 (Dkt. No. 63, at 50, 56). Overall,

Secretary Vail opined that the ADC was slow to act in response to COVID-19; that the ADC has now has taken some actions but that those actions were taken later than they needed to be; and that there is a disconnect between what actions the ADC reports taking and the actions plaintiffs report experiencing and observing in their declarations (Dkt. No. 63, at 56).

All parties agree that defendants have taken some action in response to COVID-19. At this stage of the proceedings, the record evidence suggests that, over time, defendants have adopted policies and practices in response to COVID-19. To the extent plaintiffs' argument is that defendants did not act quickly enough throughout the events leading up to or since the filing of their complaint in this action, a request for preliminary injunctive relief is moot if the injunctive relief sought would no longer have any meaning for the party seeking it. *See Forbes v. Ark. Educ. Television Comm. Network Found.*, 982 F.2d 289, 289 (8th Cir. 1992) (per curiam); *McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1210 (8th Cir. 1992). In other words, the Court will not grant preliminary injunctive relief to direct defendants to put into place policies and practices the record evidence establishes are already in place.

Plaintiffs challenge whether defendants' policies and practices are sufficient and whether defendants have implemented effectively those policies and practices. To the extent plaintiffs fault defendants for failing to implement effectively the policies and practices put into place, plaintiffs have sued defendants in their official capacities as policy makers. In general, state actors may not be sued under § 1983 for an injury inflicted solely by its employees or agents on a *respondeat superior* theory of liability. *See Monnell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694, (1978). However, a state actor may be liable for inadequate training or supervision of its employees "where (1) the . . . training practices [were] inadequate; (2) the [state actor] was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train

reflects a deliberate or conscious choice by [the state actor]'; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury." *Andrews v. Fowler,* 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting *City of Canton v. Harris,* 489 U.S. 378, 389 (1989)); *see also Parrish v. Ball*, 594 F.3d 993, 997-98 (8th Cir. 2010).

Even if certain employees or agents received training that was minimal at best, that finding alone will not satisfy a § 1983 claim for failure to train. *City of Canton,* 489 U.S. at 390-91. Instead, to satisfy the standard, a § 1983 plaintiff must demonstrate that in the light of the duties assigned to specific employees and agents the need "for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.  A § 1983 plaintiff must demonstrate that the state actor "'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'" *Andrews,* 98 F.3d at 1076 (quoting *Thelma D. v. Bd. of Educ.,* 934 F.2d 929, 934 (8th Cir. 1991)).

Having reviewed all of the record evidence before it, at this stage of the litigation, the Court concludes that plaintiffs have not demonstrated a likelihood of success on the subjective prong of their Eighth Amendment claims.  The Court has considered all arguments raised by the parties in reaching its determination and addresses specific issues here.

### a.      Visitors To And Movement Within Facilities

The record indicates that the ADC has taken steps to limit visitors to and movements within facilities and that steps have been taken in regard to incoming inmates.  Plaintiffs dispute whether practices regarding incoming inmates or residents, and the transfers or movements of inmates or residents, changed or changed sufficiently in response to COVID-19.  Based on the record

evidence at this stage, the Court determines that plaintiffs have not demonstrated a likelihood of success on their Eighth Amendment claims based on this allegation.

### b.      Information And Education

By mid-March 2020, the ADC had taken steps to inform inmates, staff, and visitors about COVID-19 and the topics discussed in the ADH guidance.  Shortly thereafter, the ADC posted signage throughout its facilities, in both English and Spanish, informing inmates and staff to wash their hands often with soap and water for at least 20 seconds; wear facemasks as much as possible; avoid touching their eyes, nose, or mouth without cleaning their hands first; clean their personal belongings; and keep as much distance between each other as possible.  Defendants have also utilized the Morning Show to provide COVID-19-related information to ADC inmates.  ADC inmates also are permitted to watch Governor Hutchinson's briefings on COVID-19.

