## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION



**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL **1 3** 2020



**JAMES W. McCORMACK, CLERK**
By:_____
                    **DEP CLERK**

---

NICHOLAS FRAZIER, ALVIN HAMPTON,
MARVIN KENT, MICHAEL KOURI, JONATHAN
NEELEY, ALFRED NICKSON, HAROLD ("SCOTT")
OTWELL, TRINIDAD SERRATO, ROBERT
STIGGERS, VICTOR WILLIAMS, JOHN DOE No. 1,
AARON ELROD, CEDRIC SIMS, PRICE BROWN,
TORRIS RICHARDSON, RODERICK WESLEY,
CHARLES CZARNETZKI, DARRYL HUSSEY, LEE
OWENS, JOSEPH "DALLAS" HEAD, WESLEY
"GRANT" BRAY, JIMMY LITTLE, JOHN DOE No. 2
individually and on behalf of all others similarly
situated,

                            Plaintiffs/Petitioners,

    v.

WENDY KELLEY, Secretary of Arkansas Department
of Corrections, in her official capacity; DEXTER
PAYNE, Division of Correction Director, Arkansas
Department of Corrections, in his official capacity;
JERRY BRADSHAW, Division of Community
Correction Director, Arkansas Department of
Corrections, in his official capacity; ASA
HUTCHINSON, Governor of Arkansas, in his official
capacity; BENNY MAGNESS, Chairman of Arkansas
Board of Corrections, in his official capacity; BOBBY
GLOVER, Vice Chairman of Arkansas Board of
Corrections, in his official capacity; LEE WATSON,
Secretary of Arkansas Board of Corrections, in his
official capacity; TYRONNE BROOMFIELD, Member
of Arkansas Board of Corrections, in his official
capacity; JOHN FELTS, Member of Arkansas Board of
Corrections, in his official capacity; WILLIAM
("DUBS") BYERS, Member of Arkansas Board of
Corrections, in his official capacity; WHITNEY GASS,
Member of Arkansas Board of Corrections, in his
official capacity; NATHANIEL SMITH, Secretary of
Arkansas Department of Health, in his official capacity;
WELLPATH LLC,

                           Defendants/Respondents.

---

Case No. 4:20-cv-00434-KGB

**AMENDED CLASS ACTION
COMPLAINT AND
PETITION FOR WRIT OF
HABEAS CORPUS**

Nicholas Frazier, Alvin Hampton, Marvin Kent, Michael Kouri, Jonathan Neeley, Alfred Nickson, Harold Scott Otwell, Trinidad Serrato, Robert Stiggers, Victor Williams, John Doe No. 1, Aaron Elrod, Cedric Sims, Price Brown, Torris Richardson, Roderick Wesley, Charles Czarnetzki, Darryl Hussey, Lee Owens, Joseph "Dallas" Head, Wesley "Grant" Bray, Jimmy Little, John Doe No. 2 (collectively, "Named Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action lawsuit and petition for writ of habeas corpus to seek relief against the substantial risk of COVID-19 infection, illness, and death while incarcerated in facilities operated by the Arkansas Department of Corrections ("DOC").

## PRELIMINARY STATEMENT

1.      Arkansas—like the rest of the United States and nations throughout the world—is facing an unprecedented public health crisis due to the COVID-19 pandemic. As of the filing of this Amended Complaint, 3,304,878 Americans have been infected with the virus, leading to 135,203 deaths nationwide.[1] The risk of infection, serious illness, and possible death from the coronavirus, especially among vulnerable populations, has led Arkansas to take the extraordinary measure of declaring a public health emergency and closing public schools for much of the past spring semester.

2.      The rate of COVID-19 infection in Arkansas continues to rise, as with many other parts of the country, with 28,367 COVID-19 infections and 321 deaths statewide.[2] COVID-19 infections in the state's correctional facilities make up a substantial portion of the infections statewide, with an infection rate of 1,368 per 10,000 incarcerated people—one of the highest prison

---

[1] *Arkansas COVID-19 Update*, Ark. Dep't of Health, https://experience.arcgis.com/experience/c2ef4a4fcbe5458fbf2e48a21e4fece9 (last visited July 13, 2020).
[2] *Id.*

2

infection rates in the country.[3] It is not a matter of *if* or *when* the pandemic will wreak havoc in Arkansas' state prison system: the crisis has been underway for months, drawing national attention. It is now beyond debate that the measures put in place by Defendants to suppress COVID-19 are completely inadequate, and dangerously so.

3.     When Plaintiffs filed their Complaint on April 21, 2020, there were 600 confirmed COVID-19 infections in Cummins Unit,[4] after a single infection there only a week earlier.[5] The day after this Court held a preliminary injunction hearing in this case, at which time Defendants pointed to the absence of viral outbreaks in other correctional facilities as evidence that the pandemic was well under control, 876 incarcerated people and 54 corrections staff in Cummins Unit had been infected, and six incarcerated people had died from COVID-19-related illness.[6]

4.     Today, the COVID-19 statistics in Arkansas correctional facilities are even more stark with the virus spreading to five additional DOC facilities—East Arkansas Regional, Grimes, Northwest Arkansas Work Release, Ouachita River Correctional, Randall L. Williams, and Wrightsville Units—with 2,581 total confirmed infections of incarcerated people and 241 confirmed infections of corrections staff.[7]   The number of incarcerated people infected with

---

[3] *A State-by-State Look at Coronavirus in Prisons*, The Marshall Project, https://www. themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last updated July 2, 2020).

[4] Meghan Rhoos, *One Arkansas Prison Makes Up Almost a Third of State's Coronavirus Cases*, Newsweek (Apr. 20, 2020), https://www.newsweek.com/one-arkansas-prison-makes-almost-third-states-coronavirus-cases-1499045.

[5] *First inmate tests positive for COVID-19 at Arkansas prison*, KATV (Apr. 12, 2020), https://katv.com/news/coronavirus/arkansas-department-of-correction-inmate-tests-positive-for-covid-19.

[6] Andrew DeMillo, *6th inmate dies of coronavirus at Arkansas prison*, Times Record, 2 (May 7, 2020), https://www.swtimes.com/news/20200507/6th-inmate-dies-of-coronavirus-at-arkansas-prison.

[7] *Coronavirus (COVID-19) Updates*, DOC, (July 3, 2020), at https://adc.arkansas.gov/coronavirus-covid-19-updates.

COVID-19 has increased over 400% since Plaintiffs filed their initial Complaint. And these numbers are likely gross underestimates due to the lack of widespread testing in all of the correctional facilities throughout the State.

5.    As we have seen from the COVID-19 outbreaks in nursing home facilities, cruise ships, and a naval aircraft carrier—as well as prisons and jails—congregate environments are breeding grounds for this highly contagious virus. Indeed, "mounting evidence has suggested that in crowded indoor spaces, the virus can stay aloft for hours and infect others, and may even seed so-called superspreader events."[8] Infection rates in prisons are 5.5 times higher than in the general population and death rates are 3 times higher, but "while these numbers are striking, . . . the disparities within prisons is much greater" due to lack of testing and reporting."[9]

6.    People who are incarcerated eat together, sleep together, share restroom facilities, and have minimal control over their physical space. On a daily basis, they may come in close contact with hundreds of other incarcerated people as well as corrections staff. There are multiple opportunities on any given day when the COVID-19 virus could spread quickly from one infected person to several more due to the congregate setting and close living quarters. Because of inadequate COVID-19 prevention policies and ineffective implementation of policies that exist, people in DOC facilities cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear adequate protective clothing, obtain specific products for cleaning or laundry, or avoid high-touch surfaces.

7.    President Trump's Coronavirus Guidelines for America, which are now ubiquitous,

---

[8] Apoorva Mandavilli, *The Coronavirus Can Be Airborne Indoors, W.H.O. Says*, N.Y. Times (July 9, 2020) https://www.nytimes.com/2020/07/09/health/virus-aerosols-who.html.
[9] Amanda Watts & Shelby Lin Erdman, *Coronavirus deaths and infection rates higher in US prisons than general population, study says*, CNN (July 8, 2020), https://www.cnn.com/2020/07/08/health/coronavirus-prisons-death-rates/index.html.

highlight the importance of avoiding social gatherings of 10 or more people, washing your hands after touching a frequently used item or surface, and disinfecting frequently used items and surfaces as much as possible.[10] These general guidelines have been translated into correctional settings in the Centers for Disease and Control and Prevention's ("CDC") Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Guidance"), which emphasize, *inter alia*, operational preparedness for the virus, enhanced cleaning/disinfecting and hygiene practices, social distancing, infection control with use of personal protective equipment ("PPE"), medical isolation of confirmed or suspected cases and contacts, clinical care for confirmed or suspected cases, and considerations of individuals at higher risk of severe disease from COVID-19.[11]

8.      Despite the availability of the CDC Guidance since March 23, 2020, and the experience of witnessing one of the largest COVID-19 outbreaks in the country at Cummins Unit, Defendants have failed to comply with the standards set by the Eighth Amendment and the Americans With Disabilities Act ("ADA") through their official policies—and the implementation of those policies—by not sufficiently preventing and stemming the spread of COVID-19 and not properly treating those infected. Defendants have likewise failed to properly supervise and train corrections staff to carry out effective prevention practices and ensure appropriate medical treatment. Most importantly, Plaintiffs' personal experiences demonstrate Defendants' complete disregard for their health and safety during the crisis of this pandemic.

9.      Some Plaintiffs continue to physically interact with well over a hundred people

---

[10] *The President's Coronavirus Guidelines for America*, The White House (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.
    [11] *CDC Guidance*, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

each day, often without PPE or ready access to hygiene products. Corrections officers and incarcerated people continue to serve meals often without properly using masks and gloves—if they use them at all—exposing everyone to transmission of the virus. Showers are cleaned after everyone in the barrack (typically about 50 to 100 people) have used them, and restroom facilities are often in unsanitary conditions. Beds are within three feet of one another, far short of the recommended six feet. Incarcerated people who exhibit symptoms are not immediately tested and are forced to wait days for a sick call, increasing the likelihood of spreading the virus to others. Those who test positive are kept in substandard conditions in punitive isolation and areas of facilities that are not designed for housing—in many cases without access to running water or a restroom. Many who have not tested positive are exposed to people who have. Through all of this, incarcerated people are not fully informed of any plans Defendants may have to protect them from COVID-19, nor are they adequately apprised of their medical condition and medical care should they be suspected or confirmed of infection.

10.     Of particular concern is the vulnerability of incarcerated people with disabilities, advanced age, and/or underlying medical conditions who could easily render COVID-19 infection a death sentence. Those individuals with chronic underlying health conditions, such as diabetes, heart disease, chronic lung and liver diseases, respiratory disease, and compromised immune systems, are at particular risk for grave outcomes from infection. People incarcerated in correctional facilities overall have a greater likelihood of infectious diseases, hypertension, diabetes, heart disease, and respiratory illness that have been found to increase the mortality of COVID-19 infection. And many of the Named Plaintiffs have severe conditions like heart disease, asthma, and cancer that would make them especially susceptible to serious illness or death from COVID-19. At the same time, prison medical facilities are limited; they lack vital equipment,

6

expertise, and treatment mechanisms that are critical to providing adequate COVID-19 treatment and care.

11.     Plaintiffs are in the custody and care of Defendants while they serve their prison sentences, and it is Defendants' responsibility to ensure that Plaintiffs' constitutional and statutory rights are protected during their confinement. Needlessly and recklessly subjecting Plaintiffs to the known risk of COVID-19 infection, with a likelihood of severe illness and possible death, is a wholesale abdication of that responsibility. Without court intervention, Plaintiffs fear that they will be left to suffer and possibly die as expendable casualties of this pandemic.

12.     The outbreak of a highly infectious, deadly virus in a closed detention setting requires urgent and decisive action to protect the health and safety of those confined, those who work there, and the medical professionals who will treat the infected. A failure to take appropriate action will not only threaten all these lives, but also the lives of Arkansans far beyond prison walls, as the virus inevitably boomerangs back into surrounding communities, straining the limited medical capacity available, and accelerating the spread across the State, where intensive care units are already starting to reach capacity.[12]

13.     While this lawsuit centers on the violation of Plaintiffs' rights and the extreme suffering they have endured—and will continue to endure—in the absence of relief from this Court, it also raises significant public health concerns for Arkansans in communities surrounding the correctional facilities. No prison is fully isolated from neighboring communities, and any COVID-19 infection can easily pass between people incarcerated in detention settings and corrections staff with subsequent transmission to friends, families, neighbors, store clerks, and

---

[12] *'We are on the edge'": UAMS chancellor says ICU is full*, KATV (July 10, 2020), https://katv.com/news/local/uams-intensive-care-unit-full-chancellor-says.

others. And with at least 25%, if not more, of COVID-19 carriers exhibiting no symptoms, it would be impossible to screen individuals entering and leaving correctional facilities without the sort of widespread and immediate testing that is currently unavailable.

14.     Importantly, the COVID-19 crisis in Arkansas correctional settings—like the pandemic at large—disproportionately harms Black and Latino Arkansans who are imprisoned at a rate four times and 1.5 times, respectively, higher than white Arkansans.[13] Already, the percentage of Black Arkansans who are infected with, and die from, COVID-19 is roughly 1.5 times more than their percentage in the statewide population.[14] The racial disparities for Latino communities are even greater: their percentage of COVID-19 cases is three times higher than their percentage of the state population.[15] The spread of COVID-19 from correctional facilities to the surrounding communities will further exacerbate this extreme racial disparity, as DOC facilities are mostly located in Southeastern Arkansas, which has a disproportionately higher population of Black residents than the rest of the state. The containment of the COVID-19 infection in DOC facilities, therefore, not only relates to Plaintiffs' rights to be free from unnecessary harm, but is also a larger racial justice issue regarding state officials' failures to equitably respond to this pandemic for all Arkansans.

15.     Accordingly, Defendants must take serious, immediate action to mitigate the public health crisis the likes of which have never been encountered, not only to protect persons confined to their facilities, but also for the sake of corrections staff and neighboring communities.

---

[13] *Arkansas Profile*, Prison Policy Institute, https://www.prisonpolicy.org/profiles/AR. html (last visited, July 13, 2020).
[14] *Arkansas COVID-19 Update: Case Demographics*, Arkansas Dep't of Health, https://experience.arcgis.com/experience/c2ef4a4fcbe5458fbf2e48a21e4fece9 (last visited July 9, 2020); *Quick Facts: Arkansas*, U.S. Census Bureau (July 1, 2019), https://www.census. gov/quickfacts/AR.
[15] Id.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2241, & 1651, and 42 U.S.C. § 1983.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of the events, acts, and/or omissions giving rise to this action occurred, and continue to occur, in this District.

## PARTIES

### I.     Plaintiffs

18.     Plaintiff Michael Kouri is 40 years old and is incarcerated in the Ouachita River Correctional Unit, a DOC prison. Mr. Kouri is housed in the 7 barracks. Mr. Kouri has been diagnosed with heart disease, specifically, aortic heart valve degeneration. He has an artificial heart valve and is on blood thinners. He also suffers from hypertension and extreme obesity. Mr. Kouri has difficulty walking more than 20 feet without stopping to catch his breath

19.     On June 21, 2020 Mr. Kouri was tested for COVID-19. On June 23, 2020, approximately seven individuals, who were believed to have tested positive, were moved out of the barracks. The next day, on June 24, 2020, five individuals, presumed to have tested negative, were moved into the barrack. Around this same time, a corrections officer who works in the barracks tested positive. On June 26, 2020, everyone in the barrack received their test results. Mr. Kouri's result was negative. On that date, however, a corrections officer asked everyone to double-check their results noting that sometimes people "slip through the cracks." It turned out that one of the five individuals moved into Mr. Kouri's barrack two days prior had in fact been positive. He was moved out of the barrack 6 hours later.

20.     On June 27, 2020, Mr. Kouri began experiencing more severe shortness of breath,

headaches, lost sense of taste and smell, feverishness, and a cough. Previously, Mr. Kouri experienced more severe shortness of breath, headaches, chills, coughing, and was previously diagnosed with pink eye. According to the American Academy of Ophthalmology, conjunctivitis could be a symptom of COVID-19.[16] Mr. Kouri requested sick calls on June 25, 26, and 27, 2020. The only response Mr. Kouri received—at the end of the day on June 28, 2020—said that he would be contacted. Mr. Kouri submitted an emergency grievance that same evening. It was only then that he was seen by a nurse.

21.     Mr. Kouri is critically vulnerable to complications from COVID-19 because of his significant underlying health conditions. Mr. Kouri shares a small cell with one other person and lives in a barrack with approximately 80 other incarcerated people. On an average day, Mr. Kouri closely interacts with the other people housed in his barrack as well as approximately five correctional staff members, making social distancing impossible.

22.     Mr. Kouri believes that the majority of his barracks is infected with COVID-19. The entire housing unit was tested again on July 8, 2020, with results pending. Many people in the barracks recently lost their sense of taste and smell. Others have exhibited additional symptoms— including fevers, coughing, and extreme exhaustion. Mr. Kouri believes the virus spread after either correctional staff moved someone who had tested positive into the barrack or after an infected corrections officer came to work sick. The cells were not sanitized or disinfected before the new people moved in. Although Ouachita River Correctional Unit took steps to improve conditions in the facility in late April and early May 2020, by the end of May, just after this Court issued an order denying a preliminary injunction, correctional staff members failed to maintain

---

[16] Reena Mukamal, *Eye Care During the Coronavirus Pandemic*, Am. Acad. Ophthalmology (Mar. 10, 2020), https://www.aao.org/eye-health/tips-prevention/coronavirus-covid19-eye-infection-pinkeye.

adequate measures to mitigate the spread of infection. Since at least June 2020, hand sanitizer has not been readily available and correctional staff members have not enforced social distancing protocols.

23.    Mr. Kouri frequently observes staff members not wearing masks properly—below their chin—or sometimes not wearing masks at all. Mr. Kouri is also aware of staff members returning to work within less than 14 days after testing positive for the virus. Mr. Kouri filed a grievance related to his vulnerability to COVID-19 and the prison's non-compliance with procedures to decrease or prevent the spread of the virus. When the grievance was denied, he appealed the grievance to step three. He received a denial from Pine Bluff, dated June 10, 2020, some three weeks later, on July 2, 2020. On April 18, 2020, Mr. Kouri submitted an emergency grievance requesting reasonable accommodations under the ADA for a single man cell, extra cleaning supplies, PPE, and release. He received a response the same day that DOC is doing everything the CDC has outlined and upper management has directed.

24.    Mr. Kouri indicated that it is difficult to file a grievance. Often, there are no grievance forms readily available to inmates and even if an inmate can locate a form, it can take hours to obtain a signature from a Sergeant. Mr. Kouri is a member of the Class and both Subclasses.

25.    Plaintiff Trinidad Serrato is 34 years old and is incarcerated in the Ouachita River Correctional Unit. Mr. Serrato is a carrier for tuberculosis and suffers from asthma. He resides in a barrack with approximately 44 other people. Mr. Serrato was tested twice for COVID-19. Mr. Serrato received negative results from both tests. Seven other people in his barracks tested positive. More recently, Mr. Serrato has experienced symptoms of COVID-19, including cold sweats and muscle aches. Mr. Serrato is critically vulnerable to COVID-19 because of his

underlying health issues.

