**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**NICHOLAS FRAZIER,** *et al.*                                      **PLAINTIFFS**

    **v.**                      **CASE NO. 4:20-CV-00434-KGB-JJV**

**SOLOMON GRAVES,**[1] *et al.*                                   **DEFENDANTS**

---

**BRIEF IN SUPPORT OF THE STATE DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

---

**INTRODUCTION**

Plaintiffs are murderers, rapists, armed robbers, arsonists, and repeat violent offenders. Most have a history of assaulting fellow inmates and staff and absconding from supervised release. And all are security risks. Yet under the guise of challenging the Arkansas Department of Corrections's response to the COVID-19 pandemic, they ask this Court to order their release or to impose requirements that will put their fellow inmates, prison staff, and society at great risk.

Plaintiffs fail to state a claim for multiple reasons. Their request for declaratory relief is retrospective and barred by sovereign immunity. Their claims against Governor Hutchinson, Dr. Romero, and Director Bradshaw are barred by sovereign immunity because they have no connection to the policies and practices Plaintiffs challenge. Their Eighth Amendment claim is merely a litany of disagreements with the State Defendants' COVID-19 policies and practices that falls short of stating a cognizable claim of deliberate indifference against the DOC officials they have named in this lawsuit. Their Americans with Disabilities Act claim, as this Court has already

---

[1] Wendy Kelley recently retired, and Solomon Graves was recently appointed to replace her as Secretary of Corrections. Secretary Graves is automatically substituted as a party for Secretary Kelley pursuant to Fed. R. Civ. P. 25(d). Under that rule, "[l]ater proceedings should be in the substituted party's name[.]" Fed. R. Civ. P. 25(d).

held, fails to seek any reasonable accommodation that the State Defendants do not already provide, and seeks accommodations that Plaintiffs never requested from any of the State Defendants before bringing suit.  And their request for temporary release to home confinement is a condition-of-confinement claim that is not cognizable in habeas.  Plaintiffs' 95-page amended complaint—while replete with detailed factual allegations against unidentified "Defendants" or "DOC staff" (or staff they actually identified by name but chose not to sue)—fails to cure the fatal deficiencies outlined in the State Defendants' motion to dismiss the original complaint.  This Court should dismiss Plaintiffs' lawsuit with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Nicholas Frazier, Alvin Hampton, Marvin Kent, Michael Kouri, Jonathan Neeley, Alfred Nickson, Harold "Scott" Otwell, Trinidad Serrato, Robert Stiggers, Victor Williams, Price Brown, Torris Richardson, Roderick Wesley, Charles Czarnetzki, Darryl Hussey, Lee Owens, Joseph "Dallas" Head, Wesley "Grant" Bray, Jimmy Little, and two unidentified John Does are inmates housed at seven of 20 state prison facilities operated by the Arkansas Division of Correction ("ADC").  DE 84 at 9-30 ¶¶ 18-85.  The ADC is one of several corrections agencies now under the umbrella of the Arkansas Department of Corrections ("DOC"), now led by Secretary Solomon Graves.  *See supra* n.1.  Plaintiffs Aaron Elrod and Cedric Sims are residents of the Central Arkansas Community Correction Center ("CAC"), operated by the Arkansas Division of Community Correction ("ACC"), a separate agency under the DOC umbrella that operates residential treatment centers.  DE 84 at 20-22 ¶¶ 52-57.

Plaintiff Stiggers is a first-degree murderer who, for no apparent reason, shot a longtime friend and his passenger after asking them for a ride.  *See Stiggers v. State*, 2014 Ark. 184, at 1-2, 433 S.W.3d 252, 254-55.

Plaintiff Neeley is a former youth minister who pled guilty to sexually assaulting a series of teenage girls in his congregation.  *See* DE 68 at 8 ¶ 29; *Former youth minister guilty of sexual assault in Howard, Pope counties*, Nashville News Leader, Sept. 24, 2015, *available at* https://www.swarkansasnews.com/2015/09/former-youth-minister-pleads-guilty-to-sexual-assault-4-more-charges-pending-in-pope-county/.

Plaintiff Frazier is serving a 10-year prison sentence for commercial burglary, manufacture, delivery, and possession of controlled substances, criminal mischief, possession of drug paraphernalia, and theft of property, DE 36-21, and is housed in the Varner Super Maximum Security Unit, ADC's most secure housing facility for inmates who have shown they cannot be safely housed in other units.  DE 84 at 12 ¶ 28.

Plaintiff Hampton is serving a five-year sentence for assaulting the director of a Salvation Army office and then assaulting and threatening to murder the police officer who arrested him. DE 36-25.

Plaintiff Kent, who was recently in restrictive housing at Varner's Super Maximum Unit, DE 84 at 13 ¶ 30, is a habitual offender serving an 18-year sentence for first-degree battery and endangering the welfare of a minor.  DE 36-26.

Plaintiff Kouri, who is also known as Michael Mercouri, is serving a 10-year sentence for the armed robbery of his former supervisor at an Aaron's furniture store.  *See Mercouri v. State*, 2016 Ark. 37, at 1-2, 480 S.W.3d 864, 865.

Plaintiff Otwell is serving a 15-year sentence for attempting to set an Arkansas Game and Fish Commission agent's car on fire, in apparent retaliation for the Commission's investigating him, and then tampering with the jury in his subsequent trial for arson.  *See* DE 36-33; Caitlan Butler, *Man sentenced to prison for attempted truck arson, jury tampering*, El Dorado News, May

2, 2019, *available at* https://www.eldoradonews.com/news/2019/may/02/man-sentenced-prison-attempted-truck-arson-jury-ta/.

Plaintiff Serrato is currently in prison on a felon-in-possession-of-a-handgun conviction, after a lifetime of theft and controlled substances convictions.  *See* DE 36-34.

Plaintiff Williams is in prison for manslaughter, a charge to which he pled guilty after being charged with murder in a double homicide that had gone unsolved for seven years.  *See* DE 36 at 25.

Plaintiff Nickson is in prison for murdering his 73-year-old neighbor, 26 years after strangling his roommate to death and then setting their apartment on fire.  *See* DE 36-31; *Hot Springs Man Admits to Neighbor's 2013 Murder*, KARK, Aug. 30, 2016, *available at* https://www.kark.com/news/local-news/hot-springs-man-admits-to-neighbors-2013-murder/541904923/; John Kass & Fred Marc Biddle, *Roommate Seized in School Adviser's Death*, Chicago Tribune, May 22, 1987, *available at* https://www.chicagotribune.com/news/ct-xpm-1987-05-22-8702070942-story.html.

These plaintiffs filed this putative class action on April 21, 2020, naming 11 separate Defendants and alleging that their collective response to the COVID-19 pandemic violates the Eighth Amendment to the United States Constitution and Title II of the Americans with Disabilities Act.  DE 1 at 42-45 ¶¶ 127-148.  More particularly, Plaintiffs alleged that two sub-classes of inmates, including a "high-risk subclass" and a "disability subclass," were at a heightened risk of harm from the virus.  They sought a myriad of injunctive and declaratory relief, including release from incarceration for inmates within those two subclasses, along with federal-court micromanagement of the ADC's comprehensive response to the COVID-19 pandemic.  DE

4

1 at 15-16 ¶ 41.  Defendants accepted service on April 22, 2020, DE 4, 7, making their responsive pleading due June 22, 2020.  *See* Fed. R. Civ. P. 12(a)(1)(ii).

On the same day that they filed their complaint, Plaintiffs filed an emergency motion for a temporary restraining order and preliminary injunction.  DE 2.  That motion requested the same relief sought in the complaint.  On April 27, 2020, Plaintiffs filed a supplemental motion for a temporary restraining order.  DE 22.  In that motion, Plaintiffs sought a subset of the relief requested in their original motion, omitting their request for release and the appointment of a special master.  This Court denied Plaintiffs' TRO motion on May 4, 2020, holding Plaintiffs had not yet shown a likelihood of success on any of their claims.  DE 42.  It held a hearing on Plaintiffs' PI motion on May 7, 2020.  It denied that motion on May 19, 2020 in a comprehensive, 73-page order, again holding that Plaintiffs had failed to show a likelihood of success on any of their claims.  DE 68.

On June 4, 2020, the Court denied the Defendants' motion to stay discovery pending a final resolution of their forthcoming motion to dismiss.  DE 74.  That same day, the Court entered an Initial Scheduling Order with a proposed trial date of April 5, 2021.  DE 75.  On June 22, 2020, Defendants timely filed a motion to dismiss for failure to state any claim upon which relief can be granted.  DE 76.  Plaintiffs requested and received an extension of time to respond to that motion on the ground that they would be filing an amended complaint superseding the original.  DE 83.

On July 13, 2020, Plaintiffs filed an Amended Class Action Complaint and Petition for a Writ of Habeas Corpus.  DE 84.  They were joined in this action by a number of new plaintiffs.

Plaintiff Sims is a resident ACC's CAC and claims he experienced symptoms of, and tested positive for, COVID-19 several months ago.  DE 84 at 21 ¶¶ 54-55.  Plaintiff Elrod resided at CAC when the Amended Complaint was filed, DE 84 at 20 ¶ 52, but he has since been released.[2]

Plaintiff Brown is a habitual offender with 18 years left on his sentences for breaking and entering, aggravated assault, possession of a firearm, battery, and failure to appear.  In the last five years, Plaintiff Brown has received multiple major guilty disciplinary violations, including violations for battery, provoking or agitating a fight, possession/manufacture of contraband, and aggravated battery.[3]

Plaintiff Richardson is a habitual offender with multiple drug possession, delivery, and firearm convictions.  He has an astounding 28 major disciplinary convictions in the last five years, including convictions for possession/manufacture of contraband, battery, trafficking and trading, unexcused absences, and lying to a staff member.[4]  He is currently in restrictive housing due to his disciplinary status.  DE 84 at 23 ¶ 60.

