THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

NICHOLAS FRAZIER, *et al.*                                          PLAINTIFFS

v.                              Case No. 4:20-cv-00434-KGB

SOLOMON GRAVES, *et al.*                                          DEFENDANTS

<u>ORDER</u>

Before the Court is defendants Solomon Graves, Secretary of the Arkansas Department of Corrections ("DOC"); Dexter Payne, Division of Correction Director, Arkansas Department of Corrections ("ADC"); Benny Magness, Chairman of Arkansas Board of Corrections ("ABC"); Bobby Glover, Vice Chairman of ABC; John Felts, Member of ABC; William "Dubs" Byers, Member of ABC (collectively, "State defendants") motion to dismiss the amended complaint of plaintiffs Marvin Kent, Michael Kouri, Jonathan Neeley, Alfred Nickson, Trinidad Serrato, Robert Stiggers, Victor Williams, John Doe No. 1, Wesley Bray, Price Brown, John Doe No. 2, Joseph Head, Darryl Hussey, Jimmy Little, Lee Owens, Torris Richardson, and Roderick Wesley, plaintiffs, individually and on behalf of all others similarly situated (collectively, "plaintiffs").[1] Plaintiffs filed a response to the motion on September 10, 2020 (Dkt. No. 103). State defendants, all of whom are sued in their official capacity only, replied to the response on October 9, 2020, and filed a supplemental reply to the response on October 20, 2020 (Dkt. Nos. 107, 111).

For the reasons set forth below, the Court grants in part and denies in part State defendants' motion to dismiss (Dkt. No. 95); denies as moot plaintiffs' motion for expedited discovery (Dkt.

---

[1] The Court adopted the parties' joint stipulation of dismissal and dismissed Governor Asa Hutchinson as a defendant in this case and Charles Czarnetski, Aaron Elrod, and Alvin Hampton as plaintiffs in this case (Dkt. No. 110). The Court also adopted the parties' joint stipulation of dismissal and dismissed Jerry Bradshaw as a defendant in the case and Nicholas Frazier, Harold S. Otwell, and Cedric Sims as plaintiffs in the case (Dkt. No. 119).

No. 37); grants plaintiffs' motion for the Court to take judicial notice of 48 additional incarcerated people testing positive for COVID-19 at third facility operated by defendants (Dkt. No. 66); denies as moot defendants' motion to dismiss the original complaint (Dkt. No. 76); and denies as moot State defendants' motion to continue the trial setting (Dkt. No. 134).

I.    Overview

A.    Complaint, Emergency Motion For Temporary Restraining Order And Preliminary Injunction, Supplemental Motion For Temporary Restraining Order

On April 21, 2020, plaintiffs filed a class action complaint and petition for writ of habeas corpus (Dkt. No. 1).  Plaintiffs alleged that conditions in ADC facilities create a serious risk of COVID-19-related infection, disease, and death (*Id.*, ¶¶ 72-89).  Plaintiffs claimed that the spread of COVID-19 in ADC facilities jeopardizes the public health of surrounding communities, especially African American communities (*Id.*, ¶¶ 90-97).  Plaintiffs asserted that defendants have intentionally failed to adopt and implement adequate policies and procedures to prevent and mitigate the spread of COVID-19 (*Id.*, ¶¶ 98-126).  Plaintiffs asserted three causes of action:  (1) violation of the Eighth Amendment brought pursuant to 42 U.S.C. § 1983 on behalf of all plaintiffs; (2) violation of the Eighth Amendment brought by a petition for writ of habeas corpus under 28 U.S.C. § 2241 on behalf of the proposed high risk subclass; and (3) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, on behalf of the proposed disability subclass (*Id.*, ¶¶ 127-48).

On the same day, plaintiffs also filed an emergency motion for temporary restraining order and preliminary injunction (Dkt. No. 2).  In this motion, plaintiffs requested that this Court grant immediate relief to protect them against the substantial risk of COVID-19 infection, illness, and death while incarcerated in ADC facilities (*Id.*, at 1-2).  Plaintiffs asserted that they are entitled to

a preliminary injunction because they are substantially likely to succeed on the merits of their claim that defendants' failure to take steps to address the imminent risk caused by COVID-19 constitutes deliberate indifference in violation of plaintiffs' Eighth Amendment rights (*Id.*, at 2). Plaintiffs further asserted that defendants have violated, and will continue to violate, the ADA by failing to provide plaintiffs with disabilities with reasonable accommodations that would allow them to have safe housing while serving their prison sentence that does not place them at substantial risk of COVID-19 infection, illness, or death by virtue of their disability (*Id.*). Plaintiffs maintained that defendants are aware of the substantial risk posed by the virus and the recommended steps issued by the Centers for Disease Control and Prevention ("CDC") to prevent its spread but have failed to take steps to protect plaintiffs (*Id.*). Plaintiffs asserted that they and putative class members are also entitled to relief because they will suffer irreparable harm absent relief and that traditional legal remedies will not adequately protect their rights (*Id.*).

On Monday, April 27, 2020, plaintiffs also filed a supplemental motion for temporary restraining order (Dkt. No. 22). Plaintiffs' supplemental motion for temporary restraining order requested that the Court enter immediately a temporary restraining order (*Id.*, at 1). Plaintiffs provided a draft proposed order outlining in detail the relief they requested in their motion, which was comparable but not identical to the relief they sought in their motion for preliminary injunction (Dkt. No. 22-1). The Court conducted a hearing with all parties on that motion on Tuesday, April 28, 2020 (Dkt. Nos. 24; 26). Plaintiffs filed a motion for expedited discovery, while the Court had under advisement their request for preliminary injunctive relief (Dkt. No. 37). On May 4, 2020, the Court entered an Order denying plaintiffs' motion for temporary restraining order but held under advisement plaintiffs' previously filed motion for preliminary injunction (Dkt. No. 42).

3

After the Court's ruling on plaintiffs' request for a temporary restraining order, plaintiffs and defendants submitted to the Court additional record evidence and further briefing.  The Court conducted a hearing on plaintiffs' motion for preliminary injunction (Dkt. Nos. 62; 63), and the parties filed post-hearing briefs (Dkt. Nos. 64; 65).  Plaintiffs filed a motion asking the Court to take judicial notice of 48 additional incarcerated people testing positive for COVID-19 at a third facility operated by defendants (Dkt. No. 66).  The motion is granted (Dkt. No. 66).

In an Order dated May 19, 2020, the Court denied plaintiffs' motion for preliminary injunction (Dkt. No. 68).

### B.    Defendants' Motion to Dismiss Original Complaint

The defendants named in the original complaint filed a motion to dismiss the complaint (Dkt. No. 76).  Plaintiffs requested an extension of time to respond to defendants' motion to dismiss on the ground that they would be filing an amended complaint superseding the original (Dkt. No. 83).  Plaintiffs filed an amended class action complaint and petition for writ of habeas corpus (Dkt. No. 84).

"[A]s a general proposition, if a defendant files a Motion to Dismiss, and the plaintiff later files an Amended Complaint, the amended pleading renders the defendant's motion to dismiss moot." *Oniyah v. St. Cloud State Univ.*, 655 F. Supp. 2d 948, 958 (D. Minn. 2009) (citing *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 956 (8th Cir. 2002) ("If anything, [plaintiff's] motion to amend the complaint rendered moot [defendant's] motion to dismiss the original complaint."); *Standard Chlorine of Del., Inc. v. Sinibaldi*, 821 F. Supp. 232, 239-40 (D. Del. 1992) (finding that plaintiff's filing of an amended complaint rendered defendant's motion to dismiss moot)).  Thus, under Eighth Circuit precedent, plaintiffs' filing an amended complaint renders

moot defendants' first motion to dismiss (Dkt. No. 76).  Accordingly, the Court denies as moot the

motion to dismiss (Dkt. No. 76).

### C.   The Amended Complaint

#### 1.   The Parties And Class Allegations

Plaintiffs filed an amended class action complaint and petition for writ of habeas corpus

on July 13, 2020 (Dkt. No. 84).  The amended complaint added a number of plaintiffs and two new

defendants, Arkansas Secretary of Health, Dr. Jose Romero,[2] and Wellpath, LLC ("Wellpath"),

the contracted medical provider for the DOC (*Id.*, ¶¶ 91-92).

