## THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**NICHOLAS FRAZIER,** *et al.*                                                            **PLAINTIFFS**

**v.**                                            **Case No. 4:20-cv-00434-KGB**

**SOLOMON GRAVES,** *et al.*                                                            **DEFENDANTS**

## <u>ORDER</u>

Before the Court are several pending motions.  There is the motion for protective order of plaintiffs Marvin Kent, Michael Kouri, Jonathan Neeley, Alfred Nickson, Trinidad Serrato, Robert Stiggers, Victor Williams, John Doe No. 1, Wesley Bray, Price Brown, John Doe No. 2, Joseph Head, Darryl Hussey, Jimmy Little, Lee Owens, Torris Richardson, and Roderick Wesley, plaintiffs, individually and on behalf of all others similarly situated (collectively, "plaintiffs") (Dkt. No. 116).  Defendants Solomon Graves, Secretary of the Arkansas Department of Corrections ("DOC"); Dexter Payne, Division of Correction Director, Arkansas Department of Corrections ("ADC"); Benny Magness, Chairman of Arkansas Board of Corrections ("ABC"); Bobby Glover, Vice Chairman of ABC; John Felts, Member of ABC; William "Dubs" Byers, Member of ABC (collectively, "State Defendants") responded to plaintiffs' motion for protective order by filing a combined renewed motion to stay discovery and response in opposition to the plaintiffs' motion for protective order (Dkt. No. 120).  Separate defendant Wellpath, LLC ("Wellpath") responded to the plaintiffs' motion for protective order by filing a motion to join the State Defendants' combined renewed motion to stay discovery and response in opposition to plaintiffs' motion for protective order (Dkt. No. 124).  Plaintiffs responded to the motion to stay of the State Defendants and Wellpath (collectively, "defendants"), and plaintiffs replied to defendants' response to the motion for protective order (Dkt. Nos. 125; 126).

Also before the Court is plaintiffs' motion to compel expert inspection of Dr. Homer Venters and depositions of Aundrea Culclager, Rex Lay, and Shirley Lubin Wilson (Dkt. No. 127). Wellpath and the State Defendants have responded to the plaintiffs' motion to compel (Dkt. Nos. 132; 133). Plaintiffs replied to the defendants' responses (Dkt. No. 139).

Finally, before the Court is defendant Wellpath's motion to dismiss plaintiffs' amended complaint (Dkt. No. 140). Plaintiffs have responded in opposition to Wellpath's motion to dismiss (Dkt. No. 143).

The Court first addresses and for the reasons stated herein grants, in part, and denies, in part, Wellpath's motion to dismiss, which the Court construes as a motion for judgment on the pleadings (Dkt. No. 140). Having denied, in part, Wellpath's motions for judgment on the pleadings and having denied, in part, the State Defendants' motion to dismiss, the Court denies as moot defendants' renewed motion to stay discovery (Dkt. Nos. 120; 124). The Court grants plaintiffs' motion for protective order (Dkt. No. 116). The Court grants, in part, and denies, in part, plaintiffs' motion to compel expert inspection of Dr. Venters and denies plaintiffs' motion to compel depositions of Mr. Culclager, Mr. Lay, and Ms. Wilson (Dkt. No. 127).

I.      **Overview**

      A.      **Complaint, Emergency Motion For Temporary Restraining Order And Preliminary Injunction, Supplemental Motion For Temporary Restraining Order**

On April 21, 2020, plaintiffs filed a class action complaint and petition for writ of habeas corpus (Dkt. No. 1). Plaintiffs alleged that conditions in ADC facilities create a serious risk of COVID-19-related infection, disease, and death (*Id.*, ¶¶ 72-89). Plaintiffs claimed that the spread of COVID-19 in ADC facilities jeopardizes the public health of surrounding communities, especially African American communities (*Id.*, ¶¶ 90-97). Plaintiffs asserted that the State

Defendants have intentionally failed to adopt and implement adequate policies and procedures to prevent and mitigate the spread of COVID-19 (*Id.*, ¶¶ 98-126).  Plaintiffs asserted three causes of action against the State Defendants:  (1) violation of the Eighth Amendment brought pursuant to 42 U.S.C. § 1983 on behalf of all plaintiffs; (2) violation of the Eighth Amendment brought by a petition for writ of habeas corpus under 28 U.S.C. § 2241 on behalf of the proposed high risk subclass; and (3) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, on behalf of the proposed disability subclass (*Id.*, ¶¶ 127-48).

On the same day, plaintiffs also filed an emergency motion for temporary restraining order and preliminary injunction (Dkt. No. 2).  In this motion, plaintiffs requested that this Court grant immediate relief to protect them against the substantial risk of COVID-19 infection, illness, and death while incarcerated in ADC facilities (*Id.*, at 1-2).  Plaintiffs asserted that they are entitled to a preliminary injunction because they are substantially likely to succeed on the merits of their claim that defendants' failure to take steps to address the imminent risk caused by COVID-19 constitutes deliberate indifference in violation of plaintiffs' Eighth Amendment rights (*Id.*, at 2).  Plaintiffs further asserted that defendants have violated, and will continue to violate, the ADA by failing to provide plaintiffs with disabilities with reasonable accommodations that would allow them to have safe housing while serving their prison sentence that does not place them at substantial risk of COVID-19 infection, illness, or death by virtue of their disability (*Id.*).  Plaintiffs maintained that defendants are aware of the substantial risk posed by the virus and the recommended steps issued by the Centers for Disease Control and Prevention ("CDC") to prevent its spread but have failed to take steps to protect plaintiffs (*Id.*).  Plaintiffs asserted that they and putative class members are also entitled to relief because they will suffer irreparable harm absent relief and that traditional legal remedies will not adequately protect their rights (*Id.*).

On Monday, April 27, 2020, plaintiffs also filed a supplemental motion for temporary restraining order (Dkt. No. 22).  Plaintiffs' supplemental motion for temporary restraining order requested that the Court enter immediately a temporary restraining order (*Id.*, at 1).  Plaintiffs provided a draft proposed order outlining in detail the relief they requested in their motion, which was comparable but not identical to the relief they sought in their motion for preliminary injunction (Dkt. No. 22-1).  The Court conducted a hearing with all parties on that motion on Tuesday, April 28, 2020 (Dkt. Nos. 24; 26).  Plaintiffs filed a motion for expedited discovery, while the Court had under advisement their request for preliminary injunctive relief (Dkt. No. 37).  On May 4, 2020, the Court entered an Order denying plaintiffs' motion for temporary restraining order but held under advisement plaintiffs' previously filed motion for preliminary injunction (Dkt. No. 42).

After the Court's ruling on plaintiffs' request for a temporary restraining order, plaintiffs and defendants submitted to the Court additional record evidence and further briefing.  The Court conducted a hearing on plaintiffs' motion for preliminary injunction (Dkt. Nos. 62; 63), and the parties filed post-hearing briefs (Dkt. Nos. 64; 65).  In an Order dated May 19, 2020, the Court denied plaintiffs' motion for preliminary injunction (Dkt. No. 68).

### B.      Defendants' Motion to Dismiss Original Complaint

The defendants named in the original complaint filed a motion to dismiss the complaint (Dkt. No. 76).  Plaintiffs requested an extension of time to respond to defendants' motion to dismiss on the ground that they would be filing an amended complaint superseding the original (Dkt. No. 83).  Plaintiffs filed an amended class action complaint and petition for writ of habeas corpus (Dkt. No. 84).  The Court denied as moot the first motion to dismiss (Dkt. No. 145).

### C.      Plaintiffs' Amended Complaint

Plaintiffs filed an amended class action complaint and petition for writ of habeas corpus (Dkt. No. 84).  The amended complaint added a number of plaintiffs and two new defendants, including Wellpath, the contracted medical provider for the DOC (*Id.*, ¶¶ 91-92).

In their amended complaint, plaintiffs seek relief on behalf of themselves and a class consisting of people who are currently incarcerated, or will be in the future, in an ADC detention facility during the duration of the COVID-19 pandemic (*Id.*, ¶ 93).  Plaintiffs also propose two subclasses, to include an (a) high risk subclass, defined as:

> People in the custody of a DOC facility aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions such as chronic lung disease or asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), or an inherited metabolic disorder; people who have had or are at risk of stroke; and people with any condition specifically identified by CDC, currently or in the future, as increasing their risk of contracting, having severe illness, and/or dying from COVID-19;

and (b) disability subclass, defined as:

> People in custody who suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of contracting, becoming severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability, with a broad construction of "disability" pursuant to 28 C.F.R. § 35.101, which favors expansive coverage to the maximum extent permitted by the terms of the Americans With Disabilities Act ("ADA") that does not require extensive analysis.

(*Id.,* ¶ 93).

In the amended complaint, plaintiffs contend that because people incarcerated in DOC facilities are housed in "close quarters, unable to maintain a six-foot distance from others, and share or touch objects used by others, the risk of contracting COVID-19 are greatly, if not

exponentially, increased as is already evident by the spread of COVID-19 in other congregate environments." (Dkt. No. 84, ¶ 131).  Plaintiffs assert that, on March 27 and April 15, 2020, then Secretary of the Arkansas Department of Health ("ADH"), Dr. Nathaniel Smith, acknowledged that there is a high risk of COVID-19 in correctional facilities and that during a press briefing on April 2, 2020, then Secretary of the DOC, Wendy Kelley, commented that "once it gets in, it will be disastrous." (*Id.*, ¶ 124).

Plaintiffs maintain that the risk of COVID-19 spreading throughout DOC facilities is "exceptionally high, in part because of the presence of outsiders and staff" (Dkt. No. 84, ¶ 132). Plaintiffs contend that there are 600 confirmed infections in Cummins Unit ("Cummins") of the DOC and most are asymptomatic (Dkt. No. 84, ¶ 132).  Plaintiffs assert that screening outsiders, including staff and visitors, for symptoms of COVID-19 will not necessarily prevent the introduction of COVID-19 from outside because the virus can spread before people show symptoms (*Id.*).  Plaintiffs also assert that they, and other putative class members, are at increased risk of serious consequences from COVID-19 because of their pre-existing health conditions, their ages, and/or their races (*Id.*, ¶¶ 121-123, 133-138).

