**THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**NICHOLAS FRAZIER**                                                              **PLAINTIFF**

**v.**                              **Case No. 4:20-cv-00434-KGB**

**SOLOMON GRAVES,** *et al.*                                            **DEFENDANTS**

## ORDER DENYING EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION REGARDING SURGE IN COVID CASES CAUSED BY OMICRON

Before the Court is plaintiffs' emergency motion for a preliminary injunction requiring defendants to take certain steps in light of the current surge in COVID cases caused by Omicron, filed by plaintiffs Darryl Hussey, Price Brown, Wesley Bray, Torris Richardson, Joseph Head, Lee Owens, Jimmy Little, Roderick Wesley, Marvin Kent, Michael Kouri, Jonathan Neeley, Alfred Nickson, Trinidad Serrato, Robert Stiggers, Victor Williams, and John Doe, individually and on behalf of all others similarly situated (collectively, "plaintiffs") (Dkt. No. 185).  Separate defendant Wellpath, LLC ("Wellpath") filed a response (Dkt. No. 187).   Separate defendants Solomon Graves, Secretary of the Arkansas Department of Corrections ("DOC"); Dexter Payne, Division of Correction Director, Arkansas Department of Corrections ("ADC"); Benny Magness, Chairman of Arkansas Board of Corrections ("ABC"); Tyronne Broomfield, Member of ABC; John Felts, Member of ABC; William "Dubs" Byers, Member of ABC; Whitney Gass, Member of ABC; and Lee Watson, Secretary of ABC, all in their official capacities (collectively, "State Defendants") filed a response (Dkt. No. 188).  Plaintiffs filed a reply and a reply declaration with exhibits (Dkt. Nos. 189; 190).  The Court entered a briefing schedule and then conducted a hearing on plaintiffs' emergency motion (Dkt. Nos. 186, 192, 198).  At the conclusion of the hearing, the Court took the pending motion under advisement.

The Court subsequently granted plaintiffs' motion to supplement the record (Dkt. No. 195). For reasons set forth in this Order, the Court grants, in part, and denies, in part, State Defendants' motion to strike the declarations submitted by plaintiffs with their supplement (Dkt. No. 200).

For the following reasons, having considered the entire record before the Court, the Court denies plaintiffs' emergency motion for preliminary injunction (Dkt. No. 185).

## I.     Overview

### A.     Claims

On April 21, 2020, plaintiffs filed a class action complaint and petition for writ of habeas corpus (Dkt. No. 1).  In their initial complaint, plaintiffs alleged that conditions in ADC facilities create a serious risk of COVID-19-related infection, disease, and death (*Id.*, ¶¶ 72-89).  Plaintiffs claimed that the spread of COVID-19 in ADC facilities jeopardized the public health of surrounding communities, especially black communities (*Id.*, ¶¶ 90-97).  Plaintiffs asserted that defendants intentionally failed to adopt and implement adequate policies and procedures to prevent and mitigate the spread of COVID-19 (*Id.*, ¶¶ 98-126).  Plaintiffs asserted three causes of action: (1) violation of the Eighth Amendment brought pursuant to 42 U.S.C. § 1983 on behalf of all plaintiffs; (2) violation of the Eighth Amendment brought by a petition for writ of habeas corpus under 28 U.S.C. § 2241 on behalf of the proposed high risk subclass; and (3) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, on behalf of the proposed disability subclass (*Id.*, ¶¶ 127-48).  Plaintiffs also filed an emergency motion for temporary restraining order and preliminary injunction on April 21, 2020 (Dkt. No. 2) and a supplemental motion for temporary restraining order (Dkt. No. 22), both of which defendants opposed (Dkt. Nos. 36, 42).  The Court denied plaintiffs' motions for temporary restraining order and preliminary injunction in written Orders (Dkt. Nos. 42, 68).

Defendants filed a motion to dismiss for failure to state a claim (Dkt. No. 76).  Plaintiffs filed an amended class action complaint (Dkt. No. 84).  Separate defendant Wellpath answered the amended complaint (Dkt. No. 92).  State Defendants moved to dismiss the amended complaint (Dkt. No. 95).  Then Wellpath moved to dismiss the amended complaint (Dkt. No. 140).  The Court issued written rulings on the motions to dismiss (Dkt. Nos. 145, 149).

In their amended complaint, plaintiffs assert three causes of action:  (1) violation of the Eighth Amendment brought pursuant to 42 U.S.C. § 1983 on behalf of all plaintiffs against all defendants; (2) a petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2241 based on violation of the Eighth Amendment on behalf of the high risk subclass against all defendants; and (3) violation of the ADA, 42 U.S.C. § 12101, *et seq.*, on behalf of the proposed disability subclass against all defendants (*Id.*, ¶¶ 255-283).

In an Order dated March 31, 2021, the Court granted, in part, and denied, in part, State Defendants' motion to dismiss plaintiffs' amended complaint (Dkt. No. 145).  In an Order dated September 30, 2021, the Court granted, in part, and denied, in part, Wellpath's motion to dismiss (Dkt. No. 149).  The Court determined that plaintiffs had alleged sufficient facts in their amended complaint to overcome State Defendants' assertion of sovereign immunity on plaintiffs' claims for declaratory relief, and the Court denied State Defendants' motion to dismiss plaintiffs' claims for declaratory relief (Dkt. No. 145, at 18-20).  The Court also concluded that plaintiffs had stated an Eighth Amendment claim for deliberate indifference, and the Court denied State Defendants' motion to dismiss plaintiffs' deliberate indifference claim (*Id.*, at 24-32).  The Court granted the motion to dismiss based on sovereign immunity filed by Jose Romero, M.D., Secretary of the Arkansas Department of Health, in his official capacity (*Id.*, at 20-24).  The Court found that plaintiffs had alleged sufficient facts in their amended complaint to support an Eighth Amendment

deliberate indifference claim against Wellpath, and the Court denied Wellpath's motion to dismiss on grounds that Wellpath is entitled to immunity under the Arkansas Emergency Services Act and Executive Orders 20-03 and 20-34 (Dkt. No. 149, at 23).  Based on controlling Eighth Circuit precedent, the Court dismissed plaintiffs' 28 U.S.C. § 2241 habeas corpus petition against State Defendants and Wellpath (Dkt. Nos. 145, at 32-35; 149, at 24).  The Court found that plaintiffs and the proposed disability subclass had stated a claim under Title II of the ADA against State Defendants and denied State Defendants' motion to dismiss plaintiffs' claim under Title II of the ADA (Dkt. No. 145, at 33-36).  Further, the Court declined to dismiss Wellpath as a party with respect to plaintiffs' claims pursuant to Title II of the ADA (Dkt. No. 149, at 30).

State Defendants and Wellpath filed motions for summary judgment on the issue of exhaustion (Dkt. No. 164, 173).  Plaintiffs have pending motions for extension of time to respond to the pending motion for summary judgment on the issue of exhaustion (Dkt. Nos. 170, 182).

### B.    Class Allegations

Plaintiffs are individuals incarcerated in facilities operated by the ADC (Dkt. No. 84, ¶¶ 18-85).  Based on the allegations in their amended complaint, many plaintiffs face a heightened risk of death or serious injury if exposed to COVID-19 due to a chronic medical condition, a disability, or both (*Id.*).

Plaintiffs seek relief on behalf of themselves and a class consisting of people who are currently incarcerated, or will be in the future, in an ADC detention facility during the duration of the COVID-19 pandemic (*Id.*, ¶¶ 93-101).  Plaintiffs also propose two subclasses:  (a) high risk subclass, defined as:

> [P]eople in the custody of an ADC facility aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions such as chronic lung disease or asthma; people with heart disease or

other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), or an inherited metabolic disorder; people who have had or are at risk of a stroke; and people with any condition specifically identified by [the Centers for Disease Control and Prevention ("CDC")], currently or in the future, as increasing their risk of contracting, having severe illness, and/or dying from COVID-19.

and (b) disability subclass, defined as:

[P]eople in custody who suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of contracting, becoming severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability, with a broad construction of "disability" pursuant to 28 C.F.R. § 35.101, which favors expansive coverage to the maximum extent permitted by the terms of the Americans With Disabilities Act ("ADA") that does not require extensive analysis.

(Dkt. 84, ¶ 93).

The Court determines that, for reasons unrelated to plaintiffs' class allegations, plaintiffs have not demonstrated that they are entitled to the emergency preliminary injunctive relief they seek in their most recently filed motion. Therefore, the Court denies plaintiffs' request for a preliminary injunction and, at this stage of the proceeding, declines to address matters related to plaintiffs' class allegations.

## II.     Supplementing The Preliminary Injunction Record

After the hearing, plaintiffs filed a motion to supplement the record of the preliminary injunction hearing held on January 11, 2022 (Dkt. No. 193). State Defendants responded in opposition to the motion to supplement (Dkt. No. 194). The Court ruled by separate Order granting the motion to supplement and permitting State Defendants and Wellpath to supplement further the record (Dkt. No. 195).

Plaintiffs filed two declarations, one from plaintiffs' lawyer Victor Genecin and one from paralegal George D. Camerlo, and then filed a corrected version of Mr. Genecin's declaration (Dkt.

Nos. 196, 197, 199). State Defendants filed a motion to strike plaintiffs' filed declarations (Dkt. No. 200), which plaintiffs opposed (Dkt. No. 201). State Defendants then filed a rebuttal declaration of Secretary Graves (Dkt. No. 202).

The Court grants, in part, and denies, in part, State Defendants' motion to strike the declarations submitted by plaintiffs to supplement the preliminary injunction record (Dkt. No. 200). The Court grants the motion to the extent State Defendants seek to strike the declaration of plaintiffs' counsel Mr. Genecin (Dkt. Nos. 196, 199). The Court takes notice of the updated Centers for Disease Control and Prevention ("CDC") Guidance issued on January 14, 2022 (Dkt. No. 199, ¶ 3). *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html. The Court also takes notice of news that the federal government will distribute 400 million high-quality N95 masks for adults free of charge at thousands of pharmacies and other locations (*Id.*, ¶ 9). *See* https://www.washingtonpost.com,/health/2022/01/19/free-n95-masks/. The Court declines to strike Mr. Camerlo's declaration (Dkt. No. 197). State Defendants can claim no surprise or prejudice as a result of Mr. Camerlo's declaration, and his declaration is in keeping with the subject matter of the request to supplement. The Court considers plaintiffs' supplement, as well as Secretary Graves' rebuttal declaration (Dkt. Nos. 197, 202).

### III.    Findings Of Fact[1]

---

[1]    To the extent defendants object to plaintiffs' affidavits and submissions, the Court overrules the objections. The Court recognizes the circumstances under which plaintiffs submit affidavits unsigned, as explained by plaintiffs and given the current COVID-19 situation. Further, district courts have "discretion to consider evidence in connection with a motion for preliminary injunction, including hearsay evidence, that would otherwise be inadmissible at trial." *Univ. of Tex. v. Camensich*, 451 U.S. 390, 395 (1981); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986); *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010); *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2949, (3d ed. 2013).

The Court has considered the entire evidentiary record presented by the parties in reaching its decision, although citing only specific portions in this Order.  The Court makes the following specific findings of fact:

1.      According to Secretary Graves, the DOC is responsible for incarceration to offenders sentenced to one of its two major operational divisions along with providing community supervision to individuals on parole or probation (Dkt. No. 198, at 80).  The ADC operates what would traditionally be considered prisons, with 19 currently in operation (*Id.*).

2.      Before Omicron, based on certain research, four of every seven prisoners in Arkansas had contracted the coronavirus, the second-highest infection rate in the United States (Dkt. No. 189, at 4 (citing Beth Schwartzapfel, Katie Park and Andrew Demillo, *1 in 5 Prisoners in the U.S. Has Had COVID-19*, THE MARSHALL PROJECT (Dec. 18, 2020, 6:00 AM), https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19.)).

3.      Before Omicron, based on certain research, incarcerated people in Arkansas were more than eight times more likely to contract the coronavirus than the general population of the state (Dkt. No. 189, at 4 (citing Beth Schwartzapfel, Katie Park and Andrew Demillo, *1 in 5 Prisoners in the U.S. Has Had COVID-19*, THE MARSHALL PROJECT (Dec. 18, 2020, 6:00 AM), https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19.)).

4.      On January 7, 2022, the DOC reported a total of 240 prison residents and 258 prison staff as testing positive for COVID-19 and not recovered, with positive inmates at:

- Cummins Unit
- East Central Community Correction Center
- Ester Unit
- McPherson Unit
- Mississippi County, Work Release Center
- Maximum Security Unit

7

- North Central Unit
- Northwest Arkansas Community Correction Center
- Hawkins Unit
- Omega Supervision Sanction Center
- Ouachita River Correctional Unit
- Pine Bluff Unit
- Southwest Arkansas Community Correction Center
- Varner Unit

(Dkt. No. 189, at 5 (citing Arkansas Department of Corrections, FACEBOOK (Jan. 7, 2022, 3:00

PM), https:///www.facebook.com/100064889168827/posts/291272116379092/; *see also* Arkansas

Department of Corrections, COVID-19 Updates, https://doc.arkansas.gov/covid-19-updates/ (last

visited Jan. 10, 2022)).