While plaintiffs may disclaim the effectiveness of these measures, plaintiffs do not deny that these measures have been taken, and the Court determines plaintiffs have not demonstrated a likelihood of success on their Eighth Amendment claims based on this allegation.

### c.      Personal Protective Equipment

Director Payne testified that defendants began distributing masks to ADC inmates in March—prior to the first positive COVID-19 test at Cummins—and that well over 40,000 masks have been distributed, leaving each ADC inmate housed in general population with two masks. The ADC intends to create a total of 80,000 masks.  The Court acknowledges that defendants do not provide masks to inmates in restricted housing; defendants explain this action by claiming that these inmates do not come into contact with other inmates, have limited exposure to staff, and therefore are not issued masks as a result.  Plaintiffs dispute how frequently inmates in restricted

housing interact with others.  Further, there is record evidence that Mr. Frazier, an inmate in restricted housing, made his own mask from a t-shirt.

There is record evidence that ADC staff are directed to wear masks and gloves when interacting with inmates, including those in restricted housing, and ADC staff and inmates have been told best practices for wearing masks.  Defendants do not dispute that compliance with ADC staff wearing masks has been an issue.  It gives the Court pause that, on April 9, 2020, a doctor reported at the COVID-19 Pandemic Physicians' Group meeting that UAMS had a problem with prisoners being brought for evaluation with guards who were refusing to wear their masks.  It also gives the Court pause that, on April 21, 2020, Director Payne sent an email to ADC Wardens, ADC Deputy Wardens, and others directing that officers transporting inmates to outside hospitals wear their masks at all times and specifically stated, "Hospitals are not wanting to treat our inmates because our staff are not following the guidelines that we are sending out." (Dkt. No. 57-8).

Along with this record evidence, Director Payne testified that remedial measures exist for staff who disregard COVID-19 directives, ranging from corrective counseling to termination.  He also explained that, after an issue was reported to defendants regarding staff members not wearing masks, those staff members received corrective counseling.

The Court acknowledges that plaintiffs present other record evidence in support of their claim that ADC staff do not wear masks and gloves as directed when interacting with inmates, including those in restricted housing, and that inmates do not wear masks as directed.

As of May 1, 2020, and prior to that date, the DOC required that masks must be worn full time by staff, that staff "in direct care, such as [correctional officers] and healthcare, and in food service positions" are required to wear gloves, and that all also must implement social distancing when possible and practice regular and proper hand washing throughout the day (Dkt. Nos. 49-29;

63, at 144-45).  Further, as of May 1, 2020, the DOC required that inmates and residents "assigned to the kitchen, as office and porters, or to community service in [ADCC] offices" wear aprons and safety glasses (Dkt. Nos. 49-29; 63, at 144-45).

Inmates have the ability to report anonymously staff or other inmates for failing to comply with health and safety procedures by anonymously submitting a request for interview form, according to defendants.  Although there is record evidence to suggest inmates are reluctant to make such complaints, that record evidence is non-specific and not well-developed at this stage.

On the record as a whole, the Court determines plaintiffs have not demonstrated a likelihood of succeeding on the subject prong of their Eighth Amendment claims against the named defendants based on these allegations.

### d.      Cleaning And Disinfecting

Defendants maintain that ADC and ADCC have ordered enhanced cleaning and disinfecting of its units, including barracks and the residential areas, showers, bathrooms, and recreational areas in barrack, as well as hallways, the chow hall, the gym and other areas; there is record evidence to support that such orders have been given.  Although plaintiffs dispute that enhanced cleaning and disinfecting are occurring, they do not challenge specifically the orders given by ADC and ADCC.

Plaintiffs do specifically assert that defendants are not using any "EPA-registered disinfectants effective against the virus that causes COVID-19," in ADC facilities (Dkt. No. 65, at 19).  Defendants have distributed Citrus Breeze III for cleaning and sanitation.  The EPA's website has a page titled "List N:  Disinfectants for Use Against SARS-CoV-2," which lists products that "meet the EPA's criteria for use against SARS-CoV-2, the virus that causes COVID-19."  *Pesticide    Registration,    List    N:        Disinfectants    for    Use    Against    SARS-CoV-2,*

https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2 (last visited

May 11, 2020). The List N webpage states that individuals hoping to find a product should "enter

the first two sets of its EPA registration number into the search bar below." *See id.* The website

further provides an example that "if EPA Reg. No. 12345-12 is on List N, you can buy EPA Reg.