26.     Mr. Serrato encounters about 60 people a day. Mr. Serrato is assigned to work in the kitchen. Prior to exhibiting symptoms, Mr. Serrato worked for 13 hours in the kitchen with other inmates that had tested positive for COVID-19. Twenty to thirty people from different barracks work in the kitchen at a time. Mr. Serrato was told he must continue working until he tests positive. Food is delivered to the kitchen from Cummins Unit, which has the highest number of documented COVID-19 cases of all DOC facilities. Mr. Serrato's current living and working conditions make social distancing impossible. Mr. Serrato filed a grievance regarding his vulnerability to COVID-19 and the prison's non-compliance with procedures to decrease or prevent the spread of the virus.

27.     On April 19, 2020, Mr. Serrato submitted an emergency grievance explaining his vulnerability to COVID-19 due to his medical conditions and requesting reasonable accommodations under the ADA. Sergeant D. Griffin (91214) acknowledged receipt by signing off on this grievance on April 19, 2020. Mr. Serrato is a member of the Class and both Subclasses.

28.     Plaintiff Nicholas Frazier is 37 years old and is incarcerated in the Varner Supermax facility, a DOC prison. Mr. Frazier suffers from seizures, asthma, and Hepatitis. Mr. Frazier has not received a COVID-19 test. Mr. Frazier is critically vulnerable to COVID-19 because of his underlying health conditions. Mr. Frazier comes in close contact with other people about six times a day. Mr. Frazier has noticed staffing shortages within the correctional facility. Staff shortages have made it difficult for Mr. Frazier and other inmates to request and receive assistance. Mr. Frazier has observed many staff members not wearing masks. Mr. Frazier has not been provided a mask or any other PPE. He also has not been provided with disinfectant to sanitize his cell.

12

29.     Mr. Frazier filed multiple grievances regarding his vulnerability to COVID-19, availability of COVID-19 testing, and the prison's non-compliance with procedures to decrease or prevent the spread of the virus. On April 18, 2020, Mr. Frazier submitted an emergency grievance explaining that his medical conditions make him high risk for COVID-19 and requesting reasonable accommodations under the ADA for daily access to cleaning supplies. Sergeant Garcia acknowledged receipt by signed off on this grievance on April 18, 2020. Mr. Frazier is a member of the Class and both Subclasses.

30.     Plaintiff Marvin Kent is 40 years old and is incarcerated in the Varner Unit. Mr. Kent has been diagnosed with heart failure and has a pacemaker. He suffers from chest pain daily. Mr. Kent also has hypertension and high cholesterol. Despite experiencing COVID-19 symptoms, including headaches, body aches, coughing, and nausea, Mr. Kent was not tested for the virus while in restrictive housing in Varner's supermax facility. Since returning to general population, Mr. Kent continues to be critically vulnerable to complications from COVID-19 because of his significant underlying health conditions. In the past, it has taken between three weeks and one month for Mr. Kent to be seen by a doctor after submitting a medical request. Mr. Kent experienced COVID-like symptoms for approximately two months, but prison staff refused to test him. He is also aware of many other incarcerated men at Varner who similarly exhibited symptoms and were not tested.

31.     Although Varner has taken some precautions since the start of the pandemic, it remains impossible for Mr. Kent to practice social distancing as of early July 2020. He lives in an open barracks with 50 other men, and comes into contact with more than 50 individuals a day, including 15-20 staff members. Only half the staff members wear masks, and even those staff members who wear masks often wear them improperly. Mr. Kent is a member of the Class and

both Subclasses.

32.    Plaintiff Harold Otwell is 49 years old. He is incarcerated in the Ouachita River Correctional Unit and is housed in the Alpha barracks. Mr. Otwell is a first-time, non-violent offender. He was approved for parole at the end of June. Mr. Otwell is obese, pre-diabetic, and has osteoarthritis. He receives physical therapy for his right hip and has limited mobility. Mr. Otwell was tested for COVID-19 twice in the month of June 2020 in a mass testing of his barracks. After receiving the results of the first test, correctional staff removed eight people out of the barracks. Six of the people removed were food services workers and one was a porter in the hospital wing. Mr. Otwell received a negative test result on his first test and has not received the results of his second test administered around June 29, 2020. Mr. Otwell is critically vulnerable to complications from COVID-19 because of his significant underlying health conditions.

33.    Mr. Otwell resides in a barrack with approximately 46 other people. He sleeps in a bed that is 2.5 feet away from neighboring beds. Mr. Otwell's laundry assignment also requires frequent interaction with newly incarcerated people who have recently been committed to the facility. At least one person housed with Mr. Otwell has demonstrated symptoms of COVID-19. Mr. Otwell's current living and working conditions make social distancing impossible. Mr. Otwell filed a grievance regarding his vulnerability to COVID-19. His grievance was denied.

34.    On April 19, 2020, Mr. Otwell submitted an emergency grievance explaining his vulnerability to COVID-19 due to his medical conditions and requesting reasonable accommodations under the ADA. He received a response on April 21, 2020, that said, "see attachment." The attachment was a typed statement from the deputy warden stating that they were doing everything they could and asking him to be patient. This typed response was given to several other men in his barrack in response to grievances related to COVID precautions. Mr. Otwell is a

14

member of the Class and both Subclasses.

35.     Plaintiff Robert Stiggers is 35 years old and is incarcerated in Cummins Unit, a DOC prison. Mr. Stiggers suffers from asthma, which makes him critically vulnerable to complications from COVID-19. He lives in a cell with another inmate, where they share a toilet and sink. In Mr. Stiggers' housing unit, five people shower at a time. The showers are not cleaned until after everyone in the barrack has showered, which is approximately 90 people. During recreation time, Mr. Stiggers is placed outside with ten other incarcerated people. Although he has observed corrections officers wearing masks, they do not wear them properly—exposing their mouth and/or nose about half the time.

36.     Mr. Stiggers's current living conditions make social distancing impossible. Mr. Stiggers filed a grievance regarding his vulnerability to COVID-19 and the prison's non-compliance with procedures to decrease or prevent the spread of the virus. Mr. Stiggers is a member of the Class and both Subclasses.

37.     Plaintiff Alfred Nickson is 61 years old and is incarcerated in Cummins Unit. Mr. Nickson suffers from diabetes, rheumatoid arthritis, and osteoarthritis. Before his incarceration, Mr. Nickson also received medication for bipolar disorder—Mr. Nickson has not received any psychiatric medication while incarcerated. Mr. Nickson is critically vulnerable to complications from COVID-19 because of his age and significant underlying health conditions. Mr. Nickson lives in Barracks 12-B with 46 other inmates. In the barrack, beds are less than 2.5 feet apart and inmates are not sleeping from head to foot. Mr. Nickson was provided with one mask, which he must regularly wash and dry himself. Barrack 12-B has major structural and sanitary issues—bathroom sinks are not functioning properly and are blackened with dirt and grime, showers are clogged and often flood, latrines are not flushing properly, and there are holes

in the ceiling that leak when it's raining. Mr. Nickson and other inmates in Barrack 12-B are not provided with sufficient cleaning equipment to maintain sanitary conditions. Previously, Mr. Nickson lived in a cell with another inmate, where they shared a toilet and sink. Mr. Nickson has not been provided with disinfectant to sanitize his cell since the COVID-19 pandemic began.

38.     Mr. Nickson filed two grievances regarding his vulnerability to COVID-19 and the prison's non-compliance with procedures to decrease or prevent the spread of the virus. The original copies of Mr. Nickson's grievances were lost. Mr. Nickson has attempted to file additional grievances, but correctional staff members have refused to sign his grievance forms. Mr. Nickson is a member of the Class and both Subclasses.

39.     Plaintiff Victor Williams is 56 years old. He is incarcerated in the Ouachita River Correctional Unit. Mr. Williams is currently in remission from lymphoma. He also suffers from a collapsed lung, hypertension, and bruised tissue surrounding his heart. On May 30, 2020, and at the end of June 2020, Mr. Williams was tested for COVID-19, as a part of a mass testing initiative within his barracks. After the administration of the mass tests, seven to eight people were moved out of his barracks. Some inmates tested negative, but were still exhibiting symptoms for COVID-19. Mr. Williams tested negative on each of his tests. Mr. Williams has experienced body aches, headaches, severe coughing, and a sore throat for over a month. Mr. Williams is critically vulnerable to complications from COVID-19 because of his significant underlying health conditions.

40.     Mr. Williams is housed with 46 other people. He sleeps in a bed that is 2.5 feet away from neighboring beds. Social distancing and mask protocols are not enforced within Mr. William's housing unit. Only 15-20 people wear masks and there is no social distancing in common areas. In Mr. Williams's housing unit, multiple people shower at a time, and showers are

not disinfected daily. In the past, common areas and bathrooms were cleaned by inmates twice a week. More recently, correctional staff have taken responsibility for cleaning the facility and have only cleaned once over a period of several weeks.

41.    Mr. Williams is a peer counselor in his barrack. He has been exposed to many people who are currently sick, and he fears that it is only a matter of time before he starts exhibiting COVID-19 symptoms. Also, many of the same corrections officers move throughout different barracks. Some officers have been sent home with high fevers. Mr. Williams has observed staff shortages in his barracks. Mr. Williams has regularly observed officers working double shifts or extended hours because there are not enough staff members available to replace them. Mr. Williams regularly observes correctional staff members without masks.

42.    Mr. Williams has noticed major delays in medical services at his facility. Normally, medical requests are addressed within two to three days. Recently, Mr. Williams waited three weeks after making a request for medical attention for a severe cough. Mr. Williams filed a grievance regarding his vulnerability to COVID-19 and the prison's non-compliance with procedures to decrease or prevent the spread of the virus. His grievance was denied. Mr. Williams is a member of the Class and both Subclasses.

43.    Plaintiff Alvin Hampton is 43 years old and is incarcerated in the Ouachita River Correctional Unit. Mr. Hampton suffers from seizures, Bell's palsy, and bipolar disorder. Mr. Hampton received two tests for COVID-19 after some people in his barrack tested positive for the virus. Mr. Hampton's first test was negative. Mr. Hampton has not received the results of his second test, taken on June 30, 2020. Many people housed in Mr. Hampton's barracks have been sick with COVID-19 symptoms, including people working in the kitchen. Mr. Hampton is critically vulnerable to complications from COVID-19 because of his significant underlying health

conditions.

44.     Since early May, Mr. Hampton has not gone to the cafeteria or recreational yard. However, even within his barrack, there are limited opportunities to social distance. He resides in a barrack with approximately 46 other people. He sleeps in a bed that is 2.5 feet away from neighboring beds. In Mr. Hampton's housing unit, multiple people shower at a time, and showers are not disinfected daily. Mr. Hampton's current living conditions make social distancing impossible.

45.     Mr. Hampton has observed major staff shortages in his barrack. Staff are forced to cover more than one barrack at a time and sometimes do not wear masks or gloves when moving between barracks. Mr. Hampton has filed two grievances regarding his vulnerability to COVID-19 and the prison's non-compliance with procedures to decrease or prevent the spread of the virus. Both grievances were denied. He submitted his second grievance on April 19, 2020. It was an emergency grievance requesting reasonable accommodations under the ADA. He received a response on April 22, 2020, that said, "see attachment." The attachment was a typed statement from the deputy warden stating that they were doing everything they could and asking him to be patient. This typed response was given to several other men in his barrack in response to grievances related to COVID precautions. Mr. Hampton has been unable to file additional grievances. The deputy warden in Mr. Hampton's facility is refusing to make grievance forms available. Mr. Hampton is a member of the Class and both Subclasses.

46.     Plaintiff Jonathan Neeley is 36 years old and is incarcerated in the Ouachita River Correctional Unit. He is housed in the Special Needs Unit. Mr. Neeley was diagnosed with rectal cancer in January 2020.  For the past month, he has been receiving both radiation and chemo treatments, which vastly suppress his immune system. His civilian doctor has repeatedly urged

prison officials to relocate Mr. Neeley to a place where he will have little contact with others, but he remains in an open barrack.  Mr. Neeley took a COVID-19 test on June 30 and June 21, 2020. Mr. Neeley never received the results of either test. Mr. Neeley is critically vulnerable to complications from COVID-19 because of his significant underlying health condition.

47.     Mr. Neeley has traveled to three local hospitals recently related to his cancer diagnosis. On one of his recent trips to radiation and chemotherapy treatment for his stage 3 cancer, his corrections officer escort was coughing and had a runny nose. They were in the same vehicle for approximately three hours. At no point during the ride did the corrections officer wear a mask or any other PPE, despite his condition and the fact that they were traveling to a medical facility.

48.     Mr. Neeley resides in the SNU barracks with approximately 46 other people. New people are moved into Mr. Neeley's barrack without first being tested to determine if they are infected with COVID-19. Mr. Neeley sleeps in a bed that is approximately 1.5-2 feet away from neighboring beds. Mr. Neeley must shower in close proximity to other inmates. About 20 people travel from their barracks to the cafeteria together. Mr. Neeley has chosen to self-quarantine and not go to the cafeteria during meal times to protect himself.  Mr. Neeley does not have access to adequate cleaning supplies or disinfectant. Mr. Neeley has also noticed less staff throughout the prison. Mr. Neeley believes the spread of the virus amongst staff members has left the prison short-staffed.

49.     Due to his health condition, Mr. Neeley frequently visits the medical clinic. While waiting to be seen by a clinician, he is put in a small holding cell with approximately 10 other incarcerated people. Mr. Neeley's current living conditions make social distancing impossible. Mr. Neeley filed a grievance regarding his vulnerability to COVID-19 and the prison's non-compliance with procedures to decrease or prevent the spread of the virus. His grievance was

19

denied.

50.     On April 19, 2020, Mr. Neely submitted an emergency grievance explaining his vulnerability to COVID-19 due to his medical conditions and requesting reasonable accommodations under the ADA. He received a response on April 21, 2020, that said, "see attachment." The attachment was a typed statement from the deputy warden stating that they were doing everything they could and asking him to be patient. This typed response was given to several other men in his barrack in response to grievances related to COVID-19 measures. Mr. Neeley is two years past his release date and has completed all required pre-release programs. Mr. Neeley is a member of the Class and both Subclasses.

51.     Plaintiff John Doe No. 1 is in his twenties and is incarcerated in Cummins Unit. John Doe No. 1 is housed in a barrack with approximately 50 other people. Mr. Doe tested positive for COVID-19. He suffers from severe asthma, which requires use of an inhaler throughout the day. John Doe No. 1 is critically vulnerable to complications from COVID-19 because of his significant underlying health condition. John Doe No. 1 reported feeling unwell and suffering from fatigue on April 11, 2020. John Doe No. 1 believes he was placed in lock down as retaliation for disclosing the unconstitutional conditions at Cummins Unit. John Doe No. 1 is a member of the Class and both Subclasses.

52.     Aaron Elrod is a 30-year-old man who is currently incarcerated at the Central Arkansas Community Correction Center ("CACCC"). In late March or early April 2020, Mr. Elrod began exhibiting symptoms of COVID-19. Contrary to representations made by Defendants that all individuals at CACCC who tested positive were asymptomatic, Mr. Elrod experienced various COVID-19 symptoms, including a fever, severe headache, and loss of taste and smell. Mr. Elrod has only recently begun to regain his sense of taste and smell. Mr. Elrod received only Tylenol and

a cough suppressant for his symptoms, and he never saw a doctor visit any of the sick residents on his wing.

53.     Mr. Elrod currently resides on a wing with approximately 40 other men with whom he sleeps, eats, and attends classes in very close proximity. His job requires him to continuously walk throughout much of the facility, closely interacting with people from other wings. Mr. Elrod also regularly interacts with most of the security and treatment staff. Mr. Elrod understands that there are currently people quarantined on A-wing who are infected with COVID-19, and staff members regularly move in and out of that wing. He fears that nothing has changed since the April outbreak and that the entire facility remains at risk.

54.     Cedric Sims is a 30-year-old man who is currently incarcerated at CACCC. Mr. Sims has high blood pressure, which places him at a heightened risk from COVID-19. In late March or early April 2020, Mr. Sims began exhibiting symptoms of COVID-19. He went to medical for treatment, where a nurse took his temperature and observed that he had a fever. Mr. Sims requested a test for COVID-19, but the nurse tested him only for the flu and then placed him in a punitive isolation cell for six days. Mr. Sims experienced various COVID-19 symptoms, including a high fever, serious headache, the worst body aches of his life, chest pain, difficulty breathing, and loss of taste and smell. He received only Tylenol and Mucinex for his symptoms.

55.     After six days in isolation and without testing him for COVID-19, medical staff returned Mr. Sims to his unit, where there was no social distancing, and individuals who did and did not exhibit symptoms were mixed together. Sometime later, after the death of counselor Richard Richardson, CACCC staff tested individuals for COVID-19. During the two-day period between Mr. Sims's test and his receipt of a positive test result, CACCC staff left him in general population. After he tested positive, they sent him back to isolation and never retested him. In

21

addition to the incarcerated individuals who tested positive, some CACCC staff tested positive and returned to work without waiting 14 days from the date of their positive results.

56.     Mr. Sims currently resides in a wing with 40 other individuals who eat together daily with no separation from each other. On an average day, he encounters at least 50 incarcerated individuals and twelve staff members. Staff members often wear masks incorrectly, leaving the masks below their mouth and nose, and rarely wear gloves. Mr. Sims sits in classes in the gym for several hours a day along with all other residents—about 100 people. During these classes, residents sit elbow-to-elbow with other residents on their wing and each wing is separated by only a few feet. Each wing eats and goes to yard call separately, but otherwise all residents can and do interact with one another throughout the day. Mr. Sims is a member of the Class and the High-Risk Subclass.

57.     Mr. Sims, along with other residents, cleans the bathroom and sleeping area twice per day. However, they are not provided chemicals effective against COVID-19. A cleaning crew comes only once per day to clean sinks and showers with bleach.

58.     Price Brown is a 48-year-old man, who is currently incarcerated at the East Arkansas Regional Unit ("EARU") in the maximum-security unit. He has high blood pressure. Although Mr. Brown is in a solitary cell, he showers at the same time as five other individuals. His repeated requests for a mask have been denied by prison staff. He receives cleaning supplies for his cell three times a week, but the quantity is insufficient. Mr. Brown has not observed increased cleaning of the prison since the beginning of the outbreak. As of July 6, 2020, there were 650 positive cases of COVID-19 in EARU. He is a member of the Class and the High-Risk Subclass.

59.     Torris Richardson is 37 years old and currently incarcerated at Cummins Unit. He

has multiple underlying conditions that place him at an elevated risk from a COVID-19 infection, including asthma, high blood pressure, and a thyroid issue. Like many individuals at Cummins, he has tested positive for COVID-19. As a result of his infection, Mr. Richardson lost 50 pounds, became very weak, struggled to breathe, and alternated between feeling both very hot and very cold. When he first tested positive, he was living in an open barrack where the beds are approximately 18 inches from each other. The barrack residents knew something was wrong when they all began losing their sense of taste.

60.     Mr. Richardson is currently in restrictive housing, where he has been placed since early June 2020. When he moved into his current cell, Mr. Richardson was still symptomatic, and his cellmate did not have COVID-19. Now his cellmate is sick but has not been retested since Mr. Richardson moved in with him. It is not possible to socially distance in the cell because the two men sleep in a bunk bed and there is not enough room in the cell to be six feet apart from each other during the day. Some corrections officers wear masks, but Mr. Richardson estimates that a little less than half do not. Mr. Richardson is a member of the Class and both Subclasses.