---

[2] *See* https://vinelink.vineapps.com/search/persons;limit=20;offset=0;showPhotos=false;isPartialSearch=false;siteRefId=ARSWVINE;personFirstName=aaron;personLastName=elrod (last accessed Aug. 15, 2020).

[3] *See* https://apps.ark.org/inmate_info/search.php?dcnum=090004&token=45f2deb46a0da77e1be676dc052db3f7f8000905995ac4d48a95ed356c5dfb28&lastname=brown&firstname=price&sex=b&agetype=1&disclaimer=1&__utma=149258854.548621310.1570550933.1591799624.1593890637.13&__utmz=149258854.1593890637.13.11.utmcsr%3Dsos.arkansas.gov%7Cutmccn%3D%28referral%29%7Cutmcmd%3Dreferral%7Cutmcct%3D%2Frules-regulations&PHPSESSID=1e4133f071e1d45200b90ff15517b045 (last accessed Aug. 15, 2020).

[4] *See* https://apps.ark.org/inmate_info/search.php?dcnum=145883&token=45f2deb46a0da77e1be676dc052db3f7f8000905995ac4d48a95ed356c5dfb28&lastname=richardson&firstname=torris&sex=b&agetype=1&disclaimer=1&__utma=149258854.548621310.1570550933.1591799624.1593890637.13&__utmz=149258854.1593890637.13.11.utmcsr%3Dsos.arkansas.gov%7Cutmccn%3D

Plaintiff Wesley is currently serving a 50-year sentence he received as a habitual offender for aggravated robbery.  He has received two major disciplinary violations for being under the influence while incarcerated and received another major disciplinary for failure to obey an order.[5]

Plaintiff Czarnetzki was incarcerated at the Tucker unit when he joined in this lawsuit (*see* DE 84 at 24 ¶ 63), but he has since been paroled.[6]

Plaintiff Hussey is serving a life sentence at Cummins for first-degree murder.  He received a major disciplinary violation in January 2020 for sexual activity.[7]

Plaintiff Owens is serving a 101-year sentence as a habitual offender for manufacture/delivery/possession of a controlled substance.  He has previous convictions for theft of property, theft by receiving, and manufacture/delivery/possession of a controlled substance.  He

---

%28referral%29%7Cutmcmd%3Dreferral%7Cutmcct%3D%2Frules-regulations&PHPSESSID=1e4133f071e1d45200b90ff15517b045 (last accessed Aug. 15, 2020).

[5] *See*
https://apps.ark.org/inmate_info/search.php?dcnum=117359&token=45f2deb46a0da77e1be676d c052db3f7f8000905995ac4d48a95ed356c5dfb28&lastname=wesley&firstname=roderick&sex=b &agetype=1&disclaimer=1&__utma=149258854.548621310.1570550933.1591799624.1593890 637.13&__utmz=149258854.1593890637.13.11.utmcsr%3Dsos.arkansas.gov%7Cutmccn%3D% 28referral%29%7Cutmcmd%3Dreferral%7Cutmcct%3D%2Frules-regulations&PHPSESSID=1e4133f071e1d45200b90ff15517b045 (last accessed Aug. 15, 2020).

[6] *See*
https://vinelink.vineapps.com/search/persons;limit=20;offset=0;showPhotos=false;isPartialSearc h=false;siteRefId=ARSWVINE;personFirstName=Charles;personLastName=Czarnetzki (last accessed Aug. 18, 2020).

[7] *See*
https://apps.ark.org/inmate_info/search.php?dcnum=109842&token=45f2deb46a0da77e1be676d c052db3f7f8000905995ac4d48a95ed356c5dfb28&lastname=hussey&firstname=darryl&sex=b& agetype=1&disclaimer=1&__utma=149258854.548621310.1570550933.1591799624.15938906 37.13&__utmz=149258854.1593890637.13.11.utmcsr%3Dsos.arkansas.gov%7Cutmccn%3D%2 8referral%29%7Cutmcmd%3Dreferral%7Cutmcct%3D%2Frules-regulations&PHPSESSID=1e4133f071e1d45200b90ff15517b045 (last accessed Aug. 15, 2020).

has received seven major disciplinary violations in the last three years, including multiple violations for possession/manufacture of contraband, failure to obey/refusing a direct order, insolence to a staff member, and threat(s) to inflict injury.[8]

Plaintiff Head is a habitual offender serving a 10-year sentence for residential burglary, aggravated robbery, and knowingly distributing controlled substances.  He has prior convictions for residential burglary and theft of property.  While incarcerated, Head has received multiple major disciplinary violations for unauthorized communication, lying to a staff member, and unauthorized use of state property/supplies.[9]

Plaintiff Bray is a habitual offender currently serving 20 years for possession of methamphetamine/cocaine with the purpose to deliver.  He has multiple prior convictions for residential burglary and theft of property.  In just the last year or so, he has received three major disciplinary violations, including one for threat(s) to inflict injury.[10]

---

[8] *See* https://apps.ark.org/inmate_info/search.php?dcnum=101589&token=45f2deb46a0da77e1be676dc052db3f7f8000905995ac4d48a95ed356c5dfb28&lastname=owens&firstname=lee&sex=b&agetype=1&disclaimer=1&__utma=149258854.548621310.1570550933.1591799624.1593890637.13&__utmz=149258854.1593890637.13.11.utmcsr%3Dsos.arkansas.gov%7Cutmccn%3D%28referral%29%7Cutmcmd%3Dreferral%7Cutmcct%3D%2Frules-regulations&PHPSESSID=1e4133f071e1d45200b90ff15517b045 (last accessed Aug. 15, 2020).

[9] *See* https://apps.ark.org/inmate_info/search.php?dcnum=553097&token=45f2deb46a0da77e1be676dc052db3f7f8000905995ac4d48a95ed356c5dfb28&lastname=head&firstname=joseph&sex=b&agetype=1&disclaimer=1&__utma=149258854.548621310.1570550933.1591799624.1593890637.13&__utmz=149258854.1593890637.13.11.utmcsr%3Dsos.arkansas.gov%7Cutmccn%3D%28referral%29%7Cutmcmd%3Dreferral%7Cutmcct%3D%2Frules-regulations&PHPSESSID=1e4133f071e1d45200b90ff15517b045 (last accessed Aug. 15, 2020).

[10] *See* https://apps.ark.org/inmate_info/search.php?dcnum=552858&token=45f2deb46a0da77e1be676dc052db3f7f8000905995ac4d48a95ed356c5dfb28&lastname=bray&firstname=wesley&sex=b&agetype=1&disclaimer=1&__utma=149258854.548621310.1570550933.1591799624.1593890063

Plaintiff Little is currently serving a four-year sentence for possession of drug paraphernalia meth/cocaine. He has a long history of convictions for various drug-related offenses.[11]

The Amended Complaint also adds two new defendants to the case, Arkansas Secretary of Health Dr. Jose Romero[12] and Wellpath, LLC, the contracted medical provider for the DOC. DE 84.

The Amended Complaint asserts the same three causes of action that Plaintiffs raised in the original complaint: (1) an Eighth Amendment claim by all Plaintiffs against all Defendants based on their alleged deliberate indifference to the Plaintiffs' serious medical needs; (2) Petition for a Writ of Habeas Corpus on behalf of the "high risk subclass," and (3) a claim pursuant to Title II of the Americans with Disabilities Act ("ADA") by the "disability subclass" against all Defendants. DE 84 at 85-90, ¶¶ 256-283. Plaintiffs continue to seek broad declaratory and injunctive relief along with federal court control and oversight over the DOC's response to the COVID-19 pandemic. DE 84 at 90-93.

---

7.13&__utmz=149258854.1593890637.13.11.utmcsr%3Dsos.arkansas.gov%7Cutmccn%3D%28 referral%29%7Cutmcmd%3Dreferral%7Cutmcct%3D%2Frules-regulations&PHPSESSID=1e4133f071e1d45200b90ff15517b045 (last accessed Aug. 15, 2020).

[11] *See* https://apps.ark.org/inmate_info/search.php?dcnum=122430&token=45f2deb46a0da77e1be676d c052db3f7f8000905995ac4d48a95ed356c5dfb28&lastname=little&firstname=jimmy&sex=b&a getype=1&disclaimer=1&__utma=149258854.548621310.1570550933.1591799624.159389063 7.13&__utmz=149258854.1593890637.13.11.utmcsr%3Dsos.arkansas.gov%7Cutmccn%3D%28 referral%29%7Cutmcmd%3Dreferral%7Cutmcct%3D%2Frules-regulations&PHPSESSID=1e4133f071e1d45200b90ff15517b045 (last accessed Aug. 15, 2020).

[12] Dr. Nathaniel Smith, who was named as a new defendant in the Amended Complaint, has been succeeded by Dr. Jose Romero. Dr. Romero is automatically substituted as a party for Dr. Smith pursuant to Fed. R. Civ. P. 25(d).

## STANDARD OF REVIEW

Rule 8 of the Federal Rules of Civil Procedure states that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) of the Federal Rules of Civil Procedure states that a defendant may raise, as a defense, a plaintiff's "failure to state a claim upon which relief can be granted" by motion.