In their amended complaint, plaintiffs seek relief on behalf of themselves and a class

consisting of people who are currently incarcerated, or will be in the future, in an ADC detention

facility during the duration of the COVID-19 pandemic (*Id.*, ¶ 93).  Plaintiffs also propose two

subclasses, to include an (a) high risk subclass, defined as:

> People in the custody of a DOC facility aged 50 or over and/or who have serious
> underlying medical conditions that put them at particular risk of serious harm or
> death from COVID-19, including but not limited to people with respiratory
> conditions such as chronic lung disease or asthma; people with heart disease or
> other heart conditions; people who are immunocompromised as a result of cancer,
> HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or
> renal failure (including hepatitis and dialysis patients); people with diabetes,
> epilepsy, hypertension, blood disorders (including sickle cell disease), or an
> inherited metabolic disorder; people who have had or are at risk of stroke; and
> people with any condition specifically identified by CDC, currently or in the future,
> as increasing their risk of contracting, having severe illness, and/or dying from
> COVID-19;

and (b) disability subclass, defined as:

> People in custody who suffer from a disability that substantially limits one or more
> of their major life activities and who are at increased risk of contracting, becoming

---

[2]  Dr. Nathanial Smith was named as a new defendant in the amended complaint, but he
has been succeeded by Dr. Romero as Arkansas Secretary of Health.  (Dkt. No. 96, n. 12).  Dr.
Romero is substituted automatically as a party for Dr. Smith.  *See* Federal Rule of Civil Procedure
25(d).

severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability, with a broad construction of "disability" pursuant to 28 C.F.R. § 35.101, which favors expansive coverage to the maximum extent permitted by the terms of the Americans With Disabilities Act ("ADA") that does not require extensive analysis.

(*Id.,* ¶ 93).

### 2.     Factual Allegations In The Amended Complaint

Plaintiffs contend that because people incarcerated in DOC facilities are housed in "close quarters, unable to maintain a six-foot distance from others, and share or touch objects used by others, the risk of contracting COVID-19 are greatly, if not exponentially, increased as is already evident by the spread of COVID-19 in other congregate environments." (Dkt. No. 84, ¶ 131). Plaintiffs assert that on March 27 and April 15, 2020, then Secretary of the Arkansas Department of Health ("ADH"), Dr. Nathaniel Smith, acknowledged that there is a high risk of COVID-19 in correctional facilities and that during a press briefing on April 2, 2020, then Secretary of the DOC, Wendy Kelley, commented that "once it gets in, it will be disastrous." (*Id.*, ¶ 124).

Plaintiffs maintain that the risk of COVID-19 spreading throughout DOC facilities is "exceptionally high, in part because of the presence of outsiders and staff" (Dkt. No. 84, ¶ 132). Plaintiffs contend that there are 600 confirmed infections in Cummins Unit ("Cummins") of the DOC and most are asymptomatic (Dkt. No. 84, ¶ 132).  Plaintiffs assert that screening outsiders, including staff and visitors, for symptoms of COVID-19 will not necessarily prevent the introduction of COVID-19 from outside because the virus can spread before people show symptoms (*Id.*).  Plaintiffs also assert that they, and other putative class members, are at increased risk of serious consequences from COVID-19 because of their pre-existing health conditions, their ages, and/or their races (*Id.*, ¶¶ 121-123, 133-138).

6

Plaintiffs state that on March 23, 2020, the CDC published its guidance for correctional facilities to help the facilities "ensure the protection of the health and safety of incarcerated people." (*Id.*, ¶ 148). Plaintiffs assert that DOC leadership, including its secretary, were made aware of the CDC guidance on March 23, 2020 (*Id.*, ¶ 148). Plaintiffs contend that Director Payne has stated that "in order to save lives and halt the spread of the virus we must be obedient to the recommendations of the Centers for Disease Control (CDC) and the Arkansas Department of Health (ADH)." (*Id.*, ¶ 148). Plaintiffs assert that "according to DOC officials, including some of the named Defendants, ADH and/or Wellpath determine which incarcerated person gets tested for COVID-19, receives medical treatment for related illnesses, is quarantined, and/or is released from quarantine," and, additionally, "officials have stated that ADH determines whether infected, but asymptomatic DOC staff, should report to work." (*Id.*, ¶ 150).

Plaintiffs assert that, in spite of Governor Hutchinson asking for review for potential release of non-violent and non-sex-offenders, ultimately only 907 people were approved for early release and "from March through the end of May 2020, populations at some DOC facilities – such as Grimes, North Central, and Tucker Units actually *increased*." (*Id.*, ¶ 153). Plaintiffs assert further that many prisons within the DOC, including Cummins, the East Arkansas Regional Unit ("EARU"), and Varner Unit ("Varner"), remained near or over capacity as of the end of May 2020 (*Id.*).

Plaintiffs state that, after Governor Hutchinson declared a state of emergency in the state on March 11, 2020, incarcerated people continued to work in the fields (*Id.*, ¶ 197). Plaintiffs claim that, when a worker at another state prison farm tested positive for COVID-19 on March 24, 2020, incarcerated people were required to work with no precautions to reduce the risk of COVID-19 infection (*Id.*). Plaintiffs maintain that the prison did not formally inform them about the

7

pandemic at all in March, but, instead, the DOC officials simply posted signs on March 11, 2020, instructing incarcerated people to wash their hands for 20 seconds (*Id.*).

Plaintiffs allege that State defendants began testing DOC staff for COVID-19 in early April 2020, but they did not track how many or which of their staff had tested positive (*Id.*, ¶ 203). Plaintiffs state that, as of the filing of the amended complaint, the COVID-19 statistics in Arkansas established that 876 incarcerated people and 54 corrections staff at Cummins had been infected, and six incarcerated people had died from COVID-19-related illness (*Id.*, ¶ 3). Additionally, Plaintiffs assert that the virus had spread to additional DOC facilities including EARU, Grimes, Northwest Arkansas Work Release, Ouachita River Correctional Unit ("ORCU"), Randall L. Williams, and the Wrightsville Units – with 2,581 total confirmed infections of incarcerated people and 241 confirmed infections of corrections staff (*Id.*, ¶ 4).

The Court will not recite here the detailed facts alleged by every plaintiff, but it offers the allegations of a few plaintiffs as an example. Plaintiff Michael Kouri is 40 years old and is incarcerated in ORCU (Dkt. No. 84, ¶ 18). Mr. Kouri asserts that, on June 21, 2020, he was tested for COVID-19 and his result was negative. He maintains that one of five individuals moved into Mr. Kouri's barracks two days prior was positive for COVID-19, and officials moved that inmate out of the barracks six hours later (*Id.*, ¶ 19). Mr. Kouri states that, on June 27, 2020, he began experiencing shortness of breath, headaches, lost sense of taste and smell, feverishness, and a cough. Mr. Kouri contends that he had previously experienced shortness of breath, headaches, chills, coughing, and was diagnosed previously with conjunctivitis, which could be a symptom of COVID-19. Mr. Kouri states that he requested sick calls on June 25, 26, and 27, and received a response at the end of the day on June 28, 2020, that he would be contacted. Mr. Kouri maintains

that on the evening of June 28, 2020, after submitting an emergency grievance, he was seen by a nurse (*Id.*, ¶ 20).

Mr. Kouri asserts that he believes that the majority of his barracks was infected with COVID-19; many people in the barracks lost their sense of taste and smell; others exhibited additional symptoms including fevers, coughing, and extreme exhaustion.  Mr. Kouri states that he believes that the virus spread after either correctional staff moved someone who had tested positive into the barrack or after an infected corrections officer came to work sick, stating further that the cells were not sanitized or disinfected before the new people moved into them.  Mr. Kouri contends that, although ORCU took steps to improve conditions in the facility in late April and early May 2020, by the end of May 2020, just after this Court issued an Order denying a preliminary injunction, correctional staff members failed to maintain adequate measures to mitigate the spread of infection.  He contends that, since at least June 2020, hand sanitizer has not been readily available and correctional staff members have not enforced social distancing protocols (*Id.*, ¶ 22).  Mr. Kouri states that he frequently observes staff members not wearing masks properly-below their chin – or sometimes not wearing masks at all (*Id.*, ¶ 23).  Mr. Kouri contends that he is also aware of staff members returning to work within less than 14 days after testing positive for the virus (*Id.*).