Plaintiffs state that on March 23, 2020, the CDC published its guidance for correctional facilities to help the facilities "ensure the protection of the health and safety of incarcerated people." (*Id.*, ¶ 148).  Plaintiffs assert that DOC leadership, including its secretary, were made aware of the CDC guidance on March 23, 2020 (*Id.*, ¶ 148).  Plaintiffs contend that Director Payne has stated that "in order to save lives and halt the spread of the virus we must be obedient to the recommendations of the Centers for Disease Control (CDC) and the Arkansas Department of Health (ADH)." (*Id.*, ¶ 148).  Plaintiffs assert that "according to DOC officials, including some of the named Defendants, ADH and/or Wellpath determine which incarcerated person gets tested for

COVID-19, receives medical treatment for related illnesses, is quarantined, and/or is released from quarantine," and, additionally, "officials have stated that ADH determines whether infected, but asymptomatic DOC staff, should report to work." (*Id.*, ¶ 150).

Plaintiffs state that, as of the filing of the amended complaint, the COVID-19 statistics in Arkansas established that 876 incarcerated people and 54 corrections staff at Cummins had been infected, and six incarcerated people had died from COVID-19-related illness (*Id.*, ¶ 3). Additionally, Plaintiffs assert that the virus had spread to additional DOC facilities including EARU, Grimes, Northwest Arkansas Work Release, Ouachita River Correctional Unit ("ORCU"), Randall L. Williams, and the Wrightsville Units – with 2,581 total confirmed infections of incarcerated people and 241 confirmed infections of corrections staff (*Id.*, ¶ 4).

The Court will not recite here the detailed facts alleged by every plaintiff, but it offers the allegations of a few plaintiffs as an example.  Plaintiff Michael Kouri is 40 years old and is incarcerated in ORCU (Dkt. No. 84, ¶ 18).  Mr. Kouri asserts that, on June 21, 2020, he was tested for COVID-19 and his result was negative.  He maintains that one of five individuals moved into Mr. Kouri's barracks two days prior was positive for COVID-19, and officials moved that inmate out of the barracks six hours later (*Id.*, ¶ 19).  Mr. Kouri states that, on June 27, 2020, he began experiencing shortness of breath, headaches, lost sense of taste and smell, feverishness, and a cough.  Mr. Kouri contends that he had previously experienced shortness of breath, headaches, chills, coughing, and was diagnosed previously with conjunctivitis, which could be a symptom of COVID.  Mr. Kouri states that he requested sick calls on June 25, 26, and 27, and received a response at the end of the day on June 28, 2020, that he would be contacted.  Mr. Kouri maintains that, on the evening of June 28, 2020, after submitting an emergency grievance, he was seen by a nurse (*Id.*, ¶ 20).

Mr. Kouri asserts that he believes that the majority of his barracks was infected with COVID-19; many people in the barracks lost their sense of taste and smell; others exhibited additional symptoms including fevers, coughing, and extreme exhaustion.  Mr. Kouri states that he believes that the virus spread after either correctional staff moved someone who had tested positive into the barrack or after an infected corrections officer came to work sick, stating further that the cells were not sanitized or disinfected before the new people moved into them.  Mr. Kouri contends that, although ORCU took steps to improve conditions in the facility in late April and early May 2020, by the end of May 2020, just after this Court issued an Order denying a preliminary injunction, correctional staff members failed to maintain adequate measures to mitigate the spread of infection.

Plaintiffs state that Mr. Kouri and Mr. Frazier requested specifically accommodation under the ADA (Dkt. No. 84, ¶¶ 23, 29).[1]  Plaintiffs allege that, on April 18, 2020, Mr. Kouri "submitted an emergency grievance requesting reasonable accommodations under the ADA. . . ." (Dkt. No. 84, ¶ 23).  Plaintiffs' initial complaint was filed April 21, 2020, and their amended complaint was filed July 13, 2020 (Dkt. Nos. 1; 84).

Plaintiff Darryl Hussey is a 49-year-old resident of Cummins who claims that he suffers from epilepsy and became infected with COVID-19 in March 2020 of this year (*Id*., ¶ 66).  Mr. Hussey states that he exhibited symptoms, including a temperature that ranged from 101 to 104 degrees, for approximately one month before he was placed in quarantine (*Id*.).  He states that, over that period, he lost 30 pounds.  Mr. Hussey contends that "a doctor" wanted to keep him "in the infirmary after seeing how ill he was; however, the warden overruled the doctor and had him

---

[1] The Court observes that the parties agreed to dismiss Mr. Frazier as a plaintiff (Dkt. No. 106).

moved to a punitive isolation cell." (*Id.*).  While in quarantine, Mr. Hussey states that he was left up to six hours without staff checking on him (*Id.*).

Mr. Hussy states that on April 9, 2020, a nurse became concerned about his condition and sent him to the University of Arkansas for Medical Sciences ("UAMS") Medical Center, where he remained for a week (*Id.*, ¶ 67).  He asserts that, after returning to Cummins, he again was placed in a punitive detention cell for a month, where staff rarely checked on him; at one point, staff found him passed out and took him to medical, where he regained consciousness with a swollen left leg and no feeling in his right arm (*Id.*).  Mr. Hussy contends that following his month in isolation, he was sent to a barrack with COVID-positive individuals, and he was not retested (*Id.*).

Plaintiffs Marvin Kent, an inmate in Varner; Mr. Kouri; Alfred Nickson, an inmate in Cummins; and Victor Williams, an inmate at ORCU, assert that they experienced symptoms of COVID-19, but prison officials did not administer tests to determine if they had the virus, did not administer treatment, and did not place them in isolation (*Id.*, ¶¶ 18, 20, 22, 30, 37, 39, 174).  Plaintiffs assert that defendants' unconstitutionally inadequate manner of handling suspected COVID-19 cases placed them at a heightened risk of contracting COVID-19 (*Id.*, ¶ 175).

Plaintiffs assert that Derick Coley was a 29 year old inmate at Cummins.  Plaintiffs claim that "gross inadequacies" of defendants' COVID-19 containment, mitigation, and medical treatment "likely cost . . . Derick Coley his life." (*Id.*, ¶ 217).  Plaintiffs claim that a Wellpath nurse examined Mr. Coley, noted he was too weak to walk and that his blood-oxygen level was 90, but did not send Mr. Coley to the hospital (*Id.*, ¶ 217).  Plaintiffs state that DOC staff sent Mr. Coley to the "the Hole" where he remained for 17 days, and medical staff never recorded his vitals again (*Id.*).  Plaintiffs contend that, when Mr. Coley's emergency contact called to check on him, a nurse told her that Mr. Coley had tested positive for COVID-19 but that his fever had gone down and

that he was doing fine (*Id.*, ¶ 219).  Plaintiffs claim that other inmates asked unsuccessfully for nurses to check on Mr. Coley as he grew weaker (*Id.*).  Plaintiffs state that, after two and a half weeks in "the Hole," officers attempted to move Mr. Coley to the general population, but he collapsed on the floor (*Id.*, ¶ 221).  Plaintiffs assert that, when a nurse arrived to take him to the infirmary, he was lying on the floor, with pale lips, and was struggling to breathe (*Id.*).  According to plaintiffs, licensed practical nurses attended to Mr. Coley while Wellpath's only doctor advised them by telephone (*Id.*, ¶ 222). The nurses gave Mr. Coley chest compression, but he passed away (*Id.*).

Plaintiffs contend that, as the contract medical provider for DOC facilities, "Wellpath – independently and/or under the direction of any of the other Defendants – failed to provide adequate testing and/or medical services to incarcerated people who are suspected or confirmed to have contracted the COVID-19 virus in a manner that is reasonably necessary to prevent the spread of COVID-19 and to properly treat all infected individuals incarcerated in DOC facilities." (*Id.*, ¶ 154).

Plaintiffs state that Wellpath's provision of medical care during the pandemic has been deliberately indifferent (*Id.*, ¶ 187).  Plaintiffs assert that Arkansas pays Wellpath $371.00 per month per incarcerated person for healthcare services, and Wellpath endeavors to spend as little of that money as possible on medical care for incarcerated people (*Id.*, ¶ 188).  Plaintiffs contend that prison medical facilities are understaff, the staff are underqualified, and incarcerated people suffer from inadequate care (*Id.*).

Plaintiffs point to the Cummins Unit and allege that it is served by one doctor, fewer than four registered nurses or nurse practitioners, and fewer than fourteen licensed practical nurses (*Id.*, ¶ 189).  Plaintiffs claim that the only doctor at the Cummins Unit has a revoked medical license,

but the Arkansas State Medical Board has granted him permission to keep practicing so long as he reports to them (*Id.*, ¶ 190).  Plaintiffs contend that Wellpath's understaffing denies them access to medical care.  Plaintiffs assert that Wellpath employees "shredded paper sick calls and threw them away" in order to avoid fines from DOC for undue delay in seeing patients (*Id.*, ¶ 192).  Plaintiffs state that, according to a former Wellpath nurse, the mentality of the infirmary is "these individuals are worthless." (*Id.*, ¶ 194).   Plaintiffs claim that Wellpath treats black inmates differently from white inmates, that nurses are denied requests for medical supplies, and that Wellpath substitutes "cheaper medications that pose[] a higher risk to the incarcerated patients who [] take them." (*Id.*, ¶ 195).

Plaintiffs assert three causes of action against Wellpath in the amended complaint:  (1) violation of the Eighth Amendment brought pursuant to 42 U.S.C. § 1983; (2) a petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2241 based on violation of the Eighth Amendment on behalf of the proposed high risk subclass; and (3) violation of the ADA, on behalf of the proposed disability subclass (*Id.*, ¶¶ 255-283).

### D.   Discovery

On May 27, 2020, the State Defendants moved to stay discovery pending a final decision on their forthcoming motion to dismiss, and plaintiffs responded by filing an emergency motion for initial scheduling order (Dkt. No.  69, 70).  In an Order dated June 4, 2020, the Court denied the State Defendants' motion to stay discovery and granted the plaintiffs' emergency motion for initial scheduling order (Dkt. No. 74).