5.       On January 7, 2022, the DOC acknowledged that employees from multiple

locations within the DOC were sick, although the DOC did not report the locations of specific staff

cases of COVID-19 (Dkt. No. 189, at 5).

6.       The State of Arkansas publishes information regarding COVID-19 and its impacts

in Arkansas generally.   www.healthy.arkansas.gov/programs-services/topics/novel-coronavirus

(last visited Jan. 25, 2022).

7.       Homer Venters, M.D., M.S., plaintiffs' retained expert, is a physician, internist, and

epidemiologist with over a decade of experience in the provision of health services for incarcerated

people (Dkt. No. 185-1, ¶ 4).  Since April 2020, he has conducted approximately 35 in-person

inspections of the COVID-19 response in jails, prisons, immigration detention facilities, and

psychiatric hospitals, including as a member of COVID-19 monitoring panels for correctional

systems in Hawaii and Connecticut (*Id.*).  Since 2019, he has worked as a retained corrections

health expert for the U.S. Deparment of Justice and as a court-appointed monitor in both jail and

prison settings (*Id.*).  Since February 2021, he has been a member of the Biden-Harris COVID-19

Health Equity Task Force (*Id.*).

8.      Dr. Venters conducted inspections of four correctional facilities operated by the DOC (Dkt. No. 185-1, ¶ 2).  He inspected the Cummins Unit on December 14, 2021; the East Arkansas Regional Unit on December 15, 2021; the Varner Unit on December 16, 2021; and the Quachita River Correctional Unit on December 17, 2021 (*Id.*).

9.      Although he has not yet submitted his full report (Dkt. No. 185-1, ¶ 3), Dr. Venters submitted two declarations and offered hearing testimony in support of plaintiffs' current motion for preliminary injunction (Dkt. Nos. 185-1; 190).

10.      Dr. Venters avers that the DOC and Wellpath exhibit important strengths in their response to COVID-19 thus far, such as making vaccines available to the incarcerated population; working to track the timing of second shots and boosters; implementing a system to identify the vaccination status of incoming incarcerated persons; and quarantining and testing newly admitted and potentially exposed incarcerated persons (Dkt. No. 185-1, ¶ 12).

11.      Dr. Venters is aware that the ADC tracks very carefully inmates' vaccination status (Dkt. No. 198, at 62).

12.      Secretary Graves testified that about 62% of inmates have received either one Johnson & Johnson vaccine dose or both doses of the Pfizer or Moderna vaccine (Dkt. No. 198,, at 94).

13.      Secretary Graves testified that, as of the date before the January 11, 2022, hearing, one-third of individuals vaccinated received a booster (Dkt. No. 198, at 112).

14.      Dr. Venters also identifies what he characterizes as "several serious deficiencies that leave [the DOC and Wellpath] well below the standards" he has observed in other jails and out of step with what he contends are basic CDC recommendations (Dkt. No. 185-1, ¶ 14).

15.     Generally, according to Dr. Venters these deficiencies relate to detecting new cases of COVID-19 as people enter the facilities, meaning that new cases of COVID-19 go undetected for far longer than they should based on correctional standards of care and current CDC Guidance, and relate to adequate surveillance and care for high-risk persons in quarantine or medical isolation areas, which is a factor leading to preventable deaths from COVID-19 in correctional facilities (Dkt. No. 185-1, ¶¶ 15-16).  In addition, Dr. Venters cites as a deficiency slowing the spread of the virus, which includes infection control, social distancing, mask wearing, and steps to help mitigate the transmission (Dkt. No. 198, at 15).

16.     According to Dr. Venters, in DOC facilities "there is little or no daily check of symptoms among people in quarantine and there does not appear to be any routine testing of asymptomatic inmates housed outside of the new admission or exposure quarantine settings" (Dkt. No. 185-1, ¶ 17).

17.     Dr. Venters reported that there appears to be no effort to check for symptoms of COVID-19 among any of the numerous types of inmate work crews (Dkt. No. 185-1, ¶ 23).

18.     According to Dr. Venters, while the CDC guidance for correctional facilities does not recommend daily verbal screening for symptoms of COVID-19 for inmates, the CDC guidance does recommend daily verbal screening for symptoms of COVID-19 among staff (Dkt. No. 198, at 59-60).  Dr. Venters states that inmate workers should be screened, as well as staff, because the virus does not care if an individual is a paid worker or an inmate worker (*Id.*).

19.     Dr. Venters reported that the only testing that occurred among the numerous types of inmate work crews was weekly testing of kitchen workers in some but not all of the facilities (Dkt. No. 185-1, ¶ 23).

20.     According to Dr. Venters, although the CDC does not recommend that correctional facilities routinely test asymptomatic individuals, the CDC is clear that testing of asymptomatic individuals should be considered when the case numbers are very high and when transmission is sustained (Dkt. No. 198, at 48).

21.     Further, Dr. Venters testified that stopping inmates and staff from working outside of their specific housing area or areas and stopping individuals from going all over the facility is one of the first measures addressed in the other several dozen facilities that Dr. Venters has been to because outbreaks generally are driven either by staff or inmate workers who are going all over the facility (Dkt. No. 198, at 49).

22.     Dr. Venters observed that, although defendants maintain that temperature checks occur, during his inspection he observed only two facilities following the protocol, while people incarcerated in the other two facilities reported that temperature checks rarely, if ever, occurred (Dkt. No. 185-1, ¶ 20).

23.     Dr. Venters also observed what he termed "little appreciation for the need to conduct dedicated and higher-level cleaning and disinfecting when a COVID-19 case is detected" (Dkt. No. 185-1, ¶ 21).  Defendants reported to Dr. Venters during the inspections that "their routine daily cleaning was more than adequate and that the inmates and staff doing this work had adequate protective equipment and training" (Dkt. No. 185-1, ¶ 21).  During his conversations with inmate porters and staff, Dr. Venters was informed "this is simply untrue," with no specialized training or increased Personal Protective Equipment ("PPE") for individuals asked to clean areas where active COVID-19 infection has been detected (*Id.*; *see also* Dkt. No. 198, at 29).

24.     On cross examination, Dr. Venters testified that inmate porters confirmed that most of the time they have available and accessible the cleaning supplies needed (Dkt. No. 198, at 38).

25.     As for high-risk persons, according to Dr. Venters, the CDC has identified a list of medical problems and other factors that signify a person may be at high risk of serious illness or death from COVID-19 infection (Dkt. No. 185-1, ¶ 7).  The CDC has updated and revised the list numerous times (*Id.*).

26.     Dr. Venters states that, although "Wellpath leadership was generally familiar with the CDC criteria," Wellpath did not report many active steps to find and protect these patients (Dkt. No. 185-1, ¶ 18).  Dr. Venters opines that, if there is no difference in how high risk patients and others are monitored in quarantine or medical isolation settings, "[t]his lack of special focus on high-risk patients is extremely dangerous because staff are likely to soon be overwhelmed with COVID-19 related work and suffer even more bleak understaffing:  under circumstances in which not everyone can be effectively monitored, it will be absolutely essential for staff to have the ability to know and follow the patients who are at greatest risk of death." (Dkt. No. 185-1, ¶ 18).

27.     Further, Dr. Venters testified that the CDC guidance has said since the beginning that the symptoms of individuals in quarantine should be checked every day, and Dr. Venters stated that, based on what staff reported, it seems as if inmates in quarantine at ADC have their symptoms checked only on the last day of quarantine (Dkt. No. 198, 21-22).

28.     Dr. Venters acknowledged that, during his inspections, he was aware of Wellpath staff bringing medicines to units but recalls that there was no check of each person's symptoms as outlined by the CDC and reported by the health staff (Dkt. No. 198, at 72).

29.     Dr. Venters expressed specific concern for inmates who are high risk in quarantine at ADC because those individuals with serious health problems can deteriorate very quickly in a setting like that and may not be able to request a sick call or take other affirmative steps required to seek care (Dkt. No. 198, at 22).

30.     Dr. Venters requested that, for high risk inmates in medical isolation, there should be lower thresholds for all action steps (Dkt. No. 198, at 22).  He gave as an example, if a certain elevated pulse rate prompts the nursing staff to call a medical provider or to alert someone, that threshold elevated pulse rate should be lower for high risk inmates in isolation (*Id.*).

31.     Dr. Venters has concerns that Wellpath and the ADC distribute KN95 masks to inmates who are on chronic care service, according to Wellpath, but that not all inmates who meet the CDC criteria of being in the high risk group for COVID-19 are included in Wellpath's chronic care service (Dkt. No. 198, at 20-21).

32.     Recognizing that the CDC guidance for correctional facilities has not been updated to account for the Omicron variant and recognizing the Omicron variant, Dr. Venters states that everybody, every inmate and all staff, should have access to KN95 masks right now (Dkt. No. 198, at 30).

33.     Dr. Venters acknowledges that CDC guidance states that PPE and medical supplies should be prioritized consistent with the healthcare capabilities of each facility (Dkt. No. 198, at 56-57).

34.     According to Secretary Graves, Wellpath has not recommended that KN95 masks be provided to all inmates (Dkt. No. 198, at 83-83).

35.     According to Secretary Graves, the Arkansas Department of Health has never advised ADC that it should consider providing KN95 masks or the equivalent to all inmates (Dkt. No. 202, ¶ 14).

36.     Secretary Graves testified that the ADC does not have enough supply of KN95 masks currently to provide them to all inmates and staff and that, due to supply chain issues, ADC

has not been able to secure an additional supply despite attempts to do so (Dkt. Nos. 198, at 85-85; 202, ¶¶ 2-11).

37.     Plaintiffs challenge the factual assertion that ADC cannot obtain a sufficient supply of KN95 masks to issue a sufficient number of masks to each ADC inmate for eight weeks (Dkt. Nos. 193, 197).

38.     Plaintiffs cite the updated CDC guidance regarding masks that provides:

> Masks and respirators (i.e., specialized filtering masks such as "N95s") can provide different levels of protection depending on the type of mask and how they are used. Loosely woven cloth products provide the least protection, layered finely woven products offer more protections, well-fitting disposable surgical masks and KN95s offer even more protection, and well-fitting NIOSH-approved respirators (including N95s) offer the highest level of protection.

*See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html.

39.     Plaintiffs maintain that "the prison has stopped passing out masks" (Dkt. No. 189-2, ¶ 4); that masks are not laundered and returned properly (Dkt. No. 189-1, ¶ 4); and that certain inmates have no masks at all (Dkt. No. 189-3, ¶ 6).

40.     Plaintiffs maintain that they have not received even cloth masks in months, which masks plaintiffs maintain are insufficient and ineffective against Omicron (Dkt. No. 189-2, ¶¶ 3-4; 189-1, ¶ 4; 189-4, ¶ 5; 189-3, ¶ 6).

41.     Plaintiffs maintain that they have not been tested for COVID in "about a year," even after making "requests to get tested" (Dkt. No. 189-1, ¶ 5).

42.     Dr. Venters opines that defendants should identify inmates who are unvaccinated and also meet the CDC criteria for being high risk so that defendants can engage with those individuals one-on-one to try and answer their questions or promote vaccination (Dkt. No. 198, at 32).

43.     With regard to the use of air purifiers at the ADC, Dr. Venters is not aware of any peer-reviewed data or CDC or Occupational Health and Safety Administration data on whether such devices reduce the transmission of COVID-19 in real-world congregate settings such as many of the settings within the ADC (Dkt. No. 198, at 31).

44.     The CDC guidance informs inmates and other detained persons of the importance of reporting symptoms to staff (Dkt. No. 198, at 59).

45.     Dr. Venters acknowledges that the CDC guidance for correctional facilities is guidance only and that correctional and detention facilities can determine in collaboration with state and local officials whether and how to implement specific COVID-19 management and testing strategies (Dkt. No. 198, at 69).

46.     Dr. Venters observed that each facility he visited had exceedingly high vacancy rates in security staff ranks, "with three of the facilities' vacancy rates being 50% or greater and the fourth's vacancy rate over 65%," and a "troublingly high number of health care staff positions" also unfilled (Dkt. No. 185-1, ¶ 18).

47.     According to plaintiffs, prison staff routinely failed to wear masks that covered their mouth and nose in April 2020 (Dkt. Nos. 3-3, ¶¶ 10, 12; 3-4, ¶ 6; 3-5, ¶¶ 7, 11-13), and routinely fail to wear masks that cover their mouth and nose in late 2021 and early 2022 (Dkt. Nos. 189-2, ¶ 5; 189-3, ¶ 5; 189-4, ¶ 5; 189-5, ¶¶ 4, 15).