No. 12345-12-2567 and know you're getting an equivalent product." *See id.* Citrus Breeze III's

EPA Registration Number is 47371-131-70332. *Razor Citrus Breeze III*,

http://www.razorchemical.com/wp-content/uploads/2020/03/127667-1-CitrusBreeze3-Net-

Contents-v2.pdf (last visited May 18, 2020). A search for Registration Number 47371-131, in

accordance with the website's instructions, reveals a product named HWS-64 included on List N.

Per the EPA, EPA Registration Number 47371-131-70332 is an "equivalent product" to EPA

Registration Number 47371-131, which the Court understands to mean that Citrus Breeze III

suffices as or is an equivalent to an EPA-approved disinfectant based on these representations on

the website. Additionally, Razor Chemical has represented that its Citrus Breeze III is EPA-

approved for combatting COVID-19 and certified as such via the EPA's Emerging Pathogen

Policy (Dkt. No. 49-33). As a result, at least on this record evidence, plaintiffs have not

demonstrated a likelihood of succeeding on this claim regarding disinfectant.

On the issue of alcohol-based sanitizer, the CDC guidelines are clear that correctional

facilities should "consider relaxing restrictions on allowing alcohol-based hand sanitizer in the

secure setting where security concerns allow. If soap and water are not available, CDC

recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60%

alcohol" (Dkt. No. 36-9, at 8). Additionally, the ADH only recommends alcohol-based sanitizer

"when practical from security and supply standpoint and under staff control" (Dkt. No. 36-20, at

1). Thus, alcohol-based sanitizer is a secondary option to soap and water, and facilities are only

encouraged to consider relaxing restrictions regarding alcohol-based sanitizer where security concerns allow.  Although plaintiffs argue that other states have implemented alcohol-based hand sanitizer in prisons, on the record as a whole at this stage, plaintiffs have not demonstrated a likelihood of succeeding on their claim that defendants' decision not to make alcohol-based sanitizer available constitutes deliberate indifference, where record evidence indicates that ADC inmates have access to soap—the CDC's preferred method of handwashing—and where defendants believe that security concerns do not allow for the introduction of alcohol-based sanitizer into ADC facilities.

### e.   Social Distancing

As to social distancing, the CDC guidelines themselves acknowledge that social distancing "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." (Dkt. No. 36-9, at 11).   The record evidence shows that defendants have heeded the following CDC recommendations:  "[s]tagger meals"; "[s]uspend group programs where participants are likely to be in closer contact than they are in their housing environment"; and "[a]rrange bunks so that individuals sleep head to foot to increase the distance between them" (*Id.*).   Defendants have suspended visitation, and incoming inmates are housed separately from existing inmates for an isolation period of 14 days.  Only one barracks goes to the chow hall or uses the hallways at a time, and Director Payne testified that the Cummins has started using non-living quarters such as the school, library, and visitation area to provide temporary housing, which Mr. Vail called "better late than never" (Dkt. No. 63, at 128, 210).  In Cummins where inmates have tested positive with COVID-19, inmates who have tested negative are isolated generally from those who have tested positive and the staff who serve them based on the record currently before the Court.

It gives the Court pause that the CDC guidance issued March 23, 2020, included the recommendation that those in congregate environments like prions sleep head to foot.  Despite this, the record evidence indicates this practice was not implemented in the DOC, if at all, until late April or early May 2020.  Defendants offer no explanation for why the recommendation was not implemented earlier.  Despite this, the record suggests defendants have implemented this practice to some extent now.