61.     Roderick Wesley is a 43-year-old man, who is incarcerated at the Varner Unit. Mr. Wesley has high blood pressure and a chronic issue with his kidneys that place him at elevated risk from a COVID-19 infection. Social distancing is difficult or impossible for him because he lives in an open barracks with 47-50 other people.

62.     Mr. Wesley currently has a single mask, and Varner staff denied his request for a second mask. He encounters five to six staff members a day, and he estimates that a little less than half of them wear masks. Incarcerated people frequently complain about corrections staff not wearing masks, but the staff do not take wearing masks seriously. Based on Mr. Wesley's experience and observations, it is very difficult to get medical treatment from the prison medical

facilities. He is a member of the Class and both Subclasses.

63.     Charles Czarnetzki is 45 years old and is currently incarcerated at the Tucker Unit. He has Hepatitis C and breathing issues, and he was treated for chronic obstructive pulmonary disease before his incarceration. He also struggles with seizures, which is compounded by the inadequate medical care that he receives at Tucker.

64.     Social distancing is not possible for Mr. Czarnetzki. He lives in a barracks with 136 other men. They sleep head to head, and their beds are separated only by 12-inch aisles. The men are supposed to share ten toilets, but only five are functioning. He takes classes where 40-60 individuals sit shoulder to shoulder in a classroom. The counselors who teach the classes generally wear masks, but they pull them aside to make themselves heard. In the chow hall, four men sit at each crowded table. On a normal day, he comes into contact with hundreds of other incarcerated men plus seven staff members.

65.     Mr. Czarnetzki received one mask, which he has been forced to repair himself multiple times, and his requests for a second mask and for gloves have been denied. He has observed only one small sign posted regarding COVID-19. In early May 2020, Tucker Unit staff began taking individuals' temperatures before they went to chow hall, but they do so inconsistently and sometimes not at all. In mid-May 2020, Tucker Unit staff began an increased cleaning regimen in the facility, but it only lasted about two weeks before reverting to previous practices. Mr. Czarnetzki has observed some corrections officers not wearing masks. Mr. Czarnetzki is a member of the Class and both Subclasses.

66.     Darryl Hussey is a 49-year-old resident of Cummins Unit who suffers from epilepsy. Mr. Hussey became infected with COVID-19 in March 2020 of this year. He exhibited symptoms, including a temperature that ranged from 101-104 degrees, for approximately one

month before he was placed in quarantine. Over that period, he lost 30 pounds. A doctor wanted to keep Mr. Hussey in the infirmary after seeing how ill he was; however, the warden overruled the doctor and had him moved to a punitive isolation cell. While in quarantine, Mr. Hussey would be left up to six hours without staff checking on him.

67.     On April 9, 2020, a nurse became concerned about his condition and sent him to the UAMS Medical Center, where he remained for a week. After returning to Cummins Unit, he was placed back in a punitive detention cell for a month, where staff rarely checked on him. At one point, staff found him passed out and took him to medical, where he regained consciousness with a swollen left leg and no feeling in his right arm. Following his month in isolation, Mr. Hussey was sent to a barrack with COVID-positive individuals.  He was not retested.

68.     Social distancing is impossible for Mr. Hussey, and Cummins Unit staff repeatedly mix barracks that are on quarantine with those that are not. Beds are placed three feet apart from each other, and Mr. Hussey comes into contact with approximately 50-55 incarcerated men each day. Multiple barracks go to the chow hall at the same time, including a mix of quarantined and non-quarantined barracks. Similarly, two barracks at a time are sent for recreation, and Mr. Hussey's quarantined barrack was recently sent for recreation with a non-quarantined barrack.

69.     Mr. Hussey knows of one staff member who exhibited COVID-19 symptoms and continued to report to work while symptomatic. Corrections officers wear masks at their discretion. Those who work in the quarantined barracks generally wear masks, but those who come through the quarantined barracks on security rounds generally do not. Even when corrections officers do wear masks, they often wear them improperly, usually keeping the masks below their chins.

70.     Mr. Hussey has not seen signs posted with information about COVID-19 and has not received COVID-19 information from corrections staff. If he wants to obtain information about

the pandemic, he has to watch the news on television. Mr. Hussey received one mask from the prison, and two from the hospital. Cummins Unit staff encourage individuals to wear masks when outside of their barracks, but have not suggested that they wear masks inside barracks. Mr. Hussey has not observed increased cleaning of the prison during the pandemic and he notes that cleaning is conducted with watered-down cleaning supplies. He is a member of the Class and both Subclasses.

71.     Lee Owens is 47 years old and incarcerated at East Arkansas Regional Unit ("EARU"). He has been diagnosed with diabetes and chronic respiratory illness. Until mid-June 2020, he lived in an open barracks with 39 people, where he could touch the bed next to him. The men were provided some information about sleeping head to foot, but few people were doing it. Because of the major outbreak at EARU, everyone in his barrack was tested for COVID-19 on June 10, 2020. They received their results a week later, and Mr. Owens and the 19 other individuals who tested negative were moved to a single classroom in the facility's school building.

72.     The men are sleeping on mats on the floor and have been told they will be quarantined in the building for three weeks. The building does not have running water, and if they need to use the bathroom, they must knock on the door to get a staff escort. Mr. Owens' medication requires him to use the bathroom with some regularity, and corrections officers have in some instances refused to escort people to the bathroom at all.

73.     Mr. Owens is aware of multiple corrections officers who continued to report to work while infected with COVID-19. Currently, only about one-half of corrections officers wear masks, and those who do wear masks usually wear them incorrectly, covering their mouths but not their noses. People incarcerated at EARU are expected to wear masks when they leave their barracks, but not inside their barracks. EARU does not have soap in the bathrooms for individuals

to wash their hands. Mr. Owens is a member of the Class and of both Subclasses.

74.     Joseph "Dallas" Head is a 42-year-old man who is incarcerated in the maximum security unit at Tucker Unit. He has asthma, cardiovascular issues resulting from two prior heart attacks, and Hepatitis C. On any given day, he comes into contact with most of the 54 men who live in his barracks and with approximately 20 staff members. Mr. Head has observed only one CDC sign posted in English and no other signage related to COVID-19. The men incarcerated at Tucker do not have access to the Morning Show. Approximately half of the staff members whom Mr. Head encounters wear their masks correctly; the other half use them as "chin straps or beard nets." Although Mr. Head has seen Citrus Breeze in the front office, he has never seen it used elsewhere in the facility. Mr. Head is a member of the Class and both Subclasses.

75.     Wesley "Grant" Bray is 29 years old and is incarcerated at the Grimes Unit. Until a few weeks ago, Mr. Bray worked in the kitchen, where several individuals exhibited symptoms consistent with COVID-19. The symptomatic men were told by prison staff to put in for a sick call and keep working in the kitchen. The treatment of these symptomatic kitchen workers was reflective of the prison's approach to symptomatic individuals generally; symptomatic inmates had no immediate access to medical care and were required to put in a sick call and wait for it to be scheduled.

76.     Mr. Bray is unable to practice social distancing. On any given day, he comes into contact with between 300-400 other incarcerated men. He lives in a barracks with 40 other people, and all of the beds are three feet apart. Although they received a memo suggesting that they sleep head to foot, none of the men in the barracks do so. Two (and sometimes three) barracks go to the chow hall at a time, and they also come into contact with the next group of barracks when they are rotating out of the hall after eating. Mr. Bray has also recently been moved from the kitchen to the

hoe squad, where he works in a group of 100 men who are forced to stand in close proximity to each other.

77.     Mr. Bray has observed corrections officers wearing masks sparingly. There are currently no posted signs with information regarding COVID-19, though signs had been posted previously. Mr. Bray is a member of the Class.

78.     Jimmy Little is 40 years old and incarcerated at Randall L. Williams Correctional Facility, a DOC prison facility. Mr. Little has a has a collapsed lung, emphysema, and Chron's Disease, which weakens his immune system. Mr. Little is in a SATP program in five barrack with approximately 60 other men. The program continued to operate, and he was expected to continue attending classes after the COVID-19 outbreak at his facility. He sleeps in the center of an open barrack. Seven men sleep in an eight-foot circle around him.

79.     In May 2020, despite the program continuing to run, mental health services and the law library were shut down. Although Mr. Little experienced increased anxiety due to the pandemic, he was unable to access mental health services. Because the law library was closed, Mr. Little was not able to access the ACLU's phone number or a 1883 form. During this time, seven barrack was infected with COVID-19. There is a window at the security station between Mr. Little's barrack and seven barrack that allows a free flow of air between the two barracks. Corrections staff also allowed peer guides from seven barrack into his barrack to get items like tablets.

80.     Mr. Little has submitted several grievances related to Defendants' failure to take precautions to protect incarcerated individuals from the spread of COVID-19 and keep incarcerated individuals informed about COVID-19. Some of his grievances were thrown in the trash. He has submitted a grievance about his grievances being thrown away. He also submitted a

request form seeking clarification of the grievance process. Instead of receiving assistance, he received a response that stated, "You have a #122430 inmate number. You should know the process. Most any inmate should be able to assist."

81.      Mr. Little submitted a grievance on May 10, 2020, requesting better masks, as the masks made at Cummins Unit do not seal on around the checks and leave open a gap. He also expressed concern that the masks came from a unit with a significant COVID-19 outbreak. Additionally, he addressed his inability to social distance and the transfer of incarcerated individuals from an infected barracks into his barrack. On that same day, Mr. Little received a response stating, "All masks issued were sanitized beforehand. Precautions are being taken within ADC to combat COVID-19. Hand sanitizers and soap are located throughout the facility."

82.      Mr. Little escalated this grievance to an emergency grievance when moving to step two. In step two of his grievance, he explained that the hand sanitizer dispensers are in the hallways, and no one is allowed to leave the barracks due to quarantine. Thus, the hand sanitizer is inaccessible. The deputy warden's response focused on COVID-19 testing procedures and did not address the issues raised by Mr. Little. The denial of the grievance was upheld at step 3, and the issues raised by Mr. Little were never addressed.

83.      Mr. Little is critically vulnerable to COVID-19 because of his underlying health conditions. Mr. Little is a member of the Class and both Subclasses.

84.      Plaintiff John Doe No. 2 is 36 years old and incarcerated at the Randall L. Williams Correctional Facility. He is obese with a history of high blood pressure, and suffers from a lifelong history of respiratory issues, including childhood asthma and intermittent bouts of pneumonia beginning in early childhood. He has been diagnosed with pneumonia approximately five times in his life, most recently in 2015. At that time, the medical personnel treating him removed close to

two liters of fluids from his lungs, noting that it was the most they had ever seen.

85.     John Doe No. 2 tested positive for the virus in May 2020. He had a cough, body aches, loss of taste and smell, and was unable to get out of bed for four days. His oxygen level dropped to 93 percent. While ill, he was not provided with even Tylenol/Ibuprofen most days. He had to purchase Tylenol from the commissary, but there was a period where the commissary no longer had any fever-reducing medication left to sell. He has been advised that the filing of a grievance could lead to expulsion from his program. He was so ill at one point that he was unable to walk to a scheduled legal call. John Doe No. 2 is a member of the Class and the High-Risk Subclass.

## II.     Defendants

86.     Defendant Wendy Kelly is the Secretary of DOC. As such, she is the executive head of DOC and commanding officer of all DOC correctional officers, guards, employees and contractors, and is responsible for their training, supervision, and conduct. At all times described herein, she was acting under color of state law. She is sued in her official capacity for declaratory and injunctive relief.

87.     Defendant Dexter Payne is the Director of the DOC Division of Correction ("ADC"). As such, he is the executive and administrative officer of ADC, and is responsible for supervising the administration of all ADC correctional institutions, facilities and services; ensuring adequate staffing levels at correctional institutions; instituting training and development of correctional staff; and coordinating with judicial districts, counties, and municipalities to provide guidance and services to ensure a full range of correctional options for the State as a whole. Defendant Payne, as the Director of the ADC, has the power to make people incarcerated in ADC

correctional facilities eligible for release. He is sued in his official capacity for declaratory and injunctive relief.

88.     Defendants Benny Magness, Bobby Glover, Lee Watson, Rev. Tyronne Broomfield, John Felts, Dr. William Byers, and Whitney Gass are members of the Arkansas Board of Corrections ("BOC") (collectively, "BOC Defendants"). The BOC is the governing authority of DOC and performs all functions with respect to the management and control of DOC. The BOC, along with the Director of the Division of Correction, has the power to release people incarcerated in DOC facilities. At all times described herein, the BOC Defendants were acting under color of state law. They are being sued in their official capacity for declaratory and injunctive relief.

89.     Defendant Jerry Bradshaw is the Director of the DOC Division of Community Corrections ("ACC"). As such, he is the administrative officer of ACC, and is responsible for supervising the administration of all ACC facilities, programs and services; maintaining adequate staffing levels; providing ACC staff with training and professional development opportunities; and coordinating with judicial districts, counties, and municipalities to provide guidance and services to ensure a full range of correctional options for the State as a whole. He is sued in his official capacity for declaratory and injunctive relief.

90.     Defendant Asa Hutchinson is the Governor of Arkansas. As such, he has executive power over the State of Arkansas. Defendant Hutchinson has the ultimate authority for ensuring that all executive agencies, including DOC and ADH, function in compliance with state and federal law, and has the power to release people incarcerated in DOC correctional facilities. He is sued in his official capacity for declaratory and injunctive relief.

91.     Defendant Nathaniel Smith is the Secretary of the Arkansas Department of Health ("ADH"). As such, he is the executive head of the ADH and is responsible for the provision of

public health guidance and directives in the State of Arkansas. Mr. Smith has the power to direct and control the State's sanitary and quarantine measures for dealing with infectious, contagious, and communicable diseases, to conduct testing to detect cases of the diseases, to suppress the diseases, and to prevent their spread; this includes the authority to issue guidance to DOC regarding how to address the COVID-19 pandemic. He is sued in his official capacity for declaratory and injunctive relief.

92.     Wellpath LLC ("Wellpath"), formerly known as Correct Care Solutions LLC, is a limited liability company with a principal address at 1283 Murfreesboro Pike, Suite 500, Nashville, TN 37217-2421, a registered address at 3411 Silverside Road Tatnall Building Suite 104, Wilmington, DE 19810, and a regional office at 6814 Princeton Pike, Pine Bluff, AR 71602. Wellpath is contracted to provide medical services, including without limitation medical services related to COVID-19 testing, infection, and related illnesses, in DOC facilities.

## CLASS ALLEGATIONS

93.     Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the individual Named Plaintiffs bring this action on behalf of themselves and a class consisting of people who are currently incarcerated, or will be in the future, in a DOC facility during the duration of the COVID-19 pandemic. Plaintiffs also propose the following Subclasses:

a)     *High Risk Subclass:* People in the custody of a DOC facility aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions such as chronic lung disease or asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or renal

32

failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), or an inherited metabolic disorder; people who have had or are at risk of stroke; and people with any condition specifically identified by CDC, currently or in the future, as increasing their risk of contracting, having severe illness, and/or dying from COVID-19; and

      b)    *Disability Subclass*: People in custody who suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of contracting, becoming severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability, with a broad construction of "disability" pursuant to 28 C.F.R. § 35.101, which favors expansive coverage to the maximum extent permitted by the terms of the Americans With Disabilities Act ("ADA") that does not require extensive analysis.

94.    A class action is the only practicable means by which the individual Named Plaintiffs and the putative class members may challenge Defendants' unconstitutional actions. Many members of the Class are without the means to retain an attorney to represent them in a civil rights lawsuit.

95.    The Class and Subclasses are so numerous that joinder of all members is impractical. The number of people in custody exceeds 15,000 on any given day, and each Subclass contains hundreds, and possibly thousands, of people. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

96.    There are questions of law and fact common to all class members and to the subclass members, including: (a) does COVID-19 present a substantial risk of harm to people in DOC custody; (b) have Defendants failed to adequately protect the Class from the immediate threat

of COVID-19; (c) what practices are Defendants actually implementing with respect to COVID-19; (d) whether Defendants' actions and/or inactions constitute deliberate indifference to the rights of putative class members; (e) whether members of the High Risk Subclass are entitled to habeas corpus relief; (f) whether the rights of the Disability Subclass under the Americans with Disabilities Act ("ADA") are being violated by Defendants' policies and practices; and (g) whether Defendants illegally discriminated against the Disability Subclass by denying them reasonable accommodations recommended by the CDC, both in policy and practice.

97.     The claims of the Named Plaintiffs are typical of those of the Class, the High Risk Subclass, and the Disability Subclass. This typicality stems from Plaintiffs' claims that Defendants have placed them at significant risk of harm by failing to take appropriate steps to address the risk of COVID-19 throughout DOC. The claims of Plaintiffs, the Class, and Subclasses arise from the same conduct by Defendants and are based not only on identical legal theories, but also seek identical relief. All members of the Class and Subclasses are similarly injured by Defendants' wrongful conduct, and the harms Plaintiffs suffer are typical of the harms suffered by the Class and Subclasses.

98.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all Class and Subclass members is impracticable.

99.     Each class member is irreparably harmed as a result of Defendants' wrongful conduct. Litigating this case as a class action will reduce the risk of repetitious litigation relating to the Defendants' conduct.

100.     The individual Named Plaintiffs will fairly and adequately represent the interest of the Class and Subclasses. The Named Plaintiffs have no conflicts with the unnamed members of

the proposed Class and Subclasses. In addition, their lawyers are experienced in complex civil rights cases, including federal class actions against governmental entities.

101.    Defendants have engaged in unlawful actions and/or inactions in a manner that applies generally to the Class and Subclasses, rendering class-wide injunctive and declaratory relief appropriate. 2:30-2:45

## STATEMENT OF FACTS

I.    **COVID-19 is a Highly Contagious, Deadly Disease that Poses a Serious Risk of Death or Injury to Anyone Who Becomes Infected.**

102.    The COVID-19 pandemic has created a public health emergency of historic proportions. Currently, more than 11 million individuals worldwide have tested positive for COVID-19, and more than 500,000 have died from the disease.[17] The pandemic has affected every corner of the world, with the United States at its epicenter.

103.    In the United States alone, 3,304,942 individuals have tested positive for COVID-19, and 135,205 have died.[18] The number of deaths and the number of individuals who have tested positive have increased exponentially over the past few months. Arkansas has reported 28,367 positive tests and 321 deaths[19]—up from 1,971 positive tests and 42 deaths when Plaintiffs filed their initial Complaint.

104.    The World Health Organization ("WHO") declared COVID-19 a pandemic on March 11, 2020.[20] The same day, Governor Asa Hutchinson signed Executive Order 20-03 ("EO

---

[17] *See Coronavirus Disease 2019 (COVID-19): Situation Report—168*, WHO, (July 6, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200706-covid-19-sitrep-168.pdf?sfvrsn=7fed5c0b_2.

[18] *Arkansas COVID-19 Update, supra* note 1.