When analyzing a Rule 12(b)(6) motion, the complaint's factual allegations are accepted as true and viewed in the light most favorable to the plaintiff.  *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999) (citing *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999)).  "At a minimum, however, a complaint must contain facts to state a claim as a matter of law and must not be merely conclusory in its allegations."  *Id.* (quoting *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998)).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

An "important mechanism for weeding out meritless claims [is a] motion to dismiss for failure to state a claim."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 50).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  "A pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557); *see also Christiansen v. W. Branch Cmty. Sch. Dist.*, 674 F.3d 927, 934 (8th Cir. 2012) ("A gallimaufry of labels, [legal] conclusions, formulaic recitations, naked assertions and the like will not pass muster.") (citing *Twombly*, 550 U.S. at 555-57).

In evaluating a motion to dismiss, a district court should employ a two-pronged approach. First, the court should identify and set aside "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Second, the court should assume the veracity of the plaintiff's "well-pleaded factual allegations . . . and then determine whether they plausibly give rise to an entitlement for relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then the complaint fails to show a plausible claim for relief." *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

The court should dismiss a complaint if the plaintiff has failed to "nudge[] [his] claims" of unlawful conduct "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. In other words, "if the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," then the complaint fails to "show[] that the pleader is entitled to relief" under Rule 8(a)(2) and must be dismissed. *Iqbal*, 556 U.S. at 679. Likewise, a court should dismiss when, based on the plaintiff's own allegations, he has no cognizable claims. "[D]ismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises

11

and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity."

*Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

## ARGUMENT

### I.   The State Defendants are immune from Plaintiffs' claims for declaratory relief.

"The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state."  *281 Care Comm. v. Aronson*, 638 F.3d 621, 632 (8th Cir. 2011).  But under the limited exception to that rule identified in *Ex parte Young*, a citizen of a state may sue state officials where he "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  That exception, however, obviously "does not permit judgments against state officers declaring that they violated federal law in the past," *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993), or what the Eighth Circuit has recently termed "retrospective declaratory relief."  *Justice Network, Inc. v. Craighead Cty.*, 931 F.3d 753, 764 (8th Cir. 2019).   That means that in order to satisfy the *Ex parte Young* exception, a request for declaratory relief must seek to "define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act." *Id.*

Plaintiffs' amended complaint seeks an order "declaring that Defendants/Respondents' policies and practices regarding COVID-19 violate the Eighth Amendment to the United States Constitution," and an order "declaring that Defendants/Respondents *have violated* the ADA by failing to reasonably accommodate incarcerated individuals with disabilities[.]"  DE 84 at 91 (Prayer for Relief) (emphasis added).   That is, Plaintiffs seek a declaration that the State Defendants' past policies and practices are unlawful.

12

The fact that those policies might continue—though, as this Court has already found, the State Defendants' COVID-19 policies and practices have continuously evolved—is not enough to make Plaintiffs' request prospective.  In *Justice Network*, for example, a private probation services provider sought a declaration that two state court judges' probation-service debt-forgiveness program violated the Contracts and Takings Clauses.  931 F.3d at 758, 762-63.  The judges had implemented that program before the provider sued, but the program continued thereafter and was still in effect when the Eighth Circuit rendered its decision.  *Id.* at 758.  But because the program had been initially implemented in the past, the Eighth Circuit found that the provider's request for a declaratory judgment was "retrospective" and sought to "invalidate the [judges' past] actions." *Id.* at 764.  As a result, the Eighth Circuit held that the provider was "not entitled to such relief under § 1983."  *Id.*

So too here; Plaintiffs do not seek a declaratory judgment "in anticipation of *some future* conduct," *id.*, but rather request a declaration that policies and practices the State Defendants adopted in the past are unlawful.  They expressly seek a declaration that the State Defendants were deliberately indifferent to the Plaintiffs' serious medical needs in the past.  They likewise seek a declaration that the State Defendants violated Title II of the ADA in the past by failing to provide reasonable accommodations for their alleged disabilities.  Because retrospective declaratory relief is plainly barred by the Eleventh Amendment, the Court should dismiss Plaintiffs' requests for such relief in Counts I and III of their amended complaint on the ground of sovereign immunity.

## II.   Governor Hutchinson and Dr. Romero have sovereign immunity from all of Plaintiffs' claims.

Governor Hutchinson and Dr. Romero also enjoy immunity from all of Plaintiffs' requests for relief because they have no role in enforcing the policies and practices that Plaintiffs challenge.

Indeed, another judge of this Court has recently so held in a COVID-19-related prisoners' suit. *See Schuler v. Hutchinson*, No. 2:20-cv-97, 2020 WL 3104668, at *1 (E.D. Ark. June 11, 2020) ("The Governor and Attorney General are not proper defendants.") (citing *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956-58 (8th Cir. 2015)).

Under *Ex parte Young*, a "state official is amenable to suit to enjoin the enforcement of an unconstitutional state [policy] only if the officer has 'some connection with the enforcement of the act.'" *Dig. Recognition Network*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)); *see also Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (requiring "some connection to the enforcement of the challenged laws"). "Without that connection, the officer would be sued merely 'as a representative of the state' in an impermissible attempt 'to make the state a party.'" *Dig. Recognition Network*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).

Plaintiffs do not allege that Governor Hutchinson or Dr. Romero have *any* direct role in enforcing the policies and practices they challenge. They allege instead that under Arkansas's Constitution, the Governor "has the ultimate authority for ensuring that all [state] agencies . . . function in compliance with state and federal law." DE 84 at 31 ¶ 90. And they allege that he "has the power to release people incarcerated in DOC correctional facilities." *Id.* As to Dr. Romero, Plaintiffs maintain he is responsible here because he "is the executive head of the ADH and is responsible for the provision of public health guidance and directives to the State" and has "the authority to issue guidance to DOC regarding how to address the COVID-19 pandemic." DE 84 at 31-32 ¶ 91. These allegations do not suffice to make out the requisite connection between these defendants and the policies Plaintiffs challenge.

14

*First*, as to Governor Hutchinson's general-enforcement authority under the Arkansas Constitution, it is well-settled that "a governor's general-enforcement authority is 'some connection' [only] if that authority gives the governor *methods* of enforcement." *Church v. Missouri*, 913 F.3d 736, 749 (8th Cir. 2019).  Plaintiffs cite no enforcement method; they only cite the Governor's enforcement authority itself.   But neither "a broad duty to uphold state law," *id.* (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017)), nor "general supervisory power over the persons responsible for enforcing the challenged provision will . . . subject an official to suit." *Id.* (quoting *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).  Indeed, the Eighth Circuit has specifically held that "the executive authority of the [Arkansas] governor" under the Arkansas Constitution is not the sort of connection to challenged state law or policy that *Ex parte Young* requires.  *Dig. Recognition Network*, 803 F.3d at 960 (citing Ark. Const. art VI, §§ 2, 7).

*Second*, as for the Governor's "power to release people incarcerated in DOC correctional facilities," DE 84 at 31 ¶ 90, the Governor does have the power to grant "[e]xecutive clemency," Ark. Const. art. VI, sec. 18, but that power has no connection to the policies and practices Plaintiffs challenge or the relief Plaintiffs seek.  As this Court has noted, "Plaintiffs represent that they 'do not seek unconditional release' but instead seek measures such as transferring vulnerable plaintiffs 'to their homes to self-isolate, while still in ADC custody . . . until the emergency abates.'"  DE 68 at 42-43 (quoting DE 3 at 56).  But the Governor's clemency power is a power to pardon inmates or commute their sentences.  *See* Ark. Code Ann. §§ 16-93-204, 16-93-207.  It is not a power to micromanage the conditions of inmates' sentences; that power is reserved to the DOC officials Plaintiffs have sued.  Indeed, even in habeas proceedings that do seek unconditional release, governors are never sued as respondents because an order compelling a governor to exercise his

discretionary pardon or commutation power is not a permissible remedy in habeas proceedings. *See Pennington v. Norris*, 257 F.3d 857, 858 n.2 (8th Cir. 2001) (declining to address possible procedural defects in a prisoner's "statutory executive clemency and/or commutation of sentence claim, because that claim is not cognizable in federal habeas proceedings in any event"). The Governor's discretionary pardon and commutation power has no connection to Plaintiffs' requests for temporary transfer to home confinement or modifications of prison conditions. Thus, this power does not subject him to suit in this case.

*Third*, Dr. Romero's authority to control the State's sanitary and quarantine measures for dealing with infectious diseases, including the authority to issue guidance to the DOC regarding how to address the COVID-19 pandemic, does not subject him to liability in this case. *See Dig. Recognition Network*, 803 F.3d at 960 (citing Ark. Const. art VI, §§ 2, 7). On Plaintiffs' own allegations, other defendants are responsible for the adoption and enforcement of the policies and practices they challenge, and there is nothing in the amended complaint to support a conclusion that Dr. Romero is capable of providing any of the injunctive relief they seek. Thus, he is not a proper defendant in this case.

As shown, all of Plaintiffs' claims against Governor Hutchinson and Dr. Romero fail as a matter of law because they lack the requisite connection to the enforcement of the policies and practices at issue in this case and are not in a position to provide any of the requested injunctive relief. For these additional reasons, all of Plaintiffs' claims against Governor Hutchinson and Dr. Romero are barred by sovereign immunity.