Plaintiff Darryl Hussey is a 49-year-old resident of Cummins who claims that he suffers from epilepsy and became infected with COVID-19 in March 2020 of this year (*Id.*, ¶ 66).  Mr. Hussey states that he exhibited symptoms, including a temperature that ranged from 101 to 104 degrees, for approximately one month before he was placed in quarantine (*Id.*).  He states that, over that period, he lost 30 pounds.  Mr. Hussey contends that "a doctor" wanted to keep him "in the infirmary after seeing how ill he was; however, the warden overruled the doctor and had him

moved to a punitive isolation cell." (*Id*.).  While in quarantine, Mr. Hussey states that he was left up to six hours without staff checking on him (*Id*.).

Mr. Hussy states that on April 9, 2020, a nurse became concerned about his condition and sent him to the University of Arkansas for Medical Sciences ("UAMS") Medical Center, where he remained for a week (*Id*., ¶ 67).  He asserts that, after returning to Cummins, he again was placed in a punitive detention cell for a month, where staff rarely checked on him; at one point, staff found him passed out and took him to medical, where he regained consciousness with a swollen left leg and no feeling in his right arm (*Id*.).  Mr. Hussy contends that following his month in isolation, he was sent to a barrack with COVID-positive individuals, and he was not retested (*Id*.).

Mr. Hussey asserts that social distancing is impossible for him at Cummins, and that Cummins staff repeatedly mix barracks that are on quarantine with those that are not; beds are placed three feet apart from each other; he comes into contact with approximately 50 to 55 incarcerated men each day; multiple barracks go to the chow hall at the same time, including a mix of quarantined and non-quarantined barracks; two barracks at a time are sent for recreation, and his quarantined barrack was recently sent for recreation with a non-quarantined barrack (*Id*., ¶ 68).

Mr. Hussey claims to know of one staff member who exhibited COVID-19 symptoms and continued to report to work while symptomatic (*Id*., ¶ 69).  He maintains that corrections officers who work in the quarantined barracks generally wear masks, but those who come through the quarantined barracks on security rounds generally do not, and that even when corrections officers do wear masks, they often wear them improperly, usually keeping the masks below their chins (*Id*.).  Mr. Hussey states that he has not seen signs posted with information about COVID-19 and has not received COVID-19 information from corrections staff (*Id*., ¶ 70).  If he wants to obtain information about the pandemic, he has to watch the news on television.  Mr. Hussey admits that

he received one mask from the prison, and two from the hospital; Cummins' staff encouraged individuals to wear masks when outside of their barracks but have not suggested that they wear masks inside barracks. Mr. Hussey states that he has not observed increased cleaning of the prison during the pandemic, and he asserts that cleaning is conducted with watered-down cleaning supplies (*Id.*).

Plaintiffs Marvin Kent, an inmate in Varner; Mr. Kouri; Alfred Nickson, an inmate in Cummins; and Victor Williams, an inmate at ORCU, assert that they experienced symptoms of COVID-19, but prison officials did not administer tests to determine if they had the virus, did not administer treatment, and did not place them in isolation (*Id.*, ¶¶ 18, 20, 22, 30, 37, 39, 174). Plaintiffs assert that defendants' unconstitutionally inadequate manner of handling suspected COVID-19 cases placed them at a heightened risk of contracting COVID-19 (*Id.*, ¶ 175).

Mr. Williams and Jonathan Neeley, inmates at ORCU allege staff shortages amid the COVID-19 pandemic that they claim put them "at great risk." (*Id.*, ¶ 40, 48, 159).

Mr. Kent; Mr. Kouri; Mr. Neeley; Mr. Nickson; Mr. Williams; Trinidad Serrato, an inmate at ORCU; Lee Owens, an inmate at EARU; Jimmy Little, an inmate at the Randall L. Williams Correctional Facility; and Torris Richardson, an inmate at Cummins, assert an inability to meet social distancing guidelines (*Id.*, ¶¶ 60, 78, 81, 171). Plaintiffs contend that "despite purporting to rely on the CDC Guidance, Defendants have taken insufficient and inadequate steps to facilitate social distancing. The minimum measures Defendants have taken, such as proposing alternating beds head-to-toe and staggered meals, have not been properly implemented or enforced, and despite widespread knowledge of these deficiencies, Defendants have failed to follow up with appropriate supervision and training." (*Id.*, ¶ 168). Plaintiffs also maintain that the DOC is transporting inmates from ORCU to other DOC facilities daily and transferring inmates into

Varner from other DOC facilities without "appropriate assurance of isolation and quarantining for those individuals exposed to – or infected with – COVID-19." (*Id.*, 169).   Plaintiff Owens states that, although inmates are told to alternate their beds head-to-toe, DOC staff have not enforced this rule, and so few inmates have changed their sleeping placement (*Id.*, ¶ 171).   Plaintiffs assert that the "inability to social distance together with a failure to adequately implement measures to reduce overcrowding," place them "at a heightened risk of contracting COVID-19." (*Id.*, ¶ 172).

Plaintiff Price Brown claims that he has not observed intensified cleaning and disinfecting at EARU (*Id.*, ¶¶ 58, 165).   Mr. Hussey asserts that he has not observed increased cleaning at Cummins (*Id.*, ¶ 70).   Plaintiffs assert that State defendant Kelley, defendant Graves's predecessor, issued a memorandum outlining DOC's protocols to reduce the risk and combat the spread of COVID-19 within DOC facilities and only recommended "*continuing* cleaning (instead of intensifying it)" (*Id.*, ¶ 147).   Plaintiffs further assert that "Defendants have not implemented the heightened hygienic, cleaning, and disinfecting practices called for by the CDC Guidance" and that "[t]hese unsanitary conditions and inadequate levels of cleaning and disinfecting, which are in contravention of the CDC Guidance, place Named Plaintiffs and the putative class members at an inexcusably higher risk of contracting COVID-19."  (*Id.*, ¶ 164, 167)   Plaintiffs assert that "Defendants have been aware of the deficiencies in the cleaning and disinfecting of DOC facilities, as evidenced in sanitation logs and other forms of documentation and communication, but have not taken sufficient steps to remedy the ongoing problems throughout DOC through appropriate follow-up, supervision, and/or training." (*Id.*, ¶ 167).

Mr. Hussey asserts that he knows of one staff member who exhibited COVID-19 symptoms and continued to report to work while symptomatic (*Id.*, ¶ 69).   Plaintiffs assert that State defendants have "permitted – and at times required – staff members who test positive to report to

work, purporting to set guidelines that positive staff be asymptomatic and only interact with infected incarcerated people, though infected staff must use the same secured entrance as not-yet-infected staff." (*Id.*, ¶ 176).  Plaintiffs claim that State defendants "knew or should have known that this policy and implemented practice" placed them and other putative class members "in great peril." (*Id.*, ¶ 177).  Plaintiffs further assert that State defendants "have acknowledged that employees who have been exposed to or exhibit symptoms of COVID-19 should not report to work until they have completed their quarantine, yet they nevertheless instituted policies and practices that heightened this well-established risk." (*Id.*, ¶ 177).

Plaintiffs allege that defendant Graves, "as secretary of the DOC," is "the executive head of DOC and commanding officer of all DOC correctional officers, guards, employees and contractors and is responsible for their training, supervision, and conduct." (*Id.*, ¶ 86).  Plaintiffs assert that, when former defendant Kelley was secretary of the DOC, she issued a memorandum on March 11, 2020, outlining DOC's protocols to reduce the risk and combat the spread of COVID-19 within DOC facilities (*Id.*, ¶ 147).  The memorandum "encouraged regular hand washing, covering coughs and sneezes, avoiding handshakes, *continuing* cleaning (instead of intensifying it), and telling staff members to stay at home if ill." (*Id.*).  The ACLU sent a letter to the Secretary of the DOC that warned of the need to "comply with CDC guidance in DOC facilities, in part by mandating social distancing and minimizing the transfer of incarcerated people from one detention facility to another." (*Id.*, ¶ 185).