On August 31, 2020, the State Defendants responded to plaintiffs' first set of requests for production of documents (Dkt. No. 117-9).  In the State Defendants' objections and responses to plaintiffs' first set of requests for production of documents, the State Defendants indicated that

they had designated thousands of pages of documents as "Confidential," without the Court entering a protective order, and stated that these documents would only be produced "after the Court enters a protective order providing for such confidentiality designations." (Dkt. Nos. 117, at 3; 117-9, at 18-19, 25-27, 59, 64, 66-67; 125, at 10 (citing Dkt. No. 125-1, at 18-19)).

Plaintiffs state that they initially sent a draft of a proposed protective order to the State Defendants on June 10, 2020, and to Wellpath after plaintiffs filed their amended complaint on July 13, 2020 (Dkt. No. 117, at 2-3). The parties exchanged versions of a proposed protective order from August 2020 to December 16, 2020, when plaintiffs moved the Court for a protective order (*Id.*, at 3-5). Plaintiffs admit in their brief supporting their motion for protective order that the State Defendants offered to produce redacted versions of certain withheld documents on a rolling basis, but plaintiffs rejected that offer because they "cannot accept the possibility of State Defendants taking their time to redact discoverable, responsive information, when Plaintiffs are entitled to unredacted copies of such information now." (*Id.*, at 7).

On November 23, 2020, plaintiffs served a Rule 34(a)(2) request for inspection on defendants requesting to inspect "those areas of Varner, Ouachita River, Cummins, Central Arkansas, and East Arkansas Regional correctional facilities" to observe the physical infrastructure of the prisons, the efforts to prevent and mitigate the spread of COVID-19, and the medical treatment of incarcerated people at the DOC facilities (Dkt. No. 128-3, at 1). Plaintiffs asserted that it is necessary to inspect the DOC facilities at which plaintiffs are confined in order to evaluate the medical treatment provided to the putative class, evaluate the impact of the physical infrastructure of the prisons on the putative class's health, assess the effect of the risk of exposure to COVID-19, and evaluate the adequacy of the measures undertaken by DOC to respond to the threat to the plaintiff class (Dkt. No. 128 at 2-3). Plaintiffs asserted that they had retained Dr.

Venters as an expert and offered to take all necessary precautions while touring facilities, including providing and wearing proper personal protective equipment (*Id*.).

The State Defendants objected to plaintiffs' request for expert inspection on several grounds, and, on December 23, 2020, the State Defendants electronically mailed plaintiffs their formal objections noting that they intended to renew their motion to stay and believed the requested inspections were irrelevant (Dkt. No. 128-5, ¶¶ 1-2). The State Defendants objected that inspections are irrelevant because "[n]one of the State Defendants work at the ADC prison units the Plaintiffs wish to inspect, nor would an inspection of those facilities shed any light on whether the State Defendants were deliberately indifferent in their preparation for and response to the COVID-19." (*Id*., ¶¶ 1-2). The State Defendants also objected to plaintiffs' requested inspection of the Central Arkansas Community Correction Center because none of the named plaintiffs were, at the time of plaintiffs requested inspections, housed at Central Arkansas Community Correction Center or any Arkansas Division of Community Correction facility (*Id*., ¶ 3). The State Defendants stated that, under existing circumstances, the inspections would be "a waste of resources for the parties" (*Id*., ¶ 11). The State Defendants also objected to inspections in the light of the ongoing COVID-19 pandemic and the health risks the inspections would pose (*Id*., ¶ 13). The State Defendants asserted that the plaintiffs' request for inspection did not "describe with 'reasonable particularity'" the property to be inspected; that plaintiffs' did not specify a reasonable time, place, and manner for the inspection; and that they object to plaintiffs' request to speak with prisoners and staff during each tour and meet confidentially with prisoner and staff identified by counsel and by the experts following inspections (*Id*., ¶¶ 14-16).

On December 17, 2020, plaintiffs noticed the depositions of Mr. Culclager, Mr. Lay, and Ms. Wilson (Dkt. No. 127-7). On January 12, 2021, counsel for plaintiffs sent counsel for

defendants detailed information for joining the remote deposition of Mr. Culclager (Dkt. No. 127-8, at 2).  Counsel for State Defendants responded that they considered the depositions "to be off until after both (1) the Court rules on the pending motion to stay discovery, and (2) until after the third-party witnesses are properly served with valid subpoenas" (Dkt. No. 127-9, at 2).  On January 14, 2021, plaintiffs filed their motion to compel expert inspection of Dr. Venters and depositions of Mr. Culclager, Mr. Lay, and Ms. Wilson (Dkt. No. 127).

### E.    State Defendants' Motion To Dismiss

In an Order dated March 31, 2021, the Court granted, in part, and denied, in part, the State Defendants' motion to dismiss plaintiffs' amended complaint (Dkt. No. 145).  The Court determined that plaintiffs had alleged sufficient facts in their amended complaint to overcome the State Defendants' assertion of sovereign immunity on plaintiffs' claims for declaratory relief, and the Court denied the State Defendants' motion to dismiss plaintiffs' claims for declaratory relief (Dkt. No. 145, at 18-20).  The Court also concluded that plaintiffs had stated an Eighth Amendment claim for deliberate indifference, and it denied the State Defendants' motion to dismiss plaintiffs' deliberate indifference claim (*Id*., at 24-32).  Based on controlling Eighth Circuit precedent the Court dismissed plaintiffs' 28 U.S.C. § 2241 habeas corpus petition against the State Defendants.  The Court found that plaintiffs and the proposed disability subclass had stated a claim under Title II of the ADA against State Defendants and denied the State Defendants' motion to dismiss plaintiffs' claim under Title II of the ADA (Dkt. No. 145, at 33-36).

### II.    Wellpath's Motion to Dismiss

Wellpath moves to dismiss plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.2 (Dkt. No. 140).  Wellpath asserts that it is entitled to immunity as to plaintiffs' Eighth Amendment claims of deliberate indifference pursuant to

Arkansas Code Annotated § 12-75-101 *et seq.* ("Arkansas Emergency Services Act") and Executive Orders 20-03 and 20-34. Wellpath also claims that it is not a proper party to plaintiffs' Eighth Amendment habeas corpus claim or plaintiffs' claim under Title II of the ADA (*Id.*).

Plaintiffs oppose defendant Wellpath's motion to dismiss on grounds that Wellpath's motion to dismiss is untimely and brought to delay the proceedings; Wellpath's arguments do not establish that it is entitled to relief as a matter of law; Wellpath is a necessary party to plaintiffs' Eighth Amendment habeas corpus claim; and Wellpath is subject to the ADA or, alternatively, is a necessary party to plaintiffs' ADA claim (Dkt. No. 143).

### A.      Timeliness Of Wellpath's Motion To Dismiss

Plaintiffs assert that Wellpath's motion to dismiss was untimely (Dkt. No. 143, at 3-5). Wellpath filed an answer in response to the plaintiffs' amended complaint on August 3, 2020 (Dkt. No. 92). In its answer, Wellpath asserted, "the immunities, privileges, limitations and benefits afforded it by Executive Order 20-34." (*Id.*, ¶ 295). Wellpath did not, however, file a motion to dismiss until February 4, 2021, six months later (Dkt. No. 140). Plaintiffs argue that Wellpath's motion to dismiss is brought for purposes of delay (Dkt. No. 143, at 4-5).

A Rule 12(b)(6) motion cannot be filed after an answer has been submitted. *See* Fed. R. Civ. P. 12(b). The Court may, however, treat an untimely motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) as a Rule 12(c) motion for judgment on the pleadings. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). Such a motion is evaluated in the same manner as a Rule 12(b)(6) motion to dismiss. *McIvor v. Credit Control Serv., Inc.*, 773 F.3d 909, 912-13 (8th Cir. 2014) (citations omitted). Wellpath fails to address the timeliness of its motion. It offers no explanation for why it waited to file the motion, nor does Wellpath even recognize the potential for the motion to be considered under Rule 12(c) in its filings. Wellpath, being aware of its alleged

immunity defense, waited more than six months, until two months before the proposed trial date set by the Court in its initial scheduling order, to file its motion to dismiss.  Despite this, the Court will consider Wellpath's motion to dismiss as a motion for judgment on the pleadings brought under Federal Rule of Civil Procedure 12(c).  *See Wescott*, 901 F.2d at 1488.

### B.   Legal Standard

The Court will evaluate Wellpath's motion for judgment on the pleadings under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *McIvor*, 773 F.3d at 912-13.  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Courts consider "plausibility" by "'draw[ing] on [our own] judicial experience and common sense,'"  *Whitney v. Guys, Inc.,* 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal,* 556 U .S. at 679), and "'review[ing] the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'"  *Id.* (quoting *Zoltek Corp. v. Structural Polymer Group,* 592 F.3d 893, 896 n. 4 (8th Cir. 2010)).  "While a complaint attacked by a [Federal] Rule [of Civil Procedure] 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).  "[T]he complaint must contain facts which state a claim as a matter of law and must not be conclusory."  *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 627 (8th Cir. 1999).

"When ruling on a motion to dismiss, the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Roe v. Nebraska*, 861 F.3d 785, 788 (8th Cir. 2017). A reviewing court "may consider these materials without converting the defendant's request to a motion for summary judgment." *Roe*, 861 F.3d at 788 (citations and quotation marks omitted); *see Lustgraaf v. Behrens*, 619 F.3d 867, 885-86 (8th Cir. 2010) ("[W]hen considering a motion to dismiss . . . , [a court] may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents[.]" (alterations in original) (emphasis omitted)).

### C.     Plaintiffs' Eighth Amendment Deliberate Indifference Claim

Wellpath argues that it is entitled to dismissal of, which this Court construes as a request for judgment as a matter of law on, plaintiffs' Eighth Amendment claim of deliberate indifference to a serious medical need because Wellpath contends that plaintiffs have not stated a claim upon which relief can be granted and because it is entitled to immunity pursuant to the Arkansas Emergency Services Act and Executive Orders 20-03 and 20-34 (Dkt. No. 140, ¶ 3). Plaintiffs counter that they have alleged sufficient facts to support their deliberate indifference claim, and Wellpath is not entitled to immunity.