48.     Dr. Venters confirmed that, while some mitigation measures touted by defendants were underway, other measures did not seem to be underway based on his observations during his inspections (Dkt. No. 198, at 22-23).

49.     Dr. Venters also questioned the ADC policy language and practice with respect to what occurs when a staff member is identified as newly COVID-19 positive (Dkt. No. 198, at 26-

27).  Some language in the ADC policy suggests that the staff member is to contact administrators or human resources for guidance, which could cause delay and confusion about what the policy requires (*Id.*).

50.     The record indicates that, after meeting with the Arkansas Department of Health, the ADC "decided to fully implement the revised CDC quarantine and isolation guidance and updated its COVID plan on January 4, 2022, to reflect that guidance." (Dkt. Nos. 188-1, ¶ 20; 188-1, at 13-18).

51.     Secretary Graves testified that, currently if staff test COVID-19 positive, they are required to follow the recent CDC guidance related to community and essential workers and isolate for five days and then follow that guidance on return to work, depending on whether the individual is asymptomatic or symptomatic at the end of the initial five-day period (Dkt. No. 198, at 97-98).

52.     State Defendants present record evidence that, under current ADC policy, all visitors to an ADC unit are rapid tested for COVID-19, their temperatures are checked, and visitors are screened for symptoms of COVID-19 such as fever, cough, sore throat, or shortness of breath (Dkt. No. 188-1, ¶¶ 3-4).

53.     According to State Defendants, staff take a rapid COVID test once a week, and visitors are rapid tested before they are allowed entry into the units (*Id.*, ¶ 17).

54.     Secretary Graves testified that it is prohibited under Arkansas state law for him to inquire about the vaccination status of staff (Dkt. No. 198, at 109).

55.     That the vaccination status of staff is unknown motivated the ADC, in part, to implement what Secretary Graves termed a "surveillance testing program" in October 2020 and to continue to implement that program today (Dkt. No. 198, at 110).

56.     Although plaintiffs present record evidence through the testimony of Dr. Venters that not all ADC units he inspected adhered to this policy with half of those units not performing the check at all (Dkt. No. 189-1, ¶ 19), Secretary Graves avers that since the inspections he has taken steps to confirm that all ADC units are screening visitors and staff for COVID symptoms at the front doors before allowing entry into ADC's facilities (Dkt. No. 188-1, ¶ 4; *see also* Dkt. No. 198, at 82-93).

57.     According to State Defendants, all visitors once inside the correctional facility are required to wear masks (Dkt. No. 188-1, ¶ 17).

58.     Secretary Graves avers that the "ADC has implemented a robust system to identify the vaccination status of inmates and to quarantine all inmates as they are initially received into ADC custody, prior to transfer to their receiving facility." (*Id.*, ¶ 5).

59.     Further, Secretary Graves confirms that the "ADC has implemented a quarantine and testing system for COVID-19 that meets current CDC guidelines for newly admitted inmates and those potentially exposed to COVID-19." (*Id.*, ¶¶ 6, 21).

60.     Secretary Graves outlines the steps taken for isolation, quarantine, and testing of new inmates, COVID-19 positive inmates, and exposed but asymptomatic inmates (*Id.*, ¶ 21).

61.     He also confirms that "ADC continues to use contact tracing to test inmates and staff who may have been exposed to COVID-19 by others." (*Id.*, ¶ 26).

62.     Secretary Graves also states that, on December 31, 2021, in the "light of increasing numbers of COVID-positive staff and inmates, [he] implemented a Department-wide restricted movement plan through January 14, 2022.  Until that time, all ADC facilities will operate with only essential movement in order to slow the spread of the virus within the ADC." (*Id.*, ¶ 18).

63.     According to Secretary Graves, "[m]ovement within the prisons is limited by housing area, so that only one housing area at a time is in any particular area, such as the dining hall or gym." (*Id.*, ¶ 21).

64.     Under the current ADC policy, inmates' temperatures are to be checked each time they enter the dining hall, and there are infrared thermometers posted at the entry doors of each dining hall for that purpose (Dkt. No. 188-1, ¶ 22).

65.     Secretary Graves also explains that "[i]nmate kitchen workers are tested weekly for COVID-19, and staggered schedules and work assignments have been implemented so that if one crew ends up in quarantine, there is another crew of available kitchen staff available who have not been exposed to COVID." (*Id.*, ¶ 23).

66.     State Defendants confirm that "ADC continues to encourage various COVID mitigation strategies, such as social distancing, hand washing, covering coughs, and the importance of wearing masks" and that "posters and signage are posted throughout ADC's facilities, including in the barracks, hallways, dining halls, libraries, and infirmaries, to remind inmates and staff of the importance of these measures." (*Id.*, ¶ 25).

67.     Moreover, Secretary Graves explains that "ADC has encouraged all staff and inmates to receive their COVID-19 vaccinations by implementing a special 'Best Shot' marketing campaign with posters and signage posted at every unit." (*Id.*, ¶ 7).  Secretary Graves describes the efforts ADC has made for staff and inmates with respect to vaccination, including offering free vaccines, hosting vaccination clinics, providing paid time off for staff, and providing a $50 financial incentive for inmates and other incentives for staff (*Id.*, ¶ 8; *see also* Dkt. No. 198, at 94-95).

68.     According to State Defendants, initial doses of vaccines are still being offered, and "boosters are now being administered at the appropriate time intervals as recommended" by the Arkansas Department of Health, the CDC, and Wellpath (Dkt. No. 188-1, ¶ 9).

69.     Secretary Graves explains that, at "ADC facilities, inmates are provided with two three-layer cotton cloth face masks.  The masks are washed in the laundry every day and are returned to the inmate in their personal laundry bag." (Dkt. No. 188-1, ¶ 11).

70.     In addition, Secretary Graves avers that consistent with CDC guidelines and recommendations from Wellpath, "ADC provides KN95 face masks to individuals identified by [Wellpath] as being medically high risk and also to inmates who are transported off-site." (*Id.*, ¶ 12).

71.     Secretary Graves states in his rebuttal declaration that, on January 18, 2021, during the ADC weekly COVID call with Wellpath, and based on recent updated CDC guidance, it was decided that inmates in the following job categories will be issued as of January 23 or 24, 2022,[2] well-fitting KN95/N95 masks for work duties:

- Farm crews
- Laundry attendants
- Hall and office porters
- Infirmary workers and inmates caregivers
- Kitchen workers
- Maintenance crews
- Commissary workers
- Arkansas State Police / Governor's Mansion / work release details
- Any other community-facing work detail

(Dkt. No. 202, ¶¶ 12-13).

---

[2]  Secretary Graves' rebuttal declaration states:  "Monday, January 23, 2022." (Dkt. No. 202, ¶ 13).  The Court notes that Sunday is January 23, 2022, and Monday is January 24, 2022.

72.     Secretary Graves confirms that "ADC staff are also provided with a new KN95 face mask every day." (Dkt. No. 188-1, ¶ 12).

73.     "Masks continue to be required inside all ADC units by order of the Board of Corrections," according to Secretary Graves (*Id.*, ¶ 15).

74.     Secretary Graves confirms that "[a]ll staff members continue to be required to wear personal protective equipment during their shifts and are required to monitor their symptoms" and that any staff who test positive "are immediately removed from work and sent home if they begin exhibiting symptoms of COVID-19." (Dkt. No. 188-1, ¶ 24).

75.     In addition, Secretary Graves explains that "ADC has installed new air filtration systems, including ultraviolet light throughout all of its units to improve ventilation and reduce the risk of air contamination" (*Id.*, ¶ 13).

76.     Secretary Graves maintains that "ADC continues to provide inmates with face masks, hand soap, towels, cleaning supplies (including EPA-registered disinfectants), and hand sanitizer free of charge.  If an inmate runs out of these items or needs replacement items, they need only request them from any staff member, either in person  or in writing." (*Id.*, ¶ 10).

77.      "According to ADC policy, personal protective equipment, including masks, gloves, face shields, paper gowns, should be worn by anyone cleaning or disinfecting surfaces after exposure to a sick person or someone who tested positive for COVID-19," based on Secretary Graves' representations (*Id.*, ¶ 16).

78.     In other words, if an inmate chooses not to wear his mask or gloves while cleaning or disinfecting surfaces after exposure to a sick person or someone who tested positive for COVID-19, that inmate is violating ADC training and policy according to Secretary Graves (Dkt. No. 198, at 91-92).

79.     Secretary Graves confirms that "PPE is provided to all cleaning staff, including inmates, free of charge.  Inmates who are assigned to clean/disinfect as their work assignment are trained on the safe use and disposal of chemicals and PPE." (Dkt. No. 188-1, ¶ 16).

80.     Secretary Graves also states that "cleaning staff clean and sanitize all surfaces in the dining hall after each group," as the ADC has taken efforts to stagger times and to limit the number of inmates in the dining hall at any one time (*Id.*, ¶ 25).

81.     In the current record before the Court, Secretary Graves confirms that social distancing measures currently include "staggering inmates on the beds in the barracks so they are not face-to-face while sleeping, suspension of all in-person visitation and congregational worship services, and limitation of movement within the facilities to individuals housing units, including but not limited to meal times." (*Id.*, ¶ 25).   He explains that, at some larger units," only half of the barracks is taken to the dining hall at a time to maximize social distancing." (*Id.*).

82.     In his affidavit, Secretary Graves represents that Wellpath "is now providing monoclonal antibody treatment for COVID-19 patients." (*Id.*, ¶ 14).

83.     Secretary Graves confirms that those inmates identified as being medically high risk by Wellpath receive KN95 masks from ADC, along with inmates who are transported off-site and ADC staff (*Id.*, ¶ 12).

84.     High risk inmates are given a two-week supply of KN95 masks every two weeks by the ADC, at the direction of Wellpath, according to Secretary Graves (Dkt. No. 198, at 112-13).  An ADC officer is told by Wellpath onsite that a specific inmate requires a KN95 mask supply, and that supply is given to the inmate by the ADC officer (*Id.*).

85. Secretary Graves also testified that, under current policy, Wellpath is to monitor regularly, at least twice daily per his testimony, the health status of inmates in quarantine and is supposed to log that in the health record (Dkt. No. 198, at 92-93).

86. Given the current situation, on December 31, 2021, Secretary Graves "issued an email memorandum to all DOC/ADC staff reminding them that, according to our Governor's December 30, 2021, press conference, there is a shortage of testing and antibody treatment in our state, as well as hospital capacity." (Dkt. No. 188-1, ¶ 19). Therefore, Secretary Graves "asked all staff to limit their movements over the next few weeks, to stay home if they become ill, to practice COVID mitigation strategies, and to consider getting vaccinated in order to lessen the impact of the virus." (*Id.*).

87. According to Secretary Graves, all staff "continue to be required to wear personal protective equipment during their shifts and are required to monitor their symptoms." (*Id.*, ¶ 24). He reports that "[a]ny staff that have tested positive are immediately removed from work and sent home if they begin exhibiting symptoms of COVID-19." (*Id.*).

88. Further, Secretary Graves avers that "ADC is currently experiencing severe staffing shortages for correctional officers." (*Id.*, ¶ 27). He represents that "[i]t would create a severe burden on ADC staff, and risk institutional safety and security, for staff to have to interview every inmate about COVID symptoms before allowing inmates to report to work outside of their housing area every day." (*Id.*).

89. Secretary Graves testified that, based on information from Wellpath, only about 20% of all ADC inmates who have had COVID-19 since Spring 2020 have experienced symptoms (Dkt. No. 198, at 88).

90.     According to Secretary Graves, "[u]nder ADC policy, inmates should monitor their own health status and submit sick call requests if they are feeling unwell." (Dkt. No. 188-1, ¶ 27).

91.     Secretary Graves testified that, if an inmate is ill and wishes to see a nurse, if it is a nonemergent request, it could take up to 72 hours to see a nurse, but if the request is related to common symptoms related to COVID-19, those requests are responded to within 24 hours (Dkt. No. 198, at 108-09).

92.     Secretary Graves testified that the ADC meets weekly with Wellpath to discuss comprehensively the ADC response to the COVID-19 pandemic, including discussing current case counts and the experiences of inmates in those current case counts (Dkt. No. 198, at 88-89).

93.     Secretary Graves testified that the ADC refers to Wellpath and the Arkansas Department of Health because they are the clinicians with medical expertise and training (Dkt. No. 198, at 98-99).

94.     Secretary Graves testified that Wellpath and the Arkansas Department of Health have indicated that the ADC's COVID-19 response currently is sufficient, but he acknowledges that it is a moving target and represents that the ADC will strive to hit that target (Dkt. No. 198, at 104)).