### f.      Medical Care

Plaintiffs also challenge the testing and medical care inmates receive in regard to COVID-19.  Generally, to prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs.  *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997).  This requires a two-part showing that:  (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it.  *Id.; see also Farmer,* 511 U.S. 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).

The law defines a serious medical need as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995) (citation omitted).  A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary.  *Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th Cir. 2004).  An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.  *Lenz v. Wade,* 490 F.3d 991, 995 (8th Cir.2007).  Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the

inmate's serious medical need are questions of fact. *Coleman*, 114 F.3d at 785; *see also Schaub v. VonWald*, 638 F.3d 905, 914–15 (8th Cir. 2011).

Here, plaintiffs have not sued the contracted provider for medical care at the ADC, Wellpath. Instead, plaintiffs have sued defendants in their official capacities as policy makers. While a policy maker or supervisor's general responsibility for supervising operations of a prison is insufficient to establish personal involvement giving rise to liability under § 1983, *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir. 1987), individuals personally involved in decisions regarding treatment and care become responsible for seeing that the inmate is adequately cared for once his needs are brought to the individual's attention, *see Schaub*, 638 F.3d at 918; *Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010) (noting that even though defendant prison supervisor was "not a medical doctor and does not personally treat inmates' medical needs, . . . [t]here is no doubt that [defendant] has a constitutional duty to see that prisoners in his charge who need medical care receive it."); *see also West v. Atkins,* 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody."). The Court recognizes the well-established proposition that, although prison officials are not doctors, when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction. *Schaub*, 638 F.3d at 918 n.6.

The Court also is mindful that, in *DeGidio v. Pung*, when confronted with § 1983 claims over the tuberculosis epidemic, the district court observed:

> No one claims ultimate responsibility for the many supervisory functions within the health services unit. The passing of blame and responsibility between the Department of Health, the administrative director of health services, and the staff physicians has been discussed at length earlier. Each person describes his or her role narrowly, and disclaims ultimate responsibility for directing the effort at controlling tuberculosis. Plaintiffs have shown through the great weight of the

> evidence that this failure of coordination persists and is a reason why Stillwater's
> response to the tuberculosis epidemic lagged.

704 F. Supp. 922, 957 (D. Minn. 1989), *aff'd*, 920 F.2d 525 (8th Cir. 1990).  The Court has these

precedents in mind when reviewing the record evidence before it at this stage of the proceeding.

Record evidence suggesting inmates with claimed symptoms of COVID-19 being denied

care and testing, record evidence suggesting a lack of follow-up evaluation or care for those with

symptoms or reported COVID-positive cases, and record evidence suggesting inmates with

claimed symptoms of COVID-19 being too weak to care for themselves or to seek medical care

for themselves with no aid from prison staff or medical staff gives the Court pause.  It is unclear

from this record how frequently these events have occurred, if at all; whether these events have

given rise to medical grievances related to COVID-19 testing and treatment; and where these

inmates were housed when certain of these claimed events occurred—barracks, restricted housing,

infirmaries, or isolated COVID-19 treatment units.  Defendants maintain that ADC staff are

directed to look for symptoms of COVID-19 and to bring inmates to the medical unit for

assessment and attention.  Further, they maintain that ADH along with Wellpath are determining

whether COVID-19 testing should be conducted.  Having considered all of the record evidence

before it, the Court determines that, at this stage, plaintiffs have not demonstrated a sufficient

likelihood of prevailing on this aspect of their Eighth Amendment claims against these defendants

to warrant injunctive relief.

### g.    Staffing During COVID-19

Based on record evidence, the ADC has implemented wide-spread testing of its staff.  At

the preliminary injunction hearing, plaintiffs' expert witness Mr. Vail was critical of the practice

of bringing COVID-19 positive but asymptomatic staff to work with COVID-19 positive inmates,

under certain conditions.  The ADH issued guidance with respect to this staffing issue on April 13,

2020 (Dkt. No. 36-19). Director Payne testified that less than ten COVID-19 positive but asymptomatic staff members have actually reported to work at Cummins, and then those staff members were restricted in their movements, were required to wear masks and gloves, and only worked with other inmates and staff positive for COVID-19. In addition, there is evidence that a COVID-19 positive staff member from Grimes was asymptomatic and allowed to work at Cummins while positive. Director Payne testified that having staff members who tested positive but were asymptomatic report to work under the conditions specified by the ADH was done only upon guidance from the ADH with the CDC providing that this is possible if necessary.