[19] *Id.*

[20] *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020*, WHO (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

20-03") declaring a state of emergency,[21] and confirmed the first presumptive case of COVID-19 in Arkansas.[22] Governor Hutchinson noted, "For months, Arkansas has been well prepared to respond to COVID-19. . . . [I have] asked each of my Cabinet secretaries to prepare a continuity of operation plan in the event of an outbreak of the virus."[23] EO 20-03 has since been amended to specify procedures to be undertaken across the State, encouraging social distancing, disinfecting, and other reasonable precautions.

105.    On March 13, 2020, President Trump declared "that the COVID-19 outbreak in the United States constitutes a national emergency."[24]

106.    COVID-19 is a highly contagious disease. When "unconstrained, the coronavirus spreads exponentially, the caseload doubling at a steady rate."[25] Infected individuals can pass the virus to others by coughing, sneezing, or talking.[26] Individuals may become infected if they breathe in a respiratory droplet containing the virus, or touch a surface that has the virus on it and then touch their mouth, nose, or eyes.[27] The virus can survive in the air in droplet form for at least three

---

[21] Ark. Proclamation No. 20-03 (Mar. 11, 2020), https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-03.__1.pdf.

[22] Press Release, Gov. Asa Hutchinson, Governor Hutchinson Confirms State's First Presumptive Positive COVID-19 Case (Mar. 11, 2020), https://governor.arkansas.gov/news-media/press-releases/governor-hutchinson-confirms-states-first-presumptive-positive-covid-19-cas.

[23] See id.

[24] Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020), https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak; *see also* President Donald Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[25] Kenneth Chang, *A Different Way to Chart the Spread of Coronavirus*, N.Y. Times (Mar. 20, 2020), https://www.nytimes.com/2020/03/20/health/coronavirus-data-logarithm-chart.html.

[26] *What you should know about COVID-19*, CDC (June 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[27] See id.

hours, and it can survive up to one day on cardboard, two days on plastic, and three days on steel.[28] There is evidence that transmission of the virus can occur before the onset of symptoms or through infected individuals who never develop symptoms.[29]

107.   Because COVID-19 is a novel virus, no vaccine exists, and no cure has been developed.[30] Unlike the flu, there is no effective antiviral medication to prevent or treat infection.[31]

108.   The combination of COVID-19's highly contagious nature and the lack of a vaccine or effective antiviral treatment mean that the disease spreads rampantly absent substantial public health interventions. Without such interventions, the CDC projects that 200 million people in the United States could become infected, and 1.5 million people could die.[32]

109.   The only known effective means of controlling the virus are social distancing—remaining physically separated from known or potentially infected individuals—and the use of hygienic measures, including frequent hand washing.[33] For purposes of social distancing, the CDC recommends that individuals stay at least six feet away from others and stay out of crowded places.[34]

---

[28] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, 382 New Eng. J. Med. 1564, 1564-67 (2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

[29] Declaration of Dr. Jonathan Louis Golob ("Golob Decl."), filed Apr. 21, 2020, at ¶ 6, attached as Exhibit 1 to Plaintiffs' Memorandum in Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. No. 3-1); Wycliffe E. Wei et al., *Presymptomatic Transmission of SARS-CoV-2 — Singapore, January 23 – March 16, 2020,* 69 MMWR. Morbidity & Mortality Wkly Rep., 411-15 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6914e1.htm.

[30] Declaration of Dr. Marc Stern ("Stern Decl."), filed Apr. 21, 2020, at ¶ 5, attached as Exhibit 2 to Plaintiffs' Memorandum in Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. No. 3-2).

[31] Golob Decl. at ¶ 10.

[32] *See id.* at ¶ 11.

[33] *See id.* at ¶ 10-11; Stern Decl. at ¶ 1.

[34] *Coronavirus Disease 2019 (COVID-19): Social Distancing*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated July 6, 2020).

110.    The virus also spreads more quickly in poorly ventilated spaces. An infected person who speaks for five minutes in a poorly ventilated area can produce as many infection droplets of the virus as one infectious cough.[35] That effect is magnified when multiple people share a space, which "build[s] up" the concentration of infectious droplets in the air.[36]

111.    The time period between when an individual becomes infected and the time that the individual exhibits symptoms varies from person to person.[37] The typical period is five days, but it can be as short as two days, and some people will never develop symptoms while still potentially spreading the disease.[38] As a result, the only way to establish the lack of risk from COVID-19 is through an aggressive testing regime.[39]

112.    People of all ages risk serious illness, injury, or death if they contract COVID-19.[40] Even mild cases of COVID-19 generally involve about two weeks of fevers and dry coughs and are more severe than the flu.[41]

113.    According to the WHO, approximately 20% of people who contract COVID-19 require treatment by a specialist, and one in six becomes seriously ill.[42] In serious cases, individuals' lungs "become filled with inflammatory material [and] are unable to get enough

---

[35] See id.

[36] See id.

[37] Golob Decl. at ¶ 6.

[38] *See id.* at ¶ 6.

[39] See id.

[40] Stephanie Bialek et al., *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020*, 69 MMWR. Morbidity & Mortality Wkly Rep. (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w.

[41] Holly Secon & Aria Bendix, *There is a wide misconception of what a 'mild' case of COVID-19 looks like. It can be ugly and brutal.*, Business Insider (Apr. 16, 2020), https://www.businessinsider.com/mild-coronavirus-cases-high-fever-dry-cough-2020-3.

[42] Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus?*, The Guardian (Apr. 14, 2020), https://www.theguardian.com/world/2020/apr/15/what-happens-to-your-lungs-with-coronavirus-covid-19.

oxygen to the bloodstream."[43]

114.    Severe cases of COVID-19 cause acute respiratory distress syndrome ("ARDS") in which fluid displaces air in the lungs. COVID-19 patients with ARDS "are essentially drowning in their own blood and fluids because their lungs are so full."[44]

115.    The virus frequently causes extreme symptoms, including fever and chills that can last for weeks, excruciating pain, debilitating fatigue, an unremitting cough, uncontrollable diarrhea, and an inability to keep down food and water.[45] CNN Anchor Chris Cuomo contracted COVID-19 and explained that "[i]t was like somebody was beating me like a piñata."[46] Cuomo shivered so much that he chipped a tooth, hallucinated, and experienced a fever in excess of 103 degrees.[47] And Cuomo's illness was not one of the more serious manifestations of the illness that required hospitalization. Others have characterized the experience of COVID-19 as "the most excruciating pain I've ever felt."[48]

116.    Even among young and healthy people, a COVID-19 infection requires supportive care, including supplemental oxygen, positive pressure ventilation, and extracorporeal mechanical

---

[43] See id.

[44] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[45] *See, e.g., id.*; Leah Groth, *Is Diarrhea a Symptom of COVID-19? New Study Says Digestive Issues May Be Common With Coronavirus*, Health (Mar. 20, 2020), https://www.health.com/condition/infectious-diseases/coronavirus/is-diarrhea-a-symptom-of-covid-19.

[46] Quint Forgey, *'Like somebody was beating me like a piñata': Chris Cuomo describes coronavirus battle*, Politico (Apr. 2, 2020), https://www.politico.com/news/2020/04/02/chris-cuomo-coronavirus-experience-161057.

[47] See id.

[48] Edward Pevos, *WDIV-TV anchor, Evrod Cassimy, recovered from coronavirus, describes 'most excruciating pain I've ever felt'*, MLive (Apr. 6, 2020), https://www.mlive.com/coronavirus/2020/04/wdiv-tv-anchor-evrod-cassimy-recovered-from-coronavirus-describes-most-excruciating-pain-ive-ever-felt.html.

oxygenation.[49]

117.    For a significant number of people, contracting COVID-19 will result in death. The

mortality rate from COVID-19 varies widely internationally but is currently 4.4% in the United

States.[50]

118.    Beyond the initial symptoms and the risk of death, COVID-19 also causes serious

long-term medical conditions.[51] It severely damages lung tissue and can cause a permanent loss of

lung capacity.[52] COVID-19 targets the heart muscle, causing inflammation of the muscle called

myocarditis.[53] Myocarditis affects both the heart muscle and electrical system leading to heart

failure that limits an individual's ability to work and exercise for the remainder of their life.[54]

COVID-19 also triggers an exaggerated response of the immune system called cytokine release

syndrome, which can result in damage to various organs, including permanent kidney injury that

requires dialysis and neurological injury.[55]

119.    Although COVID-19 can cause serious symptoms for any individual, up to and

including death, its effects are much more severe for certain populations.

120.    Among the highest risk populations, the fatality rate from COVID-19 is

---

[49] Golob Decl. at ¶ 5.

[50] *Mortality Analysis*, Johns Hopkins Univ. of Med., Coronavirus Res. Ctr., https://coronavirus.jhu.edu/data/mortality (last updated July 9, 2020).

[51] Tian-Yuan Xiong et al., *Coronaviruses and the cardiovascular system: acute and long-term implications*, 41 Eur. Heart J. 1798, 1798-1800 (2020), https://academic.oup.com/eurheartj/article/doi/10.1093/eurheartj/ehaa231/5809453.

[52] Golob Decl. at ¶ 9.

[53] See id.

[54] See id.

[55] *See id. See also* Victoria Forster, *Brain Damage and Hallucinations Associated With Even Mild COVID-19 Coronavirus Infection*, Forbes (July 8, 2020), https://www.forbes.com/sites/victoriaforster/2020/07/08/brain-damage-and-hallucinations-associated-with-even-mild-covid-19-coronavirus-infection/#26b89c3b6d91.

approximately 15%.[56] For high risk patients who do not die from the disease, the recovery period is prolonged, and individuals have a "profound" "need for extensive rehabilitation."[57]

121.    Individuals older than 50 are more vulnerable to COVID-19, and those over 70 face a particularly serious risk of death from the disease.[58]

122.    Various medical conditions also increase the risk of serious consequences from COVID-19 for individuals of any age. These conditions include lung disease, heart disease, diabetes, being immunocompromised (from cancer, HIV, autoimmune disease, etc.), blood disorders (including sickle cell disease), chronic liver or kidney disease, inherited metabolic disorders, stroke, developmental delay, or pregnancy.[59]

123.    Black individuals have faced significantly increased risks of both infection and death from COVID-19 in Arkansas, making up less than 16% of the population but accounting for 24% of confirmed cases and 25% of deaths.[60] This is consistent with the severe racial disparities with respect to the pandemic nationally. Black Americans have 65.8 COVID-related deaths per 100,000, compared to 28.5 deaths per 100,000 among white Americans.[61] The overall mortality rate for Black Americans is about 2.3 times as high as the rate for their white counterparts.[62] COVID-19 has a disproportionately harmful effect on Black people because they are more likely to have pre-existing conditions that exacerbate the symptoms of the disease due to environmental

---

[56] *Id.* at ¶ 4.

[57] *Id.*

[58] *See* Stern Decl. at ¶ 4; Golob Decl. at ¶ 3.

[59] Golob Decl. at ¶ 3.

[60] Arkansas COVID-19 Update, supra note 1.

[61] *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM Research Lab (July 8, 2020), https://www.apmresearchlab.org/covid/deaths-by-race.

[62] *Id.*

and economic factors and because of inequalities in the health care system.[63]

## II.   Conditions in DOC Facilities Create Serious Risk of COVID-19-Related Infection, Disease, and Death.

124.    On March 27 and April 15, 2020, Arkansas Secretary of the Department of Health Nathaniel Smith acknowledged that there is a high risk of COVID-19 in the correctional facility. At Governor Hutchinson's COVID-19 press briefing on April 2, 2020, Secretary Wendy Kelley commented that "once it gets in, it will be disastrous."[64]

125.    Indeed, correctional facilities are epicenters for infectious diseases, like COVID-19, because of they have higher levels of risk factors for infection; conditions that "unavoidab[ly] entail close contact in often overcrowded, poorly ventilated, and unsanitary facilities; and . . . poor access to healthcare services relative to that available in community settings."[65]

126.    Prisons are congregate environments (i.e., places where people live and sleep in close proximity).[66] In such environments, infectious diseases that are transmitted via the air or touch are more likely to spread, and therefore present an increased danger for the spread of

---

[63] Jan Wolfe, *African Americans more likely to die from coronavirus, early data shows*, Reuters (Apr. 6, 2020), https://www.reuters.com/article/us-health-coronavirus-usa-race/african-americans-more-likely-to-die-from-coronavirus-illness-early-data-shows-idUSKBN21O2B6; Colleen Walsh, *COVID-19 targets communities of color*, Harv. Gazette (Apr. 14, 2020), https://news.harvard.edu/gazette/story/2020/04/health-care-disparities-in-the-age-of-coronavirus/.

[64] Gov. Asa Hutchinson, *Live: Governor Hutchinson Provides COVID-19 Update to Media*, YouTube at 25:47 (Apr. 2, 2020), https://www.youtube.com/watch?v=xmZQ7M0J9FQ; John Moritz, *Federal prison has positive virus tests*, Ark. Democrat-Gazette, (Apr. 4, 2020) at https://www.arkansasonline.com/news/2020/apr/04/federal-prison-has-positive-virus-tests/.

[65] Stuart A. Kinner et al., Comment, *Prisons and custodial settings are part of a comprehensive response to COVID-19*, 5 Lancet Pub. Health e188, e188 (2020), https://www.thelancet.com/action/showPdf?pii=S2468-2667%2820%2930058-X; *see also* Bethany Young & Katie Robertson, *How Should Prisons and Jails Prepare for COVID-19?*, Urb. Instit.:Urb. Wire (Mar. 20, 2020), https://www.urban.org/urban-wire/how-should-prisons-and-jails-prepare-covid-19.

[66] Stern Decl. at ¶ 9.

COVID-19 if and when it is introduced into the facility.[67]

127.   COVID-19 has been especially dangerous in areas of close confinement, such as cruise ships and assisted living facilities. In early March 2020, the highest known person-to-person transmission rates for the virus were in a nursing home in Kirkland, Washington and on cruise ships in Japan and off the coast of California.[68] More recently, the highest recorded transmission rates have been in Rikers Island, a jail facility in New York City, with a rate of transmission that is over seven times higher than the city overall.[69]

128.   Similarly, on March 30, 2020, the captain of the aircraft carrier USS Theodore Roosevelt, Captain Brett Crozier, raised alarms about the spread of COVID-19 infection among the thousands of sailors on board.[70] In his letter to Navy officials, Captain Crozer noted that the "environment most conducive to spread of the disease is the environment the crew of the [Theodore Roosevelt] is in right now," including:

     a.   "Large amounts of Sailors in a confined space";

     b.   "Open, shared berthing";

     c.   "Shared restroom facilities'";

     d.   "Confined, shared workspaces . . .";

     e.   "Shared messing for large numbers"; and

     f.   "Meals cooked / food provided by exposed personnel . . . ."[71]

---

[67] *Id.*

[68] Golob Decl. at ¶ 12.

[69] *Id.*

[70] Matthias Gafni & Joe Garofoli, *Exclusive: Captain of aircraft carrier with growing coronavirus outbreak pleads for help from Navy*, S.F. Chron. (Mar. 31, 2020), https://www.sfchronicle.com/bayarea/article/Exclusive-Captain-of-aircraft-carrier-with-15167883.php.

[71] *Id.*, Letter from Capt. Brett E. Crozier, U.S. Navy, to U.S. Dep't of the Navy, Subj: Request for Assistance in Response to COVID-19 Pandemic 2 (Mar. 30, 2020).

129.    In order to "[p]revent unnecessary deaths, reduce the number of Sailors that contract COVID-19 and eliminate future virus spread," Capt. Crozier agreed that "[e]very Sailor must be guaranteed virus-free and the ship environment must be disinfected. One infected Sailor introduced to the ship will spread the virus."[72] Capt. Crozier further asserted that "[d]ecisive action is required. . . . Sailors do not need to die."[73]

130.    As of April 17, 2020, 660 crew members (13%) tested positive for the virus,[74] with one casualty—41-year-old Aviation Ordnanceman Chief Petty Officer Charles Robert Thacker Jr., who is from Fort Smith, Arkansas.[75]

131.    Because people incarcerated in DOC facilities are housed in close quarters, unable to maintain a six-foot distance from others, and share or touch objects used by others, the risks of contracting COVID-19 are greatly, if not exponentially, increased, as is already evidenced by the spread of COVID-19 in other congregate environments.[76] Indeed, despite the significant resources and discipline of the U.S. military, over 600 sailors have become infected and one sailor has died from widespread infection in a single aircraft carrier.

132.    The risk of COVID-19 spreading throughout DOC facilities is exceptionally high, in part because of the presence of outsiders and staff, who may be asymptomatic or presenting COVID-19 symptoms in these facilities.[77] Dr. Robert Redfield, Director of the CDC, has warned

---

[72] *Id.* at 3.

[73] *Id.* at 3-4.

[74] Matthew Impelli, *660 Crew Members on USS Theodore Roosevelt Test Positive for Coronavirus, Newsweek* (Apr. 17, 2020), https://www.newsweek.com/660-crew-members-uss-theodore-roosevelt-test-positive-coronavirus-1498612.

[75] Sam LaGrone, *Navy Identifies Carrier Roosevelt Sailor Who Died from COVID-19*, U.S. Naval Instit. News (Apr. 16, 2020), https://news.usni.org/2020/04/16/navy-identifies-carrier-roosevelt-sailor-who-died-from-covid-19.

[76] Stern Decl. at ¶ 9; *see also* Watts & Erdman, *supra* note 9.

[77] Stern Decl. at ¶ 9.

that as many as 25% of individuals infected with COVID-19 may not show symptoms.[78] In fact, of the 600 confirmed infections in Cummins Unit, most are asymptomatic.[79] Thus, screening outsiders, including staff and visitors, for symptoms of COVID-19, will not necessarily prevent the introduction of COVID-19 from the outside because the virus can spread before people show symptoms.

133.    Along with facing greater risk of infection, incarcerated people in Arkansas are also more likely to have underlying medical conditions that render them especially vulnerable to severe illness and even death from COVID-19. Health profiles of incarcerated people show that they are significantly sicker and more vulnerable to COVID-19 than the general population.[80] For example, incarcerated people are more likely to have medical conditions such as asthma, tuberculosis, hypertension, diabetes, and heart disease, as compared to the general population.[81] The Department of Justice has found that "[b]oth prisoners and jail inmates were more likely than the general population to report ever having a chronic condition or infectious disease."[82] "[H]alf of state and federal prisoners and local jail inmates reported ever having a chronic condition," such as "cancer, high blood pressure, stroke-related problems, diabetes, heart-related problems, kidney-related problems, arthritis, asthma, and cirrhosis of the liver," and "[t]wenty-one percent of prisoners

---

[78] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[79] Meghan Rhoos, *One Arkansas Prison Makes Up Almost a Third of State's Coronavirus Cases*, Newsweek (Apr. 20, 2020), https://www.newsweek.com/one-arkansas-prison-makes-almost-third-states-coronavirus-cases-1499045.

[80] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Pol'y Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic/.