## III.   ACC Director Bradshaw has sovereign immunity from Plaintiffs' claims.

Plaintiffs sue Jerry Bradshaw, Director of the Arkansas Division of Community Correction ("ACC"), a state agency that manages several minimum-security residential treatment facilities

housing low-risk offenders.  DE 84 at 31 ¶ 89.  Plaintiffs do not allege that Director Bradshaw adopted the policies at issue or that his action or inaction has harmed them in any way.  Indeed, Plaintiffs do not even mention Director Bradshaw outside of the paragraph of their complaint listing him as a party.  Nor could most of them.  All but two of the Plaintiffs are inmates housed in *prisons* operated by the ADC.  *See* DE 84 at 9-29 ¶¶ 18, 25, 28, 30, 32, 35, 37, 39, 43, 46, 51, 58, 59, 61, 63, 66, 71, 74, 75, 78, 84.  Plaintiffs do not allege that Director Bradshaw has any supervisory authority over Arkansas's prisons, and as a matter of law, he does not.  *See* Ark. Code Ann. § 12-27-126 (detailing powers of the Director of the Division of Community Correction). Because Director Bradshaw has nothing whatsoever to do with the conditions of Plaintiffs' prisons, Plaintiffs fail to state a claim against Director Bradshaw, and he has sovereign immunity from the claims asserted against him by all of the ADC Plaintiffs.

While Plaintiff Elrod claims to reside at ACC's CAC in Little Rock, DE 84 at 20 ¶ 52, public information indicates that he has already been released from ACC custody.  *See supra* n.2. This leaves Plaintiff Sims, a 30-year-old man who purportedly suffers from high blood pressure and had COVID-19 several months ago while a resident at CAC, DE 84 at 21 ¶¶ 54-57, as the only named Plaintiff who could even *potentially* have a claim against Director Bradshaw.  But because Plaintiff Sims has not stated *any facts* against Director Bradshaw that would give rise to any plausible claim, the Court should find that Plaintiff Sims's claims must be dismissed, as well. Plaintiff Sims's claims against Director Bradshaw also fail as a matter of law for the other reasons explained herein.

## IV.    Plaintiffs fail to state an Eighth Amendment claim.

Plaintiffs assert that the State Defendants' COVID-19 policies and practices amount to deliberate indifference to the risks posed by COVID-19, in violation of the Eighth Amendment.

Yet Plaintiffs' own allegations belie that claim.  Rather than allege reckless indifference to the risks of COVID-19, Plaintiffs merely allege that the State Defendants' responses aren't what Plaintiffs would do.  Plaintiffs' disagreement with the State Defendants' measures, whether reasonable or not, is not enough to state a deliberate indifference claim.

As this Court has already explained, "[d]eliberate indifference has both an objective and a subjective component."  DE 68 at 53.  As relevant here, the "subjective component of deliberate indifference requires proof that defendants actually knew of and recklessly disregarded [a] substantial risk of serious harm" to these Plaintiffs.  *Id.* (alteration omitted) (internal quotation marks omitted) (quoting *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)).  And "[i]n order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness:  disregarding a known risk to the inmate's health."  *Id.* (internal quotation marks omitted) (quoting *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009)).  "Deliberate indifference . . . demands more than negligent misconduct."  *Olson v. Bloomberg*, 339 F.3d 730, 736 (8th Cir. 2003).  "Deliberate indifference must be measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'"  *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011) (quoting *Lenz v. Wade*, 490 F.3d 991, 995 (8th Cir. 2007)).

The Court may consider either the objective or subjective prong first and, if there is a failure of proof on the first prong the Court chooses to consider, it need not proceed to the other prong.  *Helling v. McKinney*, 509 U.S. 24, 35 (1993).  Here, Plaintiffs have not plausibly alleged either prong necessary to proceed with their deliberate indifference claim against any of the State Defendants.  For purposes of this motion, the State Defendants will address the subjective prong

18

of the deliberate indifference analysis.  By so doing, they do not concede Plaintiffs have plausibly alleged facts sufficient to satisfy the objective inquiry.

In order to state a cognizable deliberate indifference claim against each of the State Defendants, Plaintiffs must allege facts demonstrating that each Defendant had "actual knowledge of the risk of harm, followed by deliberate inaction amounting to callousness."  *Clarke v. Taylor*, No. 2:13-CV-26, 2014 WL 4854585, at *5 (E.D. Ark. Sept. 29, 2014) (quoting *Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998)).  In other words, a plaintiff "must demonstrate the [defendant] deliberately disregarded" the plaintiff's risk.  *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015).  One way to demonstrate this is to allege "a total deprivation of care"; another way is to allege "[g]rossly incompetent or inadequate care."  *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)).  But "more than negligence, more even than gross negligence," and certainly more than "mere disagreement with treatment decisions" is required.  *Id.* (quoting *Alberson v. Norris*, 458 F.3d 762, 765 (8th Cir. 2006)).  Rather, what a plaintiff must allege at the pleading stage is that prison officials "*knew* that their conduct was inappropriate in light of [the plaintiff's] risk."  *Washington v. Denney*, 900 F.3d 549, 559 (8th Cir. 2018) (emphasis added) (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)).  And though "the obvious inadequacy of [an official's] response to a risk may support an inference that the officer recognized [its] inappropriateness . . . [i]t does not follow, however, that an unreasonable response—i.e., a negligent response—is sufficient to establish liability."  *Krout*, 583 F.3d at 567.

In light of that standard, the Eighth Circuit's and other courts' approach to suits alleging deliberate indifference to the risk of infection with a communicable disease like COVID-19 is a simple one.  Plaintiffs who allege at the pleading stage, and prove at the merits stage, that a prison

did little to nothing to combat the spread of a known communicable disease will prevail.  But Plaintiffs who sue prisons that do have policies or procedures in effect to combat the spread of a communicable disease will lose.  In light of the judicially recognizable facts available to the Court, Plaintiffs' amended complaint clearly falls in the latter category, so the Court should dismiss Plaintiffs' Eighth Amendment claim.

In *DeGidio v. Pung*, a prison allowed tuberculosis to spread unabated to hundreds of prisoners over four years.  920 F.3d 525, 529-31 (8th Cir. 1990).  Though the first case of tuberculosis was diagnosed in 1982 (in a test conducted on an inmate seven months after he first showed symptoms), and more cases followed after that, the prison did not undertake prison-wide testing until 1986—the same year it finally got around to issuing a written protocol for tuberculosis testing and control.  *See id.*  Indeed, no one was even responsible for supervising health services at the prison during the four-year outbreak period.  *Id.* at 529.  Given these facts, the Eighth Circuit had little difficulty finding deliberate indifference.

Sixteen years later in *Butler v. Fletcher*, 465 F.3d 340 (8th Cir. 2006), the Eighth Circuit confronted a very different case of alleged deliberate indifference to the risk of tuberculosis infection.  The prisoner in that case offered adequate evidence to survive summary judgment that while in prison, he was exposed to "inmates with active TB cases in a manner that created an unreasonable risk of serious harm to his health."  *Id.* at 345.  But he failed to show deliberate indifference because the officials he sued had issued policies that "specifically acknowledged the risk [of TB infection] and promulgated detailed procedures for the diagnosis, segregation, and treatment of . . . inmates infected with active cases of TB."  *Id.*  Thus, those officials "did not disregard the risk of tuberculosis infection."  *Id.*

Those principles should resolve this case on the allegations in Plaintiffs' amended complaint and the judicially noticeable facts in the public record.  Where a prison system has taken and continues to take measures—informed by guidance from the Arkansas Department of Health, the U.S. CDC, and contracted medical professionals—to abate and control the spread of the virus, it will be virtually impossible to prove that prison officials "subjectively believe the measures they are taking are inadequate." *Valentine v. Collier*, 956 F.3d 797, 802–03 (5th Cir. 2020).  And where prison officials "are trying, very hard, to protect inmates against the virus and to treat those who have contracted it," "[t]he record simply [will] not support any suggestion that [d]efendants have turned the kind of blind eye and deaf ear to a known problem that would indicate 'total unconcern' for the inmates' welfare." *Plata v. Newsom*, — F. Supp. 3d —, 2020 WL 1908776, at *9 (N.D. Cal. Apr. 17, 2020) (quoting *Money v. Pritzker*, — F. Supp. 3d —, 2020 WL 1820660, at *18 (N.D. Ill. Apr. 10, 2020)).

That language perfectly describes this case.  The public record shows that the State Defendants have worked very hard to educate inmates on how to protect against the risk of the coronavirus, to prevent COVID-19 from entering ADC units and, once it did, worked very hard to contain the outbreak and treat and isolate those inmates who have contracted it.  The State Defendants walled off the units to the symptomatic and to the outside world.  The ADC manufactured tens of thousands of masks and provided them to inmates and staff.  The public record shows increased efforts to cleanse high-touch surfaces with hospital-grade disinfectant. ADC and ACC have tested thousands of individuals, inmates and staff alike, and have isolated those prisoners and residents who tested positive and the staff who serve them from those prisoners and residents who have not.  These actions describe only a fraction of the DOC's comprehensive and immediate response to the threat posed by COVID-19.  On the judicially noticeable public

record, this is simply not a case where corrections officials have deliberately disregarded a known risk, much less acted in a fashion that Plaintiffs could ever prove the State Defendants subjectively *knew* was inappropriate in light of known risks to these Plaintiffs' health.  Plaintiffs, therefore, have not plausibly alleged an Eighth Amendment violation, and the Court should dismiss their Eighth Amendment claims against each of the State Defendants.