Plaintiffs assert that State defendant Dexter Payne is the Director of the DOC, as such he is "responsible for supervising the administration of all ADC correctional institutions, facilities and services; ensuring adequate staffing levels at correctional institutions; instituting training and development of correctional staff; and coordinating with judicial districts, counties, and

13

municipalities to provide guidance and services to ensure a full range of correctional options for the State as a whole." (*Id.*, ¶ 87).  Plaintiffs maintain that Director Payne has the "power to make people incarcerated in the ADC correctional facilities eligible for release." (*Id.*)  Plaintiffs also contend that Director Payne stated that, "in order to save lives and halt the spread of the virus we must be obedient to the recommendations of the Centers for Disease Control (CDC) and the Arkansas Department of Health (ADH)." (*Id.*, ¶ 148).  Plaintiffs state that defendants' failure to conduct needed contact tracing with follow-up testing facilitated the subsequent outbreaks of COVID-19 at each of these facilities (*Id.*, ¶ 182).  Plaintiffs point out that defendant Payne spoke at the Governor's press conference on May 16, 2020, and he stated that Cummins had only "12 positive cases"; the rest were considered to be recovered (*Id.*, ¶ 231).  Plaintiffs contend that despite defendant Payne's claim, the DOC never retested people incarcerated at Cummins (*Id.*).

Plaintiffs assert that defendants Benny Magness, Bobby Glover, Lee Watson, Rev. Tyronne Broomfield, John Felts, Dr. William Byers, and Whitney Gass are members of the Arkansas Board of Corrections ("BOC") (collectively, "BOC Defendants").  Plaintiffs contend that the BOC is the governing authority of DOC and performs all functions with respect to the management and control of DOC.  Plaintiffs maintain that the BOC, along with the Director of the Division of Correction, has the power to release people incarcerated in DOC facilities (*Id.*, ¶ 88).

Plaintiffs assert that "[a] nurse witnessed Black inmates being neglected while white inmates with similar needs were provided with treatment.  The nurse also reported that the administrator at her prison often denied her requests for medical supplies or substituted cheaper medications that posed a higher risk to the incarcerated patients who would take them. (*Id.*, ¶ 195) The nurse reported her concerns to Mr. Magness, chairman of the BOC, but she "was told Wellpath

is a private company and his hands were tied." (*Id.*, ¶ 196). Plaintiffs contend that the nurse "ultimately reported her concerns to Wellpath management and was fired three weeks later." (*Id.*).

Plaintiffs contend that, as the contract medical provider for DOC facilities, "Wellpath – independently and/or under the direction of any of the other Defendants – failed to provide adequate testing and/or medical services to incarcerated people who are suspected or confirmed to have contracted the COVID-19 virus in a manner that is reasonably necessary to prevent the spread of COVID-19 and to properly treat all infected individuals incarcerated in DOC facilities." (*Id.*, ¶ 154).

### 3.    Claims In The Amended Complaint

Plaintiffs assert three causes of action in the amended complaint: (1) violation of the Eighth Amendment brought pursuant to 42 U.S.C. § 1983 on behalf of all plaintiffs against all defendants; (2) a petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2241 based on violation of the Eighth Amendment on behalf of the high risk subclass against all defendants; and (3) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, on behalf of the proposed disability subclass against all defendants (*Id.*, ¶¶ 255-283).

## II.    State Defendants' Motion to Dismiss Plaintiffs' Amended Complaint

State defendants have filed a motion to dismiss plaintiffs' amended complaint (Dkt. No. 95). State defendants contend that they are immune from plaintiffs' claims for declaratory relief; plaintiffs' claims against Dr. Romero are barred by sovereign immunity because he has "no connection to the policies and practices Plaintiffs challenge";[3] plaintiffs' Eighth Amendment claim "falls short of stating a cognizable claim of deliberate indifference against the DOC officials named

---

[3]    State defendants assert that Governor Hutchinson and Jerry Bradshaw also have sovereign immunity from plaintiffs' claims, but both of these defendants have been dismissed from the lawsuit (Dkt. Nos. 110, 119).

in the lawsuit"; plaintiffs ADA claim "fails to seek any reasonable accommodation that the State Defendants do not already provide and seeks accommodations that Plaintiffs never requested from any of the State Defendants before bringing suit"; and plaintiffs' claim seeking "temporary release to home confinement is a condition-of-confinement claim that is not cognizable in habeas." (Dkt. No. 96, at 1-2). Plaintiffs have responded (Dkt. No. 103). State defendants have replied to the response and have filed a supplemental reply to the response (Dkt. No. 107, 111).

### A.    Legal Standard For Motions To Dismiss

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Courts consider "plausibility" by "'draw[ing] on [our own] judicial experience and common sense,'" *Whitney v. Guys, Inc.,* 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal,* 556 U .S. at 679), and "'review[ing] the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Group,* 592 F.3d 893, 896 n. 4 (8th Cir. 2010)). "While a complaint attacked by a [Federal] Rule [of Civil Procedure] 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted). "[T]he complaint must contain facts which state a claim as a matter of law and must not be conclusory." *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 627 (8th Cir. 1999).

"When ruling on a motion to dismiss, the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Roe v. Nebraska*, 861 F.3d 785, 788 (8th Cir. 2017). A reviewing court "may consider these materials without converting the defendant's request to a motion for summary judgment." *Id.* (citations and quotation marks omitted); *see Lustgraaf v. Behrens*, 619 F.3d 867, 885–86 (8th Cir. 2010) ("[W]hen considering a motion to dismiss . . . , [a court] may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents[.]" (alterations in original) (emphasis omitted)).

State defendants contend that testimony and exhibits presented at the preliminary injunction hearing are matters of public record that can be considered by the Court on their motion to dismiss (Dkt. Nos., 96, at 20-21, 26-29, 32-33; 107, at 12-15). Plaintiffs counter that the Court must ignore these documents because they are "not public records, but rather internal DOC documents produced in discovery." (Dkt. No. 103, at 18-19). They maintain that courts can only take judicial notice of the existence of a public document, but not the statements or findings contained therein for the truth of the matter asserted (Dkt. No. 103, at 18). They also argue that, because the evidentiary rules were relaxed at the preliminary injunction stage, the documents cannot be considered on a motion to dismiss because they dispute the facts in the documents on which State defendants rely (Dkt. No. 103, at 18-19, 22). State defendants point out in their reply that plaintiffs cite to and rely on testimony from the preliminary injunction hearing in their briefing (Dkt. No. 107, at 12 (citing e.g. Dkt. No. 103, at 7-9)). State defendants also argue that the DOC

is a state agency and that all of its records are public records under state law (Dkt. No. 107, at 14 (citing Ark. Code Ann. § 25-19-103(7)(A))).  State defendants contend that the documents are not being offered to show the truth of the matter asserted, rather, to show State defendants' state of mind (Dkt. No. 107, at 15).

The Court finds that at this stage of the proceedings it will only consider the operative pleadings in deciding the pending motion to dismiss.  The Court will, as it is required to do at this stage in the proceeding, accept the allegations contained in plaintiffs' amended complaint as true and draw reasonable inferences from the amended complaint in favor of plaintiffs.

### B.   Analysis Of State Defendants' Motion To Dismiss

#### 1.   Immunity From Retrospective Declaratory Relief

"The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent."  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)).  However, "[t]o ensure the enforcement of federal law. . . the Eleventh Amendment permits suits for *prospective* injunctive relief against state officials acting in violation of federal law." *Id.* (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908)).  "A state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'" *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (citing *Ex parte Young*, 209 U.S. at 157).