### 1.     Deliberate Indifference Standard

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). It is "cruel and unusual punishment to hold convicted criminals in unsafe

17

conditions." *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982). State officials have a responsibility under the Eighth Amendment to "provide humane conditions of confinement," "ensure that inmates receive adequate food, clothing, shelter, and medical care," and "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-57 (1984)). The Eighth Amendment standard for conditions of confinement asks whether defendants acted with "deliberate indifference." *Davis v. Oregon Cty.*, 607 F.3d 543, 548 (8th Cir. 2010).

The Eighth Amendment forbids deliberate indifference to conditions that "pose an unreasonable risk of serious damage to . . . future health." *Helling*, 509 U.S. at 35; *see also DeGidio v. Pung*, 920 F.2d 525, 533 (8th Cir. 1990) (continuing failure by prison officials to institute a system to prevent the spread of tuberculosis violated the Eighth Amendment); *Brown v. Moore*, 93 F. Supp. 3d 1032, 1041 (W.D. Ark. 2015) ("Plaintiff need not have contracted the disease for an actionable [Eighth Amendment] claim to be stated."). Deliberate indifference has both an objective and subjective component. *See Davis*, 607 F.3d at 548. The objective component considers "whether a substantial risk to the inmate's safety existed," and the subjective component considers "whether the officer had knowledge of the substantial risk to the inmate's safety but nevertheless disregarded it." *Id.* This "subjective component of deliberate indifference requires proof that [defendants] 'actually knew of and recklessly disregarded' this substantial risk of serious harm." *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (quoting *Pietrafeso v. Lawrence Cty., S.D.*, 452 F.3d 978, 983 (8th Cir. 2006)). "In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.'" *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)).

Under controlling precedent, the deliberate indifference standard may be satisfied when officials respond to an infectious disease "outbreak with a series of negligent and reckless actions." *DeGidio*, 920 F.2d at 533.

### 2. Facts Related To Plaintiffs' Deliberate Indifference Claim Against Wellpath

In their amended complaint, plaintiffs assert that Wellpath contracts with the DOC to provide medical services, including medical services related to COVID-19 testing, infection, and related illness, in DOC facilities (Dkt. No. 84, ¶ 92). Plaintiffs claim that ADH and Wellpath determine which incarcerated individuals get tested for COVID-19, receive medical treatment for related illnesses, is quarantined, and/or released from quarantine (*Id.*, ¶ 150). Plaintiffs claim that Wellpath, either independently or under the direction of other defendants, failed to provide adequate testing and/or medical services to incarcerated people who are suspected or confirmed to have the COVID-19 virus "in a manner that is reasonably necessary to prevent the spread of COVID-19 and to properly treat all infected individuals incarcerated in DOC facilities." (*Id.*, ¶ 154).

Plaintiffs claim that Wellpath has been deliberately indifferent to its provision of medical care during and prior to the pandemic (*Id.*, ¶ 187). Plaintiffs allege that Wellpath spends as little money as possible on medical care for incarcerated people; that Wellpath's facilities are understaffed and its staff is underqualified; that Wellpath's nurses are instructed that inmates must place three sick calls for the same symptoms before they may be seen by a physician or nurse practitioner causing inmates to wait a minimum of ten and a maximum of 20 days to receive an appointment; that Wellpath nurses take temperatures with multiple thermometers and record only the lowest temperatures; and that, because Wellpath understaffs DOC's infirmaries, Wellpath's

employees shred paper sick call forms and throw them away rather than scanning them into their system and then blame the disappearance of the forms on the inmates (*Id.*, ¶¶ 188-192).

Plaintiffs assert that a former Wellpath nurse explained that "[t]he mentality of the infirmary is:  these individuals are worthless." (*Id.*, ¶ 194).  Plaintiffs also contend that "black inmates are being neglected while white inmates with similar needs were provided with treatment." (*Id.*, ¶ 195).  Plaintiffs state that a nurse also reported that the administrator at her prison often "denied her requests for medical supplies or substituted cheaper medications that posed a higher risk to the incarcerated patients who would take them" (*Id.*).  Plaintiffs contend that, when the same nurse reported her concerns to Wellpath management, she was fired three weeks later (*Id.*, ¶ 196).

Plaintiffs claim that Wellpath was deliberately indifferent by failing to monitor, by delaying treatment, and by providing inadequate treatment to Mr. Kouri, Mr. Hussey, and Mr. Coley.  Plaintiffs contend that, rather than send sick individuals to the hospital, they were placed in "the Hole" or in a makeshift hospital set up in the visitation room, where they were left unmonitored and untreated (*Id.*, ¶ 224).  Plaintiffs assert that, as a result of Wellpath's deliberate indifference, COVID-19 spread throughout DOC facilities and sick calls went unanswered (*Id.*, ¶ 225).

### 3.     Analysis Of Plaintiffs' Deliberate Indifference Claim

Wellpath does not raise specific arguments directed at the deliberate indifference standard in their briefing.  As to the objective prong, plaintiffs allege that COVID-19 poses an objectively serious health risk to named plaintiffs and the putative subclasses given the nature of the disease and the congregate living environment of the DOC's facilities (Dkt. No. 84, ¶¶ 7, 10-12, 102-138).  As alleged in the amended complaint, these risks can be exacerbated by a lack of access to proper

testing, evaluation, and treatment. This objectively serious health risk appears heightened for named plaintiffs and members of the putative high risk subclasses given plaintiffs' allegations regarding their susceptibility to contracting COVID-19 and experiencing worsened symptoms (*Id.*, ¶¶ 133-138). Thus, plaintiffs have pleaded sufficient allegations in the amended complaint to satisfy the objective prong of the deliberate indifference test for their Eighth Amendment deliberate indifference claims.

As to the subjective prong, plaintiffs assert that Wellpath denied care and testing to inmates claiming symptoms of COVID-19, denied follow-up evaluation or care for those with symptoms or reported COVID-positive cases, and gave no aid to inmates with claimed symptoms of COVID-19 who were too weak to care for themselves or to seek medical care for themselves. Considering all of the pleadings before it, the Court determines that, at this stage, plaintiffs have stated sufficient facts to satisfy the subjective prong and have stated an Eighth Amendment claim against Wellpath based on deliberate indifference to serious medical needs. *See DeGidio*, 920 F.2d at 533 ("a consistent pattern of reckless or negligent conduct is sufficient to establish deliberate indifference to serious medical needs."); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) ("grossly incompetent or inadequate care can constitute deliberate indifference").

Wellpath claims that it is entitled to immunity from plaintiffs' Eighth Amendment deliberate indifference claim under the Arkansas Emergency Services Act and Governor Hutchinson's Executive Orders 20-03 and 20-34 (Dkt. No. 140, ¶ 4). *See* Ark. Code Ann. § 12-75-101 *et seq.* Wellpath asserts it is an "Emergency Responder" within the meaning of the Arkansas Emergency Services Act and that the actions that form the basis of plaintiff's claims were taken "in the course of providing COVID-19 related emergency management functions during this public health emergency." (*Id.* (quoting Executive Order 20-34)).

Based on the record before the Court, there are several problems with Wellpath's assertion that the Court should dismiss plaintiffs' Eighth Amendment deliberate indifference claim on the grounds that it is entitled to immunity under the Arkansas Emergency Services Act and Executive Orders 20-03 and 20-34.  Based on the record before the Court at this stage of the litigation, it is unclear whether Wellpath, as a contracted medical provider for the DOC, qualifies as an "Emergency Responder" under Arkansas Code Annotated § 12-75-103.  Executive Order 20-34 and Arkansas Code Annotated § 12-75-128 grant immunity to "Emergency Responders" "from liability for death, injury or property damage" sustained in the course of providing COVID-19 emergency management functions during this public health emergency, but, at this stage, the Court does not read either Executive Order 20-34 or Arkansas Code Annotated § 12-75-128 to grant "Emergency Responders" immunity from violations of the United States Constitution or from injunctive relief.  Additionally, plaintiffs allege in the amended complaint that Wellpath contracted with the DOC to provide health related services to incarcerated individuals before either executive order declared that healthcare providers were "Emergency Responders" for the COVID-19 emergency, and plaintiffs allege in their amended complaint that Wellpath was providing constitutionally deficient medical care well before the issuance of Executive Order 20-34 (*see* Dkt. No. 84, ¶¶ 187-96).  At this stage, it is also unclear whether all of Wellpath's activities described in the plaintiffs' amended complaint can constitute "emergency management functions." Moreover, Arkansas Code Annotated § 12-75-128 does not provide for immunity to emergency responders in cases where there is willful misconduct, gross negligence, or bad faith.  Plaintiffs' allegations in the amended complaint dispute Wellpath's assertion that any actions and omissions were the "result of a good faith effort" to comply with its emergency response duties in order for

Wellpath to qualify for immunity under Executive Order 20-34 and Arkansas Code Annotated § 12-75-128 (*See e.g.* Dkt. No. 84, ¶¶ 187-196, 217, 239-240).

The Court also recognizes that Wellpath, although a private entity, is considered a state actor for purposes of plaintiffs' claim and that Wellpath is unable to assert a defense of qualified immunity, at least at this stage of the proceedings given the claims asserted and on the record currently before the Court. *See Davis v. Buchanan County, Missouri*, 11 F.4th 604 (8th Cir. 2021).

At this stage, the Court finds that plaintiffs have alleged sufficient facts in their amended complaint to support an Eighth Amendment deliberate indifference claim against Wellpath, and the Court denies Wellpath's motion to dismiss on grounds that they are entitled to immunity under the Arkansas Emergency Services Act and Executive Orders 20-03 and 20-34.

### D.    Plaintiffs' Eighth Amendment Habeas Corpus Petition

Wellpath also asserts that it is entitled to dismissal of, which this Court construes as a request for judgment as a matter of law on, plaintiffs' Eighth Amendment habeas corpus petition because it does not have custody over plaintiffs (Dkt. No. 141, at 4).  Plaintiffs argue, however, that Wellpath is a necessary party to their habeas petition.  Federal Rule of Civil Procedure 19(a)(1) requires joinder of a party "who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction" and "(A) in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).  Plaintiffs argue that Wellpath is a necessary party to its Eighth Amendment habeas claim because in Wellpath's absence the Court will be unable to determine which plaintiffs have medical conditions that make them vulnerable to severe illness and death if exposed to COVID-19 (Dkt. No. 143, at 9-10).