95.     Defendants maintain that at all times relevant to this lawsuit ADC had a policy relating to grievances filed by inmates housed in its facilities (Dkt. Nos. 146, ¶ 311; 164).  The version of the policy in effect since December 2, 2019, is AD 19-34.

96.     Plaintiffs aver that staff are unavailable to take grievance forms because of staffing shortages (Dkt. Nos. 189-9, ¶¶ 2-3; 189-7, ¶¶ 5-6; 189-8, ¶¶ 2, 6; 189-10, ¶ 2; 189-6, ¶ 3).

97.     Plaintiffs aver that, even when staff are present, staff will refuse to give grievance forms to plaintiffs (Dkt. Nos. 189-9, ¶ 2; 189-10, ¶ 3; 189-6, ¶ 4); refuse to take or sign plaintiffs'

completed forms (Dkt. Nos. 189-9, ¶¶ 2-3; 189-10, ¶ 2; 189-8, ¶ 2; 189-6, ¶ 3); and tell other staff members not to accept grievance forms (Dkt. No. 189-6, ¶ 3).

98.     If plaintiffs are able to have staff take and sign their grievance forms, plaintiffs aver that prison officials retaliate against them for filing grievances (Dkt. Nos. 189-10, ¶ 4; 189-7, ¶ 4; 189-8, ¶ 4; 189-6, ¶ 5); refuse to investigate the claims (Dkt. No. 189-9, ¶ 2); throw the forms away (Dkt. No. 189-7, ¶ 4); hold onto the forms until plaintiffs cannot advance to the second step in the grievance process (Dkt. No. 189-9, ¶ 2; 189-8, ¶ 2); or never respond at all (Dkt. No. 189-7, ¶¶ 3, 5).

99.     One plaintiff avers that prison officials have informed other inmates that he is a "snitch" as a result of his participation in the grievance process over COVID-19 (Dkt. No. 189-8, ¶ 5).

100.    One plaintiff avers that problems with submitting grievances are at their worst when trying to file a COVID-related grievance (Dkt. No. 189-6, ¶¶ 5-6).

## IV.    Standing

Defendants in their most recent filing again assert that plaintiffs lack standing to seek preliminary injunctive relief (Dkt. No. 188, at 8-9).  The Court rejects defendants' argument on standing and determines that plaintiffs have standing to seek preliminary injunctive relief.

Defendants maintain that they are taking many of the measures plaintiffs seek.  To the extent plaintiffs seek relief based on the measures defendants are taking, defendants claim plaintiffs lack standing to seek such relief through a preliminary injunction.  Further, to the extent plaintiffs request additional measures beyond those defendants currently are taking, such a request would not preserve the status quo, according to defendants, and they claim it is improper injunctive

relief (*Id.*).  Defendants maintain that directing them to take plaintiffs' additional measures would alter the status quo (*Id.*, at 9).

The Court addressed and rejected similar arguments when it examined plaintiffs' first motion for preliminary injunction (Dkt. No. 68, at 39-41).   Plaintiffs dispute that defendants have taken the measures plaintiffs seek in their motion for preliminary injunction and, therefore, argue that they have standing to seek this relief (Dkt. No. 189, at 32-33).   Further, the record before the Court demonstrates that defendants have not taken all measures plaintiffs seek.   Therefore, plaintiffs challenge defendants' characterization of the "status quo."   Adopting the reasoning set forth in its prior Order, the Court determines on the record before it at this stage of the proceeding that plaintiffs have standing to maintain their request for preliminary injunctive relief under these circumstances.

## V.     Legal Standard For Awarding Preliminary Injunctive Relief

In the Eighth Circuit, a preliminary injunction "is an extraordinary remedy, and the burden of establishing the propriety of  an injunction is on the movant."  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (internal citations omitted).  In determining whether to issue a preliminary injunction, a district court should consider:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).  The Court examines the *Dataphase* factors as applied to plaintiffs' request for a preliminary injunction.  *See Dataphase*, 640 F.2d at 109.  "While no single factor is determinative, the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Barrett v. Claycomb*, 705 F.3d

315, 320 (8th Cir. 2013)) (internal quotations and citation omitted).  However, likelihood of success "is insufficient on its own." *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citing *Watkins*, 846 F.3d at 844).  "Even when a plaintiff has a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a threat of irreparable harm."  *Id.*  The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined."  *Watkins*, 346 F.3d at 844.

## VI.   Analysis

In ruling on plaintiffs' motion, the Court must consider:  (1) plaintiffs' likelihood of success on the merits; (2) the threat of irreparable harm; (3) the balance of the equities; and (4) the public interest.  *See Dataphase*, 640 F.2d at 113.  Having conducted this analysis, the Court concludes that the *Dataphase* factors weigh in favor of denying plaintiffs' most recent motion for preliminary injunction.

In the remaining claims of their amended complaint, plaintiffs bring a civil rights action claiming Eighth Amendment violations pursuant to 42 U.S.C. § 1983 for all plaintiffs and an ADA action pursuant to 42 U.S.C. § 12101 for the proposed disability subclass.  The Court examines each remaining claim.

### A.   Likelihood Of Success:  Exhaustion Under The PLRA

Plaintiffs' Eighth Amendment claims brought pursuant to § 1983 and ADA claims must adhere to the Prison Litigation Reform Act ("PLRA").  The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Accordingly, plaintiffs' Eighth

Amendment claims brought pursuant to § 1983 and ADA claims are governed by the PLRA's exhaustion requirement. To determine whether plaintiffs are likely to succeed on these claims, the Court first examines the issue of exhaustion, which is an affirmative defense defendants have the burden of pleading and proving.

### 1.    PLRA Legal Standard

On claims covered by the PLRA, prisoner plaintiffs are required to exhaust administrative remedies before seeking a preliminary injunction, just as they are required to do before seeking other remedies. *See Jones v. Bock*, 549 U.S. 199, 211 (2007); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Notably, exhaustion is not a pleading requirement for plaintiffs. *See Jones*, 549 U.S. at 212 (citing Fed. R. Civ. P. 8(a), (c)). Instead, "[f]ailure to exhaust is an affirmative defense under the PLRA; 'inmates are not required to specially plead or demonstrate exhaustion in their complaints.'" *Minter v. Bartruff*, 939 F.3d 925, 928 (8th Cir. 2019) (quoting *Jones*, 549 U.S. at 216); *see also Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005) ("This Circuit considers the PLRA's exhaustion requirement to be an affirmative defense that the defendant has the burden to plead and to prove."). A complaint may be subject to dismissal for failure to state a claim if the allegations, taken as true, show that relief is barred by an applicable affirmative defense. *See Jones*, 549 U.S. at 215. Although failure to exhaust is an affirmative defense, the Court must consider at the preliminary injunction stage whether defendants are likely to succeed in establishing this defense. *See Gonzales v. O Centro Espirita Benificente Uniao de Vegetal*, 546 U.S. 418, 428-29 (2006); *see also Junior v. Swain*, No. 20-11622-C, 2020 WL 2161317, at *6-7 (11th Cir. May 5, 2020).

The PLRA requires inmates:   (1) fully and properly to exhaust their administrative remedies as to each claim in the complaint; and (2) to complete the exhaustion process prior to

filing an action in federal court. *Johnson v. Jones,* 340 F.3d 624, 627 (8th Cir. 2003). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218.

"Under the PLRA, a prisoner need exhaust only 'available' administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). "[T]he availability of a remedy, according to the Supreme Court, is about more than just whether an administrative procedure is 'on the books.'" *Townsend v. Murphy*, 898 F.3d 780, 783 (8th Cir. 2018) (quoting *Ross*, 136 S. Ct. at 1859). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). A prison administrative procedure or remedy may be "unavailable" for purposes of the PLRA's exhaustion requirement when "despite what regulations or guidance materials may promise[,] it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use"; when the remedy is "essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands"; or when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. However, when the administrative procedure grants "authority to take some action in response to a complaint," that procedure is considered "available," even if it cannot provide "the remedial action an inmate demands." *Booth*, 532 U.S. at 736.

The PLRA also provides that "no court shall enter a prisoner release order unless . . . a court has previously entered an order for less intrusive relief that has failed to remedy the

deprivation of the Federal right," and defendants have "had a reasonable amount of time to comply with the previous court orders."  18 U.S.C. §§ 3626(a)(3)(A)(i)-(ii).

### 2.    PLRA Exhaustion Analysis

Plaintiffs' allegations in their amended complaint, if taken as true, do not show that relief is barred by the affirmative defense of exhaustion (Dkt. No. 84).  *See Jones*, 549 U.S. at 215. Plaintiffs allege that several, but not all, named plaintiffs filed grievances prior to filing suit (Dkt. No. 84, ¶¶ 20, 24, 27, 29, 33, 34, 38, 42, 45, 49, 50, 80, 81, 82, 85); the amended complaint is silent as to whether certain plaintiffs filed grievances at all.

Defendants do assert plaintiffs' claims subject to the PLRA are barred by exhaustion, have filed motions for summary judgment not yet ripe on the issue of exhaustion, and have the burden of establishing this affirmative defense.  At this stage of the litigation and on the record before the Court, there are factual disputes regarding whether and to what extent plaintiffs filed grievances, exhausted grievances, and the ADC's administrative remedies were available to plaintiffs.  On the record before the Court, and for the reasons explained in this Order, defendants have not demonstrated a likelihood of success on this affirmative defense as to all named plaintiffs.  For this reason, the Court will analyze the merits of plaintiffs' Eighth Amendment claims brought pursuant to § 1983 and the ADA.

### a.    ADC Grievance Process

Defendants maintain that at all times relevant to this lawsuit ADC had a policy relating to grievances filed by inmates housed in its facilities (Dkt. Nos. 146, ¶ 311; 164).  The version of the policy in effect since December 2, 2019, is AD 19-34.  AD 19-34 applies to both non-medical and medical grievances, the exhaustion process is similar for both types of grievances, and the procedure includes an informal resolution stage and a formal resolution stage.  AD 19-34 provides

detailed procedures for how inmates must grieve their problems and complaints with ADC and explains the steps inmates must take in order to exhaust their grievance fully.  Of relevance here, AD 19-34 deems release a non-grievable issue.  ADC's inmate grievance policy also accounts for emergencies and is designed to ensure that ADC staff act quickly to resolve emergencies, defining an "emergency" as "a problem that, if not immediately addressed, subjects the inmate to a substantial risk of personal injury or other serious and irreparable harm, such as physical abuse" (Dkt. No. 164-26, at 2).

### b.      Analysis Of Plaintiffs' Grievances

In part, plaintiffs argue that ADC's grievance procedure does not provide emergency relief that will protect plaintiffs' safety and remedy the alleged violation of their rights under the Eighth Amendment and the ADA.  *See Ross*, 136 S.Ct. at 1859 (directing courts to consider "the facts on the ground" when evaluating exhaustion issues).  Plaintiffs assert that, although "Defendants insist that Plaintiffs must wait to file a federal lawsuit in these emergency circumstances until an appeal to the appropriate Chief Deputy/ Deputy/Assistant Director is filed and resolved," even defendants admit that process "can take more than two months." (Dkt. No. 44, at 56).  Plaintiffs argue that this "grievance process for an emergency requiring immediate action is plainly not available if it would take two months to address." (*Id.*).

Plaintiffs also dispute whether the administrative remedies offered by defendants are "unavailable" or "not capable of use" as interpreted by the Supreme Court.  *See Ross*, 136 S. Ct. at 1859-60.  Plaintiffs aver that staff are unavailable to take grievance forms because of staffing shortages (Dkt. Nos. 189-9, ¶¶ 2-3; 189-7, ¶¶ 5-6; 189-8, ¶¶ 2, 6; 189-10, ¶ 2; 189-6, ¶ 3).  Plaintiffs aver that, even when staff are present, staff will refuse to give grievance forms to plaintiffs (Dkt. Nos. 189-9, ¶ 2; 189-10, ¶ 3; 189-6, ¶ 4); refuse to take or sign plaintiffs' completed forms (Dkt.

Nos. 189-9, ¶¶ 2-3; 189-10, ¶ 2; 189-8, ¶ 2; 189-6, ¶ 3); and tell other staff members not to accept grievance forms (Dkt. No. 189-6, ¶ 3).  If plaintiffs are able to have staff take and sign their grievance forms, plaintiffs aver that prison officials will retaliate against them for filing grievances (Dkt. Nos. 189-10, ¶ 4; 189-7, ¶ 4; 189-8, ¶ 4; 189-6, ¶ 5); refuse to investigate the claims (Dkt. No. 189-9, ¶ 2); throw the forms away (Dkt. No. 189-7, ¶ 4); hold onto the forms until plaintiffs cannot advance to the second step in the grievance process (Dkt. Nos. 189-9, ¶ 2; 189-8, ¶ 2); or never respond at all (Dkt. No. 189-7, ¶¶ 3, 5).  One plaintiff avers that prison officials have informed other inmates that he is a "snitch" (Dkt. No. 189-8, ¶ 5).  One plaintiff avers that problems with submitting grievances are at their worst when trying to file a COVID-related grievance (Dkt. No. 189-6, ¶¶ 5-6).