All parties acknowledge that certain COVID-19 positive, asymptomatic staff have been reporting to work. Plaintiffs also report apparent staffing shortages with an impact in facility operations, including the feeding of inmates even those in quarantine. The Court acknowledges that plaintiffs submit an expert opinion with respect to COVID-19 positive staff reporting to work, but that opinion does not address the specific circumstances alleged here with respect to COVID-19 positive, asymptomatic staff reporting to work with COVID-19 positive, asymptomatic inmates under the stated conditions and with the ADH's requirements imposed.

At this stage of the litigation, on the limited record before it, the Court determines plaintiffs have not demonstrated a likelihood of success on their claim that this staffing practice amounts to subjective deliberate indifference so as to entitle them to preliminary injunctive relief.

### h. Release

On April 24, 2020, the Board of Corrections voted to invoke the expanded Emergency Powers Act and certify a list of certain inmates identified as eligible for release, pending the Arkansas Board of Parole's decision. As of May 7, 2020, record evidence indicates that 300 inmates on the list of 1,200 inmates had been released, with the screening process continuing, and

the ADC waiting on the Arkansas Parole Board to conduct screening as well. The ADC has no authority to release inmates before the Arkansas Board of Parole has the opportunity to screen the inmate, according to Director Payne. Further, according to defendants, none of this was done in response to COVID-19, but measures are being taken to ensure released inmates are screened for COVID-19 and medically cleared before release. These facts weigh into the Court's overall analysis and determination.

The Court is mindful of the numbers of inmates and staff diagnosed with COVID-19 and that those numbers have increased during the few weeks this case has been pending. On this record, at this stage of the litigation, the Court cannot conclude that such an outbreak necessarily arises from deficiencies sufficient to establish plaintiffs' Eighth Amendment claims.

Having considered all record evidence before, the Court determines that plaintiffs have not demonstrated a sufficient likelihood of success on their Eighth Amendment claims so as to be entitled to preliminary injunctive relief.

### D.      Likelihood Of Success:  Title II ADA Claims

Plaintiffs claim that defendants have intentionally discriminated against named plaintiffs and members of the proposed disability subclass by denying them reasonable accommodations that have been recommended by the CDC and are necessary to protect them from COVID-19 (Dkt. No. 1, ¶ 140). In their complaint, plaintiffs assert that reasonable accommodations necessary to protect incarcerated individuals with disabilities include, but are not limited to: access to alcohol-based sanitizer; provision of cleaning supplies, including products containing bleach, adequate to clean individuals' housing areas; provision of PPE; access to antibacterial hand soap and towels to enable individuals to wash their hands as necessary; implementation of social distancing measures in all locations where incarcerated people are required to congregate; and release or

transfer to home confinement if social distancing is not practicable (*Id.*, ¶ 141).  Plaintiffs claim

that defendants have violated the ADA by failing to provide plaintiffs in the disability subclass

with reasonable accommodations that would allow them to access safely their facilities and failing

to release incarcerated people with disabilities or transfer to home detention, where they could

quarantine safely during the pandemic (Dkt. No. 44, at 49).