[81] *Id.*

[82] Laura M. Maruschak et al., Bureau of Justice Stats, *Medical Problems of State and Federal Prisons and Jail Inmates, 2011-12*, U.S. Dep't of Justice, 1 (2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

. . . reported ever having an infectious disease," "including tuberculosis, hepatitis B and C, and other sexually transmitted diseases (STDs)."[83] Also, the prevalence of tuberculosis is 12 times higher in state and federal prisons compared to overall U.S. population.[84]

| Health condition | Prevalence of health condition by population | | | |
| | Jails | State prisons | Federal prisons | United States |
|---|---|---|---|---|
| Ever tested positive for Tuberculosis | 2.5% | | 6.0% | 0.5% |
| Asthma | 20.1% | | 14.9% | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | | 1.3% | 0.4% |
| High blood pressure/hypertension | 30.2% | | 26.3% | 18.1% |
| Diabetes/high blood sugar | 7.2% | | 9.0% | 6.5% |
| Heart-related problems | 10.4% | | 9.8% | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report.*
*the CDC's                                                         , and data from the                    . Cigarette*
*smoking data are from a 2016 study.                                              , and all other data are from the 2015*
*BJS report,                                                                  , which does not offer separate data for*
*the federal and state prison populations. Cigarette smoking                            of the higher fatality rate in China*
*among men, who are far more likely to smoke than women.*

Source: Prison Policy Initiative, https://www.prisonpolicy.org/blog/2020/03/06/pandemic

134.    As with tuberculosis, the hazardous combination of overcrowding and poor ventilation, along with incarcerated people living in close quarters and without available means to ensure preventative hygiene practices, causes correctional facilities to become known breeding grounds for highly infectious respiratory illnesses like COVID-19.

135.    "Chronic health conditions, such as diabetes, hypertension, and asthma, . . . [are a] growing proportion of correctional health care needs" due to "two trends: the aging prison population and the nation's general obesity epidemic. About 40% of all inmates are estimated to have at least one chronic health condition. With a few exceptions, nearly all chronic health

_____
[83] *Id.*
[84] *Id.*

46

conditions are more prevalent among inmates than in the general population."[85]

136.    The Department of Justice has reported that 74% of incarcerated people are overweight, obese, or morbidly obese.[86] Problems with obesity within the prison population are especially troubling in this pandemic because obesity may be an important predictor of severe COVID-19-related illness, especially among younger people.[87] This is because people with obesity may already have a compromised respiratory system, and "[a]bdominal obesity, [which is] more prominent in men, can cause compression of the diaphragm, lungs and chest capacity."[88]

137.    In addition, a growing elderly prison population is especially at risk of serious COVID-19 disease or death. In fact, the "percentage of people in state prisons who are 55 and older more than tripled between 2000 and 2016," and, "[f]or the first time, older adults make up a larger share of the state prison population than people from 18 to 24."[89]

138.    Because individuals in jails and prisons are considered physiologically comparable to individuals in the community several years older, many state departments of corrections and the Federal Bureau of Prisons define "elderly" or "older" variously between 50 and 60 years of age.[90] Accordingly, people over the age of 50 in correctional settings are considered vulnerable to the

---

[85] Alexandria Macmadu & Josiah D. Rich, Correctional Health Is Community Health, 13 Issues in Sci. & Tech., Vol. XXXII, No. 1 (2015), https://issues.org/correctional-health-is-community-health/.

[86] U.S. Dep't of Justice, Bureau of Justice Stats., *Medical Problems of State and Federal Prisons and Jail Inmates, 2011-12* p. 1 (2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[87] Roni Caryn Rabin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, N.Y. Times (Apr. 16, 2020), https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html.

[88] *Id.*

[89] Weihua Li and Nicole Lewis, *This Chart Shows Why The Prison Population Is So Vulnerable to COVID-19*, Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19.

[90] Stern Decl. at ¶ 9.

COVID-19 virus.[91]

III.  **The Spread of Covid-19 In DOC Facilities Jeopardizes the Public Health of Surrounding Communities, Especially Black Communities.**

139.    Prisons are not fully closed environments. When the COVID-19 virus is introduced to a prison, all persons within the facility—whether they are staff or a incarcerated people—are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they live or come into contact with in their own homes and neighborhoods.[92] The harm caused by a COVID-19 outbreak in a correctional facility, therefore, is not confined to those who are incarcerated or work in that facility. Instead, this harm poses a serious health risk to the surrounding community.[93]

140.    For example, scarce community health resources like emergency departments, hospital beds, and ventilators inevitably become more scarce when there is a COVID-19 outbreak in a detention facility, because incarcerated people are more likely to have underlying medical conditions that carry a significantly increased risk of severe complications from COVID-19.[94]

141.    A COVID-19 outbreak exceeds the capacity of the local health infrastructure because treatment for serious cases requires significant medical intervention, including ventilator assistance and intensive care support.[95] If the need for ICU beds and life-saving medical equipment exceeds supply, the death rate increases for the entire population of Arkansas. Indeed, at least one major hospital has almost reached capacity in its intensive care unit.[96]

---

[91] *Id.*
[92] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform,* Prison Pol'y Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic/.
[93] Stern Decl. at ¶ 11.
[94] Stern Decl. at ¶ 9.
[95] *See id.* at ¶ 8.
[96] 'We are on the edge', KATV, supra note 12.

142.    The distribution of correctional facilities also poses a substantial risk that a COVID-19 outbreak in DOC facilities will create a dangerous shortage of ICU beds in surrounding areas. Of the 20 DOC facilities, nine are located in counties with no ICU beds in surrounding communities.[97] Six more are located in Jefferson County, which has only 34 ICU beds.[98] All three of the facilities with the largest detention capacities—Cummins Unit, East Arkansas Regional Unit, and Varner Unit—are in counties with no ICU beds.[99]

143.    The geographic distribution of DOC facilities greatly increases the risk additional or exacerbated COVID-19 outbreaks in communities surrounding those facilities, which would disproportionately impact Arkansas's Black residents.

144.    The DOC runs 20 detention facilities across the State.[100] These facilities are not evenly distributed across Arkansas. Instead, they are concentrated in the southeastern part of the State, near Pine Bluff.[101]

145.    Black people make up 15.7% of the Arkansas population.[102] Yet eight of the 20 DOC facilities are located in counties where Black individuals comprise a majority of residents.[103] In total, 16 of the 20 DOC detention facilities are located in counties that have a higher percentage

---

[97] These facilities are Cummins Unit, Delta Regional Unit, East Arkansas Regional Unit, Grimes Unit, McPherson Unit, North Central Unit, Texarkana Regional Corrections Center, Varner and Varner Supermax Unit, Wrightsville Unit. *See Facilities,* DOC, , https://adc.arkansas.gov/facilities (last visited July 9, 2020) (listing facilities and locations); Ninette Sosa, *A Closer Look: Arkansas and ICU Beds by County*, KNWA Fox (Mar. 27, 2020), https://www.nwahomepage.com/lifestyle/health/coronavirus/a-closer-look-arkansas-and-icu-beds-per-county/ (listing ICU beds by county).
[98] See id.
[99] See id.
[100] *Facilities,* DOC, *supra* note 97.
[101] See id.
[102] Quick Facts: Arkansas, U.S. Census Bureau, supra note 14.
[103] *See Facilities,* DOC, *supra* note 97 (listing facilities and locations); *Quick Facts*, U. S. Census Bureau, *supra* note 14 (providing search tool for demographic data for all Arkansas counties).

of Black people than the State—usually by a significant margin.[104]

146.    If COVID-19 spreads throughout DOC's facilities, Black Arkansans will disproportionately suffer consequences from that spread, as compared to their percentage of the Arkansas state population.

## IV.    Defendants Have Failed to Adopt and Implement Adequate Policies and Procedures to Prevent and Mitigate the Spread of COVID-19.

147.    On March 11, 2020, Defendant Kelley issued a memorandum outlining DOC's protocols to reduce the risk and combat the spread of COVID-19 within DOC facilities. This memorandum only encouraged regular hand washing, covering coughs and sneezes, avoiding handshakes, *continuing* cleaning (instead of intensifying it), and telling staff members to stay at home if ill.[105]

148.    On March 23, 2020, the CDC published its guidance for correctional facilities.[106] The purpose of the CDC Guidance is, in part, to help correctional facilities ensure the protection of the health and safety of incarcerated people. DOC leadership, including Defendant Kelly, were made aware of the CDC guidance on March 23, 2020. Defendant ADC Director, Dexter Payne, has stated that "in order to save lives and halt the spread of the virus we must be obedient to the recommendations of the Centers for Disease Control (CDC) and the Arkansas Department of Health (ADH)." [107]

149.    On March 27, 2020, ADH issued its Guidance for State Correctional Facilities and

---

[104] See id.

[105] Memorandum from Wendy Kelley, Sec. of Corrs., DOC, to DOC (Mar. 11, 2020), https://ssl-adc.ark.org/images/uploads/Coronavirus_Notice_for_Web_-_3-11-2020.pdf.

[106] The CDC is a federal agency and the leading national public health institute of the United States. It is charged with protecting public health and safety through the control and prevention of disease; *See CDC Guidance,* CDC, *supra* note 11

[107] Email from Dexter Paine to Dona Gordon & Charles Allen (Apr. 8, 2020), filed on May 5, 2020, attached as Exhibit 18 to Defendants Exhibit List, (Dkt. No. 49-18).

Local Detention Facilities, which noted that correctional facilities and detention centers "pose a high risk for transmission of COVID-19." ADH issued subsequent guidance, including the ADH Guidance for Reducing Spread on COVID-19 in Correctional Facilities, issued on April 13, 2020, and April 15, 2020.

150.    Defendants and DOC officials have consulted with and/or relied on this guidance, as well as other communications from ADH officials, to develop and/or implement policies and practices related to the preparation for, and response to, the COVID-19 pandemic in DOC facilities, including without limitation COVID-19 prevention, testing, quarantining, and/or medical treatment. According to DOC officials, including some of the named Defendants, ADH and/or Wellpath determine which incarcerated person gets tested for COVID-19, receives medical treatment for related illnesses, is quarantined, and/or is released from quarantine. Moreover, DOC officials have stated that ADH determines whether infected, but asymptomatic DOC staff, should report to work.

151.    People incarcerated in DOC facilities are purportedly eligible for COVID-19 tests if they present symptoms of infection. Defendant Nathaniel Smith has stated that the "only way to know whether someone has symptoms or not is to ask them. By definition, symptoms are something people report." [108] However, Defendant Smith does not consider incarcerated people to always be reliable sources about their symptoms.[109]

152.    Governor Hutchinson repeatedly denied requests to reduce prison populations in

---

[108] Anna Stitt, *COVID-19 Inside Arkansas Prisons: Virus Spreads Through Inmate Populations and Staff*, FM 89.1 KUAR NPR (June 8, 2020), https://www.ualrpublicradio.org/post/covid-19-inside-arkansas-prisons-virus-spreads-through-inmate-populations-and-staff.
[109] *Id.*

Arkansas despite expert recommendations for such reductions.[110] On April 19, 2020, the Governor finally announced that he had asked for a review for potential release only of "non-violent" and "non-sex-offenders," and only those due for release within six months of his request.[111] The Governor noted that this review was "important . . . [because] we want to have sufficient space available so that we can have the inmates that test positive isolated." [112] Ultimately, only 907 people were approved for early release.[113]

153.    This minimal number of releases did not achieve what the Governor acknowledged was important to prevent the spread of COVID-19 in DOC facilities—namely, to provide sufficient space for quarantining people who test positive, as well as to facilitate the practice of social

---

[110] *See e.g.*, Letter Holly Dickson, Interim Exec. Dir. & Legal Dir., ACLU, to Hon. Asa Hutchinson, Gov. of the State of Ark. et al, *Re: COVID-19 and the Criminal Justice System* (Mar. 18, 2020), https://www.acluarkansas.org/sites/default/files/field_documents/aclu_ar_letter_to_sta te_and_local_officials_2020-3-18.pdf (noting that health experts recommended reducing prison populations); *see also* John Moritz, *Arkansas Governor: Not considering prison releases over coronavirus concerns*, Ark. Democrat-Gazette (Mar. 19, 2020), https://www.arkansasonline.com/news/2020/mar/19/arkansas-governor-not-considering-prison-releases-/ (reporting that the Governor was not considering early release after the Mar. 18 ACLU Letter); Paige Cushman et al., *44 inmates at Arkansas prison test positive for COVID-19*, KATV (Apr. 13, 2020), https://katv.com/news/local/43-inmates-in-one-arkansas-prison-barrack-test-positive-for-covid-19 (reporting that Reps. Jamie Scott and Vivian Flowers urged a reduction in prison population and quoting the Governor as stating he had no plans to review any incarcerated people for early release); Gov. Asa Hutchinson, *Governor Hutchinson Provides COVID-19 Update* (Apr. 17, 2020), at 44:04, https://www.youtube.com/watch?v=LcyyCs8y_aQ (denying requests from legislators like Rep. Scott to review incarcerated people for compassionate release).

[111] Gov. Asa Hutchinson, *Governor Hutchinson Provides COVID-19 Update*, YouTube (Apr. 19, 2020), at 13:10–13:18, https://www.youtube.com/watch?v=YVYS2NQFljI; Scott Carroll, *Arkansas suspends parole requirement, makes 1,244 inmates eligible for early release*, KATV (Apr. 24, 2020), https://katv.com/news/local/arkansas-suspends-parole-rule-makes-1244-inmates-eligible-for-early-release.

[112] Gov. Asa Hutchinson, *Governor Hutchinson Provides COVID-19 Update*, YouTube (Apr. 19, 2020), at 13:10–13:18, https://www.youtube.com/watch?v=YVYS2NQFljI; Scott Carroll, *Arkansas suspends parole requirement, makes 1,244 inmates eligible for early release*, KATV (Apr. 24, 2020), https://katv.com/news/local/arkansas-suspends-parole-rule-makes-1244-inmates-eligible-for-early-release.

[113] DOC, *Modified EPA Update*, (Updated June 1, 2020) at https://adc.arkansas.gov/modified-epa-update.

distancing. In fact, from March through the end of May 2020, populations at some DOC facilities—such as Grimes, North Central, and Tucker Units—actually *increased*.[114] Many prisons, including Cummins, East Arkansas, and Varner, remained near or over capacity as of the end of May, 2020.[115] The Governor has continued to refuse to act to protect those incarcerated who have health conditions making them more vulnerable to complications from COVID-19, including those with health conditions so debilitating that they almost certainly pose no risk to public safety.

154.    As the contract medical provider for DOC facilities, Defendant Wellpath—independently and/or under the direction of any of the other Defendants—failed to provide adequate testing and/or medical services to incarcerated people who are suspected or confirmed to have contracted the COVID-19 virus in a manner that is reasonably necessary to prevent the spread of COVID-19 and to properly treat all infected individuals incarcerated in DOC facilities.

155.    Incarcerated people who presented symptoms of COVID-19 infection, or who were exposed to infected individuals, have been denied testing. Many are required to put in sick calls, which may take days if not more to receive medical assistance—if any medical assistance is provided at all. Moreover, many of those incarcerated people with confirmed infections who become seriously ill are left unattended without appropriate medical treatment and suffer greatly as a result. On information and belief, incarcerated people have died from COVID-19 due to the

---

[114] *Compare* Dexter Payne, Dir., ADC, *Board Report: April 2020* at 12, https://adc.arkansas.gov/images/uploads/Division_of_Correction_Directors_Board_Report_April 2020-FINAL.pdf, *with* Dexter Payne, Dir., ADC, *Board Report: June 2020* at 12, https://adc.arkansas.gov/images/uploads/Division_of_Correction_Directors_Board_Report_June 2020-FINAL.pdf.

[115] *See* Dexter Payne& Wendy Kelley, *Ark. Div. of Correction Annual Fiscal Report*, (2019) at 45-52 https://adc.arkansas.gov/images/uploads/Division_of_Correction_FY19_Annual _Report_BOC_Approval-5272020.pdf; Dexter Payne, Dir., ADC, *Board Report: June 2020* at 12, https://adc.arkansas.gov/images/uploads/Division_of_Correction_Directors_Board_Report_June 2020-FINAL.pdf.

lack of adequate medical care and attention and future deaths may also occur.

156.    Defendants' failures with respect to their preparation for and/or response to COVID-19 have placed incarcerated people in DOC facilities at a significant and unnecessarily heightened risk of infection, severe illness, and/or death despite widespread awareness of the highly contagious nature of COVID-19 and the severe consequences of infection, especially among older people and people with underlying health and medical conditions.

157.    Defendants' failures to adopt and implement adequate policies and procedures to prevent and mitigate the spread of COVID-19—as well as to sufficiently supervise and train DOC staff to ensure the effectiveness of mitigation measures—fall into eight broad categories, which are discussed below.

158.    *First*, Defendants failed to adequately plan to prevent or mitigate the spread of COVID-19 in DOC facilities. Importantly, for instance, the CDC Guidance recommends that correctional facilities should develop contingency plans for reduced workforces due to staff absences.

159.    As a result of Defendants' failure to adequately plan for staff shortages, DOC facilities are experiencing unmitigated staffing shortages amid the COVID-19 pandemic.[116] These shortages place Named Plaintiffs and the putative class members at great risk. For example, some Ouachita River Unit staff are not being screened for COVID-19 symptoms, because the facility is desperate for staff due to staffing shortages amid the COVID-19 pandemic. Notably, this failure to screen staff is also in contravention of CDC Guidance. Staff shortages are further exacerbated

---

[116] Ninette Sosa, *A CLOSER LOOK: COVID-19 continues to impact Arkansas state prisons & staff*, KNWA (June 30, 2020) https://www.nwahomepage.com/lifestyle/health/coronavirus/a-closer-look-covid-19-continues-to-impact-state-prisons-staff/.

by the need for corrections staff to conduct tasks, such as preparation of meals, that are normally handled by incarcerated people who are unavailable due to COVID-19 infection and/or illness.

160.    The CDC Guidance calls for the provision of PPE and contingency planning for shortages of PPE. Some Named Plaintiffs have yet to receive a mask or have received only one. When only one mask is provided, any attempt to clean the mask requires incarcerated people being without the mask for an unsafe period. After a mask is handwashed, it cannot be worn while it is drying. Also, an incarcerated person who sends their mask to the laundry goes without the mask until it is returned to them, and even then, they risk their mask being damaged by the laundry machines.

161.    *Second*, Defendants have failed to implement the training and educational interventions necessary to prevent the spread of COVID-19 in correctional facilities. The CDC Guidance states that correctional staff and incarcerated people should be trained on donning, doffing, and disposing of PPE. However, the guidance provided by ADH makes no mention of any training. Plaintiffs and the putative class members have not been instructed on how to properly don, doff, or dispose of PPE. And incarcerated people are instructed by DOC staff to use masks outside their barracks, but not inside the barracks.

162.    Whereas the CDC Guidance recommends that correctional facilities post signage informing staff and incarcerated people how to report COVID-19 symptoms and telling staff to stay at home when sick, Defendants do not require any such signage. Some units have utilized signage, but it is not consistently displayed throughout or across units. Many barracks do not have any signage at all. Many Named Plaintiffs and putative class members are therefore being deprived of needed information and reminders regarding how they can seek help if they become symptomatic.

163.    Moreover, despite knowledge of widespread problems with corrections staff properly following PPE protocol, Defendants have not properly and sufficiently supervised and/or trained staff to ensure satisfactory compliance with DOC policies and procedures. Many DOC staff members wear their face masks below their nose—if they wear them at all. The few staff members who wear protective gloves do not change them regularly, in contravention of the CDC Guidance for the use of PPE. The failure of DOC staff to properly use masks and other PPE has continued despite Defendants' knowledge of this widespread problem, both prior to and after the filing of this lawsuit.