Plaintiffs' allegations—particularly in light of judicially noticeable public records this Court discussed in denying Plaintiffs' preliminary-injunction motion—do not state a plausible claim of deliberate indifference.  Plaintiffs first allege that "Defendants failed to adequately plan to prevent or mitigate the spread of COVID-19 in DOC facilities" and, specifically, to "develop contingency plans for reduced workforces due to staff absences" as recommended by CDC Guidance.  DE 84 at 54 ¶ 158.  But an alleged failure to develop a contingency plan for staff shortages in the event of a pandemic that did not yet exist cannot, as a matter of law, constitute deliberate indifference to the *known* risk of harm from that pandemic.  Moreover, Plaintiffs themselves allege—and this Court has found on the basis of judicially noticeable public records— that the ADC *has* addressed staff shortages since the onset of the pandemic by allowing, in the event of a critical staffing shortage, asymptomatic staff who have tested positive to return to work on the condition that they only work with positive-tested inmates.  DE 84 at 60 ¶ 176; DE 68 at 38 (citing DE 36-19 (Arkansas Department of Health guidance)).  The Court should find no deliberate indifference as a matter of law in adopting a critical staffing policy endorsed by the State health department.

Next, Plaintiffs allege that the State Defendants' "failure to implement" various policies and procedures constitutes deliberate indifference in violation of the Eighth Amendment.  DE 84 at 54-63 ¶¶ 161-186.  As this Court has already held, *see* DE 68 at 55-56, the fact that there may

have been some variations from Defendants' policies and practices does not show deliberate indifference—especially not on the part of the officials at the very top of the Department of Corrections and its Divisions that Plaintiffs have sued.  This is because state actors generally may not be sued under § 1983 for an injury inflicted solely by their employees or agents on a *respondeat superior* theory of liability.  DE 68 at 55 (citing *Monnell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  The Eighth Circuit has explained, however, that "a supervising official who had no direct participation in an alleged constitutional violation [can be] sued for failure to train or supervise the offending actor[.]"  *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).  The supervisor is only liable, however, if the plaintiff alleges and "proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts."  *Id.*  To that end, Plaintiffs make some conclusory allegations in their amended complaint regarding the State Defendants' alleged failure "to properly supervise and train corrections staff to carry out effective prevention practices and ensure appropriate medical treatment."  DE 84 at 5 ¶ 8.

To survive a motion to dismiss, Plaintiffs must allege sufficient facts to show that, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the deprivation of constitutional rights, that the policymakers of the [DOC] can reasonably be said to have been deliberately indifferent to the need."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  To state a § 1983 claim for inadequate training or supervision, Plaintiffs must allege facts to plausibly establish each of the following elements: (1) each Defendant's training practices were inadequate; (2) each Defendant was deliberately indifferent to the rights of others in adopting those training practices, such that the failure to train reflects a deliberate or conscious choice by that Defendant; and (3) that the alleged

23

deficiency in the training procedures actually caused the Plaintiffs' injuries.  *B.A.B., Jr. v. Bd. of Educ.*, 698 F.3d 1037, 1040 (8th Cir. 2012) (quoting *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010)).  As the U.S. Supreme Court has explained, it is only when all three elements are proven that "the failure to provide proper training may fairly be said to represent a policy for which [state actors are] responsible, and for which [they] may be held liable if it actually causes injury." *Harris*, 489 U.S. at 390.

In resolving the issue of a policymaker's liability, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform," because the fact that "a particular officer may be unsatisfactorily trained" or that "an injury or accident could  have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" "says little about the training program or the legal basis for holding the [policymaker] liable." *Id.* at 390-91.  This is because an "otherwise sound program has occasionally been negligently administered" "[a]nd plainly, adequately trained officers occasionally make mistakes[.]" *Id.* at 391; *see also Brossart v. Janke*, 859 F.3d 616, 627-28 (8th Cir. 2017) (affirming summary judgment to a sheriff on a failure-to-train claim arising out of a deputy's alleged use of excessive force in tasing the plaintiffs to effectuate their arrests when it was undisputed that the supervisor had never received any prior complaints regarding the subordinate's taser use).

These principles as applied here warrant dismissal of Plaintiffs' new § 1983 claim for failure to train and supervise "corrections staff."  In their amended complaint, Plaintiffs attempt to state a supervisory liability claim against the State Defendants by alleging that, despite the State Defendants' being on notice of "problems with implementation" of DOC's COVID-related policies and procedures, "Defendants have not sufficiently supervised and/or trained DOC staff[.]"

24

DE 84 at 63 ¶ 186.  While the Plaintiffs' amended complaint contains conclusory allegations about the Defendants' alleged notice of "problems" with staff's implementation of various COVID-19 policies and practices at some DOC facilities—ranging from the proper use of PPE, heightened cleaning and disinfection practices, social distancing and quarantine measures, and their response to suspected and confirmed cases of COVID-19—these allegations, lodged against all 13 defendants as a group and without any specifics about what any individual defendant allegedly did wrong, fail to state a cognizable Eighth Amendment claim based on the failure to train or supervise.

The amended complaint is devoid of any facts demonstrating that each Defendant was responsible for the implementation of inadequate training practices with relation to the specific staff they complain about in their complaint, such as correctional officers, sanitation workers, food service workers, and medical staff.  Plaintiffs likewise state no facts showing that each Defendant was on notice of a pattern and practice of unconstitutional conduct by any particular staff member, let alone widespread constitutional violations at any facility or throughout any agency.  Nor do they allege sufficient facts to show that, in light of the specific duties assigned to the staff members at issue, the need for more or different training was so obvious, and the inadequacy was so likely to result in the deprivation of constitutional rights, that the State Defendants can reasonably be said to have been deliberately indifferent to the need.  Finally, and critically, Plaintiffs fail to state any facts supporting a conclusion that any deficiency in the State Defendants' training procedures actually caused the Plaintiffs' alleged injuries.  Their injuries, if any, are speculative.  They could have been caused just as easily by other inmates' or staff's negligent failures to follow the policies and practices the Defendants put in place.  As the Supreme Court explained in *Harris*, neither negligent administration of a policy, nor mistakes by officers in implementing a policy, are sufficient to impose supervisory liability on the State Defendants.

In addition to their supervisory claims, Plaintiffs continue to allege in their amended complaint that the State Defendants were deliberately indifferent to the serious risk of harm posed by COVID-19 in specific ways.   For example, they continue to complain about insufficient COVID-19-related signage, despite an abundance of COVID-19-related, inmate-facing signage in the record, *see* DE 36-12–17.   Plaintiffs may protest that this signage cannot be considered at the motion-to-dismiss stage and that the Court must indulge the counterfactual fantasy that it does not exist, thereby keeping their claims on temporary life support until summary judgment, but a "district court may take judicial notice of public records and may thus consider them on a motion to dismiss."   *Stahl v. USDA*, 327 F.3d 697, 700 (8th Cir. 2003).

Plaintiffs also vaguely allege that "Defendants have not implemented the heightened hygienic, cleaning, and disinfecting practices called for by the CDC Guidance," DE 84 at 56 ¶ 164, and have "not followed the CDC's recommendation that staff clean shared surfaces several times a day."   *Id.* at 57 ¶ 166.   As an initial matter, the State Defendants note that CDC guidance does not have the force and effect of law, so it cannot form the basis of an Eighth Amendment deliberate indifference claim as a matter of law.   *See Krigbaum*, 808 F.3d at 340 (explaining that a deliberate indifference claim must be based on an underlying constitutional violation).   In addition, the only facts Plaintiffs allege in support of these conclusory allegations are conditions observed by three inmates at a few of ADC's twenty units and by one resident at one ACC facility.   *Id.* at 56-57 ¶¶ 165-166.   But absent allegations of an actual unconstitutional policy on Defendants' part—which Plaintiffs do not make—these allegations of isolated unit-level implementation failures do not state a claim of deliberate indifference on Defendants' part.

And as the Court is now aware, DOC and ADC officials have given orders to ADC units to engage in heightened cleaning, *see* DE 68 at 29 (citing 17 documents in the record documenting

those orders), and Plaintiffs "do not challenge [those] orders." DE 68 at 59. Plaintiffs themselves, for example, filed an ADC memo directing sanitizer to be "continuously used daily" to "disinfect frequently touched surface[s]." DE 57-7. Similarly, as this Court observed in its order denying the Plaintiffs' request for a preliminary injunction, ACC Deputy Director of Residential Services James Banks testified at the preliminary injunction hearing that ACC units have implemented enhanced cleaning measures, and cleaning products, hospital-grade disinfectants, and alcohol-based hand sanitizer are available for all residents' use. *See* DE 68 at 32. Thus, even if the Constitution required the DOC to adopt the CDC's guidance—and it does not—the judicially noticeable public record shows that the State Defendants have, in fact, done so where practicable. Plaintiffs cannot defeat dismissal by denying the existence of orders to increase cleaning that they admit have been issued, as evidenced by a slew of judicially noticeable public records, some of which *they themselves offered* as evidence in support of their claims. The only allegations on which they can rely where cleaning is concerned, then, are their scattered unit-level allegations of implementation failures. But those sorts of conclusory allegations, again, do not suffice to state a claim against the officials they have named in this lawsuit.

Plaintiffs continue to allege that Defendants' social-distancing measures have been inadequate, particularly with respect to the space between inmates' beds. *See* DE 84 at 57-59 ¶¶ 168-172. This Court has already held that given the flexibility of CDC guidance on the subject, a mere failure to space inmates' beds six feet apart does not violate the Eighth Amendment. *See* DE 68 at 61 (citing DE 36-9 at 11). Plaintiffs also allege inadequate spacing at meals. But as this Court has found on the basis of a large array of judicially noticeable public records, Defendants have ordered staggered meal times and required spaced seating at meals. *See* DE 68 at 30. What remains, like so many of Plaintiffs' allegations, is an allegation of unit-level shortcomings in

implementation, unaccompanied by any plausible allegations that Defendants have deliberately failed to train or supervise the unit-level officials responsible for those shortcomings, or that this failure to train or supervise is what actually caused the Plaintiffs' alleged injuries.