The doctrine of *Ex parte Young,* which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law, is regarded as carving out a necessary exception to Eleventh Amendment immunity. *See*, *e.g., Green v. Mansour,* 474 U.S. 64, 68 (1985).  Moreover, the exception is narrow:  it applies only to prospective relief and

18

does not permit judgments against state officers declaring that they violated federal law in the past. *Id.,* at 73.  A court considering whether the *Ex parte Young* exception applies need only conduct "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *281 Care Committee v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002)).

Here, given the operative pleading standard and the pleadings before the Court, and drawing all reasonable inferences in plaintiffs' favor, the Court determines that plaintiffs have alleged sufficient facts in their amended complaint to support their claims and to overcome defendants' assertion of sovereign immunity on plaintiffs' claims for declaratory relief.  The *Ex parte Young* doctrine requires that plaintiffs' amended complaint allege an ongoing violation of federal law and seek relief properly characterized as prospective.  In their amended complaint, plaintiffs complain of an ongoing violation of federal law, stating that "a substantial part of the events, acts, and/or omissions giving rise to this action occurred, *and continue to occur* . . ." (Dkt. No. 84, ¶ 17 (emphasis added)).  Plaintiffs allege that "because of inadequate COVID-19 prevention policies and ineffective implementation of policies that exist, people in DOC facilities cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear adequate protective clothing, obtain specific products for cleaning or laundry, or avoid high-touch surfaces." (*Id*., ¶ 6).  Plaintiffs assert, with respect to their ADA claim, that State defendants have "denied, and continue[] to deny, these reasonable accommodations to members" of the disability subclass (*Id*., ¶ 274).  Plaintiffs contend that the ADA requires "Defendants/Respondents to provide accommodations to make those services, programs, and activities accessible." (*Id*., ¶ 275).  Further, in their prayer for relief with respect to their Eighth

Amendment deliberate indifference claim plaintiffs seek, "an order declaring that Defendants/Respondents' policies and practices regarding COVID-19 violate the Eighth Amendment to the United States Constitution" (Dkt. No. 84, at 91, ¶ b).

Drawing all reasonable inferences in favor of plaintiffs, the Court finds that plaintiffs' amended complaint seeks declaratory relief from ongoing illegal policies and practices and, as such, plaintiffs seek prospective relief permissible under *Ex parte Young*; the Court denies on this basis State defendants' motion to dismiss plaintiffs' claims for declaratory relief.

### 2.      Sovereign Immunity For Dr. Romero

State defendants argue that Dr. Romero enjoys immunity from all of plaintiffs' requests for relief because he has no role in enforcing the policies and practices that plaintiffs' challenge as unconstitutional (Dkt. No. 96, at 13-16).

In *Ex parte Young*, the Court held that a suit to enjoin a state official's enforcement of state legislation on the ground that the official's action would violate the Constitution is not a suit against the State, and is thus not barred by the Eleventh Amendment, so long as the official has "some connection with the enforcement of the act." *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956–57 (8th Cir. 2015) (citing *Ex parte Young,* 209 U.S. at 155–60; *see Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247 (2011)).  In *Digital Recognition Network*, the Eighth Circuit concluded that the "Arkansas attorney general's authority to advise state officials on the constitutionality" of the statute at issue, by itself, did "not suffice to establish 'some connection with the enforcement' of the Act" and, consequently, the attorney general did not have a causal connection to Digital Recognition's alleged injury.  *Digital Recognition Network*, 803 F.3d at 962; *see also Balough v. Lombardi*, 816 F.3d 536, 539, 545-46 (8th Cir. 2016) (holding that the Director of the Missouri Department of Corrections was entitled to

sovereign immunity in a case asserting a constitutional challenge to a Missouri statute prohibiting the disclosure of the identities of individuals who participate in executions because the Director did not have authority to enforce the statute's non-disclosure provision through a civil or criminal prosecution).

State defendants contend that Dr. Romero does not have any direct role in enforcing the policies and practices plaintiffs challenge and, thus, he is entitled to sovereign immunity (Dkt. No. 96, at 14).[4]  In their amended complaint, plaintiffs allege that Dr. Romero is responsible because he "is the executive head of the ADH and is responsible for the provision of public health guidance and directives to the State" and has "the authority to issue guidance to DOC regarding how to address the COVID-19 pandemic." (Dkt. No. 84, ¶ 91).

Plaintiffs also allege that various State defendants have taken "certain measures regarding COVID-19 '[a]t the direction of the Arkansas Department of Health.'" (Dkt. No. 103, at 8 (citing Dkt. No. 84, ¶ 149)). Specifically, plaintiffs allege:  "Defendants and DOC officials have consulted with and/or relied on this guidance, as well as other communications form ADH officials, to develop and/or implement policies and practices related to the preparation for, and response to, the COVID-19 prevention, testing, quarantining, and/or medical treatment." (Dkt. No. 84, ¶ 150).  Plaintiffs further allege that "[i]ncarcerated people who presented symptoms of COVID-19 infection, or who were exposed to infected individuals, have been denied testing." (*Id.*, ¶ 155).  Plaintiffs assert that, "[a]ccording to DOC officials, including some of the named

---

[4]  The Court has studied the docket of *Schuler v. Hutchinson*, Case No. 2:20-cv-97, 2020 WL 3104668, at *1 (E.D. Ark. June 11, 2020), which State defendants cite (Dkt. No. 96, at 14).  Plaintiff Edward Schuler proceeded *pro se*, and the Court made its determination on this issue of sovereign immunity with respect to the Arkansas Governor and Attorney General reviewing the allegations in Mr. Schuler's *pro se* complaint, which allegations are very different from those presented by plaintiffs in this case (Case No. 2:20-cv-97, Dkt. Nos. 2, 14, 31).

Defendants, ADH and/or Wellpath determine which incarcerated person gets tested for COVID-19, receives medical treatment for related illnesses, is quarantined, and/or is released from quarantine.  Moreover, DOC officials have stated that ADH determines whether infected, but asymptomatic DOC staff, should report to work." (*Id.*, ¶ 150).  Plaintiffs assert that this allegation "directly implicates" Dr. Romero's agency which "decides which incarcerated people get tested for COVID-19." (Dkt. No. 103, at 8).  Plaintiffs contend that ADH establishes a policy governing whether a test should be administered and his connection to testing policy at the DOC is sufficient to defeat Dr. Romero's claim of sovereign immunity (*Id.*, at 8-9).  Finally, plaintiffs argue that Dr. Romero is "indisputably connected:  to the policy of allowing DOC staff who have tested positive for COVID-19 to report to work at DOC facilities while still infected with the virus." (*Id.* at 9).

State defendants counter that Dr. Romero's guidance regarding sanitation and quarantine is nonbinding guidance to the DOC regarding how to address the COVID-19 pandemic and that the guidance does not subject Dr. Romero to liability in this case because he has no enforcement power (Dkt. No. 107, at 7 (citing *Digital Recognition Network*, 803 F.3d at 960 (citing Ark. Const. art. VI, §§ 2 & 7))).  State defendants point out that nothing in Dr. Romero's directive regarding state-wide face coverings permits Dr. Romero to enforce the mandate in DOC facilities as required to fall within *Ex parte Young* (Dkt. No. 107, at 8).  State defendants assert that "state prison and community corrections officials and their medical providers can isolate and quarantine inmates and offenders in their custody and control" and that "the Court has the authority to order isolation and quarantining of inmates if necessary even absent Dr. Romero as a party." (*Id.*, at 9).  Further, State defendants argue that ADH's guidance to correctional facilities regarding COVID-

19 testing, contract tracing, and staffing is nothing but guidance that does not give Dr. Romero the authority to enforce the guidance or the policies and practices of the DOC (*Id.*, at 10).