As explained in this Court's Order granting the State Defendants' motion to dismiss plaintiffs' petition for writ of habeas corpus, under Eighth Circuit precedent which controls this Court, the high risk subclass of plaintiffs are not entitled to assert in a habeas petition what are essentially conditions-of-confinement claims and seek immediate release or transfer to home confinement in a case involving unchallenged state-court convictions and sentences (Dkt. No. 145, at 32-35).  For the reasons stated in this Order and in the Court's prior Order ruling on the State Defendants' motion to dismiss, this Court grants Wellpath's motion for judgment on the pleadings and dismisses plaintiffs' 28 U.S.C. § 2241 petition against Wellpath.

### E.      Plaintiffs' ADA Claim

Wellpath asserts that it is entitled to dismissal of, which this Court construes as a request for judgment on the pleadings on, claims brought under Title II of the ADA on behalf of the named plaintiffs and potential members of the proposed disability subclass because Wellpath is not a "covered entity" that is required to comply with Title II of the ADA (Dkt. No. 140, ¶ 5).

Plaintiffs respond that plaintiffs in other courts have sued Wellpath for its medical services under the ADA (Dkt. No. 143, at l0 (citing *Hardy v. Shaikhi*, Case No. 1:18-CV-01707, 2021 WL 426238, at *5 (M.D. Pa. Feb. 8, 2021); *Gross v. Landry*, Case No. 1:17-CV-00297-JAW, 2017 WL 5509995, at *5 (D. Me. Nov. 17, 2017), *report and recommendation adopted,* Case No. 1:17-CV-00297-JAW, 2017 WL 6454235 (D. Me. Dec. 18, 2017)).  Plaintiffs further assert that medical services are a program or service subject to the ADA and that courts have denied dismissal of private organizations under Title II of the ADA at the motion to dismiss stage of litigation (*Id.*, at 11 (citing *McNally v. Prison Health Services,* 46 F. Supp. 2d 49, 59 (D. Me. 1999) (denying summary judgment to private medical contractor to prison); *McNamara v. Ohio Bldg. Auth.*, 697 F. Supp. 2d 820, 827 (N.D. Ohio 2010); *Hoot v. Milan Area Sch.*, 853 F. Supp. 243, 250-51 (E.D.

Mich. 1994)).  Plaintiffs also argue that the ADA prohibits discrimination in retaliation for making

a claim of discrimination, and plaintiffs allege in their amended complaint that Wellpath retaliated

against at least two individuals for making complaints by withholding medication prescribed to

ameliorate the effects of their disabilities (Dkt. Nos 143, at 13; 84, ¶¶ 239-41).  In addition,

plaintiffs argue that Wellpath is a necessary party to plaintiffs' ADA claim (Dkt. No. 143, at 13-

15).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a *public entity*, or be subjected to discrimination by any such entity."  42

U.S.C. § 12132 (emphasis added).  Title II defines a "public entity" as "(A) any State or local

government; (B) any department, agency, special purpose district, or other instrumentality of a

State or States or local government; and (C) the National Railroad Passenger Corporation, and any

commuter authority [ ]."  42 U.S.C. § 12131(1).  Wellpath contends that it does not fall into any

of these categories since it is a private entity that provides medical services to inmates.

The Eighth Circuit Court of Appeals has not addressed directly in a published opinion

whether a private entity contracting with a State or local government or instrumentality of the

government to provide services qualifies as a "public entity" within the meaning of Title II of the

ADA.  United States Courts of Appeals that have addressed the issue have held, however, that

private contractors do not qualify as public entities within the meaning of Title II of the ADA.

In *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006), for example, the Second

Circuit Court of Appeals held that a private hospital was not an "instrumentality" of a local

government and that "instrumentality" as used in Title II of the ADA meant that the entity "must

somehow belong to the government or have been created by it."  The Second Circuit Court of

Appeals found that a private hospital, performing services under a contract with a municipality, even if it did so according to the municipality's rules and under its direction, was not "a creature of any government entity. Instead it is a parallel private entity." *Id*.

Along the same lines, the Eleventh Circuit held, in *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010), that a private prison management corporation that contracted to provide prison management services to Florida was not a public entity within the meaning of Title II of the ADA. The Eleventh Circuit found that "'instrumentality of a State' refers to governmental units or units created by them." *Id*.; *see also Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015) (unpublished) (agreeing with the Court of Appeals for the Eleventh Circuit that "a private corporation is not a public entity merely because it contracts with a public entity to provide some service."); *Phillips v. Tiona*, 508 F. App'x 737, 748 (10th Cir. 2013) (unpublished) ("Relevant decisions by the overwhelming majority of courts support the conclusion that the ADA does not apply to private prisons").

In *Johnson v. Neiman*, 504 F. App'x 543, 545 (8th Cir. 2013) (unpublished), the Eighth Circuit Court of Appeals, relying on *Edison*, upheld a district court decision granting summary judgment as to a plaintiff's claims under Title II of the ADA against defendants Correctional Medical Services and Mental Health Management because it found that Correctional Medical Services and Mental Health Management are not "public entities" covered by Title II. *Id*.

District courts within the Eighth Circuit have also held that private entities that have contractual relationships with government entities are not public entities within the meaning of Title II of the ADA. *See Maday v. Dooley*, Case No. 4:17-cv-04168-KES, 2018 WL 4047116, at *2 (D.S.D. Aug. 24, 2018) (holding that CBM Food Service, who contracted with a governmental entity to provide governmental services, is not a "public entity" as defined by Title II of the ADA);

*Hahn v. Linn County*, 191 F. Supp. 2d 1051, 1055 n. 2 (N.D. Iowa 2002) (holding that the plain meaning of the language of Title II limits its liability to a public entity and that a contractual relationship between a private corporation and a county government does not transform the private corporation into a "public entity"); *O'Connor v. Metro Ride, Inc.*, 87 F. Supp. 2d 894, 900 (D. Minn. 2000) (observing that "Plaintiffs have cited no case, and this Court is not aware of one, finding that a private, forprofit corporation-even one that contracts with a public entity-could be subject to liability Under Title II").

Plaintiffs cite to *Hardy v. Shaikh*, Case No. 1:18-CV-01707, 2021 WL 426238 (M.D. Penn. Feb. 8, 2021), and *Gross v. Landry*, Case No. 1:17-CV-00297-JAW, 2017 WL 5509995, at *5 (D. Me. Nov. 17, 2017), *report and recommendation adopted,* Case No. 1:17-CV-00297-JAW, 2017 WL 6454235 (D. Me. Dec. 18, 2017), for the proposition that, at least in a few instances, plaintiffs have been allowed to sue Wellpath and Correct Care Solutions, LLC (now known as Wellpath), to obtain relief under Title II of the ADA (Dkt. No. 143, at 10).  In *Hardy*, however, the medical defendants did not oppose plaintiff's addition of Wellpath to the plaintiff's ADA claim.  2021 WL 426238, *4 n. 1.  Further, in *Gross* the District of Maine concluded at the motion to dismiss stage that the plaintiff could conceivably obtain relief under the ADA against defendant Correct Care Solutions, LLC, but later, at the summary judgment stage, the Court dismissed plaintiff's claim against Correct Care Solutions, LLC, noting that "private organizations are not 'public entities' under Title II, even when the private organizations perform traditional government functions pursuant to a contract with state or local governments." *Gross v. Landry*, Case No. 2:17-cv-00297-LEW, 2019 WL 1270922, at *9 (D. Me. Mar. 19, 2019), *report and recommendation adopted,* Case No. 2:17-cv-00297-LEW, 2019 WL 1756522 (D. Me. Apr. 19, 2019) (citing *Green*).

Plaintiffs also cite *McNally v. Prison Health Services*, 46 F. Supp. 2d 49, 58 (D. Me. 1999), in support of their ADA claim against Wellpath.  In *McNally*, the District of Maine allowed a plaintiff to pursue a Title II claim against a private company providing health care at a county jail, stating that the company's care constituted "a program or service" of the jail.  In *McNally* the district court focused its attention solely on the wording "services . . . by a public entity" in the statute and reasoned, without explanatory analysis, that this wording could encompass both public and private entities providing "services" to public entities; however, such an approach in this Court's view seems to ignore the comprehensive statutory analysis of the cases cited above.  *Id.*; *but see Medina v. Valdez,* Case No. 1:08-cv-00456, 2011 WL 887552, *3 (D. Idaho Mar. 10, 2011) (dismissing a former prisoner's Title II ADA claims against a private corporation that managed a state prison under contract with the Idaho Department of Corrections and dismissing *McNally* as an outlier).  In addition, *McNally* relies on *Gorman v. Bartch,* 152 F.3d 907, 912 (8th Cir. 1998), a case where a municipal police department provided for transportation of arrestees, which was deemed a "service," but which involved no private entity.  *McNally*, 46 F. Supp. 2d at 58.

Wellpath also references *Hoot v. Milan Area School*, 853 F. Supp. 243, 250-51 (E.D. Mich. 1994), and *McNamara v. Ohio Building Authority*, 697 F. Supp. 2d 820, 828 (N.D. Ohio 2010). In *Hoot*, the Eastern District of Michigan analyzed whether an athletic association constitutes a "public entity" under the ADA as it would have analyzed who is a "state actor" under § 1983. *Hoot*, 853 F. Supp. at 250-51.  After referencing plaintiff's citation to the Eastern District of Michigan's ruling in *Hoot*, the Northern District of Ohio in *McNamara*, based on the record before it, "deemed" Reuben Management, a private management company that contracted with the Ohio Building Authority to manage a government building in Toledo, Ohio, a "public entity" under Title II of the ADA at the motion to dismiss stage.  *McNamara*, 697 F. Supp. 2d at 828.  The Northern

District of Ohio noted, however, that it left open the opportunity for further briefing and argument on the issue.