The Court concludes that, at least at this stage of the proceeding, there are disputes regarding whether and to what extent plaintiffs filed grievances, exhausted grievances, and the ADC's administrative remedies were available to plaintiffs.

### B.      Likelihood Of Success:  Responsibility Of Defendants

Arguments advanced by State Defendants' counsel with respect to the responsibility of State Defendants for the medical care given to inmates in their custody give this Court pause when compared to testimony presented by Secretary Graves during the January 11, 2022, hearing.  The arguments of counsel are not evidence.

Counsel for State Defendants spent much of the cross examination of Dr. Venters intimating that the State Defendants have little or no control over or responsibility for issues that impact the medical response to COVID-19.  For example, during the cross examination of Dr. Venters, counsel for State Defendants repeatedly suggested that the State Defendants do not have the ability to identify high risk inmates; have no list of high risk inmates; cannot modify nursing

assessments used by the contracted medical provider Wellpath; and have no input into and can make no decisions regarding what Wellpath decides in conjunction with the Arkansas Department of Health about testing protocols that are employed with regard to testing inmates for COVID-19 (Dkt. No. 198, at 33-69).  In fact, during argument, counsel for State Defendants argued that the ADC cannot provide the medical monitoring, one-on-one education, or other medical relief that plaintiffs' request because the ADC does not provide the medical or nursing services or the vaccination services at ADC; those are functions of Wellpath according to counsel for State Defendants (Dkt. No. 198, at 123).

In contrast, Secretary Graves testified that the ADC meets weekly with Wellpath to discuss comprehensively the ADC response to the COVID-19 pandemic, including discussing current case counts and the experiences of inmates in those current case counts (Dkt. No. 198, at 88-89).  When asked directly, Secretary Graves conceded that, if the DOC wishes that Wellpath take additional action and asks Wellpath to do so, it is expected that Wellpath will follow the DOC direction (Dkt. No. 198, at 110).  Further, Secretary Graves testified that DOC has continued to involve the Arkansas Department of Health as an independent arbiter to monitor the adequacy of the DOC and Wellpath response to COVID-19 (*Id.*).

During his testimony, Secretary Graves acknowledged that he has ultimate responsibility to see that ADC prisons are run safely (Dkt. No. 198, at 105).  Secretary Graves testified that, as he has done for the entirety of his tenure as Secretary of ADC, he would follow the recommendation of Wellpath and the Arkansas Department of Health, as they are the trained practitioners in this area of responding to COVID-19; they are the clinicians with medical expertise and training (Dkt. No. 198, at 98-99, 105).  Secretary Graves testified that Wellpath and the Arkansas Department of Health have indicated that the ADC's COVID-19 response currently is

sufficient, but he acknowledges that it is a moving target and represents that the ADC will strive to hit that target (Dkt. No. 198, at 104).

### C.   Likelihood Of Success:  Eighth Amendment Claims

Plaintiffs allege that defendants' failure to provide adequate protection and, if necessary, medical care in response to the rapid spread of COVID-19, including but not limited to the "new and highly transmissible variant of COVID-19, Omicron," constitutes deliberate indifference to the serious medical needs of incarcerated individuals in violation of the Eighth Amendment (Dkt. Nos. 84, ¶¶ 255-263; 185, at 1).  For the following reasons, although certain aspects of the record evidence before the Court give it pause, the Court determines on the record evidence as a whole that plaintiffs have not demonstrated that they are likely to succeed on the merits of their Eighth Amendment claims at this stage of the proceeding.

### 1.   Deliberate Indifference Standard

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Helling*, 509 U.S. 25, 31 (1993). It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions."  *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982).  State officials have a responsibility under the Eighth Amendment to "provide humane conditions of confinement," "ensure that inmates receive adequate food, clothing, shelter, and medical care," and "'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-57 (1984)).  The Eighth Amendment standard for conditions of confinement asks whether defendants acted with "deliberate indifference."  *Davis v. Oregon Cty.*, 607 F.3d 543, 548 (8th Cir. 2010).

The Eighth Amendment forbids deliberate indifference to conditions that "pose an unreasonable risk of serious damage to . . . future health." *Helling*, 509 U.S. at 35; *see also DeGidio*, 920 F.2d 525, 533 (8th Cir. 1990) (continuing failure by prison officials to institute a system to prevent the spread of tuberculosis violated the Eighth Amendment); *Brown v. Moore*, 93 F. Supp. 3d 1032, 1041 (W.D. Ark. 2015) ("Plaintiff need not have contracted the disease for an actionable [Eighth Amendment] claim to be stated."). Deliberate indifference has both an objective and subjective component. *See Davis*, 607 F.3d at 548. The objective component considers "whether a substantial risk to the inmate's safety existed," and the subjective component considers "whether the officer had knowledge of the substantial risk to the inmate's safety but nevertheless disregarded it." *Id.* This "subjective component of deliberate indifference requires proof that [defendants] 'actually knew of and recklessly disregarded' this substantial risk of serious harm." *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (quoting *Pietrafeso v. Lawrence Cty., S.D.*, 452 F.3d 978, 983 (8th Cir. 2006)). "[T]o demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.'" *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (quoting *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009)) (other citations omitted).

Under controlling precedent, the deliberate indifference standard may be satisfied when officials respond to an infectious disease "outbreak with a series of negligent and reckless actions." *DeGidio*, 920 F.2d at 533. The Court stresses that these objective and subjective components should not be "collapsed" into one another and remain separate but related inquiries. *See Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317, at *4 (11th Cir. May 5, 2020); *see also Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425, at *2-3 (5th Cir. Apr. 27, 2020) (separating the

"objective" prong of the deliberate indifference test from the "subjective" consideration of whether defendants' measures were inadequate).

The district court may consider either the objective or subjective prong first and, if there is a failure of proof on the first prong the court chooses to consider, it need not proceed to the other prong. *Helling*, 509 U.S. at 35. This Court considers the subjective prong first, determines that plaintiffs are unlikely to succeed on the merits of the subjective prong of their Eighth Amendment claims, and declines to consider at this stage plaintiffs' likelihood of succeeding on the objective prong of the Eighth Amendment.

### 2.    Subjective Prong

As to the subjective prong, plaintiffs acknowledge based on an inspection of four facilities by plaintiffs' expert, Dr. Venters, that defendants have exhibited some strengths in responding to COVID-19 that could help them respond to Omicron, such as making vaccines available to the incarcerated population; working to track the timing of second shots and boosters; implementing a system to identify the vaccination status of incoming incarcerated persons; and quarantining and testing newly admitted and potentially exposed incarcerated persons (Dkt. Nos. 185, at 4; 185-1, ¶ 12). However, plaintiffs also assert that Dr. Venters found several serious deficiencies in defendants' COVID-19 response that leave defendants ill-prepared during Omicron's surge to detect new cases as people enter the units, to prevent the spread of cases once inside the units, and to provide adequate surveillance or care for high-risk persons who are exposed to or have COVID-19 (Dkt. Nos. 185, at 4; 185-1, ¶ 17). Plaintiffs claim that "not all units conduct a symptom check of people entering the units; there is no higher-level cleaning and disinfecting of sites when a COVID-19 case is detected; and there is rarely, if ever, a daily symptom check among people in quarantine or medical isolation settings, including among high-risk people" (Dkt. Nos. 185, at 4;

185-1, ¶ 17).  Further, there is no active attempt to identify and protect the high-risk individuals in the prison nor any difference in how high-risk individuals are monitored in quarantine or medical isolation settings (Dkt. Nos. 185, at 4; 185-1, ¶ 18).  All parties acknowledge that the vaccine predominantly administered in Arkansas prisons was the Johnson & Johnson vaccine which, according to plaintiffs, provides little if any protection against the Omicron variant (Dkt. Nos. 185, at 4-5; 185-1, ¶ 12).  Plaintiffs make an urgent request that incarcerated individuals who received the Johnson & Johnson vaccine be give the Moderna or Pfizer booster (Dkt. Nos. 185, at 5; 185-1, ¶ 12).

Plaintiffs seek through this motion for preliminary injunction to have the Court grant the following relief:

1. When two or more cases have been detected among incarcerated persons or staff in a unit in a fourteen-day (14) period, enhanced measures at the front gate of each unit must be adopted, requiring every person entering the unit to take a rapid test before entry; asking every person entering the unit whether he or she has any COVID-19 symptoms; and using accurate temperature instruments to read the temperature of every person before entry.

2. When two or more cases have been detected among incarcerated persons or staff in a unit in a fourteen-day (14) period, KN95 masks must be provided to all staff and incarcerated people, and wearing them must be mandated.

3. Wellpath's electronic medical records must be used to identify all high-risk incarcerated persons, and to create and maintain updated lists of these persons. Staff must hold in-person counseling sessions with any individual on the list who is not vaccinated or has not received a booster.  At this time, in light of preliminary studies showing that the J&J vaccine provides little—if any – protection against Omicron, the DOC and Wellpath should exclusively provide the Pfizer or Moderna vaccine.

4. The nursing staff must conduct a daily vital signs and symptom check of any high-risk individual housed in a quarantine area.

5. The nursing assessment for patients in quarantine must be modified to include whether the person is high risk and by lowering the threshold to take action steps (*e.g.*, contracting a doctor, transferring to hospital) for high-risk patients.

36

6.     To help slow the spread of Omicron inside the units, every person who works outside his housing area should be asked about COVID-19 symptoms before the commencement of a shift; a plan should be created and implemented for enhanced cleaning of any site where a person with known COVID-19 worked or lived; the provision of meals should not result in close contact between different housing areas; and sick call requests should be reviewed at the end of each day to ensure expedited response to any one with potential COVID-19- related symptoms.

(Dkt. Nos. 185, at 6-7; 185-1, ¶¶ 25-28).  Plaintiffs assert that "[i]t is imperative that Defendants urgently take the steps that Dr. Venters details in his declaration to stop avoidable illness and death among the incarcerated population during Omicron's surge." (Dkt. No. 185, at 7).

All parties agree that defendants have taken some action in response to COVID-19.  State Defendants maintain that their "response to the COVID-19 pandemic has been proactive, comprehensive, and meets or exceeds recommendations by the Arkansas Department of Health and the U.S. Centers for Disease Control and Prevention." (Dkt. No. 188, at 1).  Further, State Defendants argue that the preliminary relief plaintiffs currently seek is not the relief they seek in their amended complaint but instead includes a variety of new, additional measures that plaintiffs never requested in their amended complaint and to which plaintiffs are not entitled by law (*Id.*, at 1-2).  Wellpath also argues that, because Dr. Venters and plaintiffs agree that Wellpath and State Defendants "exhibit important strengths in their response to the COVID-19 thus far," plaintiffs cannot meet the high standard to establish a likelihood of success on their Eighth Amendment deliberate indifference claim (Dkt. No. 187, at 3).

Plaintiffs reply that what they seek in this motion are "basic measures" well within defendants' capabilities that "are needed to save the lives of high-risk people." (Dkt. No. 189, at 2 (quoting Dkt. No. 189-2, ¶ 3)).  Plaintiffs also emphasize that Wellpath proffers no facts in support of its response and only makes a "purely legalistic submission." (Dkt. No. 189, at 5).

At this stage of the proceedings, the record evidence suggests that, over time, defendants have adopted policies and practices in response to COVID-19. To the extent plaintiffs' argument is that defendants did not act quickly enough throughout the events leading up to or since the filing of their complaint in this action, a request for preliminary injunctive relief is moot if the injunctive relief sought would no longer have any meaning for the party seeking it. *See Forbes v. Ark. Educ. Television Comm. Network Found.*, 982 F.2d 289, 289 (8th Cir. 1992) (per curiam); *McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1210 (8th Cir. 1992). In other words, the Court will not grant preliminary injunctive relief to direct defendants to put into place policies and practices the record evidence establishes are already in place.

Plaintiffs challenge whether defendants' policies and practices are sufficient and whether defendants have implemented effectively those policies and practices. To the extent plaintiffs fault defendants for failing to implement effectively the policies and practices put into place, plaintiffs have sued defendants in their official capacities as policy makers. In general, state actors may not be sued under § 1983 for an injury inflicted solely by its employees or agents on a *respondeat superior* theory of liability. *See Monell v. New York Dep't of Soc. Servs.,* 436 U.S. 658, 694, (1978). However, a state actor may be liable for inadequate training or supervision of its employees "where (1) the . . . training practices [were] inadequate; (2) the [state actor] was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by [the state actor]'; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury." *Andrews v. Fowler,* 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting *City of Canton v. Harris,* 489 U.S. 378, 389 (1989)); *see also Parrish v. Ball*, 594 F.3d 993, 997-98 (8th Cir. 2010).