### 1.     Legal Standard For Title II ADA Claims

The ADA prohibits public entities, including state prisons, from discriminating on the basis

of disability.  *See, e.g., Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).  To assert a claim

under Title II of the ADA, plaintiffs must show that:  (1) each plaintiff is a "qualified individual

with a disability"; (2) defendants denied plaintiffs "the benefits of the services, programs, or

activities of a public entity"; and (3) plaintiffs were discriminated against "by reason of" their

disabilities.  *See* 42 U.S.C. § 12132; *see also Folkerts v. City of Waverly*, 707 F.3d 975, 983 (8th

Cir. 2013).  A "qualified individual with a disability" means an individual "with a disability who,

with or without reasonable modifications . . . , meets the essential eligibility requirements for the

receipt of services or the participation in programs or activities provided by a public entity."  *See*

42 U.S.C. § 12131(2).  The Eighth Circuit construes broadly the "services, programs, or activities"

language in the ADA to encompass "anything a public entity does."  *Bahl v. Cty. of Ramsey*, 695

F.3d 778, 787 (8th Cir. 2012) (citations omitted).  State actors may rely on the "reasonable

assessments" of their own professionals in determining whether an individual is qualified for

services and programs and whether "reasonable modifications" are available to prevent

discrimination.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999) (citing 28 C.F.R.

§§ 35.130(b)(7), (d)).  Plaintiffs need not plead exclusion from participation in or denial of benefits

offered to state a claim under Title II of the ADA.  *See, e.g., Loye v. Cty. of Dakota*, 625 F.3d 494,

496 (8th Cir. 2010) ("[W]e construe Title II of the ADA as requiring that qualified persons with disabilities receive 'meaningful access' to a public entity's services, not merely 'limited participation.'").

The regulations implementing Title II of the ADA require that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). This is considered an affirmative defense to an ADA Title II claim; the ADA regulations explicitly provide that the entity must demonstrate that making the modification would fundamentally alter the subject program. 28 C.F.R. § 35.130(b)(7). For this affirmative defense, the entity may demonstrate that the requested action "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3). The Eighth Circuit has noted that whether a requested accommodation is reasonable or imposes an undue burden on defendants should be considered in the light of "the heightened security concerns of a prison." *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir. 1999) (examining Title II ADA claim against prison). Generally, ADA plaintiffs are entitled to reasonable accommodations, which may not always be plaintiffs' preferred or ideal accommodations. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (8th Cir. 2011); *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007).

Plaintiffs may prove unlawful discrimination under Title II by offering evidence of disparate treatment based on disability or by showing that a facially-neutral policy has the "effect of discriminating against the disabled or the severely disabled." *DeBord v. Bd. of Educ.*, 126 F.3d 1102, 1105 (8th Cir. 1997). In regard to an ADA failure-to-accommodate claim, ""the

'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations . . . .  The known disability triggers the duty to reasonably accommodate and, if the [defendant] fails to fulfill that duty, [the Court] do[es] not care if he was motivated by the disability."  *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004) (internal citation omitted); *see also Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1040 (N.D. Ia. 2011) (failure to accommodate is an independent basis for liability under the ADA, but accommodation is only required when necessary to avoid discrimination on the basis of disability, and accommodation must be reasonable) (citing 28 C.F.R. § 35.130(b)(7)).  Though a plaintiff seeking compensatory money damages under Title II must show intentional discrimination on the basis of disability, a plaintiff seeking prospective injunctive relief is not required to make this showing.  *See Meagley v. City of Little Rock*, 639 F.3d 384, 388-89 (8th Cir. 2011).

### 2. Analysis Of Title II ADA Claims

On this record, and at this stage of the litigation, the Court concludes that plaintiffs have failed to demonstrate a likelihood of success on their claims under Title II of the ADA.

Assuming *arguendo* that named plaintiffs and proposed members of the disability subclass are qualified individuals with a disability, and there is some dispute in the record evidence at this stage with respect to that point, the Court concludes that plaintiffs are not likely to succeed on their claim that defendants' action or inaction in combatting the COVID-19 risk in DOC facilities has had the effect of denying plaintiffs in the disability subclass "the benefits of the services, programs, or activities" within the ADC "by reason of" those plaintiffs' disabilities.  *See* 42 U.S.C. § 12132. The Court has examined plaintiffs' claimed deficiencies in defendants' response to the COVID-19 risk when examining plaintiffs' Eighth Amendment claims and determined plaintiffs have not demonstrated a likelihood of success on those claims.  The Court acknowledges that the standard

applied to evaluate Title II ADA claims and Eighth Amendment claims may differ, *see United States v. Georgia*, 546 U.S. 151 (2006), but the Court does not see which reasonable accommodations have been denied for plaintiffs in the proposed disability subclass.  Further, on the record currently before it, to the extent plaintiffs requested and were denied reasonable accommodations, the Court is unconvinced that defendants denied those requests because of plaintiffs' alleged disabilities.