164.    *Third*, Defendants have not implemented the heightened hygienic, cleaning, and disinfecting practices called for by the CDC Guidance. Named Plaintiffs also do not have access to the cleaning supplies necessary to sanitize themselves, their personal items, or their living areas. Indeed, DOC rules continue to restrict access to such crucial cleaning supplies, even in the midst of the COVID-19 pandemic.

165.    Defendants' failures are also reflected in the unsanitary conditions of DOC facilities. DOC has not intensified cleaning and disinfecting its facilities amid the pandemic. For example, Mr. Brown has never observed intensified cleaning and disinfecting at EARU throughout the pandemic. And besides a two-week period in May, Mr. Czarnetzki likewise has not witnessed intensified cleaning and disinfecting at Tucker Unit. At CACCC, Mr. Elrod and Mr. Sims clean their bathrooms and living areas twice each day, but they are not provided any chemicals that are effective against COVID-19. Bleach may be used by a cleaning team only once per day and only in showers and sinks. Mr. Elrod has not witnessed regular cleaning of frequently touched surfaces such as doorknobs.

166. In addition, DOC has not followed the CDC's recommendation that staff clean shared surfaces several times a day. Even though Mr. Serrato shares a barracks with over 40 people, frequently touched surfaces in his barracks are not disinfected several times a day as recommended by the CDC.

167. These unsanitary conditions and inadequate levels of cleaning and disinfecting, which are in contravention of the CDC Guidance, place Named Plaintiffs and the putative class members at an inexcusably higher risk of contracting COVID-19. Defendants have been aware of the deficiencies in the cleaning and disinfecting of DOC facilities, as evidenced in sanitation logs and other forms of documentation and communication, but have not taken sufficient steps to remedy the ongoing problems throughout DOC through appropriate follow-up, supervision, and/or training.

168. *Fourth,* Defendants have failed to adequately implement measures to reduce crowding, minimize interpersonal contact, and encourage social distancing. The CDC Guidance makes clear that "although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19." Yet, despite purporting to rely on the CDC Guidance, Defendants have taken insufficient and inadequate steps to facilitate social distancing. The minimal measures Defendants have taken, such as proposing alternating beds head-to-toe and staggered meals, have not been properly implemented or enforced, and despite widespread knowledge of these deficiencies, Defendants have failed to follow up with appropriate supervision and training.

169.   The DOC has not heeded the CDC's caution against unnecessarily transferring incarcerated people from one facility to another.[117] As was the case before the COVID-19 pandemic, dozens of incarcerated people are currently being transported from Ouachita River Correctional Unit to other DOC facilities daily. Similarly, the transfer of incarcerated people into Varner Unit from other DOC facilities has continued unabated amid the pandemic. Incarcerated people are also moved within DOC facilities without appropriate assurance of isolation and quarantining for those individuals exposed to—or infected with—COVID-19.

170.   Dozens of incarcerated people are currently engaging in recreational activities and having meals together in the same place, at the same time. Also, people incarcerated in DOC facilities sit within two feet of each other while dining; this is in contravention of the CDC's recommendation of six feet of social distancing. Mr. Sims and Mr. Elrod report interacting with people from all the wings at CACCC, including sitting close together in the gym for hours each day.

171.   Named Plaintiffs and the putative class members are similarly unable to social distance in their barracks, where they sleep. Mr. Otwell is housed in a barracks in which the beds are located within 2.5 feet of each other. Mr. Serrato's bed is similarly situated within 2.5 feet of the beds of men around him.  Although the men in Mr. Owens' barracks were told to alternate their

---

[117] *Cf.* Timothy Williams and Rebecca Griesbach, *San Quentin Prison Was Free of the Virus. One Decision Fueled an Outbreak.*, N.Y. Times, (June 30, 2020), https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html, ("The transfer of inmates—an effort intended to slow the virus, which instead apparently created a new outbreak—has been denounced by health officials, a federal judge and a growing number of state lawmakers as a public health failure. How San Quentin went from being a prison that had held off the virus for months to a place inundated with sick inmates represents a cautionary tale for the nation's prison system amid the pandemic.")

beds head-to-toe, DOC staff have not enforced this rule, and so few actually have changed their sleeping placement.

172.    This inability to social distance, together with a failure to adequately implement measures to reduce overcrowding, places Named Plaintiffs and the putative class members at a heightened risk of contracting COVID-19.

173.    *Fifth*, Defendants do not adequately address suspected cases of COVID-19. If an incarcerated person exhibits symptoms of COVID-19, the CDC Guidance calls for them to be immediately given a face mask, placed in isolation, provided a medical evaluation and treatment, and evaluated for possible testing. In contrast, Defendants are not medically evaluating or treating all symptomatic people in DOC facilities and/or do not evaluate them for testing, nor are they appropriately supervising and/or training DOC staff to ensure that suspected cases of COVID-19 are properly addressed.

174.    Named Plaintiffs have firsthand experience with Defendants' inadequate treatment of incarcerated people exhibiting symptoms of COVID-19. For example, Mr. Kent informed prison staff that he had symptoms of COVID-19, but did not receive medical treatment, despite being especially vulnerable to contracting COVID-19 due to his serious heart condition. When Mr. Kouri, who is severely obese and therefore vulnerable to COVID-19, initially reported COVID-19 symptoms, such as shortness of breath and a cough, he was not evaluated for testing. Instead, he was provided eyedrops and sent back to his regular barrack. Similarly, Mr. Nickson— who, as a 61-year-old with diabetes, has an increased risk of contracting and dying from COVID-19—was not placed in isolation, despite his reporting symptoms of COVID-19. Instead, he continued to be housed with his non-symptomatic roommate. Residents at CACCC were not tested

until it became public that a staff member had died of COVID-19, despite many of them showing symptoms such as high fever.

175.   Defendants' unconstitutionally inadequate manner of handling suspected COVID-19 cases places Named Plaintiffs and the putative class members at a heightened risk of contracting COVID-19.

176.   *Sixth*, Defendants have failed to adequately manage staff who have tested positive for COVID-19. Instead, Defendants have permitted—and at times required—staff members who test positive to report to work, purporting to set guidelines that positive staff be asymptomatic and only interact with infected incarcerated people, though infected staff must use the same secured entrance as not-yet-infected staff.

177.   Defendants knew or should have known that this policy and implemented practice placed Named Plaintiffs and the putative class members in great peril. The CDC Guidance indicates that "[i]f staff test positive for COVID-19: . . . do not return to work until a decision to discontinue home medical isolation precautions is made. Monitor CDC guidance on discontinuing home isolation regularly as circumstances evolve rapidly." The CDC Guidance further warns that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress . . . ." Defendants have acknowledged that employees who have been exposed to or exhibit symptoms of COVID-19 should not report to work until they have completed their quarantine, yet they nevertheless instituted policies and practices that heighten this well-established risk.

178.   *Seventh*, Defendants do not adequately handle incarcerated people and/or corrections staff who have had contact with people known to have tested positive for COVID-19 ("Close Contact Case"). In contravention of the CDC Guidance, Defendants have not implemented

a 14-day quarantine of Close Contact Cases (with the exception of positive incarcerated people's cellmates), nor do they call for monitoring Close Contact Cases for COVID-19 symptoms. Defendants have also departed from the CDC Guidance by not requiring ADC staff who have had close contact with a COVID-19-positive person to not return to work unless they are asymptomatic 14 days after their exposure to COVID-19.

179.    *Eighth*, Defendants have woefully inadequate policies and procedures for addressing the presence of a person who has tested positive for COVID-19 in a DOC facility. In the event that an incarcerated person or staff member tests positive for COVID-19, the CDC Guidance calls for the facility to close off the areas used by the person who contracted COVID-19. These areas are to be well ventilated for at least 24 hours before they are disinfected by people equipped with proper PPE. Defendants, however, have not implemented any of these measures.

180.    Moreover, due to inadequate testing, Defendants do not have an accurate accounting of who among the incarcerated population have been infected with COVID-19 and thus should be isolated to avoid spread of the virus.

181.    In addition, Defendants have departed from the CDC Guidance by not informing incarcerated people that someone in their correctional facility has tested positive for COVID-19, thereby foregoing an opportunity to encourage incarcerated people to exercise more vigilance in their hygiene and cleaning habits when such extra vigilance is needed most.

182.    Defendant Payne's claim that "ADC has [] used contact tracing to test inmates who may have been exposed to COVID-19 by staff members that became infected by the virus" (Dkt. No. 49-14, para. 13) is belied by the fact that, as of April 29, 2020, no incarcerated people had been tested at Grimes or EARU, despite staff at each facility having tested positive for the virus

(Dkt. No. 51-6). Defendants' failure to conduct needed contact tracing with follow-up testing facilitated the subsequent outbreaks of COVID-19 at each of these facilities.

183.    For those incarcerated people who are confirmed to have contracted the COVID-19 virus and have been quarantined, the medical care provided to them has been grossly inadequate. Despite exhibiting obvious symptoms, many putative class members do not receive timely and appropriate medical attention, but instead are left to suffer on their own. Those who do receive some form of medical care may receive treatment that is medically insufficient or inappropriate for the symptoms presented and/or provided long after it is medically required.

184.    Defendants know that the aforementioned failures to adequately prevent and mitigate against the risk of COVID-19 spreading throughout DOC facilities unnecessarily heighten the risk of Plaintiffs and the putative class members contracting COVID-19. Defendants also know what actions should be taken to quarantine those Named Plaintiffs and putative class members who have contracted COVID-19 to prevent further spread of the virus and to provide adequate medical care to avoid serious illness and possible death. Despite this knowledge, Defendants have failed to take reasonable steps to protect the health, safety, and well-being of people incarcerated in DOC facilities amidst the COVID-19 pandemic.

185.    On April 8, 2020, the Arkansas Civil Liberties Union sent a letter to Governor Hutchinson, emphasizing the need to comply with the CDC Guidance in DOC facilities, in part by mandating social distancing and minimizing the transfer of incarcerated people from one detention facility to another. This letter was also sent to Defendant Kelley. Despite the serious warnings in this letter, Defendants failed to implement any of the recommendations.

186.    Even in those instances where Defendants have instituted policies and procedures to prevent and mitigate the spread of COVID-19 in DOC facilities, they have failed to ensure their

proper implementation although they knew that there were problems with implementation. Despite being on notice of these problems, Defendants have not sufficiently supervised and/or trained DOC staff to remedy widespread problems with the implementation of DOC policies and procedures.

V.     **Wellpath's Failure to Provide Adequate COVID-19-Related Medical Care to Those Incarcerated in Arkansas' Prisons.**

187.     Wellpath's provision of medical care during the pandemic has been deliberately indifferent, but its egregious failure to provide adequate medical care predates the pandemic—and was known to the Arkansas Board of Corrections months before the pandemic's onset.

188.     Although Arkansas pays Wellpath $371 per month per incarcerated person for healthcare services, Wellpath endeavors to spend as little of that money as possible on medical care for incarcerated people.[118] As a result, prison medical facilities are understaffed, the staff are underqualified, and incarcerated people suffer from grossly inadequate care.

189.     Cummins Unit, for example, is served by one doctor, fewer than four registered nurses or nurse practitioners, and fewer than fourteen licensed practical nurses, or LPN's.[119] "LPNs are neither trained nor medically allowed to assess patients without supervision . . . but nurses say that LPNs are the ones who evaluate prisoners when they place sick calls."[120]

190.     The only doctor at Cummins has a revoked medical license, but the Arkansas State Medical Board has granted him permission to keep practicing so long as he reports to them.[121] His medical license has been revoked three times, most recently in 2018, for misconduct that involved drug use and treating patients while under the influence.[122] On one occasion, the Board described

---

[118] Anna Stitt, *Covid-19 Inside Arkansas Prisons: The Death of Derick Coley*, FM 89.1 KUAR (June 9, 2020), https://www.ualrpublicradio.org/post/covid-19-inside-arkansas-prisons-death-derick-coley.

[119] See id.

[120] *Id.*

[121] See id.

[122] See id.

his behavior as "exhibit[ing] gross negligence and ignorant malpractice."[123]

191.   Wellpath's chronic understaffing also denies incarcerated persons access to medical care. According to one former nurse, incarcerated people who placed sick calls would not be seen by a doctor for approximately two weeks.[124] Wellpath instructed its nurses that an incarcerated person must place three sick calls for the same symptoms before they may see a doctor or nurse practitioner.[125] Even if someone did everything correctly, it would take them a minimum of ten and a maximum of 20 days to receive an appointment.[126] Mr. Elrod noticed Wellpath nurses taking temperatures with multiple thermometers and recording only the lowest temperatures. A Wellpath employee also attempted to take Mr. Elrod's temperature using an oral thermometer without a protective sleeve.

192.   Because Wellpath understaffs its infirmaries, they are often hundreds of sick calls behind.[127] In order to avoid fines from DOC for undue delay in seeing patients, Wellpath employees shredded paper sick calls and threw them away rather than scan them into their system.[128] According to a former nurse, "'It was general operating procedure[.]' . . . 'I watched nurses put the paper sick calls in the shredder and never blink an eye.' When prisoners complained, the nurses would say, 'Oh, the slip got lost in the box,' or 'You filled out the wrong form.' [The nurse] said, 'They could easily blame it on the inmate.'"[129]

193.   This behavior is representative of the culture at Wellpath. One woman, who worked

---

[123] Rachel Aviv, *Punishment by Pandemic*, The New Yorker (June 22, 2020), https://www.newyorker.com/magazine/2020/06/22/punishment-by-pandemic.

[124] See id.

[125] *See* Stitt, *The Death of Derick Coley*, *supra* note 118.

[126] See id.

[127] See id.

[128] *See id.; see also* Aviv, *supra* note 123.

[129] *See* Aviv, *supra* note 123 .

as a physician's assistant for Wellpath until earlier this year, reported that "when officers called about sick inmates, 'nine times out of ten the nurses would say he's just faking it or trying to get out of something. If the officer says the inmate has been throwing up, the nurse will ask, 'Well, have you seen the inmate throw up? Until you see the inmate throw up, he can't come to the infirmary.'"[130]

194.    A former Wellpath nurse explained, "'It's a pride issue. The mentality of the infirmary is: these individuals are worthless.' She said that new staff members quickly 'built up a brick wall' in order to assimilate to the culture. Those who didn't were dismissed as 'givers.' 'They would say, 'I can't believe you're falling for their games,' she said."[131]

195.    Nor were these Wellpath's only issues. A nurse witnessed Black inmates being neglected while white inmates with similar needs were provided with treatment.[132] The nurse also reported that the administrator at her prison often denied her requests for medical supplies or substituted cheaper medications that posed a higher risk to the incarcerated patients who would take them.[133]

196.    The nurse reported her concerns to Defendant Benny Magness, chairman of the Board of Corrections, but she "was told Wellpath is a private company and his hands were tied."[134] She ultimately reported her concerns to Wellpath management and was fired three weeks later.[135]

## VI.    Defendants' Deliberate Indifference in Cummins Unit

197.    Each morning at Cummins Unit, the "hoe squad"—the name given to the prison's field workers—crowds into a trailer and sits shoulder to shoulder as the trailer drives them to work

---

[130] See id.
[131] See id.
[132] *See* Stitt, *The Death of Derick Coley, supra* note 118.
[133] See id.
[134] See id.
[135] See id.

in the fields of a 16,000-acre farm that used to be several slave plantations. Unlike most other states, Arkansas does not pay incarcerated people for their labor,[136] who may be sent to isolation cells known as the Hole if they lag behind on their work.[137] When Gov. Hutchinson declared a state of emergency in the state on March 11, 2020, incarcerated people continued to work in the fields. When a worker at another state prison farm tested positive for COVID-19 on March 24, 2020, incarcerated people were required to work with no precautions to reduce the risk of COVID infection.[138] Indeed, the prison did not formally inform them about the pandemic at all in March. Instead, the DOC officials simply posted signs on March 11, 2020 instructing incarcerated people to wash their hands for 20 seconds.[139]

198.    As March progressed and the "hoe squad" continued "to swing-blade the grass in muddy ditches around a chicken plant reeking of ammonia," some began to question whether they should be working at all.[140] On March 26, 2020, one incarcerated person filed a grievance asking for the hoe squad to stop.[141] The corrections staff laughed his grievance off and returned it to him with the cover sheet still attached.[142] One man's grievance read, "'There's a global pandemic that is air-born . . . . I'm being forced to go out into the field thus putting my life in danger.'"[143] In late March 2020, dozens of hoe squad members refused to go to the fields, lying down in their beds when their names were called for work.[144] The men were disciplined for "unexcused absence,"

---

[136] See id.

[137] See Aviv, *supra* note 123 .

[138] See Stitt, *Virus Spreads Through Inmate Populations and Staff*, *supra* note 108.

[139] See id.

[140] Molly Minta, *Incarcerated, Infected, and Ignored: Inside an Arkansas Prison Outbreak*, Nation, (June 17, 2020), https://www.thenation.com/article/society/cummins-prison-arkansas-coronavirus/.

[141] See id.

[142] See id.

[143] See Aviv, *supra* note 123 .

[144] See id.

which carries a punishment of up to 15 days in isolation.[145] As one member of the hoe squad explained, "Over 19 guys got written disciplinaries for not going to work even though a pandemic was going on."[146]

199.    On April 1, 2020, the first DOC staff member at Cummins Unit—a farmworker—tested positive for COVID-19.[147] Cummins Unit did not respond by mass testing incarcerated people or ending the "hoe squad." Instead, the hoe squad continued until the first inmate at Cummins Unit received a positive test.[148] One member of the group described the last day in the fields: "'The last actual day, our hoe squad supervisor, she jumped off of her horse because she wasn't feeling good,' [he] said. 'She threw up, and lieutenants all came down off horses and surrounded her.'"[149]

200.    The treatment of the "hoe squad" was a microcosm of Defendants' approach to pandemic preparation in general. When a staff member tested positive for COVID-19 on April 1, 2020, the DOC officials withheld the information from corrections staff. One corrections officer observed, "You would think our captains or sergeants or majors would warn us about something like this, but they didn't speak about it[]" . . . . They kept everything in the closet. If you didn't catch the news, you were in the blind."[150] The next day, the corrections officer and a few of her colleagues wore masks that they purchased to work, but when they entered the prison, they were instructed to remove the masks.[151]

201.    DOC began to manufacture masks for inmates, but manufacturing was performed

---

[145] See id.

[146] See Stitt, Virus Spreads Through Inmate Populations and Staff, *supra* note 108.

[147] *See* Minta, *supra* note 140.

[148] See Stitt, Virus Spreads Through Inmate Populations and Staff, *supra* note 108.

[149] *See* Minta, *supra* note 140.

[150] *See* Aviv, *supra* note 123.