Plaintiffs also make allegations about several isolated incidents where symptomatic inmates were not given masks, tested for COVID-19, or treated.  DE 84 at 59-60 ¶¶ 173-175.  As this Court has already held when Plaintiffs put on further evidence of the sorts of incidents alleged in their amended complaint, such isolated failures do not show that these Defendants have been deliberately indifferent to the Plaintiffs' serious medical needs.  DE 68 at 63-64.  Rather, Plaintiffs must allege that the State Defendants have a policy of indifference to symptomatic inmates' needs or that the State Defendants have been deliberately indifferent in their supervision of separate defendant Wellpath, LLC.  Plaintiffs make no allegations of that kind.

Plaintiffs further allege that the State Defendants have not adequately isolated COVID-19-positive staff.  DE 84 at 60 ¶ 176.  This Court has already addressed the ADC's practice of permitting positive staff to work with positive inmates and concluded it does not constitute subjective deliberate indifference given that it was adopted on the advice of judicially noticeable expert guidance from the Arkansas Department of Health.  DE 68 at 65.  Obviously, the ADC Defendants cannot exhibit a mental state akin to criminal recklessness by following the advice of medical experts.

Finally, Plaintiffs complain that the State Defendants have shown deliberate indifference to COVID-19 by failing to adequately handle incarcerated people and corrections staff who test positive or have had close contact with people known to have tested positive for COVID-19.  DE 84 at 60-62 ¶¶ 178-182.  Plaintiffs maintain that Defendants have departed from CDC guidance in various ways, such as by not requiring a 14-day quarantine for all ADC staff who have had close

contact with a COVID-19-positive person and by failing to "close off the areas used by [any] person who has contracted COVID-19." DE 84 at 61 ¶¶ 178-179. These allegations, even if true, fail to support Plaintiffs' Eighth Amendment claim as a matter of law.

Again, alleged departures from CDC guidance cannot, as a matter of law, support an Eighth Amendment deliberate indifference claim. Moreover, the law is well established that matters of state prison administration and management are afforded significant deference by federal courts. *See, e.g.*, *Woodford v. Ngo*, 548 U.S. 81, 94 (2006); *Turner v. Safley*, 482 U.S. 78, 85 (1987); *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973); *see also South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Mem.) (denying preliminary injunctive relief to a church related to the COVID-19 pandemic, explaining "the politically accountable officials of the States" have "especially broad" latitude when they "act in areas fraught with medical and scientific uncertainties" and make policy decisions to protect "[t]he safety and the health of the people"). Federal courts do not sit in supervision of state prison operations, which are matters of acute interest to the states. *Meachum v. Fano*, 427 U.S. 215, 229 (1976).

Moreover, while the CDC's guidance does make many recommendations, it also acknowledges that all of its recommendations "**may need to be adapted based on individual facilities' physical space**" and for other reasons. DE 36-9 at 1 (emphasis in original). For example, the DOC could reasonably conclude that a 14-day quarantine for COVID-negative, asymptomatic staff based solely on their contact with a positive individual is not feasible during a period of critical staff shortages, and that closing off all the areas used by any positive inmate is not practicable in open-barracks facilities. Thus, this Court should conclude that Plaintiffs' allegations—even accepted as true at this stage of the proceedings—do not state a plausible claim for violation of the Eighth Amendment. There are no credible allegations that any of the State

Defendants have been knowingly and deliberately indifferent to the risk of harm posed to these Plaintiffs by the COVID-19 pandemic.

As shown, Plaintiffs have not stated facts to support any of the elements of an Eighth Amendment claim based on the failure to train or supervise corrections staff, nor have they stated facts to support a plausible deliberate indifference claim based on the various COVID-related policies and practices they challenge in Count I of their amended complaint.  Because the State Defendants are not liable under the Eighth Amendment as a matter of law, the Court should dismiss Count I of Plaintiffs' amended complaint with prejudice.

**V.      Plaintiffs fail to state an ADA claim.**

Plaintiffs also assert a claim against all of the State Defendants under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.  Plaintiffs allege that the State Defendants have intentionally discriminated against members of the "disability subclass" "by denying them reasonable accommodations that have been recommended by the CDC and are necessary to protect them from COVID-19."   DE 84 at 87 ¶ 270.   The "reasonable accommodations" they ask the Court to order the DOC to provide include:  (1) access to alcohol-based hand sanitizer; (2) provision of cleaning supplies, including products containing bleach, adequate to clean individuals' housing areas; (3) provision of PPE; (4) access to antibacterial hand soap and towels for hand washing; (5) implementation of social distancing measures "in all locations where incarcerated people are required to congregate"; and (6) release from prison or transfer to home confinement "if social distancing is not practicable, or the facilities cannot

otherwise eliminate the substantial risk of serious harm." DE 84 at 87-88 ¶ 271. The ADA does not require these accommodations, especially where Plaintiffs did not request them before suing.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II regulations require public entities, including prisons, to "make reasonable modifications in policies . . . when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity" at issue. 28 C.F.R. § 35.130(b)(7)(i); *see also Pa. Dep't. of Corr. v. Yeskey*, 524 U.S. 206 (1998) (holding that prisons are entities subject to Title II). The Supreme Court has explained that states may generally rely on the "reasonable assessments" of their own professionals in determining whether an individual is qualified for services and programs and whether "reasonable modifications" are available to prevent discrimination. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999) (citing 28 C.F.R. 35.130(b)(7) and (d)). As this Court observed in its order denying Plaintiffs' request for a preliminary injunction on their ADA claim, ADA plaintiffs are entitled to "reasonable" accommodations, which may not always be their preferred or ideal accommodations. DE 68 at 68 (citing *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (8th Cir. 2011); *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007)).

While the failure to make reasonable accommodations to disabled inmates is a form of prohibited discrimination under Title II of the ADA, "such discrimination occurs [only] if a covered entity does not make reasonable accommodation to the ***known physical or mental limitations*** of an otherwise qualified [person] with a disability, unless such covered entity can

demonstrate that the accommodation would impose an undue hardship on the operation of its business." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (emphasis added) (cleaned up). A public entity need not modify its policies under Title II if doing so "would create undue financial and administrative burdens." *Davis v. Francis Howell Sch. Dist.*, 138 F.3d 754, 756-57 (8th Cir. 1998). Finally, and particularly important in the context of the state prison system, a "public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities." 28 C.F.R. § 35.130(h). The Eighth Circuit has noted that whether a requested accommodation is reasonable or imposes an undue burden on defendants should be considered in the light of "the heightened security concerns of a prison." *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir. 1999).

As a matter of law, Plaintiffs are not entitled to the accommodations they seek under the ADA for three reasons. *First*, Plaintiffs do not allege that they requested these accommodations from the State Defendants—or that the State Defendants even knew about their alleged disabilities or their need for additional or different measures under Title II of the ADA—before they filed this lawsuit. That is fatal to their claims as a matter of law because a person "seeking a reasonable accommodation must request such an accommodation." *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 (8th Cir. 2001); *see also Peebles*, 354 F.3d at 767 (explaining that the duty to reasonably accommodate is only triggered if a defendant knows about the plaintiff's disability); *Wallin v. Minn. Dept. of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998) (holding in ADA suit against employer that "it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed").

*Second*, as this Court has already held, none of the accommodations Plaintiffs seek are "reasonable accommodations [that] have been denied for plaintiffs." DE 68 at 70. Alcohol-based

sanitizer is, under the CDC's guidance, merely a secondary option to handwashing, and one that prisons may opt to deny for security reasons. *See id.* at 60 (citing CDC guidance). Under *Olmstead* and the federal regulations interpreting the ADA, the Court owes deference to ADC's judgment that providing alcohol-based sanitizer in state prisons would be unsafe. The same is true of bleach, which the CDC's guidance does not even conditionally recommend providing to inmates. On the other hand, the Court has already found, based on judicially noticeable public records, that inmates are being provided soap. *See* DE 68 at 30 (citing DE 50-14). There is nothing even in the CDC guidance that requires inmates to be provided with *antibacterial* hand soap, which would be ineffective to protect inmates from the corona*virus*, or additional PPE beyond what the DOC has already provided.

*Third*, as this Court has already held, it cannot grant release under the ADA. *See* DE 68 at 51 (holding that "the PLRA prevents this Court from granting temporary release or transferring to home confinement members of the proposed disability subclass who bring Title II ADA claims seeking such relief"). That is because the PLRA, which governs ADA suits, provides that only a three-judge court may enter a prisoner release order outside a habeas proceeding, and that even a three-judge court may only do so after the entry of a prior order granting less intrusive relief on the same claim that has failed to remedy the deprivation of a federal right. *See id.* (citing 18 U.S.C. 3626(a)(3)(A)(i), (a)(3)(B), (g)(4)). No three-judge court has been empaneled, and as this Court previously held, it "has entered no such previous order." *Id.* So "regardless of the merits of plaintiffs' claims" for release under the ADA, this Court must dismiss their ADA claim insofar as it seeks release. *Id.*

For each of these reasons, the Court should dismiss Count III of Plaintiffs' amended complaint with prejudice.