Plaintiffs point the Court to *281 Care Committee v. Arneson*, 638 F.3d 621, 633 (8th Cir. 2011), to support their position that courts have found state officials to be sufficiently connected to challenged policies in cases that present a much more tenuous connection than the one present here (*Id.*). In *281 Care Committee*, the plaintiffs sued a state attorney general in a lawsuit challenging a state criminal statute for which the attorney general could not initiate prosecution and could only participate in a criminal proceeding if his assistance was requested by the assigned county attorney or the trial court asked him to sign indictments. *Id.* The Eighth Circuit Court of Appeals held, however, that the state attorney general was not entitled to sovereign immunity because, under the statute, the attorney general could become involved in criminal prosecution, was responsible for defending decisions of the Office of Administrative Hearings, and had the ability to file a civil complaint. *Id.* at 632. The Court held that the three-fold connection plaintiffs alleged was sufficient to make the attorney general amenable to suit under the *Ex parte Young* exception to Eleventh Amendment immunity. *Id.* at 633 (citing *Reprod. Health Servs. v. Nixon,* 428 F.3d 1139, 1145–46 (8th Cir. 2005)). In reaching this decision, the Eighth Circuit specifically stated: "While we do require 'some connection' between the attorney general and the challenged statute, that connection does not need to be *primary* authority to enforce the challenged law." *281 Care Comm.*, 638 F.3d at 632–33 (emphasis added)(citing *Missouri Pro. & Advocacy Servs. v. Carnahan,* 499 F.3d 803 (8th Cir.2007)); *see also Balough v. Lombardi*, 816 F.3d at 545–46 (distinguishing *281 Care Committee* and determining that, because the director had no authority to enforce the challenged law, he was entitled to sovereign immunity).

At this stage of the litigation, the Court concludes that, based on plaintiffs' allegations which the Court accepts as true and under controlling Eighth Circuit precedent which this Court is bound to follow, plaintiffs' allegations are insufficient to establish a causal connection between Dr. Romero and the enforcement of DOC's policies to bring him into the *Ex parte Young* exception and make him a proper defendant.  The Court grants State defendants' motion to dismiss Dr. Romero based on sovereign immunity.

### 3.    Eighth Amendment Claims Against State Defendants

Plaintiffs allege that defendants' failure to provide adequate protection and, if necessary, medical care in response to the rapid spread of COVID-19 constitutes deliberate indifference to the serious medical needs of incarcerated individuals in violation of the Eighth Amendment (Dkt. No. 84, ¶ 257).  Additionally, plaintiffs allege through their habeas claims that defendants are holding members of the proposed high risk subclass in violation of the Eighth Amendment (*Id.*, ¶ 266).  The Court addresses whether plaintiffs' habeas claims are cognizable elsewhere in this Order.  For the following reasons, the Court determines based on the pleadings before it that plaintiffs have stated a claim for relief under the Eighth Amendment.

### a.    Deliberate Indifference Standard

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions."  *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982).  State officials have a responsibility under the Eighth Amendment to "provide humane conditions of confinement," "ensure that inmates receive adequate food, clothing, shelter, and medical care," and "'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S. 832 (quoting

*Hudson v. Palmer*, 468 U.S. 517, 526-57 (1984)).  The Eighth Amendment standard for conditions of confinement asks whether defendants acted with "deliberate indifference."  *Davis v. Oregon Cty.*, 607 F.3d 543, 548 (8th Cir. 2010).

The Eighth Amendment forbids deliberate indifference to conditions that "pose an unreasonable risk of serious damage to . . . future health."  *Helling*, 509 U.S. at 35; *see also DeGidio v. Pung*, 920 F.2d 525, 533 (continuing failure by prison officials to institute a system to prevent the spread of tuberculosis violated the Eighth Amendment); *Brown v. Moore*, 93 F. Supp. 3d 1032, 1041 (W.D. Ark. 2015) ("Plaintiff need not have contracted the disease for an actionable [Eighth Amendment] claim to be stated.").  Deliberate indifference has both an objective and subjective component.  *See Davis*, 607 F.3d at 548.  The objective component considers "whether a substantial risk to the inmate's safety existed," and the subjective component considers "whether the officer had knowledge of the substantial risk to the inmate's safety but nevertheless disregarded it."  *Id.*  This "subjective component of deliberate indifference requires proof that [defendants] 'actually knew of and recklessly disregarded' this substantial risk of serious harm."  *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (quoting *Pietrafeso v. Lawrence Cty., S.D.*, 452 F.3d 978, 983 (8th Cir. 2006)).  "In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a 'mental state akin to criminal recklessness:  disregarding a known risk to the inmate's health.'"  *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)).  Under controlling precedent, the deliberate indifference standard may be satisfied when officials respond to an infectious disease "outbreak with a series of negligent and reckless actions."  *DeGidio*, 920 F.2d at 533.

The Court stresses that these objective and subjective components should not be "collapsed" into one another and remain separate but related inquiries. *See Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317, at *4 (11th Cir. May 5, 2020); *see also Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425, at *2-3 (5th Cir. Apr. 27, 2020) (separating the "objective" prong of the deliberate indifference test from the "subjective" consideration of whether defendants' measures were inadequate).

The Court has considered both the objective and subjective prongs in evaluating plaintiffs' Eighth Amendment claim and finds that, at this stage based on the pleadings before the Court, plaintiffs have stated an Eighth Amendment claim against State defendants.

### b.   Objective Prong

As to the objective prong, plaintiffs allege that COVID-19 poses an objectively serious health risk to named plaintiffs and the putative classes given the nature of the disease and the congregate living environment of the DOC's facilities (Dkt. No. 84, ¶¶ 7, 10-12, 102-138).  State defendants do not concede this point, but they raise no specific argument directed to it in their briefing (Dkt. Nos. 96, at 19; 103, at 14 n. 6).  As alleged in the amended complaint, these risks can be exacerbated by a lack of access to personal protective equipment ("PPE") for prisoners and many staff members, a lack of cleaning of shared items like toilets, sinks, and showers, and an inability to social distance properly (Dkt. No. 84, ¶¶ 124-132).  This objectively serious health risk appears heightened for named plaintiffs and members of the putative subclasses given plaintiffs' allegations regarding their susceptibility to contracting COVID-19 and experiencing worsened symptoms (*Id.*, ¶¶ 133-138).  Thus, plaintiffs have pleaded sufficient allegations in the amended complaint to satisfy the objective prong of the deliberate indifference test for their Eighth Amendment claims.

### c.  Subjective Prong

As to the subjective prong, State defendants contend that the amended complaint does not state a claim of reckless indifference to the risks of COVID-19, but rather plaintiffs establish a mere disagreement with the measures State defendants have taken, which is not enough to establish deliberate indifference (Dkt. No. 96, at 18).  Plaintiffs counter that State defendants, throughout their brief, ask the Court to apply a heightened and inapplicable standard that requires plaintiffs to *prove* deliberate indifference, not plead it (Dkt. No. 103, at 12-13).  Plaintiffs note that State defendants do not rely on any case that considered the pleading standards for review on a motion to dismiss but only rely on in their briefing cases decided on motions for directed verdict, summary judgment, temporary restraining orders, and preliminary injunctions (*Id*., at 13, n. 5).

To the extent plaintiffs fault defendants for failing to implement effectively the policies and practices put into place, plaintiffs have sued State defendants in their official capacities as policy makers and include sufficient allegations to overcome State defendants' motion to dismiss (Dkt. No. 84, ¶¶ 8-10, 147-237).  In general, state actors may not be sued under § 1983 for an injury inflicted solely by its employees or agents on a *respondeat superior* theory of liability.  *See Monnell v. New York Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).  However, a state actor may be liable for inadequate training or supervision of its employees "where (1) the . . . training practices [were] inadequate; (2) the [state actor] was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by [the state actor]'; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury." *Andrews v. Fowler,* 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting *City of Canton v. Harris,* 489 U.S. 378, 389 (1989)); *see also Parrish v. Ball*, 594 F.3d 993, 997–98 (8th Cir. 2010).

The Court notes that, in their amended complaint, plaintiffs also assert that State defendants failed to train properly employees and agents, but even if certain employees or agents received training that was minimal at best, that finding alone will not satisfy a § 1983 claim for failure to train. *City of Canton,* 489 U.S. at 390-91. Instead, to satisfy the standard, a § 1983 plaintiff must demonstrate that in the light of the duties assigned to specific employees and agents the need "for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. A § 1983 plaintiff must demonstrate that the state actor "'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'" *Andrews,* 98 F.3d at 1076 (quoting *Thelma D. v. Bd. of Educ.,* 934 F.2d 929, 934 (8th Cir. 1991)). Plaintiffs include such allegations in their amended complaint (Dkt. No. 84, ¶¶ 3-4, 147, 161-163, 167-168, 173-174, 186).