Wellpath has not responded to plaintiffs' alternative argument that, even if this Court finds that Wellpath is not subject to Title II of the ADA, Wellpath is a necessary party to plaintiffs' ADA claim (Dkt. No. 143, at 13-15). Plaintiffs cite Federal Rule of Civil Procedure 19 in support of this argument and maintain that, without Wellpath, the Court cannot provide complete relief in the action. Although plaintiffs dispute State Defendants' position on this issue, in support of their joinder argument, plaintiffs claim that already in this action State Defendants have taken the position that the provision of medical services to inmates is not within the control of State Defendants (Dkt. No. 143, at 13 (citing Dkt. No. 36, at 33 (State Defendants assert, "[T]he other measures Plaintiffs seek are not feasible or are not within the control of ADC, such as the provision of medical services to inmates."))).

In a case involving Eighth Amendment claims brought pursuant to 42 U.S.C. § 1983, a district court entered a joinder order adding the contracted for medical provider to the case against the state prison system, explaining as follows:

> [T]he Court permissively added Centurion as a Defendant as a courtesy because any injunctive relief involving medical care stemming from Plaintiff's claim against Shinn [the official capacity defendant Arizona Department of Corrections Director] would necessarily require Centurion, as the State's contracted prison healthcare provider, to provide such relief. . . . Joining Centurion in this way effectively allows it to be aware of and contribute to any defense brought by or on behalf of Shinn concerning Plaintiff's *Monell* liability claim, as to which Centurion is an interested party due to its potential role in providing prospective injunctive relief should Plaintiff prevail on that claim.

*Thompson v. Corizon Health Care Inc.*, Case No. CV 19-02841-PHX-SRB (ESW), 2020 WL 6748532, at *2 (Nov. 6, 2020, D. Ariz.). The district court, in a separate order, explained its reasoning as follows:

> At the time the Court joined Centurion, it noted that doing so was not strictly necessary because Shinn, not Centurion, is the proper Defendant for Plaintiff's *Monell* claim against the State, and Shinn is therefore the one responsible for ordering any injunctive relief arising from this claim. The Court nonetheless joined Centurion for equitable reasons, recognizing that, as the State's current contracted prison healthcare provider, Centurion will be tasked with providing any remedial medical care in the event Plaintiff can show he is entitled to such relief.

*Thompson v. Corizon Health Care, Inc.*, Case No. CV 19-02841-PHX-SRB (ESW), 2020 WL 6748556, at *4 n. 2 (Aug. 31, 2020, D. Ariz.).

For these reasons, on the record before it with the briefing on this issue such as it is, the Court declines to dismiss Wellpath as a party with respect to plaintiffs' claims pursuant to Title II of the ADA.

For the reasons stated above, the Court grants, in part, and denies, in part, Wellpath's motion to dismiss plaintiffs' amended complaint, which the Court construes as a motion for judgment on the pleadings (Dkt. No. 140). The Court denies Wellpath's motion for judgment on the pleadings as to plaintiffs' Eighth Amendment deliberate indifference claim and plaintiffs' claim under Title II of the ADA as to Wellpath. The Court grants Wellpath's motion for judgment on the pleadings and dismisses plaintiffs' petition for writ of habeas corpus under 28 U.S.C. § 2241.

### III.     Defendants' Motions To Stay Discovery

The State Defendants filed a renewed motion to stay discovery pending rulings on their motions to dismiss, and Wellpath moved to join the State Defendants' renewed motion to stay discovery (Dkt. Nos. 120; 124). In their motion, the State Defendants argue that discovery is inappropriate until "threshold immunity issues are finally resolved." (Dkt. No. 120, at 2 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Wellpath joins the State Defendants' motion to

stay discovery arguing that the Court's ruling on the State Defendants' motion to dismiss will affect the claims in the case and any relief which may be available (Dkt. No. 124, ¶ 2).

The Court observes that, generally, the filing of a motion to dismiss, by itself, does not constitute "good cause" to stay discovery pursuant to Rule 26(c)(1). *See Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, 236 F.R.D. 113, 115 (E.D. N.Y. 2006) ("It, of course, is black letter law that the mere filing of a motion to dismiss the complaint does not constitute 'good cause' for the issuance of a discovery stay."); *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, Case No. Civil Case No. 13-1356 ADM/FLN, 2013 WL 4487505, at *2 (D. Minn. Aug. 20, 2013) (quoting same).  Whether to grant a stay generally is up to the court's discretion, and federal courts have considered various factors in determining whether a stay is appropriate in a particular case. *TE Connectivity*, 2013 WL 4487505, at *2.

In a separate Order the Court granted, in part, and denied, in part, the State Defendants' motion to dismiss plaintiffs' amended complaint (Dkt. No. 145).  In this Order, the Court rules on Wellpath's motion to dismiss.  As a result, the Court denies as moot defendants' motions to stay discovery pending a ruling by the Court on the motions to dismiss (Dkt. Nos. 120; 124).  Given the status of this matter, and the passage of time, the Court will issue a scheduling order that proposes a new trial date and issues new pretrial deadlines.

## IV.    Plaintiffs' Motion For Protective Order

Plaintiffs move for a protective order under Federal Rule of Civil Procedure 26 that provides for discovery of confidential records and other sensitive information including institutional records of the defendants and possibly non-parties as well as medical records of plaintiffs and putative class members (Dkt. No. 116, ¶ 2).  Plaintiffs assert that they have already requested, and that the defendants have already produced, in part, information and documents

31

concerning institutional records of the defendants and medical records.  In responding to discovery requests, plaintiffs stated on August 31, 2020, however, that the State Defendants indicated that they had designated thousands of pages of documents as "Confidential" and that the State Defendants stated that they would only produce the documents "after the Court enters a protective order providing for such confidentiality designations." (Dkt. Nos. 117, at 3; 117-9, at 18-19, 25-27, 59, 64, 66-67).  Plaintiffs state that they initially sent a draft of a proposed protective order to the State Defendants on June 10, 2020, and to Wellpath after it filed its amended complaint on July 13, 2020 (Dkt. No. 117, at 2-3).  The parties exchanged versions of a proposed protective order from August 2020 to December 16, 2020, when plaintiffs moved the Court for a protective order (*Id.*, at 3-5).  Plaintiffs state in their brief supporting their motion for protective order that the State Defendants have offered to produce redacted versions of certain withheld documents on a "rolling" basis but plaintiffs rejected that offer because they "cannot accept the possibility of State Defendants taking their time to redact discoverable, responsive information, when Plaintiffs are entitled to unredacted copies of such information now."  (*Id.*, at 7).

Plaintiffs assert that the parties have reached accord on a majority of the proposed protective order but still disagree on the following:  (1) the number of paralegals, legal assistants, and other support staff who can view protected information while assisting counsel (State Defendants seek to limit accessibility to ten people); (2) whether to require plaintiffs to disclose the identity of parties to whom highly confidential information is disclosed at least three business days prior to disclosure; and (3) which party must bear the burden if there is a dispute over a confidentiality designation (the State Defendants assert that as drafted the DOC would be required to "obtain a court order confirming its confidentiality designation") (Dkt. Nos. 117, at 7-9; 120, ¶¶ 16, 17, 21-22; 126, at 2-8)

The State Defendants responded to the plaintiffs' motion for protective order by filing a renewed motion to stay all discovery pending the Court's resolution of their motion to dismiss; which argument the Court denies as moot in this Order given the Court's prior ruling on State Defendants' motion to dismiss.  The State Defendants agree with plaintiffs that the parties have not been able to agree to a resolution of their disputes "regarding the use and disclosure of confidential and highly confidential DOC documents, as well as the appropriate procedures for the parties to use to resolve disputes regarding confidentiality designations, which they have not been able to resolve despite months of negotiations" (Dkt. No. 120, ¶ 16).  The State Defendants assert that plaintiffs request "a protective order allowing inmates access to 'HIGHLY CONFIDENTIAL' 'ATTORNEYS' EYES ONLY' documents containing highly sensitive security and protected health information" (*Id*).  The State Defendants further allege that the plaintiffs ask this Court to require the designating party to obtain a court order confirming its confidentiality designation when challenged by the adverse party, regardless of whether the document is relevant, material, or being used in the proceeding for any purpose (*Id*.).  The State Defendants urge the Court to adopt their proposed protective order because it would not permit disclosure to inmates or third parties of confidential and highly confidential documents and would contain a dispute resolution procedure[2] for confidentiality designations that places the burden of filing a motion with the challenging party (*Id*.).  The State Defendants claim that the documents that they have withheld from production contain "proprietary information belonging to separate defendant Wellpath, LLC, health information protected by federal law, confidential personal and personnel information, and,

---

[2]  The State Defendants claim the dispute-resolution procedure they propose is similar to one "this Court adopted in *McGehee v. Hutchinson*, No. 4:17-cv-179" (Dkt. No. 120, ¶ 16).  The Court in *McGehee*, however, entered the parties' agreed protective order, without being required to resolve these types of disputes.

most critically, highly sensitive security information about inmate housing and guard post assignments and other security issues protected from disclosure by state or federal law." (*Id.*, ¶ 17).  The State Defendants request a hearing in the event the Court decides to hear and decide plaintiffs' motion for protective order on the merits.

The party or person seeking a protective order bears the burden of making a "good cause" showing that the information being sought falls within the scope of Rule 26(c) and that the party will be harmed by its disclosure.  *Iowa Beef Processors, Inc. v. Bagley*, 601 F.2d 949, 954 n. 5 (8th Cir.), *cert. denied sub nom. Iowa Beef Processors, Inc. v. Smith*, 441 U.S. 907 (1979); *see General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973), *cert. denied*, 414 U.S. 1162 (1974).  "'Good cause' exists, according to Rule 26(c), when justice requires the protection of 'a party or a person from any annoyance, embarrassment, oppression, or undue burden or expense.'"  *United States v. Miracle Recreation Equipment Co.*, 118 F.R.D. 100, 104 (S.D. Iowa 1987).  The party requesting a protective order must make a specific demonstration of facts in support of the request, as opposed to conclusory or speculative statements about the need for a protective order, and the harm which will be suffered without one.  *Brittain v. Stroh Brewery Co.*, 136 F.R.D. 408, 412 (M.D.N.C. 1991); *see also Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16 (1981).  This requirement "furthers the goal that the Court only grant as narrow a protective order as is necessary under the facts." *Brittain*, 136 F.R.D. at 412.  Courts have imposed a balancing test in determining whether good cause has been shown.  *See Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985); *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1277–78 (7th Cir. 1982).  Such determination includes a consideration of the relative hardship to the non-moving party should the protective order be granted.  *See United States v. Kordel*, 397 U.S. 1, 4-5 (1970).