Even if certain employees or agents received training that was minimal at best, that finding alone will not satisfy a § 1983 claim for failure to train. *City of Canton,* 489 U.S. at 390-91. Instead, to satisfy the standard, a § 1983 plaintiff must demonstrate that in the light of the duties assigned to specific employees and agents the need "for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.  A § 1983 plaintiff must demonstrate that the state actor "'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'" *Andrews,* 98 F.3d at 1076 (quoting *Thelma D. v. Bd. of Educ.,* 934 F.2d 929, 934 (8th Cir. 1991)).

Having reviewed all of the record evidence before it, at this stage of the litigation, the Court concludes that plaintiffs have not demonstrated a likelihood of success on the subjective prong of their Eighth Amendment claims.  The Court has considered all arguments raised by the parties in reaching its determination and addresses specific issues here.

### a.      Visitors To And Movement Within Facilities

The record indicates that the ADC has taken steps to limit visitors to and movements within facilities and that steps have been taken in regard to incoming inmates.  The record also indicates that, after meeting with the Arkansas Department of Health, the ADC "decided to fully implement the revised CDC quarantine and isolation guidance and updated its COVID plan on January 4, 2022, to reflect that guidance." (Dkt. Nos. 188-1, ¶ 20; 188-1, at 13-18).

In this motion for preliminary injunction, plaintiffs seek to have the Court order the following with respect to visitors to and movement within facilities:

1.      When two or more cases have been detected among incarcerated persons or staff in a unit in a fourteen-day (14) period, enhanced measures at the front gate of each unit must be adopted, requiring every person entering the unit to take a rapid test before entry; asking every person entering the unit whether he or she has any

39

COVID-19 symptoms; and using accurate temperature instruments to read the temperature of every person before entry.

. . .

(Dkt. No. 185, at 5-6).

State Defendants present record evidence that, under current ADC policy, all visitors to an ADC unit are rapid tested for COVID-19, their temperatures are checked, and visitors are screened for symptoms of COVID-19 such as fever, cough, sore throat, or shortness of breath (Dkt. No. 188-1, ¶¶ 3-4).  Staff take a rapid COVID test once a week, and visitors are rapid tested before they are allowed entry into the units (*Id.*, ¶ 17).  Although plaintiffs present record evidence through the testimony of Dr. Venters that not all ADC units he inspected adhered to this policy with half of those units not performing the check at all (Dkt. No. 190, ¶ 19), Secretary Graves avers that since the inspections he has taken steps to confirm that all ADC units are screening visitors and staff for COVID symptoms at the front doors before allowing entry into ADC's facilities (Dkt. No. 188-1, ¶ 4).  All visitors once inside the correctional facility are required to wear masks (*Id.*, ¶ 17).

Plaintiffs maintain that "[w]eekly testing has no value against Omicron" due to the average incubation period of 72 hours (Dkt. Nos. 189, at 7; 190, ¶¶ 25-27).  Likewise, Dr. Venters explains that temperature checks do not capture the milder or asymptomatic spread common with Omicron (Dkt. Nos. 185-1, ¶ 25; 190, ¶ 17).  Plaintiffs maintain that testing and brief symptom checks are what is needed (Dkt. No. 190, ¶ 17).  Moreover, Dr. Venters avers that State Defendants use thermometers that are "extremely inaccurate" and that do not provide valid, accurate readings (Dkt. Nos. 185-1, ¶ 25; 190, ¶ 17).  According to plaintiffs, prison staff routinely failed to wear masks that covered their mouth and nose in April 2020 (Dkt. Nos. 3-3, ¶¶ 10, 12; 3-4, ¶ 6; 3-5, ¶¶ 7, 11-

13), and routinely fail to wear masks that cover their mouth and nose in late 2021 and early 2022 (Dkt. Nos. 189-2, ¶ 5; 189-3, ¶ 5; 189-4, ¶ 5; 189-5, ¶¶ 4, 15).

Secretary Graves avers that the "ADC has implemented a robust system to identify the vaccination status of inmates and to quarantine all inmates as they are initially received into ADC custody, prior to transfer to their receiving facility." (Dkt. No. 188-1, ¶ 5).  Further, he confirms that the "ADC has implemented a quarantine and testing system for COVID-19 that meets current CDC guidelines for newly admitted inmates and those potentially exposed to COVID-19." (*Id.*, ¶¶ 6, 21).  He outlines the steps taken for isolation, quarantine, and testing of new inmates, COVID-19 positive inmates, and exposed but asymptomatic inmates (*Id.*, ¶ 21).  He also confirms that "ADC continues to use contact tracing to test inmates and staff who may have been exposed to COVID-19 by others." (*Id.*, ¶ 26).

Plaintiffs in their moving papers agree that defendants have exhibited some strengths in responding to COVID-19 that could help them respond to Omicron, such as making vaccines available to the incarcerated population; working to track the timing of second shots and boosters; implementing a system to identify the vaccination status of incoming incarcerated persons; and quarantining and testing newly admitted and potentially exposed incarcerated persons (Dkt. No. 185, at 4).

Secretary Graves also states that, on December 31, 2021, in the "light of increasing numbers of COVID-positive staff and inmates, [he] implemented a Department-wide restricted movement plan through January 14, 2022.  Until that time, all ADC facilities will operate with only essential movement in order to slow the spread of the virus within the ADC." (Dkt. No. 188-1, ¶ 18).  "Movement within the prisons is limited by housing area, so that only one housing area at a time is in any particular area, such as the dining hall or gym." (*Id.*, ¶ 21).

41

Under the current ADC policy, inmates' temperatures are to be checked each time they enter the dining hall, and there are infrared thermometers posted at the entry doors of each dining hall for that purpose (*Id.*, ¶ 22). Secretary Graves also explains that "[i]nmate kitchen workers are tested weekly for COVID-19, and staggered schedules and work assignments have been implemented so that if one crew ends up in quarantine, there is another crew of available kitchen staff available who have not been exposed to COVID." (*Id.*, ¶ 23).

Plaintiffs dispute whether practices regarding incoming inmates or residents, and the transfers or movements of inmates or residents, changed or changed sufficiently in response to COVID-19. Plaintiffs also dispute the sufficiency and implementation of the screening policies for visitors, staff, and inmates, including inmates assigned to perform certain duties within the prison. Based on the record evidence at this stage, the Court determines that plaintiffs have not demonstrated a likelihood of success on their Eighth Amendment claims based on this allegation.

### b.    Information And Education

By mid-March 2020, the ADC had taken steps to inform inmates, staff, and visitors about COVID-19 and the topics discussed in the Arkansas Department of Health guidance. Shortly thereafter, the ADC posted signage throughout its facilities, in both English and Spanish, informing inmates and staff to wash their hands often with soap and water for at least 20 seconds; wear facemasks as much as possible; avoid touching their eyes, nose, or mouth without cleaning their hands first; clean their personal belongings; and keep as much distance between each other as possible. Defendants have also utilized the Morning Show to provide COVID-19-related information to ADC inmates. ADC inmates also are permitted to watch Governor Hutchinson's briefings on COVID-19.

In their current papers, State Defendants confirm that "ADC continues to encourage various COVID mitigation strategies, such as social distancing, hand washing, covering coughs, and the importance of wearing masks" and that "posters and signage are posted throughout ADC's facilities, including in the barracks, hallways, dining halls, libraries, and infirmaries, to remind inmates and staff of the importance of these measures." (Dkt. No. 188-1, ¶ 25).

Moreover, Secretary Graves explains that "ADC has encouraged all staff and inmates to receive their COVID-19 vaccinations by implementing a special 'Best Shot' marketing campaign with posters and signage posted at every unit." (*Id.*, ¶ 7). Secretary Graves describes the efforts ADC has made for staff and inmates with respect to vaccination, including offering free vaccines, hosting vaccination clinics, providing paid time off for staff, and providing a $50 financial incentive for inmates and other incentives for staff (*Id.*, ¶ 8). Initial doses of vaccines are still being offered, and "boosters are now being administered at the appropriate time intervals as recommended" by the Arkansas Department of Health, the Centers for Disease Control and Prevention, and Wellpath, according to Secretary Graves (*Id.*, ¶ 9).

Among the relief they seek, plaintiffs specifically request:

. . .

3.      Wellpath's electronic medical records must be used to identify all high-risk incarcerated persons, and to create and maintain updated lists of these persons. Staff must hold in-person counseling sessions with any individual on the list who is not vaccinated or has not received a booster. At this time, in light of preliminary studies showing that the J&J vaccine provides little—if any – protection against Omicron, the DOC and Wellpath should exclusively provide the Pfizer or Moderna vaccine.

. . .

(Dkt. No. 185, at 6).

On the current record before the Court, the Court is not inclined to order defendants to take such action.  There is evidence in the record that Wellpath has identified high risk inmates, based on criteria identified by Wellpath and the medical histories of inmates, for distribution by ADC of KN95 masks to these inmates.  There is evidence in the record of DOC and ADC efforts to vaccinate inmates and staff and of the percentage of inmates who have received the vaccine and booster to date.  Further, the CDC guidance informs inmates and other detained persons of the importance of reporting symptoms to staff (Dkt. No. 198, at 59).  According to Secretary Graves, "[u]nder ADC policy, inmates should monitor their own health status and submit sick call requests if they are feeling unwell." (Dkt. No. 188-1, ¶ 27).  Secretary Graves testified that, if an inmate is ill and wishes to see a nurse, if it is a nonemergent request, it could take up to 72 hours to see a nurse, but if the request is related to common symptoms related to COVID-19, those requests are responded to within 24 hours (Dkt. No. 198, at 108-09).

Even if the evidence in the record casts doubt on whether these policies are followed all of the time in every facility, there remains evidence that these expectations and policies are in place. While plaintiffs may disclaim the effectiveness and question the implementation and enforcement of these measures, plaintiffs do not deny that these measures have been taken, and the Court determines plaintiffs have not demonstrated a likelihood of success on their Eighth Amendment claims based on this allegation.

### c.    Personal Protective Equipment

At the initial preliminary injunction hearing, Director Payne testified that defendants began distributing cloth masks to ADC inmates in March 2020—prior to the first positive COVID-19 test at Cummins—and that well over 40,000 cloth masks have been distributed, leaving each ADC

inmate housed in general population with two cloth masks.  The ADC intended at that time to create a total of 80,000 cloth masks.

Now, plaintiffs seek the following relief specific to masks:

. . .

2.       When two or more cases have been detected among incarcerated persons or staff in a unit in a fourteen-day (14) period, KN95 masks must be provided to all staff and incarcerated people, and wearing them must be mandated.

. . .

(Dkt. No. 185, at 6).

Secretary Graves explains that, currently at "ADC facilities, inmates are provided with two three-layer cotton cloth face masks.  The masks are washed in the laundry every day and are returned to the inmate in their personal laundry bag." (Dkt. No. 188-1, ¶ 11).  In addition, Secretary Graves avers that, consistent with CDC guidelines and recommendations from Wellpath, "ADC provides KN95 face masks to individuals identified by [Wellpath] as being medically high risk and also to inmates who are transported off-site." (*Id.*, ¶ 12).  Secretary Graves confirms that "ADC staff are also provided with a new KN95 face mask every day." (*Id.*, ¶ 12).

In his rebuttal declaration, Secretary Graves states that, on January 18, 2021, during the ADC weekly COVID call with Wellpath, and based on recent updated CDC guidance, it was decided that inmates in the following job categories will be issued as of January 23 or 24, 2022, well-fitting KN95/N95 masks for work duties:

- Farm crews
- Laundry attendants
- Hall and office porters
- Infirmary workers and inmate caregivers
- Kitchen workers
- Maintenance crews
- Commissary workers
- Arkansas State Police / Governor's Mansion / work release details
- Any other community-facing work detail

(Dkt. No. 202, ¶¶ 12-13).

"Masks continue to be required inside all ADC units by order of the Board of Corrections," according to Secretary Graves (Dkt. No. 188-1, ¶ 15).  Secretary Graves confirms that "[a]ll staff members continue to be required to wear personal protective equipment during their shifts and are required to monitor their symptoms" and that any staff who test positive "are immediately removed from work and sent home if they being exhibiting symptoms of COVID-19." (*Id.*, ¶ 24).