### E.    Threat Of Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Ia. Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).  A plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (citations omitted).  The Eighth Circuit has held that it is "no question . . . that irreparable injury exist[s]" when the harm contemplated is "a life threatening illness." *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993); *see also Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003) ("[T]he danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury.").

Plaintiffs' alleged harm is both imminent and irreparable, as plaintiffs face a risk of severe illness or possible death in the light of COVID-19.  Based on allegations in plaintiffs' complaint, one of the named plaintiffs has already tested positive for COVID-19, along with hundreds more

individuals in ADC facilities.  Plaintiffs face the progression of the COVID-19 pandemic in a congregate environment.  The irreparability of this harm is magnified by the fact that no known vaccine or cure for COVID-19 exists at this time.  Accordingly, the Court finds the threat of irreparable harm to cut in plaintiffs' favor.

### F.       Balance Of The Equities

"The third *Dataphase* factor requires a district court to consider the balance between the harm to the movant and the injury that granting the injunction will inflict on other interested parties." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993) (citing *Dataphase*, 640 F.2d at 114).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113 (footnote omitted).  "No single [*Dataphase*] factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (citations omitted).

The balance of the equities at this stage is a neutral factor in this analysis.  Plaintiffs face irreparable harm to their constitutional rights and their health, including severe illness, long-term health effects, and possible death.  Plaintiffs argue that there is not much potential harm to defendants in granting plaintiffs' requested relief in the instant motion other than potentially increased costs and energy, which are insufficient to justify a denial of plaintiffs' motion. Defendants maintain that requiring defendants to implement steps they already have taken as demonstrated by record evidence is unnecessary and that requiring them to implement the steps requested that go beyond those already implemented would impose undue costs, harms, burdens, and disruptions in running the ADC facilities.  Further, defendants argue that the State of Arkansas

has a significant interest in preserving the health, welfare, and safety of its citizens, whether in prison or out of prison, and that its choices not to release certain ADC prisoners serves that interest. There are strong considerations that favor both sides in this dispute.

### G.    Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The public is certainly served by the preservation of constitutional rights. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (internal quotations and citations omitted). However, in assessing the public interest, the Supreme Court has also cautioned that federal courts must tread lightly when it comes to questions of managing prisons, particularly state prisons. States have a strong interest in the administration of their prisons, which is "bound up with state laws, regulations, and procedures." *Woodford v. Ngo*, 548 U.S. 81, 94 (2006). The Supreme Court has stated that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973); *see also Turner v. Safley*, 482 U.S. 78, 85 (1987) ("[W]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities."); *Meachum v. Fano*, 427 U.S. 215, 229 (1976) ("Federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States."). Courts accordingly should give deference to prison authorities. *See Turner*, 482 U.S. at 84-85.

The public interest in this case cuts both ways. In plaintiffs' favor, the public interest is served by protecting plaintiffs and the putative class members from COVID-19 and its possible

consequences.   Further, minimizing the spread of COVID-19 both within DOC facilities and among communities surrounding and interacting with those facilities serves the public interest. Efforts to stop the spread of COVID-19 and promote public health appear to be in the public interest.  In defendants' favor, the public interest also commands respect for federalism and comity. These factors dictate that the Court should approach intrusion into the core activities of the state's prison system with caution.

## VI.     Conclusion

For the above reasons, the Court denies plaintiffs' motion for preliminary injunction (Dkt. No. 2).

It is so ordered this 19th day of May, 2020.

_____
Kristine G. Baker
United States District Judge