[151] See id.

at Cummins Unit, the epicenter of the DOC COVID-19 outbreak. One incarcerated person at Cummins Unit was required to sew masks for days while he had a fever and chills and did not stop until he was taken to the infirmary with a temperature of 104 degrees.[152]

202.    Moreover, the masks produced by the prison are poorly made and likely ineffective. The masks are made of the same material as prison bedsheets, which were very thin seemed to offer little protection against COVID-19.[153] When the incarcerated people attempted to make thicker masks for themselves, DOC staff threatened to write them up for contraband and send them to the Hole. One corrections officer reported that her prison-manufactured mask kept falling off her face, and she sucked the material into her mouth whenever she talked.[154] This same corrections officer noticed wardens and deputy wardens secretly wearing their own masks from home underneath the state-issued masks.[155]

203.    Defendants began testing DOC staff for COVID-19 in early April 2020, but they did not track how many or which of their staff had tested positive. In response to a reporter's query, a DOC spokesperson said that the department knew of 17 employees who tested positive, but did not know "a precise number because some employees used other providers for tests".[156]

204.    Both incarcerated people and corrections staff at Cummins Unit soon began falling sick.[157] Around the start of April 2020, Plaintiff Hussey stopped getting out of bed. Mr. Hussey lived in an open barracks with cots that were stationed three feet apart and bolted to the floor.[158] On April 9, 2020, Mr. Hussey passed out and was tested for COVID-19. When the test results

---

[152] See id.

[153] *See* Minta, *supra* note 140.

[154] *See* Aviv, *supra* note 123.

[155] *Id.*

[156] *See* Minta, *supra* note 140.

[157] See id.

[158] *See* Aviv, *supra* note 123.

came back positive, "Hussey was taken to the Hole in a wheelchair."[159] After Mr. Hussey left the barracks, another inmate stripped his COVID-infused sheets from the bed and walked to the nursing station to request a boil bag so he could separate the sheets from the rest of the wash. "[T]he nurse there, Shirley Lubin Wilson, told him, 'Get the f**k away from my window.' In a federal civil-rights lawsuit last year, Wilson was accused of wrapping a telephone cord around an inmate's neck while a second nurse blocked the surveillance camera."[160]

205.    The same day, a different incarcerated person went to the infirmary and said that he was experiencing COVID-19 symptoms.[161] The man informed medical staff that he had a "real bad case of diarrhea" and that he was unable to taste or smell anything; he was given two Tylenol and sent back to his barracks.[162] He was not tested for COVID-19.

206.    On April 11, 2020, following Mr. Hussey's positive test, Cummins Unit tested the rest of Mr. Hussey's barracks. Four nurses tested the remaining 46 men in the barracks without changing their gloves between tests.[163] The next morning, corrections officers showed up at the barracks door and began shouting out names. They led the named men away without telling them whether they were positive or negative. A few hours later, the corrections officers brought them all back because all but three members of the barracks had tested positive.[164] A nearby barracks was also tested, and a sergeant later informed the men "Y'all are negative."[165] The men were not. When one of them noticed that he had lost his smell, he asked his cousin to call the prison's central

---

[159] *Id.*
[160] *Id.*
[161] *See* Minta, *supra* note 140.
[162] See id.
[163] *See* Aviv, *supra* note 123.
[164] *See* Minta, *supra* note 140.
[165] *See* Aviv, *supra* note 123.

office and find out the results of his test.[166] He had tested positive.[167] Many of the others had too.

207.    On April 12, 2020—the same day that the men in Mr. Hussey's barracks learned that they had tested positive—Governor Hutchinson dismissed calls for broader testing at Cummins Unit, stating that he was hopeful that the outbreak had already been contained.[168] The same day, DOC staff tested a random sample of incarcerated people in other barracks to see whether the virus was, in fact, contained.[169] The results showed that the virus had spread throughout the prison. The corrections staff responded by locking down the barracks and, purportedly, separating those who tested positive from those who had tested negative.[170]

208.    But some incarcerated people, like Demarco Raynor, were never moved at all regardless of test results.[171] As Mr. Raynor told a reporter, "I'm looking at a guy who tested negative right next to a guy who tested positive."[172] The men on both sides of Mr. Raynor later shared their results with the *New Yorker* and substantiated Mr. Raynor's statement.

209.    Another incarcerated person reported that he was tested and then left in a barracks with sick individuals for two days.[173] By the time that his results had come back negative, he was running a fever and feeling weak. Prison staff transferred him to a COVID-negative barracks without asking him how he was feeling, taking his temperature, or telling him where he was going.[174] He later tested positive.[175] Incarcerated people who tested negative for COVID-19 were

---

[166] See id.

[167] See id.

[168] *See* Minta, *supra* note 140.

[169] See id.

[170] See id.

[171] *See* Aviv, *supra* note 123.

[172] See Stitt, Virus Spreads Through Inmate Populations and Staff, supra note 108.

[173] *Id.*

[174] See id.

[175] See id.

moved to various places, including an abandoned school, the prison's law library, and temporary holding cells.[176] People who were moved to these locations report that they did not have access to grievance forms or phones and needed to bathe with a hose.[177] Some were forced to resort to urinating and defecating on the floor, then physically picking up their feces and putting it in the hall, using a small trap door in the bolted door to the room.[178]

210.     When incarcerated people began testing positive, the prison eventually halted some jobs like the "hoe squad." But others continued, even for individuals who had tested positive and could further spread the virus. One man who worked as a picket man sorting and folding laundry told The Nation that he had to keep working despite testing positive.[179] "'I been working throughout the quarantine, I pretty much don't have a choice,' he said. 'If I don't work, they'll turn around and write a disciplinary.'"[180]

211.     Defendants' approach to COVID-positive corrections staff also likely played a role in Cummins Unit outbreak and resulting deaths. On April 15, 2020, one person incarcerated in Cummins Unit noticed a corrections officer who had come in looking unwell. "We could look at her and tell that she was sick," he said. "She was all around the barracks, coughing, making rounds."[181] The same day, Defendants decided that staff who had tested positive could return to work if their facilities—like Cummins Unit—were understaffed.[182]

212.     Another incarcerated person heard a staff member say, "All of us got it, but they're

---

[176] See id.

[177] See id.

[178] *See* Stitt, Virus Spreads Through Inmate Population and Staff, supra note 108.

[179] *See* Minta, *supra* note 140.

[180] *Id.*

[181] See id.

[182] See id.

telling us to work anyway if we're not showing symptoms." [183] Still another incarcerated person reported asking an officer who had come to his COVID-positive barracks whether she had the virus, and she replied that she had not been tested. [184] "'Our newspaper says you must be positive for corona if you're working our barracks,' [the incarcerated person] told her. He said that she responded sarcastically, 'Well, they say your beds are six feet apart, too.'"[185]

213.    One corrections officer observed that the DOC's policy did not make sense because "all the guards were passing through the same entrance, checkpoints, and hallways." [186] DOC defended its policy and told Mother Jones that its rules are based on a CDC guidance for "critical infrastructure workers."[187] But the CDC guidance was limited to asymptomatic workers with "'potential exposure to COVID-19'"—not those who had themselves tested positive for COVID-19. [188]

214.    "[W]hen asked about the Arkansas policy, a CDC spokesperson did not condone it."[189] "'CDC guidelines state that if staff test positive, they should self-isolate at home until they have met the CDC criteria for release from isolation in consultation with their physician,' CDC spokesperson Bert Kelly told Mother Jones." Contrary to the DOC policy, the CDC recommends that asymptomatic individuals who test positive should stay home for at least ten days after their

---

[183] *See* Samantha Michaels, *Arkansas Told Corrections Officials to Keep Working Even If They're Infected With COVID-19,* Mother Jones (June 2, 2020), https://www.motherjones.com/crime-justice/2020/06/arkansas-told-corrections-officers-to-keep-working-even-if-theyre-infected-with-covid-19/.

[184] See id.

[185] *See* Aviv, *supra* note 123.

[186] *Id.*

[187] Michaels, *supra* note 183.

[188] *See id.* (quoting CDC, Implementing Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html).

[189] *Id.*

positive test result, or until they have tested negative twice in a row.[190]

215.    As the virus spread from barracks to barracks in Cummins Unit, its deadly effects were exacerbated by the deliberately indifferent medical attention given to people who tested positive for COVID-19. One incarcerated person  stated that no nurses visited his barracks, which was filled with COVID-positive men, for three weeks after they were tested.[191] The same person also put in a sick call citing COVID symptoms; he did not hear back from a nurse for four days.[192]

216.    One night, a different incarcerated person told a corrections officer that he was struggling to breathe. The man looked ready to faint, and his eyes were bloodshot. The officer asked a sergeant to escort the inmate to the infirmary, but the sergeant refused and told her "'Tell him to go get on that kiosk'—a computer touched by dozens of inmates each day—so that he could fill out a request to visit the infirmary . . . ."[193] She eventually signaled a medical emergency over the prison radio system, and a nurse arrived with a wheelchair. But the infirmary was full so the nurse deposited him in a holding cell with no bed, no toilet, and no running water.[194] As the officer explained, "A lot of times [staff] forget the inmates are there . . . . They'll stay there for hours—hours."[195] Once the man was taken away, the officer was reprimanded by a sergeant, who told her that the man could have stayed on his bed. "That's how they look at it: 'Tell him to sleep it off.'"[196]

217.    Defendants knew about the gross inadequacies of their COVID-19 containment, mitigation, and medical treatment in Cummins Unit.  Their deliberate indifference likely cost 29-year-old Derick Coley his life. On April 15, 2020, a Wellpath nurse examined Mr. Coley. She

---

[190] See id.

[191] See Stitt, *The Death of Derick Coley*, *supra* note 118.

[192] See id.

[193] See Aviv, *supra* note 123.

[194] See id.

[195] *Id.*

[196] *Id.*

noted that he was too weak to walk and that his blood-oxygen level was 90, a figure that typically indicated a patient should be hospitalized.[197] Rather than send Mr. Coley to the hospital, DOC staff sent him to the Hole.[198] He remained in the Hole for 17 days, and medical staff never recorded his vitals again.[199]

218.    As time passed, the men in the neighboring cells became increasingly worried about Mr. Coley's wellbeing. They repeatedly told corrections staff that Mr. Coley could not breathe and needed to go to the infirmary, but the corrections officers just walked by.[200]

219.    Cecilia Tate, the mother of Mr. Coley's eight-year-old daughter and his emergency contact, made repeated efforts to reach him at the prison. "I just kept calling, they just kept saying he had no more symptoms."[201] A prison nurse told Ms. Tate that Mr. Coley had tested positive for COVID-19 but that his fever had gone down and he was doing fine.[202] Meanwhile, family members of other men incarcerated with Mr. Coley were calling her to report that Mr. Coley was seriously ill.[203] Those men had also been unsuccessfully asking nurses to check on Mr. Coley as he grew weaker.[204]

220.    Another incarcerated person who had been housed in the Hole observed that Mr. Coley's treatment was unsurprising. "Listen, these people are supposed to come every thirty minutes, but they weren't making any rounds. They might come every four hours, but they wouldn't even turn their heads unless you were calling their names."[205] "It makes perfect sense

---

[197] See id.

[198] See id.

[199] See id.

[200] See id.

[201] *See* Stitt, *The Death of Derick Coley, supra* note 118.

[202] See id.

[203] See id.

[204] See id.

[205] *See* Aviv, *supra* note 123.

that Coley was back there dying and no one ever noticed."[206]

221.    After two and a half weeks in the Hole, officers finally paid Mr. Coley a visit—but only because they needed to move a new person into his cell.[207] The officers told Mr. Coley that he needed to return to general population, but when he tried to stand up, he collapsed on the floor.[208] He was still lying on the floor, lips pale and struggling to breathe, when a nurse arrived to take him to the infirmary. Several men watched through their cell windows as Mr. Coley was wheeled away, unresponsive and with his wrists handcuffed.[209]

222.    Mr. Coley's final medical care was provided by licensed practical nurses—nurses who are expected to assist registered nurses—while the prison's sole doctor (whose medical license had been revoked) advised them by telephone.[210] "Coley was given chest compressions by the nurses, one of whom had been involved in the incident in which an inmate was allegedly choked with a telephone cord."[211] The coroner's report states that Mr. Coley was "'worked on and then passed away.'"[212]

223.    DOC officially said "that it did not consider [Mr.] Coley's death to be COVID-related."[213]

224.    Not all of the sickest inmates at Cummins Unit were placed in the Hole like Mr. Coley. Some were also placed in the visitation room, which had been turned into a makeshift hospital even though it had no showers or phones.[214] One incarcerated person died there, sitting in

---

[206] *Id.*

[207] See id.

[208] See id.

[209] See id.

[210] *See* Stitt, *The Death of Derick Coley*, *supra* note 118.

[211] *See* Aviv, *supra* note 123.

[212] See id.

[213] *See* Stitt, *The Death of Derick Coley*, *supra* note 118.

[214] *See* Aviv, *supra* note 123.

his wheelchair.[215] On another occasion, prison staff moved a man who had tested negative into the visitation room.[216] He tried repeatedly to give officers his paperwork showing his negative test results, but they refused to look at it.[217]

225. As the outbreak spread through the prison, prison staff stopped fulfilling even basic responsibilities. Some stopped coming to work altogether.[218] The officers who did come to work rarely made security rounds and delivered meals sporadically, often on carts used to transport trash or laundry.[219] One corrections officer told an incarcerated person that he should not expect to get his grievance signed by a sergeant—as required by DOC regulations—because he had seen grievances discarded in a bathroom trash can.[220]

226. During the last weekend of April 2020, men in one barracks threw a television through a window. When a corrections officer arrived to investigate the disturbance, the men began shouting to her that their sick calls were going unanswered, and that people who tested positive were being mixed in with those who had tested negative.[221]

227. On May 2, 2020, an officer refused to sign a grievance about the prison's failure to feed people in the prison, which drove a few men to break into the officers' control booth and open the doors on their hallway.[222] An hour later, a team of corrections officers showed up in riot gear "with a cart of weapons from the prison's armory."[223] In the midst of a respiratory pandemic, they fired tear gas into the barracks, causing one incarcerated person to have a seizure. "'He just laid

---

[215] See id.
[216] See id.
[217] See id.
[218] See id.
[219] See id.
[220] See id.
[221] See id.
[222] See id.
[223] See id.

on the ground, twitching,' . . . an inmate in the barracks, said. 'He almost suffocated.'"[224]

228.    Smoke and tear gas drifted into an adjacent barracks, where every individual had tested positive for COVID-19.[225] Darrell Jones, who was in the COVID-positive barracks, realized that he needed to shut off the ceiling fan in the barracks. "'It was pulling the smoke in from the hallway. . . . People sounded like they were choking to death.'[226]" The switch for the fan was just outside the barracks doorway, and as Mr. Jones stepped through the door to turn off the switch, a guard shot him in the face with a rubber bullet.[227] Hours passed before guards took him to the infirmary. "They left him in a puddle of his own blood," according to a witness.[228] He was later taken to a hospital in Little Rock.

229.    Following the incident, Defendant Payne acknowledged that there had been a "minor disturbance" at the prison.[229] When asked if there were any injuries, he answered, "No."[230]

230.    Mr. Jones still cannot see out of his left eye and suffers from migraines if he keeps it open for more than 20 minutes.[231] He filled out a sick call in early May 2020, but had not received an appointment with a specialist as of mid-June 2020.[232] He now spends all day in bed with his eyes shut to stave off migraines.[233]

231.    On May 16, 2020, Defendant Payne spoke at the Governor's press conference to announce that Cummins Unit had only 12 positive cases.[234] The rest were "considered to be

---

[224] See id.
[225] See id.
[226] See id.
[227] See id.
[228] See Minta, supra note 140.
[229] See Aviv, supra note 123.
[230] See id.
[231] See Aviv, supra note 123.
[232] See id.
[233] See id.
[234] See id.

recovered."[235] Despite his claim, DOC has admitted that it never retested people incarcerated at Cummins Unit.

232.    As one person incarcerated at Cummins Unit wrote in a letter to the Governor, "Watching a press conference witnessing your saying almost 900 people have recovered at Cummins Unit and then I walk by a guy that can't get out of the bed makes me question my sanity level."[236]

**VII.    Viral Outbreaks of COVID-19 in More DOC Facilities**

233.    When Plaintiffs sought emergency relief from this Court after filing their initial Complaint, they argued that COVID-19 outbreaks were likely to spread to facilities other than Cummins Unit and would continue to spread to the COVID-negative individuals incarcerated in Cummins.[237] Defendants' response was: "That makes no sense."[238] In the Defendants' view, their "containment and mitigation strategies" protected against this possibility[239] and the fact that Cummins Unit was the only facility beset with a COVID outbreak in the early stages of the pandemic suggested that Plaintiffs' requested actions were unnecessary to stave off the spread of the virus.[240]

234.    Shortly thereafter, a major COVID-19 outbreak occurred at the Randall L. Williams Correctional Facility. At least 286 incarcerated individuals tested positive and one died.

---

[235] See id.
[236] See Aviv, *supra* note 123.
[237] *See* Doc. No. 36 at 62-63, 70.
[238] *Id.* at 70.
[239] *See id.* at 62-63.
[240] *See id.* at 72.

235. Since the outbreak at Randall L. Williams, individuals have tested positive at several DOC facilities .[241] The outbreak at EARU was particularly large, with approximately 650 individuals testing positive and at least two dying.[242] The Ouachita River Correctional Unit, which houses many of the DOC's most vulnerable inmates, now has at least 1,162 positive tests for COVID-19.[243] The Wrightsville Unit has recorded 81 positive tests, and the Northwest Arkansas Work Release Center has registered 41 positives.[244] The Grimes Unit has five positives.[245]

236. On June 25, 2020, a prison spokeswoman confirmed that Cummins Unit, already the site of one of the largest COVID-19 outbreaks in the country, recently recorded 30 new positive cases. They currently report 41 positive cases at the facility. The renewed spread of COVID-19 in Cummins Unit may well relate to the facility's decision to mix quarantined barracks with non-quarantined barracks, and to continue to permit corrections staff to wear masks haphazardly or not at all.

237. In addition to the facilities with incarcerated people who have tested positive, other facilities employ staff members who have tested positive, including the Texarkana Regional Correction Center, Varner Unit, Barbara Ester Unit, and McPherson Unit. In total, 185 DOC employees have tested positive, as have seven Wellpath employees.

---

[241] The Central Arkansas Community Corrections Center also had an outbreak in April that led to at least 63 inmates and 27 staff members testing positive. One staff member died.

[242] Ninette Sosa, *A Closer Look: COVID-19 continues to impact Arkansas prisons and staff*, WREG Memphis (July 1, 2020), https://wreg.com/news/a-closer-look-covid-19-continues-to-impact-arkansas-state-prisons-staff/.

[243] See id.

[244] *See COVID-19 update: HS County cases lead the state*, The Sentinel Record (Jul. 11, 2020), https://www.hotsr.com/news/2020/jul/11/covid-19-update-hs-county-cases-lead-the-state/

[245] See id.

VIII.  **Named Plaintiffs and Pu.tative Class Members Are Subject to Retaliation and/or Intimidation Regarding the Deficiencies of COVID-19 Mitigation and Medical Treatment in DOC Facilities.**

238.    By allowing retaliation and intimidation to occur unabated, Defendants have fostered a hostile environment in which Named Plaintiffs and putative class members are afraid to seek remedies and recourse for deficiencies in Defendants' handling of the COVID-19 pandemic through DOC's internal processes, the media, and/or outside legal assistance. These instances of retaliation and intimidation are not limited to any specific facility but are part of a pervasive culture embedded throughout DOC facilities across the State of Arkansas. These instances prevent Named Plaintiffs and putative class members from receiving the appropriate supplies and/or medical services to prevent contraction of COVID-19 and/or the development of serious illness or death.