###### VI.   Plaintiffs' condition-of-confinement claims are not cognizable in habeas.

Plaintiffs' habeas claim (Count II) challenges their conditions of confinement.  They argue that, due to temporary conditions that they allege exist in DOC facilities on account of COVID-19, a putative subclass of medically vulnerable plaintiffs have an Eighth Amendment right to be transferred from prisons or residential correctional facilities to home confinement.  *See* DE 84 at 86 ¶ 266.  That claim encounters an insurmountable obstacle at the starting gate:  In the Eighth Circuit, "a habeas petition is not a proper remedy for a condition-of-confinement claim."  *Holt v. Kelley*, No. 5:18-cv-00264, 2019 WL 3928633, at *1 (E.D. Ark. Aug. 18, 2019) (Baker, J.) (citing *Spencer v. Haynes*, 774 F.3d 467, 469 (8th Cir. 2014)).

In *Spencer v. Haynes*, the Eighth Circuit held that if a prisoner's "constitutional claim relates to the conditions of his confinement . . . a habeas petition is not the proper claim to remedy his alleged injury."  774 F.3d at 470.  And that is how this Court understood *Spencer* in *Holt*.  *See Holt*, 2019 WL 3928633, at *1-2 (reading *Spencer* as "holding that a habeas petition is not a proper remedy for a condition-of-confinement claim," and "declin[ing] Mr. Holt's invitation to distinguish or decline to follow . . . *Spencer*").  Plaintiffs' claim "relates to the conditions of their confinement," "as distinct from the fact or length of the confinement."  *Spencer*, 774 F.3d at 470 (quoting *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979)).  Plaintiffs do not challenge the validity of their sentences, nor their length; their claim has nothing to do with the legality of their sentences as imposed.  It only attacks living conditions in DOC facilities as currently affected by COVID-19.  As such, they cannot bring that claim in a habeas proceeding.

Moreover, the relief that Plaintiffs seek is not cognizable in habeas.  In *Kruger v. Erickson*, 77 F.3d 1071 (8th Cir. 1996), the Eighth Circuit held that "[i]f the prisoner is not challenging the validity of his conviction or the length of his detention, then a writ of habeas corpus is not the

proper remedy . . . [and] the district court lacks the power or subject matter jurisdiction to issue the writ." *Id.* at 1073.  The Eighth Circuit reaffirmed that rule in *Spencer* and held that habeas relief was unavailable in that case because Spencer did "not challenge his conviction, nor . . . seek a remedy that would result in an earlier release." *Spencer*, 774 F.3d at 469.  Plaintiffs do not "challenge [their] conviction[s]." *Id.*  Nor do they seek a writ that would reduce "the length of their state custody." *Kruger*, 77 F.3d at 1073.  Rather, under Plaintiffs' proposed remedy they would "still [be] in ADC custody," DE 3 at 56, just in a different location:  their homes.  During that "temporary medical furlough" to "home confinement," *id.* at 36, 45, they would continue to serve their sentences, whose length Plaintiffs do not attack.

At the preliminary-injunction stage, Plaintiffs maintained that their claim is *not* a condition-of-confinement claim.  Instead, they argued their request is tantamount to a request for early release because a temporary transfer to home confinement would amount to "a quantum change in the level of custody."  DE 44 at 66 n.17.  But even if an order granting home confinement were permissible relief in habeas, Plaintiffs still could not bring that claim because they do not assert that their sentences are unlawful; they only claim that the present health-and-safety *conditions* of their confinement have made their imprisonment temporarily unlawful.

Moreover, courts have overwhelmingly rejected Plaintiffs' construction of their claim.  Plaintiffs have identified over twenty cases which they say hold COVID-19-based requests for release from prison to less restrictive confinement are cognizable in habeas.  *See* DE 44 at 67 n.18 and accompanying text.  Of these, Plaintiffs focus on just two that say a COVID-19-based request for release from prison is not a condition-of-confinement claim.  *See* DE 44 at 65-66 (citing *Wilson v. Williams*, — F. Supp. 3d —, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020), *vacated on other grounds*, — F.3d —, 2020 WL 3056217 (6th Cir. June 9, 2020); *Malam v. Adducci*, — F. Supp. 3d

—, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020)); *see also* DE 54 at 2 (citing *Wilson v. Williams*, No. 20-3447 (6th Cir. May 4, 2020) (denying stay of *Wilson*)).   The focus on these cases is not accidental.   Virtually every other case granting habeas relief on such claims has said they *are* condition-of-confinement claims and can be heard in habeas because local circuit precedent has condoned condition-of-confinement habeas petitions.   The following are examples, culled from cases Plaintiffs themselves cite in supposed support of their argument that their claims are *not* condition-of-confinement claims and can be heard in habeas:

- "Respondents submit that Petitioners cannot challenge their conditions of confinement through a habeas petition. Taking the latter challenge first, we note that federal courts, including the Third Circuit, have condoned conditions of confinement challenges through habeas.  Accordingly, we find that Petitioners have appropriately invoked this court's jurisdiction through a 28 U.S.C. § 2241 petition for writ of habeas corpus." *Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at *2 (M.D. Pa. Mar. 31, 2020) (citations omitted).

- Federal courts . . . have seemingly condoned challenges to conditions of confinement raised through a habeas petition.  Accordingly, I find the caselaw indicates that an immigration detainee may raise a conditions of confinement claim in his § 2241." *Leandro R. P. v. Decker*, No. CV 20-3853, 2020 WL 1899791, at *4 (D.N.J. Apr. 17, 2020) (alterations omitted) (citations omitted) (internal quotation marks omitted).

- "An application for habeas corpus under 28 U.S.C. § 2241 is the appropriate vehicle for an inmate in federal custody to challenge conditions or actions that pose a threat to his medical wellbeing.  *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (allowing a § 2241 application to challenge an inmate's 'transfer while seriously ill' where that transfer posed a risk of fatal heart failure)." *Basank v. Decker*, No. 20 CIV. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020).

- "Courts are divided on whether section 2241 provides a vehicle for challenging (and a remedy for addressing) allegedly unconstitutional conditions of confinement.  This Court need not resolve these difficult questions at this junction because the Second Circuit 'has long interpreted section 2241 as applying to challenges to ... prison conditions,' *Thompson v.*

36

*Choinski*, 525 F.3d 205, 209 (2d Cir. 2008)[.]" *Jones v. Wolf*, No. 20-CV-
361, 2020 WL 1643857, at *14 (W.D.N.Y. Apr. 2, 2020) (footnote omitted)
(alteration omitted).

On the other hand, courts in Circuits like the Eighth that bar condition-of-confinement

claims from being heard in habeas overwhelmingly conclude that claims like Plaintiffs' are

condition-of-confinement claims and therefore cannot be heard in habeas.  For example:

- "Although Plaintiffs are requesting immediate release, they are not
  challenging the legality or duration of their detention. At the core of their
  argument, they contend that the conditions of their detention at Otero are
  inadequate to protect them from exposure to COVID-19 . . . Accordingly, the
  Court finds that Plaintiffs are challenging the conditions of their detention, as
  opposed to its fact or duration, which is not appropriate under 28 U.S.C. §
  2241." *Barco v. Price*, —F. Supp. 3d —, 2020 WL 2099890, at *6 (D.N.M.
  May 1, 2020).

- "[Petitioner] seeks release on the basis of his 'Living Conditions' at Terminal
  Island.  Petitioner's allegations sound in civil rights, not in habeas.  Although
  Petitioner requests relief in the form of release from prison, which is within
  the ambit of a writ of habeas corpus, Petitioner's claims challenge the
  conditions of his confinement and are properly the subject of a civil rights
  complaint, despite the relief he seeks." *Bolden v. Ponce*, No.
  220CV03870JFWMAA, 2020 WL 2097751, at *2 (C.D. Cal. May 1, 2020)
  (alteration omitted) (citations omitted) (internal quotation marks omitted).

- "Drakos does not challenge the fact or duration of his confinement.  While he
  requests injunctive relief ordering his release, his attack is on the conditions
  of his confinement, not on the fact that he was ordered detained before trial.
  Therefore, the relief Drakos seeks is not available in habeas corpus." *Drakos
  v. Gonzalez*, No. H-20-1505, 2020 WL 2110409, at *1 (S.D. Tex. May 1,
  2020) (citations omitted).

Despite the abundance of authority holding that claims like Plaintiffs' are condition-of-

confinement claims, only cognizable in habeas if condition-of-confinement claims are, Plaintiffs

insist all these courts are wrong.  They rest that argument almost entirely on an Ohio district court

decision in *Wilson v. Williams*, No. 4:20-cv-794, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020),

which Justice Sotomayor subsequently stayed and the Sixth Circuit subsequently vacated.  That

decision is singularly unpersuasive and rests on an approach to condition-of-confinement claims that the Eighth Circuit explicitly rejected in *Spencer*.

In that case, the district court ordered that the Bureau of Prisons grant inmates in a federal prison with a severe COVID-19 outbreak one of either compassionate release, release to home confinement, or transfer to another BOP facility. *Wilson*, 2020 WL 1940882, at *10-11. According to the district court, all of these remedies, including transfer to a different prison, were available in habeas because in the Sixth Circuit, habeas petitioners could not only challenge "the fact or duration of confinement," but "also . . . the execution or manner in which the sentence is served." *Id.* at *5 (internal quotation marks omitted) (quoting *United States v. Peterman*, 249 F.3d 458, 461 (6th Cir. 2002)).