As to the subjective prong, plaintiffs assert that defendants have failed to address the COVID-19 risk despite being aware of it (Dkt. No. 84, ¶¶ 260-61). In their amended complaint, plaintiffs contend that, as of March 23, 2020, State defendants were aware of CDC published guidance for correctional facilities to ensure the protection of the health and safety of incarcerated people (*Id.*, ¶ 148). Additionally, as of March 27, 2020, State defendants were provided Guidance for State Correctional Facilities and Local Detention Facilities from the ADH which noted that correctional facilities "pose a high risk for transmission of COVID-19." (*Id.*, ¶ 149). Plaintiffs allege that with respect to their preparation for and response to COVID-19 State defendants failed "to adopt and implement policies and procedures to prevent and mitigate the spread of COVID-19 – as well as to sufficiently supervise and train DOC staff to ensure the effectiveness of mitigation

measures. . . ." (*Id.*, ¶ 157).  Plaintiffs allege these purported failures fall into "eight broad categories" as described in their amended complaint (*Id.*).

Plaintiffs assert State defendants failed to adequately plan for staff shortages at DOC facilities (*Id.*, ¶ 159).  Plaintiffs contend there is an obvious danger created by State defendants' policy of allowing or requiring that staff infected with COVID-19 continue to work at DOC facilities for incarcerated people and staff who are not infected (*Id.*, ¶¶ 158, 177).  Plaintiffs maintain that State defendants have failed to implement the training and educational interventions necessary to prevent the spread of COVID-19 in the DOC by, among other things, failing to train DOC staff to instruct incarcerated people how to use masks properly, as well as failing to post signage informing incarcerated people how to report COVID-19 symptoms, how to seek help if they become symptomatic, and informing staff to stay home when sick (*Id.*, ¶¶ 161-162).

Plaintiffs also claim that State defendants have neither implemented the hygiene, cleaning, and disinfecting practices nor provided necessary personal items and cleaning supplies needed to permit plaintiffs to sanitize themselves and clean adequately their living areas (*Id.*, ¶¶ 164-167).  Plaintiffs allege State defendants have not implemented adequate measures to reduce crowding, minimize interpersonal contact, and encourage social distancing and that, even when aware of widespread deficiencies, State defendants have failed to follow-up with supervision and training (*Id.*, ¶¶ 168-172).  Plaintiffs complain that State defendants have failed to address adequately suspected cases of COVID-19 among inmates, positive COVID-19 cases among staff, and inmates and staff who have had contact with people known to have tested positive for COVID-19 (*Id.*, ¶¶ 173-178).  Finally, plaintiffs assert that State defendants' have inadequate policies and procedures in place to address the presence of a person who has tested positive for COVID-19 in a DOC facility (*Id.*, ¶ 179).

Plaintiffs also challenge the testing and medical care inmates are receiving in regard to COVID-19.  Generally, to prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs.  *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997).  This requires a two-part showing that:  (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it.  *Id.; see also Farmer,* 511 U.S. 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).

The law defines a serious medical need as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995) (citation omitted).  A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary.  *Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th Cir. 2004).  An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.  *Lenz v. Wade,* 490 F.3d 991, 995 (8th Cir.2007).  Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact.  *Coleman,* 114 F.3d at 785; *see also Schaub v. VonWald*, 638 F.3d 905, 914–15 (8th Cir. 2011).

In their amended complaint, plaintiffs have not only sued Wellpath, the contract provider for medical care at the DOC, but also State defendants in their official capacities as policy makers. While a policy maker or supervisor's general responsibility for supervising operations of a prison is insufficient to establish personal involvement giving rise to liability under § 1983, *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir. 1987), individuals personally involved in decisions regarding treatment and care become responsible for seeing that the inmate is adequately cared for

once his needs are brought to the individual's attention, *see Schaub*, 638 F.3d at 918; *Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010) (noting that even though defendant prison supervisor was "not a medical doctor and does not personally treat inmates' medical needs, . . . [t]here is no doubt that [defendant] has a constitutional duty to see that prisoners in his charge who need medical care receive it."); *see also West v. Atkins,* 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody.").  The Court recognizes the well-established proposition that, although prison officials are not doctors, when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction.  *Schaub*, 638 F.3d at 918 n. 6.

The Court also is mindful that, in *DeGidio v. Pung*, when confronted with § 1983 claims over the tuberculosis epidemic, the district court observed:

> No one claims ultimate responsibility for the many supervisory functions within the health services unit.  The passing of blame and responsibility between the Department of Health, the administrative director of health services, and the staff physicians has been discussed at length earlier.  Each person describes his or her role narrowly, and disclaims ultimate responsibility for directing the effort at controlling tuberculosis.  Plaintiffs have shown through the great weight of the evidence that this failure of coordination persists and is a reason why Stillwater's response to the tuberculosis epidemic lagged.

704 F. Supp. 922, 957 (D. Minn. 1989), *aff'd*, 920 F.2d 525 (8th Cir. 1990).  The Court has these precedents in mind when reviewing the pleadings before it at this stage of the proceeding.

Plaintiffs assert that Wellpath and State defendants denied care and testing to inmates claiming symptoms of COVID-19, denied follow-up evaluation or care for those with symptoms or reported COVID-positive cases, and gave no aid to inmates with claimed symptoms of COVID-19 who were too weak to care for themselves or to seek medical care for themselves.  Considering all of the pleadings before it, the Court determines that, at this stage, plaintiffs have stated an

31

Eighth Amendment claim against State defendants based on deliberate indifference to serious medical needs.

Accepting the allegations in the amended complaint as true and drawing all reasonable inferences in favor of plaintiffs, the Court concludes that plaintiffs have stated an Eighth Amendment claim for deliberate indifference against State defendants. *See DeGidio*, 920 F.2d at 533 ("a consistent pattern of reckless or negligent conduct is sufficient to establish deliberate indifference to serious medical needs."); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) ("grossly incompetent or inadequate care can constitute deliberate indifference").

### 4.    Petition For Writ Of Habeas Corpus

Plaintiffs allege that 28 U.S.C. § 224l(c)(3) permits this Court to order the release of incarcerated individuals who are being held "in violation of the Constitution or laws . . . of the United States." (Dkt. No. 84, ¶ 265 (citing *Preiser v. Rodriguez*, 411 U.S. 475,484 (1973) ("It is clear, not only from the language of §§ 224l(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody.")).   Plaintiffs assert that State defendants are currently holding them in custody in violation of the Eighth Amendment, given the highly contagious nature of COVID-19 and the deadly and debilitating threat that it poses to members of the high risk subclass (*Id*., ¶ 266). Plaintiffs assert that, "[g]iven the highly contagious nature of COVID-19 and the deadly and debilitating threat that it poses to members of the High Risk Subclass, Defendants/Respondents cannot currently mitigate the risks to members of the High Risk Subclass sufficiently to satisfy the Eighth Amendment by any means short of release from custody." (Dkt. No. 84, ¶¶ 266, at 91, ¶ d).

State defendants argue that plaintiffs' claims are conditions of confinement claims that are not cognizable in habeas (Dkt. No. 96, at 34-35). State defendants point to *Spencer v. Haynes*, 774 F.3d 467, 469–70 (8th Cir. 2014), quoting *Kruger v. Erickson,* where the Eighth Circuit stated "[i]f the prisoner is not challenging the validity of his conviction or the length of his detention, such as loss of good time, then a writ of habeas corpus is not the proper remedy." 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam) (citing *Preiser v. Rodriguez,* 411 U.S. 475, 499 (1973)). State defendants assert that, because plaintiffs do not challenge their convictions or the fact of their confinement, their constitutional claims relate to their conditions of confinement.