The Supreme Court has explained the purpose of Rule 26(c) as follows:

> Rule 26(c) furthers a substantial governmental interest unrelated to the suppression of expression. . . .  Liberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes.  Because of the liberality of pretrial discovery permitted by Rule 26(b)(1), it is necessary for the trial court to have the authority to issue protective orders conferred by Rule 26(c).  It is clear from experience that pretrial discovery by depositions and interrogatories has a significant potential for abuse.  This abuse is not limited to matters of delay and expense; discovery also may seriously implicate privacy interests of litigants and third parties.  The Rules do not distinguish between public and private information.  Nor do they apply only to parties to the litigation, as relevant information in the hands of third parties may be subject to discovery.

> There is an opportunity, therefore, for litigants to obtain—incidentally or purposefully—information that not only is irrelevant but if publicly released could be damaging to reputation and privacy.  The government clearly has a substantial interest in preventing this sort of abuse of its processes.

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34–35 (1984) (citations and footnotes omitted).  The rule "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  *Id.* at 36.

Here, the parties do not dispute that a protective order is appropriate (Dkt. No. 117, at 5).  Defendants assert that the documents they have withheld from discovery "contain proprietary information" (Dkt. No. 120, ¶ 17).  Defendants seek particularly to prevent "any inmates or third parties" from viewing these documents (*Id.*).  Plaintiffs seek to protect their medical information (Dkt. No. 117, at 2, 5).

The parties dispute the parameters of the protective order.  The Court has reviewed the protective order proposed by the defendants and the proposed revisions to the defendants' protective order proposed by plaintiffs, and the Court does not believe that a hearing is necessary given the limited number of provisions of the protective order on which the parties disagree and given that the Court has now ruled on all pending motions to dismiss resolving as moot the stay issue (Dkt. No. 126-1).

Plaintiffs maintain that many of the points raised by defendants have been worked out through negotiation by the parties and are no longer valid reasons to object to entry of the proposed protective order. Based on the Court's review of the record before it, the Court agrees, as there does not appear to be a basis in the language of the proposed protective order for many of the objections asserted by defendants. To the extent these disputes have not been worked out by the parties, at this point and on the record before it, the Court overrules defendants' objections.

Plaintiffs address in their filing, and in the language of the parties' negotiated draft protective order, concerns about incarcerated individuals having confidential or highly confidential information or items (Dkt. No. 126, at 2-3). There appears to be no basis for defendants' objection on this point. If the Court is mistaken in this regard, defendants may explain to the Court in a detailed filing their position with respect to the changes they propose.

With respect to disputes over challenging designations, based upon the Court's review of what it understands to be the most recent version of the parties' negotiated draft protective order, the party challenging the designation must file the challenge with the Court, but the party who designated the information as confidential bears the burden of persuasion in such a proceeding (Dkt. No. 126-1, ¶ 7). The Court fails to understand why this mechanism is objectionable, as it seems to track Eighth Circuit law that requires the designating party to bear the burden of establishing that the designation of confidential is appropriate. Further, the most recent draft requires that, "[u]nless the Designating Party has waived or withdrawn the confidential designation or the Court enters an order allowing further use or disclosure," all parties shall continue to afford the materials the protection commensurate with the designation (*Id.*). There appears to be no basis for defendants' objection on this point. If the Court is mistaken in this regard, defendants may explain to the Court in a detailed filing their position with respect to the changes they propose.

36

The Court sees no basis to limit to ten the number of staff persons who may assist the Receiving Party's Outside Counsel with respect to confidential information or items as designated by the parties' negotiated draft protective order when all individuals permitted access to confidential information or items will have executed Exhibit A to the parties' negotiated draft protective order. Defendants do not offer the Court a meaningful explanation for their request to limit to ten this number (Dkt. No. 126-1, ¶ 8(b)(ii)). The Court overrules defendants' objection on this point.

The Court has reviewed the proposed terms of disclosure of highly confidential information or items as proposed in the parties' negotiated draft protective order (Dkt. No. 126-1, ¶ 8(c)). The Court understands the parties' to be proposing the revised language, deleting the language that is redlined from this paragraph. Defendants' position with respect to this paragraph is unclear to the Court. The paragraph as currently revised is narrower than what the Court understands defendants to be seeking. If that is the case, defendants may explain to the Court in a detailed filing their position with respect to the changes they propose. At this point, on the record before it, the Court opts to enter the Order with the narrower provision as proposed.

For these reasons, and for good cause shown after having reviewed all of the parties' filings on this point, the Court grants plaintiffs' motion for protective order (Dkt. No. 126). The Court understands that the most recent version of the proposed protective order that incorporates the results of the parties' ongoing negotiations, save and except for those points raised by the parties with the Court in their filings, appears at Docket No. 126-1. The Court will enter by separate order that version of the proposed protective order, incorporating the Court's rulings in this Order, within seven days, unless the parties notify the Court in a written filing that a more up-to-date version of the proposed protective order exists resulting from further negotiation.

V.       **Plaintiffs' Motion To Compel Expert Inspection And Depositions**

Plaintiffs' move to compel expert inspection of Dr. Venters and to depose Mr. Culclager, Mr. Lay, and Ms. Wilson (Dkt. No. 127).  In their motion, plaintiffs state that their requests for expert inspection of DOC facilities and to depose Mr. Culclager, Mr. Lay, and Ms. Wilson are within the Court's powers to direct under Federal Rule of Civil Procedure 37(a)(3)(B) (*Id*., ¶ 2). Plaintiffs state that they have attempted to confer in good faith with defendants on both issues but have been unable to reach a resolution (*Id*., ¶ 3).  The Court will discuss separately each issue.

A.       **Expert Inspection Of Dr. Venters**

Plaintiffs state that on November 23, 2020, they served a Rule 34(a)(2) request for inspection on plaintiffs requesting to inspect "those areas of Varner, Ouachita River, Cummins, Central Arkansas, and East Arkansas Regional correctional facilities" to observe the physical infrastructure of the prisons, the efforts to prevent and mitigate the spread of COVID-19, and the medical treatment of incarcerated people at the DOC facilities (Dkt. No. 128-3, at 1).  In their motion to compel, plaintiffs assert that it is necessary to inspect the DOC facilities at which plaintiffs are confined in order to evaluate the medical treatment provided to the putative class, evaluate the impact of the physical infrastructure of the prisons on the putative class's health, assess the effect of the risk of exposure to COVID-19, and evaluate the adequacy of the measures undertaken by DOC to respond to the threat to the plaintiff class (Dkt. No. 128 at 2-3).  Plaintiffs contend that they have retained Dr. Venters as an expert and that he is "highly qualified to analyze and evaluate Defendants' medical treatment of Plaintiffs." (Dkt. No. 128, at 3).  Plaintiffs state that they will take all necessary precautions while touring facilities, including providing and wearing proper personal protective equipment (*Id*.).

Wellpath responds to the motion to compel Dr. Venters' inspection and objects, in part, based on its motion to stay discovery (Dkt. No. 132). Wellpath also contends that Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320-d, and regulations promulgated in connection with HIPAA prohibit health care providers from disclosing any individually identifiable health information "without the patient's written consent" and therefore plaintiffs' counsel and an expert witness should not be permitted to inspect medical treatment and medical treatment areas (*Id*., at 1-2).

The State Defendants respond in opposition to plaintiffs' motion to compel Dr. Venters' inspection arguing that they are entitled to immunity as set forth in their motion to dismiss and that plaintiffs are not entitled to discovery until the Court rejects their immunity defense (Dkt. No. 133, ¶¶ 2-5). The State Defendants also point to their motion to stay as grounds for denial of plaintiffs' motion to compel (*Id*., ¶ 6). The State Defendants also contend that plaintiffs' request for inspection and notices were fatally flawed and that plaintiffs failed to confer about the expert inspections in a good-faith attempt to resolve issues without the Court's intervention (*Id*., ¶¶ 7-8). The State Defendants claim that they will appeal the Court's denial of their motion to dismiss on immunity grounds and divest the Court of jurisdiction (*Id*., ¶ 9). Finally, the State Defendants argue that the situation on the ground "will change between now and the time the immunity issues are finally resolved after appeal" and so "the Court should deny their motion to compel for lack of relevance and/or disproportionality to the needs of the case." (*Id*., ¶ 10).

Plaintiffs replied to defendants' responses to the motion to compel (Dkt. No. 139). Plaintiffs contend that defendants' objections to the motion are invalid because they are based primarily on the State Defendants' flawed motion to dismiss and renewed motion to stay discovery (*Id*.). Plaintiffs also assert that Wellpath's HIPAA concerns can be addressed in a protective order.

The Court agrees that defendants' challenges to the motion to compel based on the State Defendants' motion to dismiss and their renewed motion to stay discovery are unpersuasive because the Court granted, in part, and denied, in part, the State Defendants' motion to dismiss plaintiffs' amended complaint (Dkt. No. 145).  The State Defendants have not filed a notice of appeal.  The Court also denied as moot the defendants' renewed motion to stay discovery.  These arguments do not serve as a basis to oppose this discovery request.

Rule 34(a)(2) of the Federal Rules of Civil Procedure states that a party may serve on any other party a request within the scope of Rule 26(b) to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may, "inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it."  Fed. R. Civ. P. 34.

After reviewing the plaintiffs' motion to compel, defendants' responses, and plaintiffs' reply, the Court grants, in part, and denies, in part, plaintiffs' motion to compel expert inspection of Dr. Venters.  The Court makes the following rulings at this time to provide the parties guidance on these issues.