In addition, Secretary Graves explains that "ADC has installed new air filtration systems, including ultraviolet light throughout all of its units to improve ventilation and reduce the risk of air contamination" (*Id.*, ¶ 13).  The Court acknowledges that Dr. Venters questioned the efficacy and demonstrated there is in the record no peer-reviewed data or CDC or Occupational Health and Safety Administration data on whether such devices reduce the transmission of COVID-19 in real-world congregate settings such as many of the settings within the ADC (Dkt. No. 198, at 31).

It is unclear at this stage of the litigation whether defendants provide masks to inmates in restricted housing.  Previously, defendants did not; defendants explained this action early in the pandemic by claiming that these inmates do not come into contact with other inmates, have limited exposure to staff, and therefore are not issued masks as a result.  Plaintiffs disputed how frequently inmates in restricted housing interact with others.

There is record evidence that ADC staff are directed to wear masks and gloves when interacting with inmates, including those in restricted housing, and ADC staff and inmates have been told best practices for wearing masks.  Defendants do not dispute that compliance with ADC staff wearing masks has been an issue.  Previously, the Court explained that record evidence indicated that, on April 9, 2020, a doctor reported at the COVID-19 Pandemic Physicians' Group meeting that UAMS had a problem with prisoners being brought for evaluation with guards who

were refusing to wear their masks.  It also gives the Court pause that, on April 21, 2020, Director Payne sent an email to ADC Wardens, ADC Deputy Wardens, and others directing that officers transporting inmates to outside hospitals wear their masks at all times and specifically stated, "Hospitals are not wanting to treat our inmates because our staff are not following the guidelines that we are sending out." (Dkt. No. 57-8).

Plaintiffs present new record evidence of reports of staff failing to wear masks when interacting with inmates; that such evidence persists in the current record is cause for concern. According to plaintiffs, prison staff routinely failed to wear masks that covered their mouth and nose in April 2020 (Dkt. Nos. 3-3, ¶¶ 10, 12; 3-4, ¶ 6; 3-5, ¶¶ 7, 11-13), and routinely failed to wear masks that cover their mouth and nose in late 2021 and early 2022 (Dkt. Nos. 189-2, ¶ 5; 189-3, ¶ 5; 189-4, ¶ 5; 189-5, ¶¶ 4, 15).

Director Payne previously testified that remedial measures exist for staff who disregard COVID-19 directives, ranging from corrective counseling to termination.  He also explained that, after an issue was reported to defendants regarding staff members not wearing masks, those staff members received corrective counseling.  Secretary Graves does not address these remedial measures or their continued use.

Inmates have the ability to report anonymously staff or other inmates for failing to comply with health and safety procedures by anonymously submitting a request for interview form, according to defendants.  There is record evidence, and numerous allegations by plaintiffs, that inmates are reluctant to make such complaints.

Furthermore, there is current record evidence that "the prison has stopped passing out masks" (Dkt. No. 189-2, ¶ 4); that masks are not laundered and returned properly (Dkt. No. 189-1, ¶ 4); and that certain inmates have no masks at all (Dkt. No. 189-3, ¶ 6).  Plaintiffs maintain that

they have not received even cloth masks in months, which masks plaintiffs maintain are insufficient and ineffective against Omicron (Dkt. Nos. 189-2, ¶¶ 3-4; 189-1, ¶ 4; 189-4, ¶ 5; 189-3, ¶ 6).  Plaintiffs maintain that they have not been tested for COVID in "about a year," even after making "requests to get tested" (Dkt. No. 189-1, ¶ 5).

Although there is evidence in the record that gives the Court pause, on the record as a whole, the Court determines plaintiffs have not demonstrated a likelihood of succeeding on the subjective prong of their Eighth Amendment claims against the named defendants based on these allegations.

### d.    Cleaning And Disinfecting

Plaintiffs seek specific relief directing defendants to create and implement a plan for enhanced cleaning of any site where a person with known COVID-19 worked or lived (Dkt. No. 185, at 6-7).  Defendants maintain that ADC has ordered enhanced cleaning and disinfecting of its units, including barracks and the residential areas, showers, bathrooms, and recreational areas in barrack, as well as hallways, the chow hall, the gym and other areas; there is record evidence to support that such orders have been given.  Although plaintiffs dispute that enhanced cleaning and disinfecting are occurring, they do not challenge specifically the orders given by ADC.

Secretary Graves maintains that "ADC continues to provide inmates with face masks, hand soap, towels, cleaning supplies (including EPA-registered disinfectants), and hand sanitizer free of charge.  If an inmate runs out of these items or needs preplacement items, they need only request them from any staff member, either in person  or in writing." (Dkt. No. 188-1, ¶ 10).  Plaintiffs previously asserted that defendants were not using any "EPA-registered disinfectants effective against the virus that causes COVID-19," in ADC facilities (Dkt. No. 65, at 19).  State Defendants contested the issue.  Plaintiffs at this stage have not raised this issue again.

"According to ADC policy, personal protective equipment, including masks, gloves, face shields, paper gowns, should be worn by anyone cleaning or disinfecting surfaces after exposure to a sick person or someone who tested positive for COVID-19," based on Secretary Graves' representations (Dkt. No. 188-1, ¶ 16).  He confirms that "PPE is provided to all cleaning staff, including inmates, free of charge.  Inmates who are assigned to clean/disinfect as their work assignment are trained on the safe use and disposal of chemicals and PPE." (*Id.*).  Secretary Graves also states that "cleaning staff clean and sanitize all surfaces in the dining hall after each group," as the ADC has taken efforts to stagger times and limit the number of inmates in the dining hall at any one time (*Id.*, ¶ 25).

Plaintiffs maintain that cleaning materials "are in short supply" and run out before reaching the floor of certain plaintiffs, despite State Defendants claims to the contrary (Dkt. Nos. 189-3, ¶ 8; 189-5, ¶¶ 11-14).  Dr. Venters also observed what he termed "little appreciation for the need to conduct dedicated and higher-level cleaning and disinfecting when a COVID-19 case is detected" (Dkt. No. 185-1, ¶ 21).  Defendants reported to Dr. Venters during the inspections that "their routine daily cleaning was more than adequate and that the inmates and staff doing this work had adequate protective equipment and training" (Dkt. No. 185-1, ¶ 21).  During his conversations with inmate porters and staff, Dr. Venters was informed "this is simply untrue," with no specialized training or increased PPE for individuals asked to clean areas where active COVID-19 infection has been detected (*Id.*).

On the record as a whole, the Court determines plaintiffs have not demonstrated a likelihood of succeeding on the subjective prong of their Eighth Amendment claims against the named defendants based on these allegations.

### e.      Social Distancing

49

Plaintiffs request that "the provision of meals should not result in close contact between different housing areas. . ." (Dkt. No. 185, at 6).  As to social distancing, the CDC guidelines themselves acknowledge that social distancing "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." (Dkt. No. 36-9, at 11).  The record evidence in May 2020 showed that defendants heeded the following CDC recommendations:  "[s]tagger meals"; "[s]uspend group programs where participants are likely to be in closer contact than they are in their housing environment"; and "[a]rrange bunks so that individuals sleep head to foot to increase the distance between them" (*Id.*).  Defendants have suspended visitation at various points during the pandemic, and incoming inmates are housed separately from existing inmates for an isolation period.  The record evidence was that, in May 2020, only one barracks went to the chow hall or used the hallways at a time, and Director Payne testified that Cummins used non-living quarters such as the school, library, and visitation area to provide temporary housing (Dkt. No. 63, at 128, 210).

In the current record before the Court, Secretary Graves confirms that "ADC continues to encourage various COVID mitigation strategies, such as social distancing, hand washing, covering coughs, and the importance of wearing masks, and posters and signage are posted through ADC's facilities, including in the barracks, hallways, dining halls, libraries, and infirmaries, to remind inmates and staff of the importance of these measures." (Dkt. No. 188-1, ¶ 25).  He states that social distancing measures currently include "staggering inmates on the beds in the barracks so they are not face-to-face while sleeping, suspension of all in-person visitation and congregational worship services, and limitation of movement within the facilities to individuals housing units, including but not limited to meal times." (*Id.*; *see also* Dkt. No. 198, at 92, 95-96).  He explains

that, at some larger units," only half of the barracks is taken to the dining hall at a time to maximize social distancing." (Dkt. No. 188-1, ¶ 25).

Plaintiffs dispute that social distancing efforts as described by defendants are always undertaken (Dkt. Nos. 189-1, ¶¶ 6-7; 189-5, ¶¶ 23-26).

On the record as a whole, the Court determines plaintiffs have not demonstrated a likelihood of succeeding on the subjective prong of their Eighth Amendment claims against the named defendants based on these allegations.

### f.    Medical Care

Plaintiffs also challenge the testing and medical care inmates receive in regard to COVID-19. Generally, to prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that: (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it. *Id.; see also Farmer,* 511 U.S. at 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).

The law defines a serious medical need as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995) (citation omitted). A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary. *Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th Cir. 2004). An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. *Lenz v. Wade,* 490 F.3d 991, 995 (8th Cir. 2007). Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the

inmate's serious medical need are questions of fact.  *Coleman,* 114 F.3d at 785; *see also Schaub v. VonWald*, 638 F.3d 905, 914–15 (8th Cir. 2011).

Plaintiffs have sued the contracted provider for medical care at the ADC, Wellpath, and State Defendants in their official capacities as policy makers.  While a policy maker or supervisor's general responsibility for supervising operations of a prison is insufficient to establish personal involvement giving rise to liability under § 1983, *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir. 1987), individuals personally involved in decisions regarding treatment and care become responsible for seeing that the inmate is adequately cared for once his needs are brought to the individual's attention, *see Schaub*, 638 F.3d at 918; *Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010) (noting that even though defendant prison supervisor was "not a medical doctor and does not personally treat inmates' medical needs, . . . [t]here is no doubt that [defendant] has a constitutional duty to see that prisoners in his charge who need medical care receive it."); *see also West v. Atkins,* 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody.").  The Court recognizes the well-established proposition that, although prison officials are not doctors, when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction.  *Schaub*, 638 F.3d at 918 n.6.

The Court also is mindful that, in *DeGidio v. Pung*, when confronted with § 1983 claims over the tuberculosis epidemic, the district court observed:

> No one claims ultimate responsibility for the many supervisory functions within the health services unit.  The passing of blame and responsibility between the Department of Health, the administrative director of health services, and the staff physicians has been discussed at length earlier.  Each person describes his or her role narrowly, and disclaims ultimate responsibility for directing the effort at controlling tuberculosis.  Plaintiffs have shown through the great weight of the evidence that this failure of coordination persists and is a reason why Stillwater's response to the tuberculosis epidemic lagged.

704 F. Supp. 922, 957 (D. Minn. 1989), *aff'd*, 920 F.2d 525 (8th Cir. 1990).  The Court has these

precedents in mind when reviewing the record evidence before it at this stage of the proceeding.

Now, with respect to medical care, plaintiffs seek to have the Court order the following:

. . .

3.      Wellpath's electronic medical records must be used to identify all high-risk
        incarcerated persons, and to create and maintain updated lists of these persons.
        Staff must hold in-person counseling sessions with any individual on the list who
        is not vaccinated or has not received a booster.  At this time, in light of preliminary
        studies showing that the J&J vaccine provides little—if any – protection against
        Omicron, the DOC and Wellpath should exclusively provide the Pfizer or Moderna
        vaccine.

4.      The nursing staff must conduct a daily vital signs and symptom check of any high-
        risk individual housed in a quarantine area.

5.      The nursing assessment for patients in quarantine must be modified to include
        whether the person is high risk and by lowering the threshold to take action steps
        (*e.g.*, contacting a doctor, transferring to hospital) for high-risk patients.

6.      To help slow the spread of Omicron inside the units, every person who works
        outside his housing area should be asked about COVID-19 symptoms before the
        commencement of a shift; a plan should be created and implemented for enhanced
        cleaning of any site where a person with known COVID-19 worked or lived; the
        provision of meals should not result in close contact between different housing
        areas; and sick call requests should be reviewed at the end of each day to ensure
        expedited response to any one with potential COVID-19-related symptoms.

(Dkt. No. 185, at 6-7).

Record evidence suggesting inmates with claimed symptoms of COVID-19 being denied

care and testing, record evidence suggesting a lack of follow-up evaluation or care for those with

symptoms or reported COVID-positive cases, and record evidence suggesting inmates with

claimed symptoms of COVID-19 being too weak to care for themselves or to seek medical care

for themselves with no aid from prison staff or medical staff gave the Court pause when it

evaluated plaintiffs' initial motion for preliminary injunction.  However, the Court determined that

it was unclear from this record how frequently those events have occurred, if at all; whether the

events gave rise to medical grievances related to COVID-19 testing and treatment; and where the inmates were housed when certain of these claimed events occurred—barracks, restricted housing, infirmaries, or isolated COVID-19 treatment units.  The Court acknowledges that some current record evidence suggests these problems persist.