239.    After the original complaint was filed in this case, DOC staff and/or Wellpath began withholding medication for some Named Plaintiffs. Marvin Kent's Omeprazole has been withheld multiple times since the complaint was filed in this case. On June 23, 2020, he submitted a grievance stating that Nurse A. Jones refused to provide his medication and that he was afraid Nurse A. Jones would retaliate against him for filing the grievance. Due to his medical conditions, Mr. Kent experiences significant pain and discomfort when he misses just one day of Omeprazole.

240.    On May 4, 2020, Nicholas Frazier was examined by a Wellpath nurse practitioner working for DOC, who he believes is named Ms. Bland. The visit was a chronic care visit for Mr. Frazier's asthma. The Wellpath nurse took Mr. Frazier's blood pressure and temperature but did not listen to his lungs, despite his complaint of chest tightness, and denied Mr. Frazier's request for an inhaler. The nurse stated that because Mr. Frazier refused have blood drawn for bloodwork, he could not get a life-saving inhaler for his asthma. Mr. Frazier's bloodwork helps monitor his Hepatitis and is unrelated to his asthma. Mr. Frazier has always been compliant with his bloodwork

in the past but refused having his blood drawn one time because he did not believe sufficient precautionary measures were in place to ensure a sterile environment for the blood to be drawn during the pandemic. Mr. Frazier asked the nurse for her name. She refused to provide her name and stated, "You know my name."

241.    Mr. Frazier completed a written request to seek medical assistance regarding his asthmatic symptoms. Several days later, he received a response stating that he needed to utilize a sick call. The written request that Mr. Frazier completed was a sick call form. He is in solitary confinement and does not have access to a kiosk to complete the sick call form electronically.

242.    Many people incarcerated in DOC facilities will not write grievances about COVID-19 due to fears of retaliation. Others have experienced intimidation and/or retaliation in response to their grievances. On April 18, 2020, Captain Mulliguin sent Michael Kouri back to his barracks to get his own pen to sign the response to a grievance about Defendants' deficiencies in preventing and mitigating the spread of the COVID-19 virus and protecting his health and safety. Captain Mulliguin confiscated Mr. Kouri's pen as contraband after he signed the grievance. Mr. Kouri had a hobby craft card that allowed him to have that pen.

243.    Joseph "Dallas" Head has experienced retaliation and intimidation for submitting grievances many times. He has been cursed at and threatened for writing grievances. He has also witnessed staff withholding necessities, such as socks, in retaliation for grievances.

244.    On April 1, 2020, Mr. Head asked Sergeant Penister to sign off on a grievance. About three hours later, Mr. Head was called to the office of Max Unit Captain John Spears. Captain Spears threatened him with loss of class, loss of job, and a drug test. Captain Spears told Mr. Head that the prison was making him crazy and that he must be on methamphetamines and threw the grievance at Mr. Head. Captain Spears refused to acknowledge the "Problem Solver"

procedure or sign the grievance. Mr. Head placed the grievance in the box for step 2 and never saw it again.

245.    After filing grievances regarding COVID-19 measures and issues with his legal mail, Aaron Elrod received two cardinal violations. One violation was for reporting a story with "racial material" while giving the world news report as assigned. The other violation was for taking a document from the law library even though he received permission to take the document to his hearing as evidence. The later violation was eventually overturned by the Warden, but Mr. Elrod had already been denied parole due to the cardinal violations.

246.    Jimmy Little has submitted several grievances since the COVID-19 pandemic began. He has a collapsed lung, emphysema, and Crohn's disease. He fears he will not survive if he contracts COVID-19. On May 19, 2020, Mr. Little submitted an Inmate Request Form regarding incarcerated people who tested positive for COVID-19 being moved to his barrack. The response he received stated that "it's not a good practice to talk other inmates [sic] business." Mr. Little perceived this to be a threat intended to intimidate him from continuing to write grievances.

247.    Jimmy Little is currently incarcerated at Randall L. Williams Correctional Facility. His TE date is August 1, 2020. He is also included on the list of incarcerated people approved by the Parole Board and Director Payne for early release under Modified Emergency Powers. https://adc.arkansas.gov/images/uploads/Special_EPA_Approvals_060120.pdf. When Mr. Little went before the Parole Board, however, he was given a one-year denial. Mr. Little has no current major disciplinaries. In fact, he only received one major disciplinary in 2012 for refusal of assignment. Mr. Little believes that the one-year denial is retaliation for writing grievances and sharing information with counsel about Defendants' actions and inactions related to the COVID-

19 pandemic.

248.    Marvin Kent's TE date is July 30, 2020. Mr. Kent went before the Parole Board on May 26, 2020. Approximately 10 minutes after his phone hearing, Mr. Kent was called back from his barrack to the phone. He spoke with a commissioner who asked him if he would be willing to drop this lawsuit if the Parole Board granted him parole. Mr. Kent was ultimately denied parole. Because he was asked about the lawsuit by a commissioner as part of his parole hearing, he believes that his participation in this lawsuit was considered by the Parole Board when deciding whether he should be granted parole. Mr. Kent submitted a reconsideration letter addressing the inappropriateness of being asked about the lawsuit as part of his parole hearing.

249.    Plaintiffs have not been allowed confidential phone calls with their attorneys. ORCU unit calls are made from the barracks. Although the calls are not supposed to be monitored, several attorney calls have been disconnected for suspected third party calling. Most scheduled legal calls at other units have been made from a Captain's or another high-ranking officer's office. Several plaintiffs have reported feeling uncomfortable and/or intimidated talking to their attorneys in the presence of correctional officers.

250.    During Marvin Kent's last two scheduled legal calls, the warden put the entire unit on lock down. During these lock downs, correctional officers shake down all the barracks and no one is allowed to leave their barrack. Mr. Kent has to walk down the hallway past every barracks to get the Captain's office for his legal call. The other incarcerated individuals can see that he is out during lockdown as he walks past the hallway windows. This sends a message to other incarcerated persons that he is getting a special privilege while they are being searched on lockdown. Mr. Kent believes that he is being set up to being viewed with suspicion by others incarcerated in his facility.

251.   The media has also encountered fears of retaliation when speaking to people incarcerated in DOC facilities. In her three-part series on the coronavirus outbreak in Arkansas prisons, Anna Stitt reported, "We talked with half a dozen prisoners in barracks throughout Cummins for this story. All but one asked to be kept anonymous. They said they feared retaliation for raising concerns about the outbreak."[246] In Molly Minta's article for the Nation, she stated, "Through phone interviews and letters sent in March, April, and May, a dozen prisoners at Cummins gave firsthand accounts of the outbreak. (Most asked that their real names not be published out of fear of being punished; unless otherwise noted, prisoners' names are pseudonyms.)"[247] In her New Yorker article, Rachel Aviv stated, "Some of the men I spoke with were afraid to use their names; they thought that they would be put in the Hole, or sent to the Hoe Squad, as punishment. When I asked Raynor why he chose to go on the record, he told me, 'I want the men in here to know that someone they know was willing to sacrifice themselves for them.'"[248]

252.   DeMarco Raynor, who has been quoted in multiple media stories, has suffered from retaliation since speaking to reporters. Correctional officers have been hostile towards him, openly bringing up his contact with the media. On July 5, 2020, he was aggressively approached by Captain Johnson, Sergeant Goforth, and Sergeant Gardner. They searched his person and property, throwing things around his cell. No contraband was found. (Lieutenant Powell, Sergeant Hadley, and Sergeant Lewis were also present, but were not aggressive or hostile. Sergeant Mouser was present and made sarcastic remarks but was not hostile.)

253.   On July 7, 2020, Mr. Raynor's belongings were ransacked again by five ranking officers at 1:30 a.m. and then again around 1 p.m. Although he was searched three times within 48

---

[246] Stitt, Virus Spreads Through Inmate Populations and Staff, supra note 108.

[247] See Minta, *supra* note 140.

[248] See Aviv, *supra* note 123.

hours, no contraband was found. These searches were kept off the record and were indicative of targeted harassment.

254.    After Austin Mitchell and his family spoke to the media and to this Court regarding the outbreak at CACCC, residents in quarantine lost phone and other privileges, and their time in an over-crowded quarantined wing was extended without explanation. Named Plaintiffs Arron Elrod and Cedrick Sims have fears of retaliation due to their participation in this lawsuit.

**CAUSES OF ACTION**

**COUNT ONE**
**Violation of the Eighth Amendment**
**(42 U.S.C. § 1983)**
*All Plaintiffs/Petitioners versus All Defendants/Respondents*

255.    Plaintiffs/Petitioners incorporate by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

256.    The Eighth Amendment to the Constitution of the United States, as incorporated through the Fourteenth Amendment, provides that individuals who are incarcerated following a conviction have the right to be free from cruel and unusual punishment. That right entails, among other things, Defendants/Respondents' obligation to protect incarcerated individuals from a substantial risk of serious harm to their health and safety. *See generally Farmer v. Brennan*, 511 U.S. 825 (1994).

257.    Defendants/Respondents' failure to provide adequate protection and, if necessary, medical care in response to the rapid spread of a highly infectious deadly virus constitutes deliberate indifference to the serious medical needs of incarcerated individuals in violation of the Eighth Amendment.

258.    Plaintiffs/Petitioners, and the proposed Class they represent, are at a substantial risk of serious harm to their health and safety due to the spread of COVID-19 in DOC facilities.

259.    Defendants/Respondents have acted with deliberate indifference to the risks posed by COVID-19 to Plaintiffs/Petitioners.

260.    Defendants/Respondents knew, and know, of the obvious and well-established risks to Plaintiffs/Petitioners caused by COVID-19.

261.    Defendants/Respondents have failed to act with reasonable care to mitigate the risk posed by COVID-19.

262.    As a result of Defendants/Respondents' actions, Plaintiffs/Petitioners and members of the proposed Class are suffering irreparable injury.

263.    At all times, Defendants/Respondents acted under color of state law.

**COUNT TWO**
**Petition for Writ of Habeas Corpus**
**Violation of the Eighth Amendment**
**(28 U.S.C. § 2241)**
*High Risk Subclass versus All Defendants*

264.    Plaintiffs/Petitioners repeat and re-allege the preceding paragraphs as if set forth herein.

265.    28 U.S.C. § 2241(c)(3) permits this Court to order the release of incarcerated individuals like Plaintiffs/Petitioners who are being held "in violation of the Constitution or laws . . . of the United States." *See also Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of §§ 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody.").

266.    Defendants/Respondents are currently holding Plaintiffs/Petitioners in custody in violation of the Eighth Amendment. Given the highly contagious nature of COVID-19 and the deadly and debilitating threat that it poses to members of the High Risk Subclass,

Defendants/Respondents cannot currently mitigate the risks to members of the High Risk Subclass sufficiently to satisfy the Eighth Amendment by any means short of release from custody.

**COUNT THREE**
**Violation of the Americans with Disabilities Act**
**(42 U.S.C. § 12101 et seq.)**
*Disability Subclass versus All Defendants*

267.    Plaintiffs/Petitioners repeat and re-allege the preceding paragraphs as if set forth herein.

268.    Members of the Disability Subclass have a physical impairment that substantially limits one or more of their major life activities.

269.    Members of the Disability Subclass are qualified individuals with a disability under the meaning of both the ADA and the Rehabilitation Act.

270.    Defendants/Respondents intentionally discriminate against members of the Disability Subclass by denying them reasonable accommodations that have been recommended by the CDC and are necessary to protect them from COVID-19.

271.    Reasonable accommodations necessary to protect incarcerated individuals with disabilities include, but are not limited to:

  a. Access to alcohol-based sanitizer;

  b. Provision of cleaning supplies, including products containing bleach, adequate to clean individuals' housing areas;

  c. Provision of PPE;

  d. Access to antibacterial hand soap and towels to enable individuals to wash their hands as necessary;

  e. Implementation of social distancing measures in all locations where incarcerated people are required to congregate; and

f. Release or transfer to home confinement if social distancing is not practicable, or the facilities cannot otherwise eliminate the substantial risk of serious harm.

272. The failure to provide these accommodations constitutes illegal discrimination under the ADA and entitles Plaintiffs/Petitioners to injunctive and declaratory relief.

273. Members of the Disability Subclass, including without limitation certain Named Plaintiffs/Petitioners, request cleaning supplies, PPE, early release, and/or the ability to socially distance themselves because their individual disabilities significantly increase the risk of COVID-19 infection, serious illness, and/or death. These requests for items and/or services constitute a request for accommodations under the ADA, regardless of whether the specific terms "accommodation," "Americans With Disabilities Act," or "ADA" were referenced, because they are requests due to a disability and because these items and/or services are expressly not provided to all people who are incarcerated.

274. Defendants/Respondents know that members of the Disability Subclass are qualified individuals with a disability. Defendants/Respondents know that members of the Disability Subclass are in especially acute need of access to accommodations during the COVID-19 pandemic, including without limitation hand sanitizer and the other items identified above, yet it has denied, and continues to deny, these reasonable accommodations to members of the Disability Subclass.

275. Title II of the ADA requires Defendants/Respondents to make its services, programs, and activities accessible to people with disabilities. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. If members of the Disability Subclass are unable to access those

88

services, programs, and activities by reason of their disabilities, the ADA requires Defendants/Respondents to provide accommodations to make those services, programs, and activities accessible.

276.    DOC is a public entity covered by Title II of the ADA. 42 U.S.C. § 12131.

277.    "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. § 35.130(b)(7).

278.    For purposes of the ADA, medical treatment and safe conditions of confinement are programs or services that DOC facilities provide to Plaintiffs/Petitioners. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in').")

279.    In addition, DOC facilities are replete with programs and activities provided by Defendants/Respondents. There are myriad number of individual "programs" within the facility. Some of these programs are necessary for an individual to achieve an early release. Without the opportunity to participate in these programs safely, without threat to their lives, the members of the Disability Subclass are not afforded an equal opportunity to achieve that early release.

280.    Members of the Disability Subclass are given the choice between their health and safety and the net benefit of the programs provided by Defendants/Respondents. Members of the Disability Subclass are at a significantly higher risk of contracting COVID-19, as well as experiencing complications and dying from COVID-19-related illnesses. Offering mere participation—unaccommodated, unmitigated, and unsafe—to the Disability Subclass who are at

greater risk is discrimination on the basis of disability.

281.    The accommodations requested by members of the Disability Subclass, including without limitation certain Named Plaintiffs/Petitioners, were reasonable but were nevertheless denied. Requiring members of the Disability Subclass to choose between Defendants/Respondents' services, programs, and activities on one hand, and a heightened risk of substantial harm or death when compared with their peers without a disability on the other, is not a meaningful opportunity for participation.

282.    "A public entity, in providing any aid, benefit, or service, may not, . . . on the basis of disability, . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(i). When the risk of participation is a greater likelihood of death, failing to accommodate an individual with a disability constructively denies that individual the meaningful opportunity to participate or benefit from the public entity's services, programs, or activities.

283.    "A public entity, in providing any aid, benefit, or service, may not . . . , on the basis of disability . . . , [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii). Requiring members of the Disability Subclass to experience a heightened risk of death when compared to their peers without a disability, due only to Defendants/Respondents' failure to accommodate their disabilities, constitutes discrimination, which is duly prohibited by the ADA. 42 U.S.C.A. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by any such entity.").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs/Petitioners and proposed Class members respectfully request

that this Court:

      a.      Certify the proposed Class and Subclasses;

      b.      Enter an order declaring that Defendants/Respondents' policies and practices regarding COVID-19 violate the Eighth Amendment to the United States Constitution;

      c.      Enter an order declaring that the Defendants/Respondents have violated the ADA by failing to reasonably accommodate incarcerated individuals with disabilities;

      d.      Enter a permanent injunction and/or writs of habeas corpus requiring Defendants/Respondents to immediately release members of the High Risk Subclass and Disability Subclass or transfer them to home confinement;

      e.      Appoint a special master or an expert under Federal Rule of Evidence 706 to make recommendations to the Court regarding:

          i.      A comprehensive plan to ensure adequate spacing of six feet or more between incarcerated people, to the maximum extent possible, so that social distancing can be accomplished;

          ii.      The number of incarcerated people that each Arkansas Department of Corrections facility can house in order to ensure adequate spacing of six feet or more between incarcerated people, to the maximum extent possible, so that social distancing can be accomplished;

          iii.      The identification of people in the custody of the Arkansas Department of Corrections (a) who are older than 50 years old; (b) who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19; and/or (c) who are at increased risk of contracting,

becoming severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability, and who should be released from their facility or transferred to home confinement due to their age, serious underlying medical condition(s), and/or disability, in a manner that is consistent with public safety.

      f.     Enter a temporary restraining order, preliminary injunction, permanent injunction, and/or writs of habeas corpus requiring that Defendants/Respondents:

      i.     Ensure that each incarcerated individual receives EPA-registered disinfectants that are effective against COVID-19 infection, without costs;

      ii.     Ensure that all incarcerated individuals have access to hand sanitizer containing at least 60% alcohol in specific locations or under the appropriate supervision of DOC staff;

      iii.     Clean and disinfect frequently touched surfaces, including but not limited to doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones, at least three times a day with EPA-registered disinfectants that are effective against the virus that causes COVID-19, as appropriate for the surface;

      iv.     Conduct immediate testing for anyone displaying known symptoms of COVID-19 or upon request;

      v.     Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, toilets, soap, warm water, recreation, mental health services, hot meals during appropriate times, reading materials,

commissary, phone and video visitation with loved ones, communication with counsel, and personal property;

vi.     Prohibit Arkansas Department of Corrections employees from entering Arkansas Department of Corrections facilities if they test positive for COVID-19 and/or exhibit symptoms of having contracted COVID-19;

vii.     Substantially comply with CDC guidance in all other respects, unless Defendants identify a specific reason why circumstances in one or more Arkansas Department of Corrections facilities render such substantial compliance unreasonable; and

viii.     Permit any Court-appointed special master or expert to freely visit Arkansas Department of Corrections facilities without advanced notice; to freely access relevant records maintained by the Arkansas Department of Corrections, including medical records of persons in custody provided the person whose medical records are accessed authorizes such access and inspection; and to freely contact, call, visit, and/or interview any person in the custody of the Arkansas Department of Correction facility within 24-hour notice; and

g.     Retain jurisdiction over this case until Defendants/Respondents have fully complied with the orders of this Court, and there is a reasonable assurance that they will continue to comply in the future, absent continuing jurisdiction;

h.     Issue an order granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 and 12205; and

i.     Grant any further relief that this Court deems necessary.

Dated: July 13, 2020

Respectfully submitted,

By: _Sarah Everett_

Samuel Spital*
Jin Hee Lee*
Natasha Merle*
Omavi Shukur (Arkansas Bar No. 2016067)
Patricia Okonta*
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Christopher Kemmitt*
Ajmel Quereshi*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 216-5573

George H. Kendall*
Jenay Nurse*
Corrine Irish*
Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
(212) 872-9800

Laura Fernandez*
127 Wall Street
New Haven, CT 06511
(203) 432-1779

Cristy Park
Disability Rights Arkansas
400 West Capitol Ave, Suite 1200
Little Rock, AR 72201
(501) 296-1775

Sarah Everett
Arkansas Civil Liberties Union Foundation, Inc.
904 W. 2nd Street, Suite One
Little Rock, AR 72202

(501) 374-2660

*Admitted *pro hac vice*

*Attorneys for Plaintiffs and the Putative Class*