On appeal, the Sixth Circuit took a somewhat different view.[13] It held the prisoners' request for transfer to safer prisons merely sought "an improvement of prison conditions" and "could not be brought under § 2241." *Wilson*, 2020 WL 3056217, at *5, *6. It concluded, however, that a claim seeking release to home confinement on the basis of conditions of confinement should be "construed" as though it were not a conditions claim. *Id.* at *5. As it put it, "[o]ur precedent supports the conclusion that where a petitioner claims that no set of conditions

---

[13] Prior to the Sixth Circuit vacating the district court's injunction, the government twice sought a stay in the Supreme Court. On the first occasion, the district court modified its order while the government's stay application regarding the original order was pending. *See Williams v. Wilson*, — S. Ct. —, 2020 WL 2644305, at *1 (U.S. May 26, 2020). "Particularly in light of that procedural posture, the Court decline[d] to stay the [original] preliminary injunction without prejudice to the Government seeking a new stay." *Id.* Justices Thomas, Alito and Gorsuch, however, would have granted a stay, the intervening order notwithstanding. *Id.* The government then sought a new stay. This time Justice Sotomayor, the Sixth Circuit's Circuit Justice, granted a stay on her own. *Williams v. Wilson*, — S. Ct. —, 2020 WL 2988458 (U.S. June 4, 2020). Notably, both of the government's stay applications relied heavily on the argument that the relief the district court granted was non-cognizable in habeas.

would be constitutionally sufficient"—thus challenging *conditions*—"the claim should be construed as challenging the fact or extent, rather than the conditions, of the confinement." *Id.* (citing *Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011)).  For reasons left unexplained, it understood the prisoners' request for release to home confinement to make such a claim—only to vacate the district court's grant of that relief on the merits for reasons closely paralleling this Court's denial of injunctive relief. *See id.* at *8-11.

Besides the Supreme Court's strong hint that it would stay *Wilson* in an appropriate procedural posture, and Justice Sotomayor's stay, *Wilson* is unpersuasive for two reasons.  First, it is inconsistent with the Sixth Circuit's own stated approach to habeas and condition-of-confinement claims; second, the Eighth Circuit has, in any event, rejected that approach.  The Sixth Circuit reasoned that the prisoners' claims in *Wilson* were attacks on their sentences themselves because they asserted that all possible conditions of those sentences were unconstitutional—relying on a lethal-injection case holding that where a prisoner claimed there was *no* "acceptable . . . procedure" for lethal injection, the claim was cognizable in habeas because it would "render his death sentence effectively invalid." *Adams*, 644 F.3d at 483.   That, however, was not what the prisoners in *Wilson* were claiming.

Rather, the prisoners in *Wilson* sought to temporarily serve the balances of their sentences at home; by definition, then, they claimed that there *were* conditions under which their sentences could be administered constitutionally.  The same is true of Plaintiffs' claims, which both acknowledge that they can be constitutionally confined at home, and that they can be confined in prison once "the emergency abates."  DE 68 at 43 (quoting DE 3 at 56)  Far from resembling a challenge to the very sentence of death by lethal injection, Plaintiffs' claim is more like a claim that due to a temporary health condition, lethal injection must be postponed or administered by a

different procedure until the condition subsides. No court would entertain that sort of claim in habeas. *C.f. Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) (entertaining a lethal-injection claim based on a *more* permanent medical condition under Section 1983).

Second, the Eighth Circuit rejected the Sixth Circuit's approach to conditions claims in *Spencer*. In *Adams*, the Sixth Circuit said that Eighth Amendment challenges to the conditions of a sentence transform into challenges to the "fact" of sentence if they assert that a sentence would be unconstitutional under any set of conditions. Likewise, Plaintiffs reason that their claim is not a conditions claim because it claims no set of prison conditions could be safe enough for certain inmates. In *Spencer*, however, the Eighth Circuit specifically addressed *Adams* and rejected it. There, it acknowledged "a split ha[d] arisen amongst our sister circuits" in permitting condition-of-confinement claims in habeas. *Spencer*, 774 F.3d at 470. "Notwithstanding" that split, it wrote it was "bound" by *Kruger* to reject the view of those circuits that allowed condition-of-confinement habeas petitions. In cataloguing the split, the *Spencer* court wrote that "the Sixth Circuit firmly stand[s] in the camp of *allowing* conditions-of-confinement claims to be brought in the habeas corpus context." *Id.* at 470 n.6 (emphasis added). *Spencer*'s only authority for that statement was *Adams*—which on the Sixth Circuit's and Plaintiffs' theory, only permitted a challenge to the fact of sentence. *Id.* Thus, the Eighth Circuit necessarily rejected *Adams*'s distinction of condition claims that effectively attack a sentence itself, deeming those claims condition-of-confinement claims too. As *Wilson* is based entirely (albeit unpersuasively) on the Sixth Circuit's hybrid approach to conditions claims in *Adams* that the Eighth Circuit rejected in *Spencer*, the Eighth Circuit would necessarily reject *Wilson*.

40

**VII.    Plaintiffs' habeas claim is barred for non-exhaustion.**

Even if Plaintiffs had brought their habeas claim in a circuit where condition-of-confinement claims were cognizable in habeas, their claim would be barred for failure to exhaust. Plaintiffs style their habeas claim as one under 28 U.S.C. § 2241.  DE 1 at 43 ¶ 137.  But in the Eighth Circuit, "[28 U.S.C.] § 2254 is the only means by which 'a person in custody pursuant to the judgment of a State court' may raise challenges to the validity of his conviction or sentence *or to the execution of his sentence*."  *Singleton v. Norris*, 319 F.3d 1018, 1023 (8th Cir. 2003) (en banc) (emphasis added) (citing *Crouch v. Norris*, 251 F.3d 720, 722-23 (8th Cir. 2001)).  Indeed, *Singleton* specifically rejected a state prisoner's argument that his habeas "claim [wa]s properly before the court under authority of § 2241," *id.* at 1022, as did *Crouch*.  *See* 251 F.3d at 722 ("According to Crouch, his proposed petition is properly classified as a habeas action under 28 U.S.C. § 2241 . . . We disagree.").

Because in the Eighth Circuit, prisoners in custody pursuant to state-court judgments can only seek habeas relief under Section 2254, "[t]he petition at bar must . . . be construed as one pursuant to 28 U.S.C. § 2254."  *Jones v. Norris*, No. 5:09CV00353, 2010 WL 346440, at *5 (E.D. Ark. Jan. 25, 2010) (Moody, J.); *see also Murphy v. Bradly*, No. 1:19cv00091, 2019 WL 5777712, at *1 n.1 (E.D. Ark. Sept. 20, 2019) (Volpe, J.), *report and recommendation adopted*, 2019 WL 5755886 (E.D. Ark. Nov. 5, 2019) (Miller, J.) ("constru[ing]" habeas petition that "purport[ed] to be pursuant to 28 U.S.C. § 2241 . . . as being pursuant to § 2254" because "where a habeas petitioner is in custody pursuant to a state court judgment, she 'can only obtain habeas relief through § 2254, no matter how [her] pleadings are styled.'" (quoting *Crouch*, 251 F.3d at 723).

As a Section 2254 petition, however, Plaintiffs' would-be habeas petition hits an insurmountable roadblock:  Section 2254's prohibition against granting relief "unless it appears

that . . . the applicant has exhausted the remedies available in the courts of the State"—which the "applicant shall not be deemed to have [done], within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. §§ 2254(b)(1)(A), 2254(c).  Plaintiffs do not allege that they have pursued any state-court remedy.  To the contrary, their briefing concedes they did not.  *See* DE 44 at 64-65.

Plaintiffs may raise their deliberate-indifference claims in state court under Section 1983 and the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-105, which this Court has interpreted as providing identical protections to Section 1983.  *See Hess v. Ables*, No. 5:11-cv-249, 2012 WL 3882184, at *14 (E.D. Ark. Sept. 6, 2012) (Baker, J.), *aff'd*, 714 F.3d 1048, 1054 (8th Cir. 2013) (upholding this Court's analysis).  Indeed, the Arkansas Supreme Court has decided deliberate-indifference claims under both Section 1983 and the ACRA.  *See, e.g.*, *Early v. Crockett*, 2014 Ark. 278, 436 S.W.3d 141.

Plaintiffs may contend that their claim for release is only cognizable in habeas, not Section 1983.  But, as discussed above, many courts disagree, and so might the Arkansas courts.  Therefore, whatever conclusion this Court reaches on that question, it must dismiss for non-exhaustion.  For "[i]f a federal court is *unsure* whether a claim would be rejected by the state courts, the habeas proceeding should be dismissed without prejudice or stayed until the claim is fairly presented to them."  *Sloan v. Delo*, 54 F.3d 1371, 1381 (8th Cir. 1995) (emphasis added).  Here the Court can be, at best, unsure whether Arkansas courts would reject Plaintiffs' potential Section 1983 and ACRA claims out of hand.

## CONCLUSION

For all of the forgoing reasons, the Court should grant the State Defendants' motion to dismiss Plaintiffs' amended complaint with prejudice.

Respectfully submitted,

LESLIE RUTLEDGE
  Arkansas Attorney General

NICHOLAS J. BRONNI (2016097)
  Arkansas Solicitor General

VINCENT M. WAGNER (2019071)
  Deputy Solicitor General

ASHER STEINBERG (2019058)
  Assistant Solicitor General

JENNIFER L. MERRITT (2002148)
  Senior Assistant Attorney General

JERRY GARNER (2014134)
  Assistant Attorney General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201

Tel.: (501) 682-1319
Fax: (501) 682-2591
Email: Jennifer.Merritt@ArkansasAG.gov

43