Plaintiffs respond that, unlike the petitioner in *Spencer*, they seek a remedy that would result in an earlier release from prison (Dkt. No. 103, at 43). Plaintiffs also assert that the Eighth Circuit has held that conditions-of-confinement claims are cognizable in habeas (*Id*., at 44 (citing *Willis v. Ciccone*, 506 F.2d 1011, 1014 (8th Cir. 1974)). Plaintiffs also cite to district courts in many other circuits that have permitted conditions-of-confinement claims in habeas (*Id*., at 45-47).

This Court has studied the parties' arguments and briefing on this issue, as well as the legal authorities cited. A habeas corpus petition is the appropriate means to challenge the "actual fact or duration" of one's confinement. *See Heck v. Humphrey*, 512 U.S. 477, 481 (1994); *Preiser,* 411 U.S. at 488-90; *Otey v. Hopkins,* 5 F.3d 1125, 1130-31 (8th Cir. 1993), *cert. denied,* 512 U.S. 1246 (1994). Habeas relief can be sought by persons "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Generally, state prisoners must exhaust appropriate state remedies before seeking federal habeas corpus relief under § 2241. *See Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 490-93 (1973); *Sacco v. Falke*, 649 F.2d 634, 635-36 (8th Cir. 1981).

However, where an inmate seeks injunctive relief to stop or prevent alleged unconstitutional conditions of confinement, these claims tend to fall outside the "core" of habeas corpus and are not cognizable via habeas corpus.  *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) (citing *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam); *Preiser*, 411 U.S. at 489).  The Supreme Court has left open the possibility that plaintiffs might be able to challenge the conditions of their confinement via a habeas corpus petition.  *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the constraints making custody illegal.").  As recognized by the Eighth Circuit, this Supreme Court precedent has created a split among the Circuit Courts of Appeals.  *See Spencer*, 774 F.3d at 470 n.6 (detailing the circuit split over this issue).

The Eighth Circuit has held that "[i]f the prisoner is not challenging the validity of his conviction or the length of his detention, such as loss of good time, then a writ of habeas corpus is not the proper remedy. . . . [, and] the district court lacks the power or subject matter jurisdiction to issue a writ."  *Kruger*, 77 F.3d at 1073 (citing *Preiser*, 411 U.S. at 499); *see also Spencer*, 774 F.3d at 469-72 (outlining the Eighth Circuit's position that "a habeas petition is not the proper claim" for conditions-of-confinement claims).

Further, at least one district court in the Eastern District of Arkansas has determined that, when a § 2241 petitioner's "claim concerns only where the remainder of his [ ] sentence should be

served," such a claim "cannot be properly brought and maintained in a federal habeas action." *Watt v. Rivera*, No. 2:15-cv-00081-JLH-JTR, 2016 WL 1689004, at *3 (E.D. Ark. Apr. 1, 2016) (citing *Spencer*, 774 F.3d at 470) *report and recommendation adopted* 2016 WL 1643837 (E.D. Ark. Apr. 25, 2016); *see also Robinson v. Kelley*, No. 5:18-cv-00018-KGB/JTR, 2018 WL 8799899, at *2 (E.D. Ark. Sept. 4, 2018) (reaching the same holding for § 2254 habeas petitioners). Other district courts within the Eighth Circuit have reached similar outcomes. *See, e.g.*, *Smith v. Warden of Duluth Prison Camp*, No. 18-cv-2555 (WMW/LIB), 2019 WL 3325837 (D. Minn. Apr. 23, 2019), *report and recommendation adopted as modified*, 2019 WL 3323063 (D. Minn. July 24, 2019).

Citing *Willis v. Ciccone*, 506 F.2d 1011, 1014 (8th Cir. 1974), plaintiffs argue that the Eighth Circuit has held that conditions-of-confinement claims are cognizable in habeas corpus. This Court is persuaded by the reasoning in *Smith v. Warden of Duluth Prison Camp*, with respect to reconciling *Spencer v. Haynes*, 774 F.3d 467 (8th Cir. 2014), and *Willis v. Ciccone*, 506 F.2d 1011 (8th Cir. 1974).

This Court is bound by controlling Eighth Circuit precedent, and the Court determines that *Spencer* forecloses plaintiffs' 28 U.S.C. § 2241 claim.  Here, the subclass plaintiffs are not challenging the validity of their convictions or the length of their detentions, such as through alleged loss of good time credits.  Instead, the subclass plaintiffs assert what are essentially conditions-of-confinement claims and seek for this federal court to order immediate release or transfer to home confinement, in a case involving an unchallenged state-court conviction and sentence (Dkt. No. 84, at 91, ¶ d).  For these reasons, the Court dismisses plaintiffs' 28 U.S.C. § 2241 claim.

### 5.   ADA Claim

State defendants assert that named plaintiffs and members of the disability subclass fail to state a claim under Title II of the ADA because they did not seek the requested accommodations. State defendants also contend that the ADA does not require them to make the accommodations plaintiffs seek (Dkt. No. 96, at 30-31).  Finally, State defendants assert that the Court cannot grant release under the ADA (*Id*., at 33).

Plaintiffs respond that they have alleged sufficiently that State defendants violated the ADA.  Plaintiffs state that they requested accommodations, pointing specifically to Mr. Kouri and Mr. Frazier, who requested specifically accommodation under the ADA (Dkt. No. 103, at 28 (citing Dkt. No. 84, ¶¶ 23, 29)).  The Court observes that, since filing this briefing, the parties agreed to dismiss Mr. Frazier as a plaintiff.  Plaintiffs allege that, on April 18, 2020, Mr. Kouri "submitted an emergency grievance requesting reasonable accommodations under the ADA. . . ." (Dkt. No. 84, ¶ 23).  Plaintiffs' initial complaint was filed April 21, 2020, and their amended complaint was filed July 13, 2020 (Dkt. Nos. 1, 84).  Further, plaintiffs in the putative disability subclass state that they have alleged plausibly that State defendants have refused to provide the reasonable accommodations that they have requested and, as a result, they are at a greater risk of contracting or succumbing to COVID-19 (Dkt. No. 103, at 29-30).

The Court concludes that, at this stage, based on the allegations in the amended complaint, the named plaintiffs and putative class members in the disability subclass have stated a claim under Title II of the ADA.

### III.   Other Pending Motions

The Court notes that there are other pending motions including plaintiffs' motion for discovery (Dkt. No. 37); plaintiffs' motion for protective order (Dkt. No. 116); State defendants'

combined renewed motion to stay discovery and response in opposition to plaintiffs' motion for protective order (Dkt. No. 120); separate defendant Wellpath's motion to join State defendants' combined renewed motion to stay discovery and response in opposition to plaintiffs' motion for protective order (Dkt. No. 124); plaintiffs' motion to compel expert inspection of Dr. Homer Venters and depositions of Aundrea Culclager, Rex Lay, and Shirley Lubin Wilson (Dkt. No. 127); State defendants' motion to continue the trial setting with incorporated memorandum brief in support (Dkt. No. 134); and Wellpath's motion to dismiss plaintiffs' class action complaint (Dkt. No. 140).

The Court denies as moot State defendants' motion to continue the trial setting because the Court never entered a final scheduling order setting a firm trial date and under Administrative Order 12 all non-jury trials for the period between March 23, 2021, and May 21, 2021 have been continued (Dkt. No. 134). The Court denies as moot plaintiffs' motion for expedited discovery, which plaintiffs filed while the Court had under advisement their request for preliminary injunctive relief (Dkt. No. 37). The Court will issue a final scheduling order setting a new trial date and other pre-trial deadlines. The Court has the parties' other pending motions under advisement and will rule on those motions in a separate order.

## IV.    Conclusion

For the foregoing reasons the Court denies as moot plaintiffs' motion for expedited discovery (Dkt. No. 37); grants plaintiffs' motion for the Court to take judicial notice of 48 additional incarcerated people testing positive for COVID-19 at third facility operated by defendants (Dkt. No. 66); denies as moot defendants' motion to dismiss the original complaint (Dkt. No. 76); denies as moot State defendants' motion to continue the trial setting (Dkt. No. 134);

and grants, in part, and denies, in part, State defendants' motion to dismiss plaintiffs' amended complaint (Dkt. No. 95).

So ordered this 31st day of March, 2021.

Kristine G. Baker
United States District Judge