Due to the Court's recent orders, and the passage of time, the Court orders the parties to confer in good faith regarding dates, times, and ground rules for an expert inspection by Dr. Venters of the DOC facilities the Court will permit him to inspect at this time and to report to the Court in writing within 14 days of the date of this Order if the parties have not reached agreement on these issues.  The Court will conduct a hearing with all parties within 21 days to confer regarding the terms of a written plan for inspection:

1.      The Court denies plaintiffs' motion to compel to permit Dr. Venters to inspect any Arkansas Division of Community Correction facilities because none of the named plaintiffs are

housed currently at an Arkansas Division of Community Correction facility.

2.      The Court grants plaintiffs' motion to compel to permit Dr. Venters and attorneys for plaintiffs to enter and to inspect the DOC's Varner, Ouachita River, Cummins, and East Arkansas Regional Units, including the medical treatment areas at these facilities where the Court understands that named plaintiffs reside currently (Dkt. No. 127-5, ¶ 3).

3.      The Court conditions inspection of the medical treatment areas at the facilities on the parties obtaining patient waivers or satisfactory protections through a protective order in this litigation to address HIPAA concerns.

4.      At this time, and on the record before it, the Court is not inclined to grant plaintiffs' motion to compel to "briefly interview DOC personnel and to conduct brief 'cell front' interviews with incarcerated people in the course of such inspections"; permit Dr. Venters to "interview a reasonable number of class members . . . in private"; and to permit Dr. Venters to conduct additional observations of the treatment and detention of individuals incarcerated, and conduct similar interviews, at "later dates" at "such additional facilities as may be identified by the Plaintiffs." (Dkt. No. 127, at 2, ¶¶ 2-4).  The Court will conduct a hearing on this request, in part, to understand access currently being provided to plaintiffs, their counsel, and their expert witnesses for such interviews; to understand plaintiffs' requests in this regard; and to understand defendants' concerns with respect to this particular request.

5.      The Court grants plaintiffs' motion to compel to be permitted to bring on the inspections paper, pens, and other materials requested by the experts and agreed to by the parties in writing or as further ordered by the Court, if the parties are unable to reach agreement (Dkt. No. 127, at 2, ¶ 5).

For these reasons, the Court grants, in part, and denies, in part, plaintiffs' motion to compel expert inspection of Dr. Venters (Dkt. No. 127).

> **B.**     **Motion to Compel Depositions Of Mr. Culclager, Mr. Lay, and Ms. Wilson**

Plaintiffs move to compel the depositions of Mr. Culclager and Mr. Lay, who are employees of the State Defendants, and Ms. Wilson[3] (Dkt. No. 127).  Wellpath responds in opposition to the plaintiffs' motion to compel depositions and argues that the Court should deny the motion to compel depositions of these "non-party witnesses" because the depositions were not properly noticed and the witnesses were never subpoenaed pursuant to Rule 45 of the Rules of Civil Procedure and so it is "unclear what counsel for Plaintiffs is seeking to compel with respect to the invalid Notices of Deposition." (Dkt. No. 132, at 2).

The State Defendants respond in opposition to the plaintiffs' motion to compel depositions and argue that the Court should deny the motion to compel depositions because "Rule 37 is not an appropriate vehicle to obtain relief from the Court with regard to the third-party depositions the Plaintiffs seek to compel in this case." (Dkt. No. 133, ¶ 11).  The State Defendants argue that the only way plaintiffs can compel third parties to appear for deposition is to serve them with a valid subpoena under Federal Rule of Civil Procedure 45 (*Id*.).

Plaintiffs reply to defendants' responses and point out that the "State Defendants have already conceded that the state agencies are parties to the case, and accordingly, any of their employees are directly involved in the case." (Dkt. No. 139, at 3 (citing Dkt. No. 78, at 2)).  In a letter to the Court from counsel for the State Defendants responding to a letter to the Court from

---

[3]  Although it is unclear from the parties' pleadings, the Court believes, based on other filings with the Court, that Ms. Wilson is or has been an employee of Wellpath.  *See Robinson v. Wilson et al*., Case No. 4:20-cv-392-BSM (filed April 9, 2020).

counsel for plaintiffs, the State Defendants represented that "the DOC and ADC are represented parties in connection with this lawsuit and that the State agencies are the real parties in interest in this official-capacity-only lawsuit seeking to hold them liable for alleged violations of Plaintiffs' constitutional and statutory rights in connection with their response to the COVID-19 pandemic." The State Defendants made this representation in an attempt to prevent counsel for plaintiffs from continuing what the State Defendants deemed were "improper *ex parte* contacts with DOC and ADC employees" (Dkt. Nos. 77; 78, at 2).  Based on the Court's finding of the possibility of vicarious liability under at least Title II of the ADA, the Court concluded that plaintiffs could not proceed with *ex parte* communications with nonsupervisory DOC employees (Dkt. No. 93, at 11).

With respect to the discovery dispute before the Court, Federal Rule of Civil Procedure 37(a)(1) provides that "a party may move for an order compelling disclosure or discovery" and Rule 37(d) provides for sanctions where "a party or a party's officer, director, or managing agent. . . fails, after proper notice, to appear for that person's deposition."  Fed. R. Civ. P. 37.  If an individual is a non-party, is not an officer, director, or managing agent of a party, and does not consent to having his or her deposition pursuant to notice, the deposition cannot be compelled without a subpoena.  *See, e.g., Ulin v. Lovell's Antique Gallery*, Case No. C-09-03160 EDL, 2010 WL 2680761, at *2 (N.D. Cal. July 6, 2010); *Avago Technologies General IP Pte Ltd. v. Elan Microelectronics Corp.,* Case No. C04-05385 JW (HRL), 2007 WL 1140450, *2 (N.D. Cal. April 17, 2007) ("the test is not 'control,' but whether the [employees] are officers, directors, or managing agents of Avago.  Only such high-ranking employees can be compelled to appear pursuant to a mere Rule 30 deposition notice. . . .  Because [they] are not representatives of Avago for purposes of Rule 30, Elan must treat them as ordinary third parties.  To obtain their presence at a deposition, Elan would have to serve Rule 45 subpoenas or other compulsory

process."); *McMahon v. Presidential Airways, Inc.,* Case No. 6:05-cv-01992-Orl-28JGG, 2006 WL 5359797, *1 (M.D. Fla. Jan. 18, 2006) ("Although most corporate litigants voluntarily produce subordinate employees, if the corporate party refuses to produce the person, the person must be subpoenaed."); *In re Honda Am. Motor Co., Inc. Dealership Relations Litig.,* 168 F.R.D. 535, 540 (D. Md. 1996) ("Only a party to the litigation may, of course, be compelled to give testimony pursuant to a notice of deposition. . . .  If an examining party fails to meet its burden [of proving that a deponent is a managing agent], it must resort to Fed. R. Civ. P. 45 for subpoenas on non-party witnesses.").

As a result, based upon the position taken by the State Defendants with respect to these deposition requests, the State Defendants maintain that Mr. Culclager and Mr. Lay, who are or were at times relevant to this litigation wardens, are not officers, directors, or managing agents of the DOC and ADC.  There are no filings before the Court that challenge this assertion or that define for the Court "officers, directors, or managing agents" under Rule 37.

As highlighted by plaintiffs, the position the State Defendants seek to carve out on these issues is unclear to the Court.  The State Defendants have argued previously nonsupervisory DOC employees are essentially represented parties in this lawsuit, and the Court has agreed due to the possibility of vicarious liability under at least Title II of the ADA.  If as the State Defendants seem to be insisting now individuals falling into this category and likely others, with supervisory authority such as wardens, must be subpoenaed for deposition because they are not parties but instead are third-parties to the litigation, then it is unclear to the Court whether State Defendants intend to persist in their insistence that *ex parte* communications between nonsupervisory DOC employees, and potentially others such as Mr. Culclager and Mr. Lay, and counsel for plaintiffs continues to be improper under Arkansas Rule of Professional Conduct 4.2.  The Court directs that

State Defendants state their position on these issues in a written filing to be provided to the Court within 14 days from the entry of this Order. The Court also requests that Wellpath explain its position with respect to Ms. Wilson within 14 days from the entry of this Order.

For these reasons, at this time and on the record before it, the Court denies a motion to compel pursuant to Rule 37 the depositions of witnesses Mr. Culclager, Mr. Lay, and Ms. Wilson (Dkt. No. 127).

### VI.    Conclusion

For the foregoing reasons the Court rules as follows:

1. The Court grants, in part, and denies, in part, Wellpath's motion to dismiss, which the Court construes as a motion for judgment on the pleadings (Dkt. No. 140).

2. The Court denies as moot defendants' combined renewed motion to stay discovery (Dkt. Nos. 120; 124).

3. The Court grants plaintiffs' motion for protective order (Dkt. Nos. 116). The Court understands that the most recent version of the proposed protective order that incorporates the results of the parties' ongoing negotiations, save and except for those points raised by the parties with the Court in their filings, appears at Docket No. 126-1. The Court will enter by separate order that version of the proposed protective order, incorporating the Court's rulings in this Order, within seven days, unless the parties notify the Court in a written filing that a more up-to-date version of the proposed protective order exists resulting from further negotiation.

4. The Court grants, in part, and denies, in part, plaintiffs' motion to compel expert inspection of Dr. Venters of DOC facilities as detailed herein (Dkt. No. 127). Due to the Court's recent orders, and the passage of time, the Court orders the parties to confer in good faith

regarding dates, times, and ground rules for an expert inspection by Dr. Venters of the DOC facilities the Court will permit him to inspect at this time and to report to the Court in writing within 14 days of the date of this Order if the parties have not reached agreement on these issues.  The Court will conduct a hearing with all parties within 21 days to confer regarding the terms of a written plan for inspection

5.  The Court denies plaintiffs' motion to compel the depositions of Mr. Culclager, Mr. Lay, and Ms. Wilson without issuing subpoenas (Dkt. No. 127).  The Court directs that defendants comply with the Court's directive in this Order on claimed represented individuals and *ex parte* communications with those individuals within 14 days from the entry of the Order.

So ordered this 30th day of September, 2021.

_____
Kristine G. Baker
United States District Judge