Although we are still addressing COVID-19, much has changed since May 2020.  In his affidavit, Secretary Graves explains the efforts undertaken to vaccinate and boost staff and inmates and to incentivize those individuals to make the decision to vaccinate fully (Dkt. No. 188-1, ¶¶ 7-9).  He also represents that Wellpath "is now providing monoclonal antibody treatment for COVID-19 patients." (*Id.*, ¶ 14).  In addition, Secretary Graves confirms that those inmates identified as being medically high risk by Wellpath receive KN95 masks from ADC, along with inmates who are transported off-site and ADC staff (*Id.*, ¶ 12).  Secretary Graves states in his rebuttal declaration that, on January 18, 2021, during the ADC weekly COVID call with Wellpath, and based on recent updated CDC guidance, it was decided that inmates in certain job categories be issued well-fitting KN95/N95 masks for work duties (Dkt. No. 202, ¶¶ 12-13).

The Court acknowledges that Dr. Venters testified that the CDC guidance has said since the beginning that the symptoms of individuals in quarantine should be checked every day, and Dr. Venters stated that, based on what staff reported, it seems as if inmates in quarantine at ADC have their symptoms checked only on the last day of quarantine (Dkt. No. 198, at 21-22).  Dr. Venters acknowledged that, during his inspections, he was aware of Wellpath staff bringing medicines to units but recalls that there was no check of each person's symptoms as outlined by the CDC and reported by the health staff (Dkt. No. 198, at 72).  Dr. Venters expressed specific concern for inmates who are high risk in quarantine at ADC because those individuals with serious health problems can deteriorate very quickly in a setting like that and may not be able to request a

sick call or take other affirmative steps required to seek care (Dkt. No. 198, at 22).  Further, Dr. Venters requested that, for high risk inmates in medical isolation, there should be lower thresholds for all action steps (Dkt. No. 198, at 22).  He gave as an example, if a certain elevated pulse rate prompts the nursing staff to call a medical provider or to alert someone, that threshold elevated pulse rate should be lower for high risk inmates in isolation (*Id.*).

Wellpath argues that the preliminary relief sought by plaintiffs in their current motion "impermissibly inserts the Court into the management of prisons and the healthcare of all inmates based solely on recommendations by Plaintiff's expert physician, which have not been adopted by the Centers for Disease Control [and] Prevention or the Arkansas Department of Health." (Dkt. No. 187, at 5-6).  According to Secretary Graves, "[u]nder ADC policy, inmates should monitor their own health status and submit sick call requests if they are feeling unwell." (Dkt. No. 188-1, ¶ 27).  Secretary Graves testified that, if an inmate is ill and wishes to see a nurse, if it is a nonemergent request, it could take up to 72 hours to see a nurse, but if the request is related to common symptoms related to COVID-19, those requests are responded to within 24 hours (Dkt. No. 198, at 108-09).

Secretary Graves also testified that, based on information from Wellpath, only about 20% of all ADC inmates who have had COVID-19 since Spring 2020 have experienced symptoms (Dkt. No. 198, at 88).  Secretary Graves confirmed that, under current policy, Wellpath is to monitor regularly, at least twice daily per his testimony, the health status of inmates in quarantine and is supposed to log that in the health record (Dkt. No. 198, at 92).

There is record evidence that casts doubt on whether these policies are followed all of the time in every facility, but there remains evidence that these expectations and policies are in place. While plaintiffs may disclaim the effectiveness and question the implementation and enforcement

of these measures, the Court determines plaintiffs have not demonstrated a likelihood of success on their Eighth Amendment claims based on this allegation.

### g.      Staffing During COVID-19

Based on record evidence, the ADC has implemented wide-spread testing and symptom checks of its staff (Dkt. No. 188-1, ¶ 17).  Masks are required inside all ADC units by order of the Board of Corrections (*Id.*, ¶ 18).  ADC staff are provided with a new KN95 face mask every day (*Id.*, ¶ 12).  ADC has encouraged and incentivized staff to receive vaccinations and boosters (*Id.*, ¶¶ 7-9).

At the preliminary injunction hearing in 2020, plaintiffs' expert witness was critical of the practice of bringing COVID-19 positive but asymptomatic staff to work with COVID-19 positive inmates, under certain conditions.  The Arkansas Department of Health issued guidance with respect to this staffing issue on April 13, 2020 (Dkt. No. 36-19).  Director Payne testified to this circumstance.   All parties acknowledged at that time that certain COVID-19 positive, asymptomatic staff had been reporting to work.  Plaintiffs also reported in April and May 2020 apparent staffing shortages with an impact in facility operations, including the feeding of inmates even those in quarantine.  Plaintiffs submitted an expert opinion with respect to COVID-19 positive staff reporting to work but that may not have accounted for the specific circumstances alleged in this case.

Given the current situation, on December 31, 2021, Secretary Graves "issued an email memorandum to all DOC/ADC staff reminding them that, according to our Governor's December 30, 2021, press conference, there is a shortage of testing and antibody treatment in our state, as well as hospital capacity." (Dkt. No. 188-1, ¶ 19).  Therefore, Secretary Graves "asked all staff to limit their movements over the next few weeks, to stay home if they become ill, to practice COVID

mitigation strategies, and to consider getting vaccinated in order to lessen the impact of the virus." (*Id*.).

According to Secretary Graves, all staff "continue to be required to wear personal protective equipment during their shifts and are required to monitor their symptoms." (*Id.*, ¶ 24). He reports that "[a]ny staff that have tested positive are immediately removed from work and sent home if they begin exhibiting symptoms of COVID-19." (*Id*.).

Further, Secretary Graves avers that "ADC is currently experiencing severe staffing shortages for correctional officers." (*Id*., ¶ 27). He represents that "[i]t would create a severe burden on ADC staff, and risk institutional safety and security, for staff to have to interview every inmate about COVID symptoms before allowing inmates to report to work outside of their housing area every day." (*Id*.). He offers that inmates are responsible under ADC policy for monitoring their own health and symptoms (*Id.*). Plaintiffs present no record evidence to rebut this assertion.

At this stage of the litigation, on the limited record before it, the Court determines plaintiffs have not demonstrated a likelihood of success on their Eighth Amendment claims based on this allegation.

### D.    Likelihood Of Success:  Title II ADA Claims

Plaintiffs claim that defendants have intentionally discriminated against named plaintiffs and members of the proposed disability subclass by denying them reasonable accommodations that have been recommended by the CDC and are necessary to protect them from COVID-19 (Dkt. No. 84, ¶¶ 267-283). In their amended complaint, plaintiffs assert that reasonable accommodations necessary to protect incarcerated individuals with disabilities include, but are not limited to:  access to alcohol-based sanitizer; provision of cleaning supplies, including products containing bleach, adequate to clean individuals' housing areas; provision of PPE; access to antibacterial hand soap

and towels to enable individuals to wash their hands as necessary; implementation of social distancing measures in all locations where incarcerated people are required to congregate; and release or transfer to home confinement if social distancing is not practicable (*Id.*, ¶ 271).  In their amended complaint, plaintiffs claim that defendants have violated the ADA by failing to provide plaintiffs in the disability subclass with reasonable accommodations that would allow them to access safely their facilities, programs, and activities (*Id.*, ¶¶ 275-283).

### 1.    Legal Standard For Title II ADA Claims

The ADA prohibits public entities, including state prisons, from discriminating on the basis of disability.  *See, e.g., Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).  To assert a claim under Title II of the ADA, plaintiffs must show that:  (1) each plaintiff is a "qualified individual with a disability"; (2) defendants denied plaintiffs "the benefits of the services, programs, or activities of a public entity"; and (3) plaintiffs were discriminated against "by reason of" their disabilities.  *See* 42 U.S.C. § 12132; *see also Folkerts v. City of Waverly*, 707 F.3d 975, 983 (8th Cir. 2013).  A "qualified individual with a disability" means an individual "with a disability who, with or without reasonable modifications . . . , meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *See* 42 U.S.C. § 12131(2).  The Eighth Circuit construes broadly the "services, programs, or activities" language in the ADA to encompass "anything a public entity does."  *Bahl v. Cty. of Ramsey*, 695 F.3d 778, 787 (8th Cir. 2012) (citations omitted).  State actors may rely on the "reasonable assessments" of their own professionals in determining whether an individual is qualified for services and programs and whether "reasonable modifications" are available to prevent discrimination.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999) (citing 28 C.F.R. §§ 35.130(b)(7), (d)).  Plaintiffs need not plead exclusion from participation in or denial of benefits

offered to state a claim under Title II of the ADA.  *See, e.g., Loye v. Cty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010) ("[W]e construe Title II of the ADA as requiring that qualified persons with disabilities receive 'meaningful access' to a public entity's services, not merely 'limited participation.'").

The regulations implementing Title II of the ADA require that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  This is considered an affirmative defense to an ADA Title II claim; the ADA regulations explicitly provide that the entity must demonstrate that making the modification would fundamentally alter the subject program.  28 C.F.R. § 35.130(b)(7).  For this affirmative defense, the entity may demonstrate that the requested action "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."  28 C.F.R. § 35.150(a)(3).  The Eighth Circuit has noted that whether a requested accommodation is reasonable or imposes an undue burden on defendants should be considered in the light of "the heightened security concerns of a prison."  *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir. 1999) (examining Title II ADA claim against prison).  Generally, ADA plaintiffs are entitled to reasonable accommodations, which may not always be plaintiffs' preferred or ideal accommodations.  *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (8th Cir. 2011); *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007).

Plaintiffs may prove unlawful discrimination under Title II by offering evidence of disparate treatment based on disability or by showing that a facially-neutral policy has the "effect of discriminating against the disabled or the severely disabled."  *DeBord v. Bd. of Educ.*, 126 F.3d

1102, 1105 (8th Cir. 1997).   In regard to an ADA failure-to-accommodate claim, ""the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations . . . .  The known disability triggers the duty to reasonably accommodate and, if the [defendant] fails to fulfill that duty, [the Court] do[es] not care if he was motivated by the disability." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004) (internal citation omitted); *see also Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1040 (N.D. Ia. 2011) (failure to accommodate is an independent basis for liability under the ADA, but accommodation is only required when necessary to avoid discrimination on the basis of disability, and accommodation must be reasonable) (citing 28 C.F.R. § 35.130(b)(7)).   Though a plaintiff seeking compensatory money damages under Title II must show intentional discrimination on the basis of disability, a plaintiff seeking prospective injunctive relief is not required to make this showing.  *See Meagley v. City of Little Rock*, 639 F.3d 384, 388-89 (8th Cir. 2011).

### 2.      Analysis Of Title II ADA Claims

On this record, and at this stage of the litigation, the Court concludes that plaintiffs have failed to demonstrate a likelihood of success on their claims under Title II of the ADA.

Wellpath argues that plaintiffs have not identified or offered any evidence to show that they are in fact disabled or that Wellpath denied their alleged requests for reasonable accommodations because of their disabilities (Dkt. No. 187, at 4).

Assuming *arguendo* that named plaintiffs and proposed members of the disability subclass are qualified individuals with a disability, and there is some dispute in the record evidence at this stage with respect to that point, the Court concludes that plaintiffs are not likely to succeed on their claim that defendants' action or inaction in combatting the COVID-19 risk in ADC facilities has had the effect of denying plaintiffs in the disability subclass "the benefits of the services, programs,

or activities" within the ADC "by reason of" those plaintiffs' disabilities.  *See* 42 U.S.C. § 12132. The Court has examined plaintiffs' claimed deficiencies in defendants' response to the COVID-19 risk when examining plaintiffs' Eighth Amendment claims and determined plaintiffs have not demonstrated a likelihood of success on those claims.  The Court acknowledges that the standard applied to evaluate Title II ADA claims and Eighth Amendment claims may differ, *see United States v. Georgia*, 546 U.S. 151 (2006), but the Court does not see which reasonable accommodations have been denied for plaintiffs in the proposed disability subclass.  Further, on the record currently before it, to the extent plaintiffs requested and were denied reasonable accommodations, the Court is unconvinced that defendants denied those requests because of plaintiffs' alleged disabilities.

### E.   Threat Of Irreparable Harm, Balance Of The Equities, And Public Interest

Because the Court concludes that plaintiffs are unlikely to succeed on the merits of their Eighth Amendment and Title II ADA claims, the Court declines to address at this time the remaining *Dataphase* factors – the threat of irreparable harm, the balance of the equities, and the public interest.

### VII.   Conclusion

For the above reasons, the Court denies plaintiffs' motion for emergency preliminary injunction (Dkt. No. 185).  The Court also grants, in part, and denies, in part, State Defendants' motion to strike the declarations submitted by plaintiffs to supplement the preliminary injunction record (Dkt. No. 200).

It is so ordered this 28th day of January, 2022.

Kristine G. Baker
United States District Judge